# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

Case No. 6:22-cv-02075-RBD-LHP

MARISSA GIANNERINI,

     Plaintiff,

v.

EMBRY-RIDDLE AERONAUTICAL
UNIVERSITY, INC.,

     Defendant.

_____/

## DEFENDANT'S NOTICE OF FILING COLOR-CODED COPIES OF DEPOSITION TRANSCRIPTS PURSUANT TO THE COURT'S PREFERENCES ON DEPOSITION TESTIMONY FOR TRIAL

Defendant EMBRY-RIDDLE AERONAUTICAL UNIVERSITY, INC. ("ERAU"), by and through undersigned counsel, hereby submit the following color-coded copies of deposition transcripts pursuant to Judge Dalton's preferences on deposition testimony for trial.

     DATED: January 29, 2025.

               Respectfully submitted,

               */s/ Allison O. Kahn*
               Allison O. Kahn (FBN 496138)
               E-mail: akahn@carltonfields.com
               Alana Zorrilla-Gaston (FBN 27256)
               Email: agaston@carltonfields.com
               **CARLTON FIELDS, P.A.**
               525 Okeechobee Boulevard, Suite 1200
               West Palm Beach, FL 33401-6350

Telephone: (561) 659-7070

*/s/ Matthew J. Conigliaro*
Matthew J. Conigliaro (FBN 63525)
Email: mconigliaro@carltonfields.com
**CARLTON FIELDS, P.A.**
4221 W. Boy Scout Blvd., Suite 1000
Tampa, FL 33601
Telephone: (813) 229-4254

*Attorneys for Defendant,*
*Embry-Riddle Aeronautical University, Inc.*

2

CONFIDENTIAL

Page 1

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                   ORLANDO DIVISION
 3                      CASE NO.: 6:22-cv-02075-RBD-LHP
 4
 5   MARISSA GIANNERINI,
 6          Plaintiff,
 7   vs.
 8   EMBRY-RIDDLE AERONAUTICAL UNIVERSITY,
     INC.,
 9
             Defendant.
10
11    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
12                   CONFIDENTIAL
13
     VIDEO-RECORDED
14   DEPOSITION OF:  MARISSA GIANNERINI
15   DATE:           January 16, 2024
16   TIME:           COMMENCED:  9:11 a.m.
                     CONCLUDED:  7:29 p.m.
17
     TAKEN BY:       Defendant
18
     PLACE:          Carlton Fields, LLP
19                   200 South Orange Avenue
                     Suite 1000
20                   Orlando, Florida 32801
21   REPORTED BY:    Mae Fisher, RMR, CRR
22
23   Defendant's Designations
24   Plaintiff's Counter-Designations
25
```

CONFIDENTIAL

Page 2

```
 1        A P P E A R A N C E S:
 2  NEIL HENRICHSEN, ESQUIRE
    RONALD ANGERER, ESQUIRE (via videoconference)
 3   Of: Henrichsen Law Group, PLLC
        301 West Bay Street
 4      Suite 1400
        Jacksonville, Florida 32202-5100
 5      (904) 381-8183
        Nhenrichsen@hslawyers.com
 6      Rangerer@hslawyers.com
 7  RENEE COOK, ESQUIRE (via videoconference)
     Of: Henrichsen Law Group
 8      4179 Sandhill Crane Terrace
        Middleburg, Florida 32068-9007
 9      (904) 381-8183
        Rcook@hslawyers.com
10
        Counsel for the PLAINTIFF
11
    ALLISON KAHN, ESQUIRE
12  ALANA ZORILLA-GASTON, ESQUIRE (via videoconference)
     Of: Carlton Fields P A
13      525 Okeechobee Boulevard
        Suite 1200
14      West Palm Beach, Florida 33401
        (561) 659-7070
15      Akahn@carltonfields.com
        Agaston@carltonfields.com
16
    CHARLIE SEVASTOS, ESQUIRE (via videoconference)
17   Of: Embry-Riddle Aeronautical University, Inc.
        1 Aerospace Boulevard
18      Daytona Beach, Florida 32114-3910
        (386) 323-8812
19      Charlie.sevastos@erau.edu
20      Counsel for the DEFENDANT
21  ALSO PRESENT:
22  PAMELA PELTZMAN, ESQUIRE (via videoconference)
    Resolutions Counsel - United Educators
23
    Brandon Young (via videoconference)
24  Vice President & Chief Human Resources Officer
    Embry-Riddle Aeronautical University, Inc.
25
```

Page 3

```
 1        A P P E A R A N C E S (Cont'd)
 2  MICHAEL PETERMAN
    Videographer
 3
    CODY HENDERSON
 4  Videographer
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          I N D E X
 2  TESTIMONY OF MARISSA GIANNERINI
 3     DIRECT EXAMINATION BY MS. KAHN ........... 10
 4     CROSS-EXAMINATION BY MR. HENRICHSEN ...... 243
 5     REDIRECT EXAMINATION BY MS. KAHN ......... 246
 6  CERTIFICATE OF OATH ........................... 251
 7  REPORTER'S DEPOSITION CERTIFICATE .............. 252
 8  NOTIFICATION LETTER ........................... 253
 9  ERRATA SHEET .................................. 254
10
11        E X H I B I T S
12  PLAINTIFF'S EXHIBITS
13  (NONE)
14  DEFENDANT'S EXHIBITS
15  Exhibit 1 - Messages
        GianneriniTexts_00000246 ............ 20
16
    Exhibit 2 - e-mails
17      ERAU(Giannerini)_0000354-0000356 .... 25
18  Exhibit 3 - Letter
        ERAU(Giannerini)_0000028-0000032 .... 29
19
    Exhibit 4 - Letter
20      ERAU(Giannerini)_0000103 ............ 30
21  Exhibit 5 - Voluntary Self-Identification of
        Disability
22      ERAU(Giannerini)_0000108-0000109 .... 31
23  Exhibit 6 - New Hire Orientation
        ERAU(Giannerini)_0000090 ............ 32
24
    Exhibit 7 - 2021 Code of Ethical Conduct
25      Agreement
        ERAU(Giannerini)_0000066-0000067 .... 32
```

Page 5

```
 1  Exhibit 8 - Athletics Mission Statement
        ERAU(Giannerini)_00000110 ........... 33
 2
    Exhibit 9 - Policies & Procedures Manual
 3      ERAU(Giannerini)_0000150-0000207 ..... 34
 4  Exhibit 10 - e-mails & attachments ............... 40
 5  Exhibit 11 - Student-Athlete Handbook 2020-21
        ERAU(Giannerini)_0000111-0000149 .... 45
 6
    Exhibit 12 - Code of Ethical Conduct ............ 50
 7
    Exhibit 13 - Employees with Disabilities Policy
 8      ERAU(Giannerini)_0000321-0000323 .... 51
 9  Exhibit 14 - Equal Employment Opportunity Policy
        ERAU(Giannerini)_0000219-0000323 .... 52
10
    Exhibit 15 - Position Description
11      ERAU(Giannerini)_0000092-0000096 .... 72
12  Exhibit 16 - 2020-21 Supervisory Staff
        Performance Review
13      ERAU(Giannerini)_0000032-0000065 .... 74
14  Exhibit 17 - Messages
        ERAU(Giannerini)_00000008 ........... 105
15
    Exhibit 18 - Messages
16      ERAU(Giannerini)_00000029 ........... 106
17  Exhibit 19 - Messages
        ERAU(Giannerini)_00000092 ........... 109
18
    Exhibit 20 - Messages
19      ERAU(Giannerini)_00000127 ........... 111
20  Exhibit 21 - Messages
        ERAU(Giannerini)_00000173 ........... 112
21
    Exhibit 22 - Messages
22      ERAU(Giannerini)_00000093-00000094 .. 113
23  Exhibit 23 - Messages
        ERAU(Giannerini)_00000175 ........... 114
24
    Exhibit 24 - Messages
25      ERAU(Giannerini)_00000031 ........... 115
```

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1  Exhibit 25 - Messages
       GianneriniTexts_00000181 ............ 117
2
   Exhibit 26 - Messages
3      GianneriniTexts_00000231-00000232 ... 117
4  Exhibit 27 - Messages
       GianneriniTexts_00000196-00000197 ... 119
5
   Exhibit 28 - Messages
6      GianneriniTexts_00000036 ............ 120
7  Exhibit 29 - Messages
       GianneriniTexts_00000050 ............ 122
8
   Exhibit 30 - Messages
9      GianneriniTexts_00000011 ............ 124
10 Exhibit 31 - Messages
       GianneriniTexts_00000025 ............ 125
11
   Exhibit 32 - Messages
12     GianneriniTexts_00000183 ............ 126
13 Exhibit 33 - Messages
       GianneriniTexts_00000184 ............ 126
14
15 Exhibit 34 - e-mails
       ERAU(Giannerini)_0000629-0000630 .... 128
16 Exhibit 35 - Messages ........................... 129
17 Exhibit 36 - e-mails ............................ 131
18 Exhibit 37 - e-mails
       ERAU(Giannerini)_0000609-0001-0002 .. 134
19 Exhibit 38 - Message
       ERAU(Giannerini)_0000610 ............ 135
20
   Exhibit 39 - Fall 2019 Women's Lacrosse Evaluation
21     ERAU(Giannerini)_0000613-001-002 .... 135
22 Exhibit 40 - Messages
       GianneriniTexts_00000144-00000145 ... 145
23
   Exhibit 41 - Messages
24     GianneriniTexts_00000043-00000044 ... 146
25

Page 7

1  Exhibit 42 - e-mails & attachments
       ERAU(Giannerini)_0000604-001-004 .... 148
2
   Exhibit 43 - Messages
3      GianneriniTexts_00000247-00000248 ... 149
4  Exhibit 44 - Messages
       GianneriniTexts_00000146-00000147 ... 151
5
   Exhibit 45 - Messages
6      GianneriniTexts_00000205-00000207 ... 155
7  Exhibit 46 - Messages
       GianneriniTexts_00000188-00000189 ... 156
8
   Exhibit 47 - e-mails
9      ERAU(Giannerini)_0000407-0000408 .... 157
10 Exhibit 48 - Messages
       GianneriniTexts_00000235-00000236 ... 158
11
   Exhibit 49 - e-mails ............................ 158
12
   Exhibit 50 - e-mails ............................ 161
13
   Exhibit 51 - Messages
14     GianneriniTexts_00000105-00000106 ... 164
15 Exhibit 52 - Messages
       GianneriniTexts_00000158-00000159 ... 167
16
   Exhibit 53 - Messages
17     GianneriniTexts_00000153-00000154 ... 168
18 Exhibit 54 - e-mail
       GianneriniTexts_00000160 ............ 169
19
   Exhibit 55 - Messages
20     GianneriniTexts_00000216-00000220 ... 171
21 Exhibit 56 - e-mail
       ERAU(Giannerini)_0000341 ............ 178
22
   Exhibit 57 - e-mails ............................ 183
23
   Exhibit 58 - Messages
24     GianneriniTexts_00000161-00000162 ... 185
25

Page 8

1  Exhibit 59 - Messages
       GianneriniTexts_00000163-00000164 ... 188
2
   Exhibit 60 - e-mail
3      ERAU(Giannerini) 0000339 ............ 189
4  Exhibit 61 - Messages
       GianneriniTexts_00000223-00000224 ... 195
5
   Exhibit 62 - e-mails ............................ 200
6
   Exhibit 63 - e-mails ............................ 206
7
   Exhibit 64 - Student 37 Documentation
8      ERAU(Giannerini) 0000666-001-003 .... 210
9  Exhibit 65 - Messages ........................... 242
10 Exhibit 66 - Social Media posts ................. 242
11 Exhibit 67 - Web Data Collection Report .......... 243
12
13
14    S T I P U L A T I O N S
15    It is hereby stipulated and agreed by and
   between counsel present for the respective parties, and
16 the deponent, that the reading and signing of the
   deposition are hereby RESERVED.
17
18
19
20
21
22
23
24
25

Page 9

1      P R O C E E D I N G S
2      THE VIDEOGRAPHER:  We are now on the record.
3  Today is January 16, 2024, time is 9:11 a.m.  This is
4  media unit 1, letter A of the videotaped deposition of
5  Marissa Gia...
6      THE WITNESS:  Giannerini.
7      THE VIDEOGRAPHER:  -- Giannerini in the matter
8  of Giannerini versus Embry-Riddle, et al., being taken
9  at 200 South Orange Avenue, Suite 1000, Orlando,
10 Florida 32801, to be heard in the United States
11 District Court, Middle of Florida, Orlando Division.
12     My name is Michael Peterman.  I'm the
13 videographer.  Court reporter is Mae Fisher with
14 Veritext Legal Solutions.
15     Will counsel please introduce themselves.
16     MR. HENRICHSEN:  Neil Henrichsen on behalf of
17 the plaintiff.
18     MS. KAHN:  Allison Kahn on behalf of the
19 defendant Embry-Riddle.
20     THE VIDEOGRAPHER:  Is anybody on Zoom going to
21 do it?
22     Okay.  Will the court reporter please swear in
23 the witness.
24     THE COURT REPORTER:  Can you raise your right
25 hand, please.

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

1    Do you solemnly swear or affirm that the
2 testimony you are about to give in this cause will be
3 the truth, the whole truth, and nothing but the truth?
4    THE WITNESS:  I do.
5        MARISSA GIANNERINI,
6 a witness herein, having been first duly sworn, was
7 examined, and testified as follows:
8        DIRECT EXAMINATION
9 BY MS. KAHN:
10    Q.  Would you mind stating your full name for the
11 record?
12    A.  Sure.  Marissa Lynn Giannerini.
13    Q.  Thank you.  I just want to start by saying if you
14 need a break at any point, just tell me, you know, it's
15 not an endure contest.  If you're hungry, okay?
16    A.  Perfect.
17    Q.  So have you ever had your deposition taken
18 before?
19    A.  I have not.
20    Q.  Okay.  So just a couple ground rules.  If I ask
21 you a question and you don't understand it, just tell me
22 and I can say it again or rephrase it.  And if you
23 answer my question, I'm going to assume that you
24 understood it.  Okay?
25    A.  Okay.

Page 11

1    Q.  Okay.  The other thing is that when I ask you a
2 question, I have to have a verbal response, even though
3 I can see your head and I know --
4    A.  Oh.
5    Q.  -- what you mean, Mae over here needs to be able
6 to take that down for the paper.  So there'll be some
7 times where I'll ask you to say your answer out loud or
8 I may ask you questions that are kind of silly because
9 they're obvious because we're sitting right here.  So --
10    A.  I understand.
11    Q.  Okay.  And we have to be careful not to talk over
12 each other so that the court reporter can get down
13 everything that we each say.
14    So we talked about breaks.  If you need a break,
15 just let me know, no problem at all, okay?
16    Do you believe honesty is always the best policy?
17    A.  I do.
18    Q.  Do you understand that you're under oath to tell
19 the truth?
20    A.  I do.
21    Q.  Are you taking any medications that could prevent
22 you from telling the truth?
23    A.  No.
24    Q.  Are you taking any medications that could affect
25 your memory?

Page 12

1    A.  No.
2    Q.  There -- let's see -- you're aware that we have a
3 confidentiality order in this case as to your health
4 information, student names and -- and employee names
5 when we're talking about performance reviews and that
6 kind of thing?  Are you aware of that?
7    A.  I'm aware there's a document that exists.
8    Q.  Okay.  So you'll see on some of the documents, if
9 you haven't already, that the names are redacted.
10    A.  I have.
11    Q.  Okay.  So to the extent we can, if we can refer
12 to people by their names so that there's less to redact
13 later, okay?  Like while we're talking?
14    A.  Okay.  So I wasn't given the names so I --
15    Q.  I'm going to give you a list.
16    A.  Oh, gotcha.  Okay.  That's helpful.  Thank you.
17    Q.  Yes.  All right.  Do you have any prior names?
18    A.  No.
19    Q.  What cell service do you have?
20    A.  Well, I just switched over because I was on
21 Verizon with my mother.  But I switched over to my
22 fiance's and, honestly, I'm not quite sure what that
23 service is.
24    Q.  Okay.  Have you -- were you on Verizon the whole
25 time you were working for Embry-Riddle?

Page 13

1    A.  I was.
2    Q.  To present?
3    A.  Um-hmm.
4    Q.  Okay.  And have you had the same phone number
5 since you were working at Embry-Riddle also?
6    A.  I do.
7    Q.  What's your address?
8    A.  480 Cedar Street, Ormond Beach, Florida, 32176.
9    Q.  How long have you lived there?
10    A.  We moved in, it would have been May of this year.
11    Q.  When you say we, you mean your fiance?
12    A.  I do.
13    Q.  Do you own or rent?
14    A.  I do not own the house I live in.
15    Q.  Okay.  Does your fiance own the house?
16    A.  Yes.
17    Q.  Are you paying any kind of rent?
18    A.  I pay a portion towards the bills each month.
19    Q.  Okay.  He's not expecting any sort of
20 reimbursement for --
21    A.  No.
22    Q.  Have you ever been married before?
23    A.  I have not.
24    Q.  Do you have any kids?
25    A.  I do not.

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

1  Q. Are you presently employed?
2  A. Self-employed.
3  Q. Tell me about how you're self-employed.
4  A. I have two properties that I own and they are
5  being used as short-term rentals. And that is under
6  Piccolo Palms, my LLC. And I also contract with a
7  company called Heritage Elite, and I assist them with
8  operations, consulting.
9  Q. What kind of company is Heritage Elite?
10  A. Heritage Elite owns multiple companies. But of
11  those companies, they own Elite Pools, which is the
12  majority that I'm working with now. They also owned a
13  start-up company of Uber Pools, when I begun with them,
14  I think it was around August of '22. But that shortly
15  did not materialize into a business and it was shut
16  down.
17  Q. Okay. Was that your brother's business?
18  A. Neither, none of them are my brother's business.
19  Q. Okay. So you're not doing any consulting right
20  now for Heritage Elite or you are but just for Elite
21  Pool?
22  A. Correct.
23  Q. Okay. Was Uber Pools subsumed by Elite Pools or
24  were they totally separate entities?
25  A. They were separate, from what I know, they are

Page 15

1  separate entities.
2  Q. Fair enough. How many hours a week are you
3  working for Heritage Elite?
4  A. It's really dependent upon the week. The weeks
5  that I am in office I work more than the weeks that I am
6  remote.
7  Q. Where are they located?
8  A. Rosedale, Maryland.
9  Q. Okay. So you're working when you're not home?
10  A. Yes.
11  Q. Did you --
12  A. In their office.
13  Q. In their office?
14  A. Yes.
15  Q. How often do you go to Maryland?
16  A. It's around once a month.
17  Q. Okay. Do you have someone that you report to at
18  Heritage Elite?
19  A. I do.
20  Q. Who's that?
21  A. His name is Mike Shaffery.
22  Q. How do you spell that for me, please?
23  A. S-H-A-F-F-E-R-Y.
24  Q. So do your hours vacillate then, every week?
25  A. Yes.

Page 16

1  Q. How much do you work when you're not in Maryland?
2  A. It really is dependent on the week and dependent
3  upon the task that is given to me by the owner, Mike
4  Shaffery.
5  Q. What's your rate of pay?
6  A. I get a consulting fee of, if it's 1200 a week,
7  2400 biweekly. And I get that in the form of a check.
8  Q. Is the check made out to you or at Piccolo Palms?
9  A. To me.
10  Q. When did you start working for Heritage?
11  A. You have to be more specific. Because
12  Heritage -- Heritage owns both, so I --
13  Q. Oh, I'm sorry.
14  A. That's okay.
15  Q. When did you start working for Elite Pools?
16  A. In March of 2023.
17  Q. And you've been working them for -- since that
18  time?
19  A. Correct.
20  Q. And making $1,200 a week?
21  A. Correct.
22  Q. And before that, you were working for Uber Pools,
23  how much were you making?
24  A. Honestly, I -- I don't recall.
25  Q. Okay.

Page 17

1  A. It was -- it was less than I'm making with Elite,
2  but I don't feel comfortable giving a number.
3  Q. I don't want you to guess.
4  A. Okay. I'm not.
5  Q. So you worked for -- through Uber Pools from
6  August 2022 through March 2023?
7  A. Correct.
8  Q. What's your bachelor's degree in?
9  A. Psychology.
10  Q. What year did you get that?
11  A. That would have been in 2011.
12  Q. And you have a master's?
13  A. I do.
14  Q. What year was that?
15  A. I graduated in 2012.
16  Q. Okay. Your master's is in what?
17  A. Human resource management.
18  Q. And you graduated from Rollins also?
19  A. I did.
20  Q. So for your human resource management master's,
21  what type of curriculum did you study?
22  A. Pretty traditional human resource track. We had
23  law classes. We had organizational development classes.
24  We had recruitment classes. We had team-building
25  classes. That's the bulk of it.

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1  Q. You remember a lot for ten years.
2     Did you have classes for -- you said law, like on
3  things like discrimination and retaliation?
4  A. I was -- they were, yes, within that.
5  Q. Okay. And on work safety rules?
6  A. I don't recall work safety rules.
7  Q. Okay. What about complaint procedures for
8  discrimination and retaliation?
9  A. I can't recall specifically the -- I can't recall
10 specifically.
11 Q. I'm going to show you, just -- I'm not going to
12 mark it.
13 A. Sure.
14 Q. It's something I pulled off the internet.
15 A. Okay.
16 Q. It's the current Rollins College curriculum.
17 A. Okay.
18 Q. And if you look at page 3 of 7.
19 A. Okay.
20 Q. Do any of those classes look familiar?
21 A. I mean, they look familiar. I'm not sure that I
22 can attest to --
23 Q. You don't remember which ones?
24 A. Well, and, also, this is their current.
25 Q. Right.

Page 19

1  A. What has changed in ten years in the working
2  environment would probably dictate different courses. I
3  mean, they -- yeah. I can't attest to exactly what I
4  took.
5  Q. So you don't know, okay. Do you have any human
6  resource certifications?
7  A. I was SHRM certified at one point.
8  Q. Okay. Did you let that lapse?
9  A. I did.
10 Q. When did you let that lapse?
11 A. I can't give you a specific date. That was a
12 long time ago. I can't give you a specific date.
13 Q. You can put that down.
14 A. Okay.
15 Q. So let's start off by talking about Embry-Riddle.
16 A. Um-hmm.
17 Q. You were hired as the women's lacrosse coach; is
18 that right?
19 A. That's correct.
20 Q. The head coach?
21 A. Correct.
22 Q. And it was your job to put together a new team?
23 A. Correct.
24 Q. Who did you interview with when you applied for
25 the position?

Page 20

1  A. I had a phone interview with John Mark Adkinson
2  and Sonja Taylor. There might have been other people on
3  the call but I don't -- I don't recall who they were. I
4  interviewed with John Phillips when I got on campus. I
5  had lunch with Lisa Wilson as well. I don't recall who
6  exactly was at that lunch. And then I remember
7  interviewing with Coach Ridder.
8  Q. For purposes of today, is it okay if we call John
9  Phillips JP?
10 A. Yes.
11 Q. So after you interviewed, did you have to submit
12 to a background check?
13 A. I did.
14 Q. And what happened after you submitted to the
15 background check?
16 A. I waited a long time to hear back from them. I
17 then was questioned about the background check by JP.
18 Q. Okay. And that had you worried, right?
19 A. No.
20 Q. No? Okay.
21    MS. KAHN: We're going to mark this as
22 Defendant's Exhibit 1.
23    (Defendant's Exhibit No. 1 was marked for
24 identification.)
25 BY MS. KAHN:

Page 21

1  Q. Is this a text message exchange that you had with
2  Dennis Short?
3  A. Yes, I recall.
4  Q. And in the letter -- or, I'm sorry, in the text
5  message, you're worried about whether you're going to
6  get the position because of the background check, right?
7  A. No.
8  Q. You're not?
9  A. Uh-uh.
10 Q. All right.
11 A. What I was worried about was being asked about my
12 mental health background, which I believed was to be
13 protected. I didn't feel comfortable disclosing that.
14 Q. Where does that say that in Exhibit 1?
15 A. It doesn't. But that's what this was about when
16 you asked what I was worried about.
17 Q. In your first message, does it say, screwed up
18 situation with my offer?
19 A. I don't know what context that's in.
20 Q. Well, if you keep reading, you talk about -- you
21 talk about wanting a letter, right, from Dennis Short?
22 A. Um-hmm.
23 Q. And a character reference, right?
24 A. Yes.
25 Q. And that was because they raised concern about

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1 the convictions, right? Or, I'm sorry, about the
2 arrests?
3    A. I should clarify, screwed up situation with my
4 offer was not implying that I screwed up the situation
5 with my offer. I was saying that it was a screwed-up
6 situation with my offer.
7    Q. I wasn't implying otherwise.
8    A. Okay.
9    Q. But that's what you're saying; you're saying
10 that -- you're insinuating that it's not going to be
11 smooth sailing because they've asked about your
12 background check, correct?
13    A. No.
14    Q. All right. If you go a couple down.
15    A. Um-hmm.
16    Q. Dennis Short says to you, Hang in there, right?
17 He thinks you're nervous too?
18       MR. HENRICHSEN: Form objection. Calls for
19 speculation. If you can answer it, go ahead.
20       THE WITNESS: He was my mentor and one of my
21 biggest supporters so him telling me to hang in there
22 happened quite often.
23 BY MS. KAHN:
24    Q. Do you tell him you had already talked to a
25 lawyer?

Page 23

1    A. Yes, I did, it says it right here. Talked to the
2 lawyer.
3    Q. What -- which arrest did Embry-Riddle raise with
4 you when you applied for the position?
5    A. I don't recall.
6    Q. Well, it says here that apparently there was a
7 separate case that was not sealed.
8       Do you see that?
9    A. Yes.
10    Q. What case was sealed?
11    A. I don't know exactly. That was quite a long time
12 ago. It was also, I was not in a good frame of mind.
13 And I was never convicted of anything. So I don't know
14 what was sealed, what wasn't. There was a lot going on
15 at that time.
16    Q. What do you mean, there was a lot going on?
17    A. Meaning there was a lot going on with, you know,
18 that case at that time. Yes, I know I had charges. At
19 the time I was in a psychosis and was under, you know,
20 treatment.
21    Q. At the time you had this text message exchange?
22    A. No. At the time of the cases.
23    Q. Okay. Well, looking back, do you recall now what
24 case you had that was sealed?
25       MR. HENRICHSEN: Form objection. Asked and

"Object to 23:10-15 -
FRE 402 (not
relevant evidence);
FRE 404
(inadmissible
character
evidence); FRE
802 (hearsay); FRE
403 (unduly
prejudicial and
confusing)"

Page 24

1 answered.
2       Go ahead if you can answer.
3       THE WITNESS: No.
4 BY MS. KAHN:
5    Q. Did he suggest that you get references from two
6 of your prior employers?
7       MR. HENRICHSEN: Form objection. Speculation.
8       Go ahead if you can answer.
9       MS. KAHN: Hey, Neil, you can just object to
10 form and please don't do speaking objections.
11       MR. HENRICHSEN: Go ahead. Answer if you can.
12       THE WITNESS: Could you repeat the question,
13 please?
14 BY MS. KAHN:
15    Q. Sure. Dennis suggested that you get references
16 from two prior employers, correct?
17       MR. HENRICHSEN: Form objection. Go ahead.
18       THE WITNESS: Where is that? Hold on.
19 BY MS. KAHN:
20    Q. Third to the last line.
21    A. I mean, he -- I took this as that, you know, my
22 track record at Oglethorpe and Stevenson was good and
23 therefore, there were no issues and that, you know, that
24 should speak to continuing on with the hiring process.
25    Q. Did you reach out to Oglethorpe to get a

Page 25

1 character reference?
2    A. I don't believe so.
3    Q. Why not?
4    A. I don't recall.
5    Q. Did you have a good relationship with your
6 supervisor when you left Oglethorpe?
7    A. I don't -- I think it was okay. I don't think
8 she wanted me to leave.
9    Q. Did you quit or were you fired?
10    A. I quit. I resigned because I took the job at
11 Embry-Riddle.
12    Q. We were talking a moment ago about references
13 that you got. I'm just going to show you a packet and
14 ask you if these are the letters you requested, if you
15 know.
16       (Defendant's Exhibit No. 2 was marked for
17 identification.)
18 BY MS. KAHN:
19    Q. I'll give you a second to look at it.
20       MS. ZORILLA-GASTON: While she does that, I
21 believe there's someone waiting to be let in.
22 BY MS. KAHN:
23    Q. So you requested a reference letter from Crista
24 Samaras?
25    A. Yes. This was a part of my application process.

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1 This wasn't following the background check.
2   Q.  Okay.  We'll go back to that in a second.  And is
3 Crista someone that you coached with?
4   A.  I worked for her for her club program.
5   Q.  Then if we go to the next letter.
6   A.  Um-hmm.
7   Q.  Who is Kathy Railey?
8   A.  Kathy Railey was the head coach at Stevenson
9 University in which I was the assistant coach for her.
10  Q.  Did you have problems with initially securing
11 employment at Stevenson because of your arrest record?
12     MR. HENRICHSEN:  Form objection.  Go ahead.
13     THE WITNESS:  Yes.  For my arrest record.
14 BY MS. KAHN:
15  Q.  Why did you leave Stevenson?
16  A.  I got the opportunity to be a head coach and
17 wanted to move closer to the south.
18  Q.  Stevenson is in Maryland, right?
19  A.  Correct.
20  Q.  Where does your family live?
21  A.  At the time, they were living in Baltimore.
22  Q.  So you were not fired from Stevenson?
23  A.  I was not.
24  Q.  Did you resign in lieu of termination?
25  A.  No.

"Object to 26:10-13 - FRE 402 (not relevant evidence); FRE 404 (inadmissible character evidence); FRE 403 (unduly prejudicial and confusing)"

Page 27

1   Q.  If we switch to the next page.
2   A.  Um-hmm.
3   Q.  Is that a reference that you asked for from
4 Dennis Short?
5   A.  This was also a part of my reference list in my
6 application.
7   Q.  Okay.  But my question was, is this a letter
8 reference that you requested from Dennis Short?
9   A.  Yes.
10  Q.  So the date on that is July 16th, correct?
11  A.  It is.
12  Q.  Okay.  Could you go back and look at the document
13 that we marked as number 1.  The other document.
14  A.  Oh, I'm sorry.
15  Q.  Yes.  Does it refresh your memory that
16 Embry-Riddle had already raised the issue of your
17 background check at the time that you asked Dennis to
18 send a reference?
19  A.  I asked Dennis to send a reference prior to any
20 of that.  Whether or not it got there before then is a
21 totally different story.
22  Q.  Okay.  I want you to read the first sentence of
23 your first text message out loud.  I'm sorry.  The
24 second sentence.
25  A.  JP wants a letter from you about my arrest and a

Page 28

1 character reference.  Any chance you can do that for me
2 today?  This sucks.
3   Q.  So you agree now that --
4   A.  No.  I believe --
5   Q.  Let me ask the question first so Mae can get
6 everything down, okay?
7   A.  Sure.
8   Q.  You agree that JP had already raised the issue of
9 your background check at the time that you sent this
10 text message on July 15th, right?
11  A.  I honestly don't know the chronological events.
12 I know I requested a reference letter from Dennis that
13 was a part of my hire process.  I know that I had a
14 conversation about it, but I believe there could be a
15 second reference letter but the one that I was shown was
16 the one that was given as a part of my new hire process.
17  Q.  Okay.  I'm asking whether in July 2000-and --
18 July 15, 2016, you said to Dennis that JP wants a
19 reference because of your arrest and for your character.
20  A.  I can't attest if that was the reference letter
21 for my new hire or down the line after what happened
22 with JP.
23  Q.  Can we agree that you sent this text message on
24 July 15, 2016?
25  A.  Yes.

Page 29

1   Q.  Can we agree that Dennis Short sent a letter to
2 JP with a character reference on July 16, 2016, the next
3 day?
4   A.  Yes.
5   Q.  And in Exhibit 1, you say that you had talked to
6 a lawyer, correct?
7   A.  Yes.
8   Q.  There's nothing wrong with it.  I'm just asking.
9   A.  Sure.
10  Q.  I'm showing you what's been marked as Defendant's
11 Exhibit 3.
12     (Defendant's Exhibit No. 3 was marked for
13     identification.)
14 BY MS. KAHN:
15  Q.  And, actually, just pull up that first page.
16     Ms. Giannerini -- I'm just talking about the
17 first page.
18  A.  Oh, okay.
19     MR. HENRICHSEN:  You could pull off -- I think
20 she said to pull off the --
21 BY MS. KAHN:
22  Q.  We can fix it in a minute.
23  A.  I don't understand.  Just that?
24  Q.  Yes.
25  A.  Okay.

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1  Q. Exactly. All right. And you requested that your
2  lawyer send a letter over to Embry-Riddle on June 15,
3  2016; is that right?
4  A. I did.
5  Q. Did you get an offer letter?
6  A. I'm sure I did.
7  Q. I'm handing you what's been marked as Defendant's
8  Exhibit 4.
9      (Defendant's Exhibit No. 4 was marked for
10  identification.)
11  BY MS. KAHN:
12  Q. Does that look familiar?
13  A. Yes.
14  Q. So your hire date was August 15, 2016?
15  A. I believe that was the date. I'm not sure. It
16  should say it on here. Yes, it does.
17  Q. And you were making $47,500 when you were hired,
18  right?
19  A. Correct.
20  Q. And if you look at the bottom, does that say that
21  you electronically accepted it on July 26, 2016?
22  A. It does.
23  Q. Do you need a break or are you okay?
24  A. I'm okay.
25  Q. Did you have to sign a bunch of paperwork when

"Object to 30:1-4 FRE 402 (not relevant evidence); FRE 404 (inadmissible character evidence); FRE 802 (hearsay); FRE 403 (unduly prejudicial and confusing)"

Page 31

1  you were hired?
2  A. I'm sure I did.
3  Q. Okay. Is that a voluntary self-identification of
4  disability form?
5      (Defendant's Exhibit No. 5 was marked for
6  identification.)
7      THE WITNESS: It is.
8  BY MS. KAHN:
9  Q. Okay. And did you check that, no, I don't have a
10  disability?
11  A. It looks as though I did.
12  Q. And if you look at the second page, it talks
13  about reasonable accommodations, correct?
14  A. It does.
15  Q. Did you have a new hire orientation?
16  A. I believe I sat down with somebody from HR.
17  Q. Did you go over rules and policies and that type
18  of thing?
19  A. I don't recall. The only thing I recall is
20  signing some -- or talking about employee benefits.
21  Q. Do you remember what Embry-Riddle calls APPMs?
22  A. No.
23  Q. Do you remember they had internal policies? Does
24  that sound familiar?
25  A. No.

Page 32

1  Q. All right. I'm going to show you what's been
2  marked as number 6.
3      (Defendant's Exhibit No. 6 was marked for
4  identification.)
5      THE WITNESS: Sure.
6  BY MS. KAHN:
7  Q. And you electronically signed that on
8  November 28, 2016, correct?
9  A. I did.
10  Q. Okay. I'm showing you what's been marked as
11  Defendant's Exhibit 7 -- put a sticker on it --
12  Defendant's Exhibit 7.
13      (Defendant's Exhibit No. 7 was marked for
14  identification.)
15  BY MS. KAHN:
16  Q. It's actually a two-page exhibit. And you see
17  that you electronically signed your 2021 code of ethical
18  conduct agreement on February 15, 2021?
19  A. I did.
20  Q. Okay. If you turn to the next page, you signed
21  that you had read and understood the ethical code of
22  conduct on May 21, 2020, correct?
23  A. Just to clarify, these weren't during my new
24  hire --
25  Q. Correct.

Page 33

1  A. -- paperwork?
2  Q. Right.
3  A. Okay.
4  Q. We talked about the dates, right?
5  A. Okay. Sure.
6  Q. Did Embry-Riddle have an athletic philosophy?
7  A. Yes.
8  Q. What was it?
9  A. Student-person-player.
10  Q. What did that mean?
11  A. That we embodied our student athletes in the
12  whole sense, first and foremost, as a student performing
13  in the classroom; second as a person, making them better
14  all around, providing resources for -- to better them as
15  a person; and then thirdly, how they, you know, operated
16  as an athlete and that all three were, you know, very
17  important to the whole philosophy. It was also what
18  attracted me to applying to Embry-Riddle and why I was
19  so excited about it.
20  Q. The whole person was important to you?
21  A. It was and is.
22  Q. Okay. I'm going to show you what's been marked
23  as Defendant's Exhibit 8.
24      (Defendant's Exhibit No. 8 was marked for
25  identification.)

9 (Pages 30 - 33)

Page 34

1     THE WITNESS: Okay.  Got it.
2 BY MS. KAHN:
3     Q.  Is that a copy of their athletics mission
4 statement?
5     A.  Um-hmm.  It is.
6     Q.  I'm going to show you what's been marked as
7 Exhibit 9.
8         (Defendant's Exhibit No. 9 was marked for
9     identification.)
10 BY MS. KAHN:
11    Q.  Is this the student-person-player policies and
12 procedure manual?
13    A.  It is.
14    Q.  And if you turn to the page that has the little
15 number at the bottom.  Those are called Bates stamps.
16    A.  Okay.
17    Q.  If you turn to the page that says 151.
18    A.  Yes.
19    Q.  Second paragraph, first sentence talks about
20 staff being responsible for knowing and complying with
21 the manual.
22    A.  Um-hmm.
23    Q.  Right?
24    A.  Yes.
25    Q.  If you go to the page that's Bates stamped on the

Page 35

1 bottom right-hand corner that says 165.  It's also page
2 15 at the PDF if that's easier.
3     A.  Yeah.  Got it.  Thank you.
4     Q.  Embry-Riddle has a diversity and inclusion
5 statement in this manual, right?
6     A.  Yes.
7     Q.  And that diversity and inclusion is a core value?
8     A.  Yes.
9     Q.  If you could turn the page.  Could you just read
10 me the first sentence and stop.
11    A.  Mental health has become an increasingly
12 important aspect of overall student athlete wellness.
13 Coaches and athletic staff are encouraged to be mindful
14 of student athlete mental health and refer students to
15 campus support resources as appropriate.  Coaches are --
16    Q.  You can stop there.
17    A.  Okay.
18    Q.  Thank you.  And then does the policy go on to
19 give different resources for mental health?
20    A.  Yes, it does.
21    Q.  And you were familiar with all these policies
22 when you worked at Embry-Riddle, correct?
23    A.  I was.  I used the resources quite a bit.
24    Q.  If I could get you to go to page 20 of the PDF.
25    A.  Yes.

Page 36

1     Q.  Do you see that the code of conduct at the very
2 last bullet point at the top, it says that
3 Embry-Riddle's intolerant of physical abuse, harassment,
4 intimidation and discrimination?
5     A.  Yes.
6     Q.  And it also says that student athletes who engage
7 in misconduct can have disciplinary penalties, right?
8     A.  Yes.
9     Q.  And that happens sometimes, didn't it?
10    A.  It does.
11    Q.  Okay.  Page 22 of the PDF.  At the top of the
12 page.  Does it talk about hazing?
13    A.  Yes.
14    Q.  Does the policy require that harassment,
15 emotional or physical abuse or harm, embarrassment,
16 anxiety, ridicule are a violation of the university
17 policies?
18    A.  It does state that.
19    Q.  And that it doesn't matter how good the end
20 result or the intent, correct?
21    A.  Where does it say that?
22    Q.  The next sentence from where we were just
23 reading.  First paragraph.
24    A.  We're still talking about the first paragraph
25 under the hazing?  Is that correct?

Page 37

1     Q.  Yes.
2     A.  Could you please repeat your question?  I've lost
3 my --
4     Q.  I would be happy to.
5     A.  Okay.
6     Q.  During the -- or in the hazing section of the
7 manual, does it say that hazing is harassment, emotional
8 or physical abuse or harm, embarrassment, anxiety,
9 ridicule or the violation of a university rule no matter
10 how good the end result or the intent?
11    A.  It does say that.
12    Q.  And does it list under the third bullet point
13 that forced excessive exercise is an example of hazing?
14    A.  It does.
15    Q.  If I could get you to go to the bottom of that
16 same page.
17    A.  Um-hmm.
18    Q.  Is there a policy on alcohol?
19    A.  Yes.
20    Q.  Students have to be 21 to purchase, possess and
21 consume alcohol, right?
22    A.  Yes.
23    Q.  And that it can only be used in designated areas
24 or events?
25    A.  On university property.

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1  Q. But is that what it says?
2  A. Yes. On university property.
3  Q. So when we look at -- we're going to go back to
4  this but when we look at this manual, Exhibit 9, at the
5  top it talks about team agreements. Is that --
6  A. Where? I'm sorry.
7  Q. I'm on that same page. 23.
8  A. Okay. Yes.
9  Q. Of the PDF.
10  A. Uh-huh.
11  Q. At the top, you see there's a rule about alcohol
12  and then it goes on to say that there can also be
13  guidelines and team agreements?
14  A. Yes. Under team agreements and rules.
15  Q. Did you ever do a team agreement?
16  A. Every year.
17  Q. What types of things are in the team agreement?
18  A. I won't -- I can't exactly say word for word.
19  But it is essentially team policies from academic --
20  from academic to behavior while traveling. It's a
21  manual of policies and procedures.
22  Q. It addresses academics usually?
23  A. Honestly, I haven't looked at it in probably
24  close, what, over two years, so I'm not going to speak
25  directly to what it says.

Page 39

1  Q. Okay. When you are presenting the player
2  agreement to students, do you get them together in a
3  group?
4  A. Yes. It's in the beginning of our team meeting
5  every year before practices start.
6  Q. Tell me about that.
7  A. It was just standard to -- it was the first
8  meeting back that we were allowed to be together. It
9  was before practices begun. It was outlining our player
10  agreement and explaining what I meant. It was answering
11  questions. It was talking about our schedule. It was
12  connecting with each other, especially for new freshman,
13  as well as returners. It was the meeting that kicked
14  off our fall season.
15  Q. And when you're talking right now about before
16  the season started, you're referring to the 2021 school
17  year, right?
18  A. So there's two seasons every year. There's the
19  fall, fall ball season, which is our, you know, out of
20  normal competition season, and then there's our spring
21  season in which we are playing games. And so we really
22  separate them by the two, because the nature of the two
23  seasons are very different.
24  Q. So do you do -- strike that.
25     Did you do two player agreements a year then?

Page 40

1  A. No. The player agreement was for the fall of
2  each year and through the spring of each year.
3  Q. Okay. I'm going to show you what's been marked
4  as Defendant's Exhibit 10.
5     (Defendant's Exhibit No. 10 was marked for
6  identification.)
7     THE WITNESS: Okay.
8     MR. HENRICHSEN: And just for the record, there
9  are no Bates stamp numbers on 10. And was this --
10     MS. KAHN: This is a --
11     MR. HENRICHSEN: -- previously produced or?
12     MS. KAHN: No.
13     MR. HENRICHSEN: Okay. And is 10, just on --
14  for the record, is it both the two pages of e-mail and
15  then the player agreement?
16     MS. KAHN: Correct. It's the attachment.
17     MR. HENRICHSEN: Great. Thank you.
18     THE WITNESS: Yes. This is my player
19  agreement.
20  BY MS. KAHN:
21  Q. If we could turn to -- I'll say the third page of
22  the document. At the top it says: Player agreement.
23  A. Third page. Yep. Got it.
24  Q. And I notice that there's some red font in the
25  middle of the page. Do you see that?

Page 41

1  A. Yes.
2  Q. Are those notes to remind you what to say when
3  you're going over the agreement?
4  A. I don't -- I don't recall if these were given to
5  them or they were notes for me. They could be either.
6  Q. They were communicated one way or the other to
7  the students?
8  A. They were.
9  Q. And I notice some of the font is in all caps.
10  Does that usually mean emphasis or some people call it
11  yelling?
12  A. I wouldn't.
13  Q. Why did you put it in caps, then?
14  A. I couldn't tell you what my frame of mind was
15  when I wrote that.
16  Q. Okay. If you'd go to page 10.
17  A. Um-hmm.
18  Q. In all caps in red, what does it say under
19  coaching staff?
20  A. All caps? I think I might be on the wrong page.
21  Q. Number 12. It's paragraph 12.
22  A. I don't have numbers. Okay. Number 12. Yeah.
23  It says that.
24  Q. What does it say?
25  A. It says: We are not your mothers. We are your

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1 employers.
2 Q. Okay. Let's put this aside and go back to the
3 handbook, Exhibit 9.
4 A. Do you mind if we have a bathroom break real
5 quick?
6 Q. No problem at all.
7 A. Okay.
8 Q. We'll go off the record?
9    THE VIDEOGRAPHER: Going off the record at
10 10:05.
11    (A brief recess was taken.)
12    THE VIDEOGRAPHER: Going back on the record at
13 10:16. This is media unit 1, letter B.
14 BY MS. KAHN:
15 Q. We're going to go back to the document that's
16 marked as Exhibit 9.
17 A. Okay.
18 Q. I want to go through some more policies.
19 A. Sure.
20 Q. Let's turn to page 23 of the PDF.
21 A. Okay.
22 Q. We were talking about the player agreements --
23 A. Um-hmm.
24 Q. -- when we left off.
25    Let's turn to page 25 of the PDF.

Page 43

1 A. 25. Okay.
2 Q. And there's a policy letting students know that
3 there's a counseling center; is that right?
4 A. That's correct.
5 Q. Turn to page 32.
6 A. Okay.
7 Q. Do you see it says: Team discipline?
8 A. Yes.
9 Q. And that first bullet point, could you read me
10 that last sentence, please.
11 A. Although student athletes --
12 Q. Not that one.
13 A. I'm sorry.
14 Q. I'm sorry. The very -- under team discipline.
15 A. Okay.
16 Q. The first bullet point. That last sentence. Oh,
17 I'm sorry. You're right. That was a comma.
18    Go ahead. I'm sorry.
19 A. So what I was reading?
20 Q. Yes, please.
21 A. Okay. The head coach is responsible for
22 enforcing the Embry-Riddle code of conduct, NCAA
23 standards of ethical conduct, Embry-Riddle athletic
24 standard of conduct.
25 Q. Right. I'm going to stop you right there.

Page 44

1 A. Okay.
2 Q. I'll read it. You just tell me if it says it.
3 A. Oh, I'm sorry.
4 Q. It's okay.
5    If you look at team discipline, I'm going to
6 start with the second sentence. Do you see it says:
7 Although student athletes are ultimately responsible for
8 their own behavior, head coaches are expected to respond
9 to misconduct in a consistent, fair and appropriate
10 manner?
11 A. Yes.
12 Q. If we go down to the third bullet point, does it
13 say that: Conduct on away trips should reflect the
14 highest standards of Embry-Riddle?
15    MR. HENRICHSEN: Objection to form. That
16 document speaks for itself.
17    Go ahead, if you can answer.
18    THE WITNESS: Yes. It says that.
19    THE VIDEOGRAPHER: Ms. Kahn, do you have your
20 microphone on?
21    MS. KAHN: No, I don't. Sorry.
22 BY MS. KAHN:
23 Q. All right. Let's turn to page 37.
24 A. Okay.
25 Q. Do you see the section that says: Team travel?

Page 45

1 A. Um-hmm.
2 Q. And this is one of those times where I knew what
3 you meant but for the record, did you say yes?
4 A. Team travel. The head coach is responsible for
5 the team, yes. I see that.
6 Q. And it says that the team's going to travel
7 together in the bus or the van, right?
8 A. It does.
9 Q. Okay. And what does the second bullet point say?
10 A. Individuals and teams are representatives of the
11 university and should act accordingly.
12 Q. Do you agree with that?
13 A. I do.
14 Q. Okay. I'm going to show you another handbook.
15    (Defendant's Exhibit No. 11 was marked for
16 identification.)
17    THE WITNESS: Okay.
18 BY MS. KAHN:
19 Q. Oh, can you get it?
20 A. It's okay.
21 Q. What is this document?
22 A. It's the student athlete handbook.
23 Q. Were you familiar with it?
24 A. I was.
25 Q. Okay. And if we go to page -- it says 2 at the

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1 bottom.
2   A. Uh-huh.
3   Q. Well, first of all, it has the program philosophy
4 that we talked about earlier, right?
5   A. Yes. The student-person-player. I'm not seeing
6 2. Is it -- I only see the Bates stamps. Oh, there we
7 go. I got it.
8       MR. HENRICHSEN: Just so I'm -- 116 Bates
9 stamp?
10       MS. KAHN: Correct.
11       MR. HENRICHSEN: Thank you.
12       THE WITNESS: Oh. Yes.
13 BY MS. KAHN:
14   Q. And it talks about Embry-Riddle's athletic goals,
15 right?
16   A. Yes.
17   Q. Okay. If I could get you to look at the
18 third-to-the-last bullet point.
19   A. The third to the last. I only see three bullet
20 points.
21   Q. Yeah. If you turn the page.
22   A. Okay. Provide a climate which protects and
23 enhances the physical, emotional, and social welfare of
24 student athletes with particular focus on diversity and
25 inclusion.

Page 47

1   Q. And speaking of diversity and inclusion, if you
2 go to the next page.
3   A. Yes.
4   Q. There's a diversity policy in this handbook also,
5 right?
6   A. Yes.
7   Q. Okay. And let's turn to page 12.
8   A. Almost there. Okay.
9   Q. And the student athlete handbook has a code of
10 conduct, right?
11   A. Yes.
12   Q. Turn to page 15.
13   A. Okay.
14   Q. If you look at hazing, is this the similar
15 language to what we just looked at in the
16 student-person-player handbook?
17   A. It looks similar. I can't say for -- it's exact,
18 I would have to look at both documents. But it looks
19 similar.
20   Q. Okay. I was just going to ask whether this
21 policy also says that emotional abuse is -- and I'm
22 paraphrasing -- not okay no matter how good the end
23 result or intent?
24   A. It says hazing, not emotional abuse.
25   Q. If you look at the sentence, the second sentence,

Page 48

1 it defines hazing as emotional abuse or harm and
2 embarrassment, right?
3   A. I'm not seeing where that says that. So you'll
4 have to be more specific.
5   Q. Okay. It's the second sentence of that
6 paragraph.
7   A. It says: As a result in harassment, emotional or
8 physical abuse or harm, embarrassment.
9       Yes.
10   Q. And does it also list forced excessive exercise
11 as a form of hazing?
12   A. Yes.
13   Q. Turn to the next page. Does this handbook also
14 have an alcohol policy?
15   A. Yes.
16   Q. And if you look at the second-to-the-last
17 sentence of that paragraph, does it talk about student
18 athletes making better individual choices or making
19 better individual choices in regards to alcohol?
20       MR. HENRICHSEN: Form objection. Go ahead.
21       THE WITNESS: You -- I can --
22 BY MS. KAHN:
23   Q. You can answer.
24   A. Oh, okay.
25       MR. HENRICHSEN: Go ahead.

Page 49

1       THE WITNESS: It says: Poor choices involving
2   the consumption of alcohol can lead to poor personal
3   behavior and reflect negatively on the athletic
4   program at Embry-Riddle Aeronautical University.
5 BY MS. KAHN:
6   Q. Let's turn to page 21. And there's another
7 diversity and inclusion policy, right?
8   A. Yes.
9   Q. And then 22, there's more policies on diversity
10 and inclusion?
11   A. Yes.
12   Q. And if we turn to page 27.
13   A. Okay.
14   Q. If you go to paragraph number 4. Does it talk
15 about how to get help for mental health needs?
16       MR. HENRICHSEN: Form objection. Go ahead.
17       THE WITNESS: Yes.
18 BY MS. KAHN:
19   Q. And then if you go to page 30. There's
20 information about the counseling center, correct?
21   A. Yes.
22   Q. Do you remember earlier we went through some of
23 the acknowledgement of policies that you signed?
24   A. Yes.
25   Q. Okay. I'm just going to show you some of those

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1 policies.
2    MS. KAHN: Okay. I'm going to mark it as
3 Exhibit 12.
4    (Defendant's Exhibit No. 12 was marked for
5 identification.)
6    MR. HENRICHSEN: Thank you.
7 BY MS. KAHN:
8    Q. Is this the ethical code of conduct?
9    MR. HENRICHSEN: Form objection. Go ahead.
10    THE WITNESS: It appears so.
11 BY MS. KAHN:
12    Q. Okay. If you look towards the bottom.
13    A. Um-hmm.
14    Q. Does it talk about items that Embry-Riddle is
15 committed to? The very last sentence on that page.
16    A. Yes. In summary, we are committed to the
17 following basic expectations.
18    Q. Okay. And it talks about having individual
19 responsibility and accountability, right, number --
20 number 2?
21    A. Yes.
22    Q. It talks about, number 3 is respect and support
23 for others?
24    A. Yes.
25    Q. 5 is culture of compliance and applicable

Page 51

1 university policies and procedures?
2    A. Yes.
3    Q. 13 is nonretaliation?
4    A. Yes.
5    Q. If we go to paragraph number 3, you can see on
6 the bottom, there's a little 3 out of 7 if your eyes are
7 good enough.
8    A. Yeah. 3 out of 7.
9    Q. Mine are not.
10    A. I have it.
11    Q. Does it talk about respect and support for
12 others?
13    A. Yes.
14    Q. Okay. You can put that one aside.
15    A. Okay.
16    Q. I'm going to talk about Defendant's Exhibit 13.
17    (Defendant's Exhibit No. 13 was marked for
18 identification.)
19    THE WITNESS: Okay.
20 BY MS. KAHN:
21    Q. It's a disability policy.
22    A. Okay.
23    Q. And it gives employees information they need if
24 they have a disability, correct?
25    MR. HENRICHSEN: Form objection. Go ahead.

Page 52

1    THE WITNESS: I've never seen this before. I
2 mean, where -- where would I have found this? Was
3 that -- did I sign it?
4 BY MS. KAHN:
5    Q. This -- you signed for this when you signed one
6 of your acknowledgement cards.
7    A. Okay.
8    MR. HENRICHSEN: Hold on. Form objection. Go
9 ahead.
10    THE WITNESS: Yeah.
11 BY MS. KAHN:
12    Q. Do you have any reason to doubt that Embry-Riddle
13 had a policy on employees with disabilities?
14    A. No. I just don't recall the actual page.
15    Q. Okay. That was Exhibit 13. This is going to be
16 14.
17    (Defendant's Exhibit No. 14 was marked for
18 identification.)
19    THE WITNESS: Okay.
20 BY MS. KAHN:
21    Q. Embry-Riddle had an equal opportunity employment
22 policy?
23    MR. HENRICHSEN: Form. Go ahead and answer.
24    THE WITNESS: Yes.
25 BY MS. KAHN:

Page 53

1    Q. And if we go two more pages, it says it's the
2 work rules policy.
3    A. Okay.
4    Q. You see that it talks about infractions under
5 number 3, under the policy?
6    MR. HENRICHSEN: Form objection. Go ahead.
7 BY MS. KAHN:
8    Q. Do you see that?
9    A. It does have a work performance infractions.
10    Q. Okay. And if you look to G on the next page,
11 does it talk about bullying or interfering with the
12 performance of other employees?
13    A. Yes.
14    Q. What if we go back up to D? Does it -- is it an
15 infraction to be unable or unwilling to work in harmony
16 with others or be discourteous to students?
17    A. It does say that.
18    Q. Okay. The Bates number at the bottom is 225. If
19 we look at the discipline policy. If you look at the
20 bottom 2 and then go to the next page where it says B.
21 Under the discipline policy does it say: Correction of
22 employee shortcomings or negative behavior only to the
23 extent required?
24    A. It does.
25    Q. And then if we turn to the next page, the

14 (Pages 50 - 53)

Page 54

1 substance abuse policy.
2   A. Um-hmm.
3   Q. Is this a policy of the university addressing the
4 use of alcohol?
5       MR. HENRICHSEN: Form objection. Go ahead.
6       THE WITNESS: Yes.
7 BY MS. KAHN:
8   Q. And if you go under policy number 2.
9   A. Um-hmm.
10  Q. Does it talk about use of alcohol on university
11 property?
12  A. Yes.
13  Q. It says prohibited, right?
14  A. With the exception of designated approved areas
15 or events.
16  Q. Correct.
17  A. On university property.
18  Q. And then if I could get you to go to 865. I'm
19 sorry. That's the policy number. It says: Abuse of
20 power. At the bottom, it's Bates stamped 230.
21  A. Okay.
22  Q. And if I could get you to turn to the second page
23 of that policy. At the bottom, it says Bates stamp 231.
24  A. Yes.
25  Q. Okay. Does it talk about abusive power when

Page 55

1 someone is in an inherent position of power?
2       MR. HENRICHSEN: Form objection. Go ahead.
3       THE WITNESS: Are you talking about number 5?
4 BY MS. KAHN:
5   Q. I'm talking about number 1.
6   A. Oh, I'm sorry.
7   Q. At the top it says: Definition of conflict of
8 interest and abuse of power.
9   A. Um-hmm. I see it.
10  Q. All right. Does it define abuse of power as
11 someone in a position of authority intimidating another
12 person?
13      MR. HENRICHSEN: Form objection. Go ahead.
14 BY MS. KAHN:
15  Q. It's the first sentence.
16  A. Yes.
17  Q. And then the next sentence, what does that next
18 sentence say?
19  A. This includes pressure of any kind to accept
20 abuse or risk, reprisal in the form of recommendations,
21 evaluations, including academic grades, promotions,
22 salary adjustments, schedule adjustments or even job
23 offers.
24  Q. And under policy number 1, does it say that
25 everyone is entitled to be free from abuse of power?

Page 56

1   A. Yes.
2   Q. And then if we look at number 4. That first
3 sentence, does it say: The university is committed to
4 vigorously enforcing its policy against the abuse of
5 power in all relationships among members of the
6 university community?
7   A. It does.
8   Q. And then at the end of that same paragraph:
9 Abuse of an individual within any such relationship is a
10 violation of university rules and therefore, is grounds
11 for disciplinary action up to and including termination
12 of employment.
13  A. It does.
14  Q. Is that what the policy says?
15  A. Um-hmm.
16  Q. Is that a yes?
17  A. Yes. Sorry.
18  Q. Okay. That's all I have on that one.
19      This morning, we talked about your education in
20 human resources, right?
21  A. Um-hmm.
22  Q. Is that a yes?
23  A. Yes.
24  Q. You also did and currently do some human
25 resources work, right?

Page 57

1   A. I do.
2   Q. So you're pretty familiar with navigating through
3 issues of discrimination and retaliation, right?
4   A. I'm familiar, yes.
5   Q. Are you familiar with -- do you remember Maxient
6 from Embry-Riddle, the anonymous reporting system?
7   A. No.
8   Q. Let's talk a little bit about the program.
9   A. Okay.
10  Q. This was a program that you built up, right?
11      THE WITNESS: Can I ask a question?
12      MR. HENRICHSEN: Go ahead.
13      THE WITNESS: Are you talking about my lacrosse
14 program?
15 BY MS. KAHN:
16  Q. I am.
17  A. Okay. Yes. The answer's yes.
18  Q. When did you start playing lacrosse?
19  A. I was probably 11, around that time.
20  Q. Who introduced you to it?
21  A. I got introduced to it at Notre Dame prep when I
22 was in middle school.
23  Q. Do you still play lacrosse?
24  A. I do not.
25  Q. You're not on a club team?

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1    A. I have a lot of back injuries. I can't play
2 anymore.
3    Q. Fair enough. Do you like to be outdoors?
4    A. I do.
5    Q. What do you like to do outdoors?
6    A. My favorite is sitting by the beach, walking on
7 the beach.
8    Q. Relaxing?
9    A. Correct.
10    Q. What else do you like to do outdoors?
11    A. Well, I like to travel. And when I travel, I
12 like to do, you know, like expedition-type things,
13 hiking, exploring, I paddleboarded for quite a while.
14    Q. That requires a lot of strength, right,
15 paddleboarding?
16    A. Kind of. Core strength.
17    Q. Core strength. Anything else you like to do
18 outdoors?
19    A. That's about it.
20    Q. That's all you can think of?
21    A. Yeah.
22    Q. All right. I want to talk about different types
23 of coaching style.
24    A. Sure.
25    Q. Describe your coaching style when you first

Page 59

1 started the program in Embry-Riddle.
2    A. I -- it didn't change up until the end of my
3 coaching position at Embry-Riddle. I truly believed
4 that my coaching style was transformational, rather
5 transactional. And I truly believed in using lacrosse
6 as an outlet to teach life lessons to young women.
7    Q. Is that part of the reflections that --
8    A. It was my mantra.
9    Q. And you said that your style is transformational,
10 not transactional, right?
11    A. Correct.
12    Q. So when athletes -- and you said that your style
13 did not change until the end, right?
14    A. That philosophy did not change.
15    Q. Okay. Did there come a time where it did change?
16    A. I think that the time during COVID was incredibly
17 difficult. It was incredibly difficult on myself trying
18 to keep a team together when they not only lost one
19 season but two and they happened to be the only team in
20 the entire country, and including the conference, that
21 didn't play that season. So the entire program was in
22 disarray because of that. And so you couldn't operate
23 in a normal culture, a normal program because of the
24 university's decision to not only cancel our season but
25 we couldn't even practice with contact. So there was

Page 60

1 nothing normal about the last two years of running that
2 program.
3    Q. Right. You described your coaching style as
4 transformational, right?
5    A. Correct.
6    Q. So you're saying you have less ability to coach
7 in light of the fact that you didn't have any games?
8    A. Oh, 100 percent. Not only that, I wasn't able to
9 form relationships with younger players. So there were
10 juniors that had barely even played and we've been
11 able -- we were able to, you know, make relationships.
12    Q. When student athletes are playing sports like
13 lacrosse with you, should collegiate sports be joyful
14 for those students?
15    A. Should they?
16    Q. Yes.
17    A. I certainly think that depends. I think that
18 depends on your level. I think that depends on the
19 athlete. I think that depends on the culture. And I
20 think that depends on what the team is currently going
21 through.
22    Q. Okay. I'm not talking about COVID anymore. I'm
23 sorry.
24    A. I'm not either.
25    Q. Okay. So when you say it depends on the level,

Page 61

1 does that mean students who are playing lacrosse, if
2 their level is not as, I guess, sophisticated or good as
3 some other students, then it couldn't be joyful?
4    A. No. That's not what I'm saying.
5    Q. Okay. Would you explain to me what you meant?
6    A. You know, joy in sport is individualized based
7 off of the player. So to conceptualize what a player
8 should be experiencing, I wouldn't even begin to say
9 that because every single player is different. What
10 brought me joy as an athlete is not the same as what
11 maybe someone else -- what brought them joy. So I
12 can't -- I'm not going to -- I can't say a broad
13 statement like that.
14    Q. Is joy something you would hope that the student
15 athletes would feel when you're coaching them?
16        MR. HENRICHSEN: Form objection. Go ahead.
17        THE WITNESS: Absolutely. I would hope for
18    that. Can I control their joy? I'm not that
19    powerful.
20 BY MS. KAHN:
21    Q. What about camaraderie, do you want them to feel
22 camaraderie?
23    A. Absolutely.
24    Q. Do you want them to love playing the sport like
25 you loved it?

Veritext Legal Solutions

800-726-7007                                                   305-376-8800

CONFIDENTIAL

Page 62

1    A.  Absolutely.
2    Q.  Do you want them to feel passion?
3    A.  Absolutely.
4    Q.  It's hard work, right?
5    A.  Very.  Lot of sacrifices the student athletes
6  made to be an athlete.
7    Q.  It's fun but it's hard work, right?
8        MR. HENRICHSEN:  Form objection.  Go ahead.
9        THE WITNESS:  It's fun but it's also work.  And
10  sometimes work is not fun.  They're not the same
11  thing.
12  BY MS. KAHN:
13    Q.  It's exercise, correct?
14    A.  An incredible amount of exercise.
15    Q.  And for some, would you hope that exercise
16  is helping students clear their mind?
17    A.  I don't know how to answer that question.  For
18  some of them, it did help clear their mind, you know.  I
19  can think of one off the top of my head that that was
20  their favorite thing to do, whereas the next one who,
21  you know, didn't like exercise, no, they didn't -- you
22  know, that wasn't to clear their mind.  I personally
23  don't like running either.
24    Q.  But for some people, it's a stress release,
25  right?

Page 63

1        MR. HENRICHSEN:  Form objection.  Go ahead.
2        THE WITNESS:  Yes.  It's also a massive part of
3  our sport.  And exercise is not something that we
4  have -- we do, we have to be -- we have to do.  Mid
5  fielders run seven miles in a game.  So if you are not
6  conditioned to go into that game, you could injure
7  yourself and others.
8  BY MS. KAHN:
9    Q.  Some of the students, would you agree, also were
10  only playing lacrosse because they wanted to keep a
11  scholarship?
12        MR. HENRICHSEN:  Form objection.  Go ahead.
13        THE WITNESS:  I can't speak to that.  What I
14  can speak to is that every single one of my players
15  was on a scholarship.  And that was a part of creating
16  a culture that did not put them against one another
17  for having scholarship or not having scholarship.
18  It's a talk amongst players.  So that is something
19  that I felt very strongly about that every single one
20  of them was on scholarship.
21  BY MS. KAHN:
22    Q.  You didn't want your students to be pitted
23  against each other?
24    A.  No, I did not.
25    Q.  Okay.  Did you ever hear any students talking

Page 64

1  about playing lacrosse at college because they wanted to
2  keep their grades up?
3    A.  Not that I can recall.
4    Q.  Is that usually a benefit to the students because
5  coaches are monitoring grades, correct?
6        MR. HENRICHSEN:  Form objection.  Go ahead.
7        THE WITNESS:  Yes.  A lot of student athletes
8  really liked being held accountable for their grades.
9  It helped them keep on track.  And we did so in
10  numerous different ways, including a team-run study
11  hall, as well as academic progress cards that if they
12  were struggling, I would know about it and be able to
13  get them the resources to help them.
14  BY MS. KAHN:
15    Q.  You were talking a minute ago about how
16  collegiate lacrosse is hard work.  Would you agree that
17  it's okay for the students to feel frustrated sometimes?
18    A.  Absolutely.
19    Q.  Maybe a little jealous, too?
20    A.  Sure.  We're dealing with a bunch of girls that
21  are 18- to 22-year-olds.
22    Q.  They feel pressure to perform?
23        MR. HENRICHSEN:  Form objection.  Go ahead, if
24  you can answer.
25        THE WITNESS:  Each one of these players were

Page 65

1  recruited and could have played at a D1 institution.
2  They also chose Embry-Riddle because of the high
3  academic, you know, reputation.  So, you know -- I'm
4  sorry.  I lost my train of thought.  Can you ask me
5  again?
6  BY MS. KAHN:
7    Q.  That's okay.  That's okay.  I was just asking
8  about whether they feel pressure to perform?
9        MR. HENRICHSEN:  Form objection.  Go ahead.
10        THE WITNESS:  Sure.  Absolutely, every athlete
11  that is competitive feels pressure to perform.
12  BY MS. KAHN:
13    Q.  Okay.  And it's okay that they want to get that
14  game time from coaches, right?
15        MR. HENRICHSEN:  Form objection.  Go ahead.
16        THE WITNESS:  Hundred percent.
17  BY MS. KAHN:
18    Q.  And they sometimes worry about being injured or
19  recovering from an injury, right?
20        MR. HENRICHSEN:  Form objection.  Go ahead.
21        THE WITNESS:  Because of the nature of our
22  sport, injuries are highly likely.  Because of the
23  nature of our sport, they happen quite often.  And
24  yes, when you have an injury, you do have fear around
25  recovering and coming back to practice.  It's just --

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1   again, it's a part of the gig.
2   BY MS. KAHN:
3     Q.  Okay.  Do you think that your lacrosse student
4   athletes should feel depressed about joining the sport?
5         MR. HENRICHSEN:  Form objection.  Go ahead.
6         THE WITNESS:  No.
7   BY MS. KAHN:
8     Q.  Should they feel powerless?
9         MR. HENRICHSEN:  Same objection.  Go ahead.
10        THE WITNESS:  No.  But I would understand why
11   they had, especially in the last two years.  That was
12   an environment that was created by the university's
13   choices to withhold us from having a season, as well
14   as the season before.  My team was very upset, every
15   single one of them.
16      So yeah.  That's powerless, I would say.  I
17   also think that that formed mental health issues
18   amongst them and that caused a lot of them to wonder
19   if they wanted to continue playing after they hadn't
20   played the sport they loved in over two years.
21  BY MS. KAHN:
22    Q.  Did you encourage one of the parents to send a
23  letter requesting that sports be initiated to Barry
24  Butler?
25    A.  That sports be initiated to -- I'm aware of a

Page 67

1   letter that was sent.  And I had discussions with Donna
2   Jo Toney about it because she was furious.
3     Q.  Did you ask her to write that letter?
4     A.  No, I did not.
5     Q.  Do you still talk to her?
6     A.  I commented on her Facebook the other day.  But
7   I -- I haven't talked -- I haven't seen her or talked to
8   her really in about a year.
9     Q.  Did you know her family before her daughter came
10  to Embry-Riddle?
11    A.  The Toneys?  Is that who you're --
12    Q.  Yes.
13    A.  No.  I meant them during Carson's recruiting
14  process.
15    Q.  She was a freshman during her last year at
16  Embry-Riddle, right?
17    A.  No.  Carson had already graduated.  She was a
18  part of my inaugural class.
19    Q.  Okay.  Do you think student athletes should feel
20  constantly overwhelmed?
21    A.  I think that the student athlete at Embry-Riddle
22  felt constantly overwhelmed.
23    Q.  That is not the goal of the lacrosse program,
24  correct?
25    A.  No.  I don't want my kids to feel overwhelmed

Page 68

1   constantly.  But the demands, the academic demands,
2   along with playing a sport, along with navigating a
3   pandemic, along with personal issues, along with being
4   the first time at a college, it is overwhelming.  There
5   is one thing that changes when you become a college
6   athlete and it's everything.  Everything you know
7   changes.  So being overwhelmed is a part of the deal.
8     Q.  I said constantly overwhelmed.  Should they be
9   constantly overwhelmed?
10    A.  No.
11        MR. HENRICHSEN:  Form objection.
12  BY MS. KAHN:
13    Q.  Should they feel a constant set -- sense of dread
14  for coming to practice?
15    A.  No.
16    Q.  Should they worry about punishments?
17    A.  Punishments are consequences.  They're two very
18  different things.
19    Q.  What's the difference?
20    A.  A punishment is because you did something wrong,
21  and a consequence -- well, a consequence was, everybody
22  had a consequence.  They weren't punishments.  They were
23  consequences of something that happened.  It was also
24  all of the -- you know.  Never mind.  That's it.
25    Q.  If one of the lacrosse athletes made an error in

Page 69

1   judgment and got in trouble, would the whole team face a
2   consequence?
3     A.  It was very depending.  It depended on who the
4   athlete was, what the consequence was, if it involved
5   the whole team.  So, I mean, it was really a
6   case-by-case basis.  And whether it was their first
7   time, second time, third time.
8     Q.  Was your goal as the head lacrosse coach to build
9   confidence in these young women?
10    A.  Absolutely.
11    Q.  Was it to nurture well-rounded students?
12    A.  100 percent.
13    Q.  And to nurture future leaders, right?
14    A.  Absolutely.
15    Q.  And it was your job to make sure they were
16  getting their education?
17    A.  It was also their job.
18    Q.  Yes.  Teachers could reach out if students
19  weren't doing what they needed to be doing, correct?
20    A.  Yes.
21    Q.  It's your job to create an environment that was
22  healthy, right?
23        MR. HENRICHSEN:  Form objection.  Go ahead.
24        THE WITNESS:  I did my best to.  There was no
25  such thing as a healthy environment in that last two

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1    years.
2    BY MS. KAHN:
3    Q.  Aside from COVID, was --
4    A.  Brought on by COVID and supported by the
5    university during that time and extended every -- every
6    team in that athletic department was disgruntled.  Every
7    coach was too.  Every administrator was as well and
8    would speak to that.  So there was no natural state to
9    compare it to.
10   Q.  I can still hear -- hear that in your voice.
11   A.  Yeah.  It was horrible.
12   Q.  But even in light of those conditions, it was
13   still your job to make sure that the athletes were doing
14   the best they could in light of the circumstances,
15   right?
16       MR. HENRICHSEN:  Form objection.  Go ahead.
17       THE WITNESS:  Absolutely.
18   BY MS. KAHN:
19   Q.  You were an example to the students, right?
20   A.  Well, yes.  But that example wasn't as a coach
21   and our relationships wasn't present because we had not
22   had a normal season in two years.  You can't compare the
23   cultures.  It's just not -- they're not -- they're not
24   comparable.
25   Q.  Even without playing -- and I understand --

Page 71

1    A.  Yeah.  Sure.
2    Q.  -- that that is not desirable --
3    A.  Right.
4    Q.  -- if you're, you know, trying to play collegiate
5    sports that you can't play because of a virus.  But --
6    A.  Well, it wasn't just the virus.  So, yeah.
7    Q.  What do you mean?
8    A.  It wasn't just the virus.  The virus finished and
9    everybody else in the country continued to play and we
10   didn't.  That was a university decision that kept my
11   team out of playing a normal season and the entire
12   people around us were playing.
13   Q.  Okay.  But --
14   A.  So that wasn't due to the virus.
15   Q.  But you were still the head lacrosse coach,
16   right?
17   A.  Yes, ma'am.
18   Q.  Okay.  You were still their leader, right?
19   A.  Yes.
20   Q.  And as the leader, you agree that you were in a
21   position of trust, right?
22       MR. HENRICHSEN:  Form objection.  Go ahead.
23       THE VIDEOGRAPHER:  Ms. Kahn, we need a media
24   break.
25       MS. KAHN:  Okay.  Just let her answer this one

Page 72

1    question.
2        THE WITNESS:  Yes.
3        MS. KAHN:  Yes.  Okay.  Thank you.
4        Yeah, that's fine.  Take a break.
5        THE VIDEOGRAPHER:  Going off the record at
6    11:04.
7        (A brief recess was taken.)
8        THE VIDEOGRAPHER:  Going back on the record at
9    11:09.  This is media unit 2, letter A.
10   BY MS. KAHN:
11   Q.  I'm going to show you what's been marked as
12   Defendant's Exhibit 15.
13   A.  Okay.
14       (Defendant's Exhibit No. 15 was marked for
15   identification.)
16   BY MS. KAHN:
17   Q.  Not the best copy, but --
18   A.  Um-hmm.
19   Q.  If I could get you to flip to the back page.
20   A.  Could you tell me what date this was?  There
21   was --
22   Q.  Yeah, it's --
23   A.  -- or this was position description.  Sorry.
24   Q.  Yeah, if you look on the back.  Your --
25   A.  Okay.

Page 73

1    Q.  Is that your signature with the date?
2    A.  Yes, it is.
3    Q.  Okay.  So was this a position description for the
4    head woman's lacrosse coach that you signed upon your
5    hiring?
6    A.  Yes.
7    Q.  Okay.  If I could just -- at the top of the first
8    page.
9    A.  Okay.
10   Q.  Do you see it says:  Job summary on scope?  You
11   see --
12   A.  I do.  Sorry.  It's hard to read with the
13   blackout.
14   Q.  So would you agree that the bullet points that
15   are in that section were your job responsibilities?
16   A.  Yes.
17   Q.  Some of your responsibilities, anyway, right?
18   A.  Sure.
19   Q.  If I could get you to go to the next page.
20   A.  Um-hmm.
21   Q.  Do you see paragraph 5, it says that one of your
22   responsibilities was to mentor athletes with regard to
23   life skills in preparation for life after their sport?
24   A.  Yes.
25   Q.  Okay.  If I could get you to go to page 4.

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1  A. Okay.
2  Q. Do you see where it says:  Mental demands?
3  A. Yes.
4  Q. It says:  Each employee is expected to conform to
5  the following in the performance of his or her task.
6    Do you see that?
7  A. I do.
8  Q. Okay.  The second one from the bottom, do you see
9  that?  And if you could read it to me, what that
10  requirement is.
11  A. Maintain work pace appropriate --
12  Q. No, the second-to-the-last one.
13  A. Oh, the second to the last.  Consistently relate
14  to other people beyond giving and receiving
15  instructions, interact with coworkers and peers without
16  exhibiting behavioral extremes, respond appropriately to
17  constructive criticism from a supervisor, perform work
18  activities requiring negotiating, instructing,
19  supervising, persuading or speaking with others.
20  Q. Thank you.
21    MS. KAHN:  I'm going to mark the next exhibit
22  as 16.
23    (Defendant's Exhibit No. 16 was marked for
24  identification.)
25    MS. KAHN:  And I'm actually going to make it

Page 75

1  a -- going to make it a composite exhibit to make it
2  easier.
3    THE WITNESS:  It's a big one.
4  BY MS. KAHN:
5  Q. I know.  Are there two in there?  I think -- may
6  I have the one behind?  I think there's two.
7  A. There's a lot.  I'm going to give it back to you.
8  Q. Okay.  There you go.
9  A. Thank you.
10  Q. Okay.  Now, so what I want to talk about here is,
11  I just want to go through and talk about who your
12  supervisors were and just quickly, this is -- will be a
13  faster section.  But --
14  A. Okay.
15  Q. -- I want to talk about your supervisors.  And to
16  do that, could we start on your first evaluation, which
17  is Bates stamp 62?
18  A. Yes.  Got it.
19  Q. So when you were first hired, John Mark was your
20  supervisor?
21  A. He was.
22  Q. Okay.  What was your relationship like with him?
23    MR. HENRICHSEN:  Form objection.  Go ahead.
24    THE WITNESS:  So I had a really interesting
25  year this first year because I was brought on and it

Page 76

1  was a recruiting year.  So I didn't have a team on
2  campus.  Very strange to, you know, go through that.
3  So I spent the majority of my time recruiting and on
4  the road.
5    So I was, you know, in and out of the office
6  and meeting with such people to get preparation, but
7  my year was just a really strange year because without
8  having a team.  I liked my relationship with John
9  Mark.  It grew over, you know, the years that I spent
10  underneath of him.  And I thought we had a great
11  relationship.
12  BY MS. KAHN:
13  Q. You felt like he treated you fairly?
14  A. I did.  There were some frustrations from time to
15  time but mostly they were with building the program and,
16  you know, lacrosse was not a sport that a university was
17  used to.  And so our -- kind of our nature of how things
18  work were different and it was something they didn't
19  understand.  So I had to educate them as how this works.
20    So there was some pushback of, no, we don't do
21  that and, well, we have to because this is, you know, a
22  rule or, you know, whatnot.  So I think it was normal.
23  I think it was a normal kind of supervisor-employee
24  relationship.
25  Q. Okay.  If you look at the back page of this

Page 77

1  evaluation.
2  A. Um-hmm.
3  Q. For the 2016-2017 year, is that your signature?
4  A. Yes.
5  Q. Do you believe this was a fair evaluation?
6  A. I would have to spend some time looking through
7  it.  It was a while back.  I recall it feeling fair.
8  But again -- yes.
9  Q. All right.  So let's look at 2018 to 2000- -- or
10  2017 to 2018, which begins on Bates stamp 55.
11  A. Okay.
12  Q. John still your supervisor at that time?
13  A. He is.
14  Q. Okay.  If you look at page Bates stamp 61.  Is
15  that your signature on the back of this evaluation?
16  A. Yes.  Yes.
17  Q. Under employee comments, right above your
18  signature, did you say:  I feel as though I've been
19  supported every step of the way, especially by John
20  Mark?
21  A. I'd have to read it.  Yes.
22  Q. Okay.  Let's look at your 2018 to 2019
23  evaluation, which begins at Bates stamp 47.
24  A. Okay.
25  Q. John Mark is still your supervisor that year?

20 (Pages 74 - 77)

Page 78

1  A. He was.
2  Q. Okay. Is your signature on the back page of this
3  evaluation?
4  A. What page -- can you give me the Bates stamp on
5  that?
6  Q. Sure. It's Bates stamp 53.
7  A. Okay.
8  Q. Is that your signature?
9  A. It is.
10  Q. Okay. Was your 2018-2019 evaluation fair?
11  A. Can you ask your question again?
12  Q. Yes. Was your evaluation that we're looking at,
13  the 2018 to 2019, pages Bates stamp 47 through, it's
14  actually 54. Is this a fair evaluation?
15  A. Oh, I don't think in full, no.
16  Q. What was unfair about it?
17  A. My employee comments is not, in fact, how I felt
18  about the administration and/or the support that I was
19  receiving.
20  Q. What do you mean when you say support?
21  A. I would say more so, maybe lack thereof. So, you
22  know, to say one individual, you know, there was a lot
23  that happened in 2019 off the field that changed who I
24  was as a person and an employee because of the treatment
25  of administrators and/or -- mostly administrators.

Page 79

1  Q. Okay. We'll get to that after lunch. But you're
2  talking about a student who did not pass a conditioning
3  test and left? Is that what you're referring to?
4  A. No, I'm not.
5  Q. What are you referring to?
6  A. I'm referring to during that investigation, how I
7  was treated when brought into numerous meetings with
8  Brandon Young, JP, Charlie Sevastos and that whole
9  nature of 2019 investigation. From that point forward,
10  I didn't feel safe or comfortable in those types of
11  settings.
12  Q. Okay. So I understand that you say on this
13  evaluation that you wrote something that you didn't
14  mean. But you also think you were not fairly graded?
15  MR. HENRICHSEN: Form objection. Go ahead.
16  THE WITNESS: That's not what I mean at all. I
17  think I was fairly graded.
18  BY MS. KAHN:
19  Q. Thank you. Okay. Let's look at your 2019 to
20  2020 evaluation.
21  A. Um-hmm.
22  Q. Did your supervisor change?
23  A. It did, unfortunately, without any prior
24  preparation or discussion, which I was not pleased with.
25  I had spent many years forming a relationship with John

Page 80

1  Mark. And overnight, and right before I was meant to
2  get back, I was notified without conversation through
3  e-mail that I was then going to be under Sonja Taylor.
4  Q. Did you have a good relationship with her?
5  A. It was up and down, I would say. I think by the
6  end of it, we had really developed a really strong
7  relationship and got to know each other better.
8  In the beginning, you know, she was the senior
9  women's administrator; she was tough, and I respected
10  her greatly. You know, but she challenged me, so --
11  which in a good way. I have a lot of respect for Sonja.
12  Q. Would you describe yourself as tough also?
13  MR. HENRICHSEN: Form objection. Go ahead.
14  THE WITNESS: Yeah. I would. And not in a bad
15  way.
16  BY MS. KAHN:
17  Q. You have a big personality?
18  A. I do.
19  Q. Some people might call you fiery, right?
20  MR. HENRICHSEN: Form objection. Go ahead.
21  THE WITNESS: I don't recall somebody calling
22  me fiery to my face. However, I can see that
23  potentially being said.
24  BY MS. KAHN:
25  Q. Okay. So if we look again at the 2019 to 2020

Page 81

1  evaluation with Sonja Taylor, is that a fair evaluation?
2  A. The evaluation with Sonja Taylor was 2020 to
3  2021, not 2019.
4  Q. If you look at Bates stamp 42.
5  A. Okay. Okay.
6  Q. Is your signature on the back page of this
7  evaluation, which can be found at Bates stamp 46?
8  A. Yes, it is my signature.
9  Q. Okay. Was this a fair evaluation?
10  A. Unless I read it completely, I couldn't -- you
11  know, I can't speak to it exactly. But according to my
12  comments, and it was -- at that time, I probably -- you
13  know, I say the athletic administration, I was referring
14  to more Sonja Taylor. I wasn't so convinced that the
15  entire athletic administration was in support of myself.
16  Q. Sonja did your evaluation, right?
17  A. She did.
18  Q. Okay. Do you think Sonja gave you a fair
19  evaluation?
20  A. I do.
21  Q. Okay. And if I didn't already ask, that's your
22  signature on the back page, right, 46, Bates stamped 46?
23  A. It is.
24  Q. Okay. Now let's look at Bates stamp 37.
25  A. Okay.

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1    Q. That's your 2021 evaluation, right?
2    A. Correct.
3    Q. Sonja's still your supervisor?
4    A. No. Well, she was for part of 2021. She retired
5  at the end of the spring of 2021, and therefore, I
6  really -- I was told that JP was my direct report and
7  site supervisor but he didn't act as one.
8    Q. Okay. If you look at the top right-hand corner,
9  do you see that this evaluation covers May 2020 to
10  May 2021?
11    A. Correct.
12    Q. Okay. So Sonja was still there at that time,
13  right?
14    A. She left right after this, I think it was maybe
15  even right around the time of June 1st. At that time, I
16  wasn't even sure who was now my support supervisor or my
17  direct supervisor. I don't think I was told that,
18  maybe, till the end of the summer. I'm not sure.
19    Q. Was the 2020 to 2021 evaluation by Sonja a fair
20  evaluation?
21    MR. HENRICHSEN: Form objection.
22    THE WITNESS: I think it was -- sorry.
23    MR. HENRICHSEN: Form objection. Go ahead.
24    THE WITNESS: Yeah, I think it was. I think it
25  was.

Page 83

1  BY MS. KAHN:
2    Q. Okay.
3    A. 100 percent.
4    Q. And then those top two pages that are attached.
5    A. Which one, this?
6    Q. Yes.
7    A. 37?
8    Q. Yeah.
9    A. And 38?
10    Q. Those are your 2021 goals?
11    A. These aren't my goals. These are the notes from
12  Sonja about my ratings. I don't see anything with --
13    Q. Okay.
14    A. -- goals.
15    Q. Okay. Are those fair?
16    A. The notes from Sonja?
17    Q. Yes.
18    A. Yes.
19    Q. Okay. Did you have a good relationship with JP?
20    MR. HENRICHSEN: Form objection. Go ahead.
21    THE WITNESS: It's complicated.
22  BY MS. KAHN:
23    Q. What do you mean?
24    A. Because I didn't -- I didn't have as much contact
25  with JP because I reported directly to my support

Page 84

1  supervisors. But when I did, it was enjoyable.
2  However, when I mentioned in 2019 when the investigation
3  started into -- well, there was two things going on,
4  but -- I changed my mind. I didn't feel safe around him
5  anymore.
6    Q. In 2019?
7    A. Yes.
8    Q. And we can talk about -- we'll talk about that
9  after lunch.
10    A. Okay.
11    Q. Was there a point where you considered him a
12  friend?
13    A. No. You're never a friend with the athletic
14  director, as a coach. I mean, we're friendly. But I
15  respected him. He was in a position of leadership and
16  authority and I was not in that role.
17    MS. KAHN: Okay. I think this is a good time
18  to break for lunch.
19    MR. HENRICHSEN: Okay.
20    THE VIDEOGRAPHER: Going off the record at
21  11:31.
22    (Luncheon recess was taken.)
23    THE VIDEOGRAPHER: Going back on the record at
24  12:51. This is media unit 2, letter B.
25  BY MS. KAHN:

Page 85

1    Q. Did you have a nice lunch?
2    A. It was okay.
3    Q. It was okay?
4    A. It was okay.
5    Q. Okay enough?
6    A. Did the trick.
7    Q. Okay. So let's kind of change gears a little.
8    A. Okay.
9    Q. And talk about something that I know is probably
10  sensitive, but of course my point is not to shame you at
11  all.
12    A. Sure.
13    Q. I'd like to go through your arrest record.
14    A. Okay.
15    Q. Could you tell me what the -- what led to your
16  arrest in 2010?
17    A. I would need to know what the arrest was,
18  because -- yeah.
19    Q. I can help you with that.
20    A. Sure.
21    Q. I'll show you this to jog your memory.
22    A. That should be helpful. Thank you.
23    MR. HENRICHSEN: Do you have another copy?
24    MS. KAHN: Yes.
25    MR. HENRICHSEN: Thank you.

22 (Pages 82 - 85)

Page 86

1    THE VIDEOGRAPHER: Ms. Kahn, do you have
2 something rubbing on the mic like a necklace or
3 something?
4    MS. KAHN: My hair.
5    THE VIDEOGRAPHER: Oh.
6    MS. KAHN: Sorry.
7    THE WITNESS: So 9/10 is -- because this has
8 9 -- this has 2012, too.
9 BY MS. KAHN:
10    Q. Okay.
11    A. There were two different instances so I'm just
12 trying to --
13    Q. Right. Let's start with 2010.
14    MR. HENRICHSEN: Is this an exhibit? Are we
15 marking it?
16    MS. KAHN: No, I was just showing her.
17    THE WITNESS: Okay.
18 BY MS. KAHN:
19    Q. In 2010, was that the first time you'd ever been
20 arrested?
21    A. No. I believe -- well, it's difficult to say
22 because as you know, I suffer from bipolar so I've had
23 psychosises and during them there were arrests, a lot of
24 which I was not in the right frame of mind. So it's
25 difficult to exactly say that I have, like, and when

Page 87

1 they were and whatnot because they lasted for a long
2 time and there were mental hospitals and arrests and
3 whatnot.
4    Q. Okay. Were you still living at your parents'
5 house in Maryland the first time you were arrested?
6    A. No. No, I was not.
7    Q. So can you -- were you in college the first time
8 you were arrested?
9    A. Was I in college? I went to college two
10 different times. So one time, I was at Rutgers when --
11 and that was in 2003. Yes. 2003. And then I went back
12 to college at Rollins in 2008-9. I did not get arrested
13 while I was at Rutgers.
14    Q. Okay. What did you -- how long were you at
15 Rutgers?
16    A. It was pretty brief. I was there just in the
17 fall of 2000 -- 2002. Because I graduated from high
18 school in 2002.
19    Q. Okay. So you were there about a year?
20    A. Less than.
21    Q. Less than a year, okay. Why did you leave?
22    A. I had -- I had a trauma event occur there. And
23 as a result, it wasn't healthy for me to return.
24    Q. What happened?
25    A. I was dating a guy on the lacrosse team. There

Page 88

1 was a party occurring. And I was in his room and the
2 door was off the hinges and I was videotaped having sex
3 with him. And then it was shown to the entire men's
4 lacrosse team.
5    Q. I'm sorry. That must have been very traumatic.
6    A. To say the least.
7    Q. Is that something that he circulated or showed on
8 his phone?
9    A. No, they put it on a television, while at a team
10 party.
11    Q. Has that since been deleted or you don't know?
12    A. I don't know. It was a long time ago.
13    Q. Did you report him to the Rutgers?
14    A. I did.
15    Q. Did they do anything?
16    A. From my knowledge, they did an investigation and
17 I think -- I think he was expelled.
18    Q. All right. So did you go home for a period,
19 then, before you went to Orlando?
20    A. Oh, I didn't -- I wasn't in Orlando. But yes.
21 The answer is yes. I went home after the event and was
22 with my parents.
23    Q. How long were you with your parents?
24    A. That -- that time is really foggy for me. It was
25 also what stimulated my first bipolar breakdown.

Page 89

1    Q. When was your first bipolar breakdown?
2    A. It was following that. I don't know the exact
3 dates. I want -- I want to -- I remember it being
4 Thanksgiving, so it would have been mostly Thanksgiving,
5 I think, of 2003.
6    Q. What happened during your breakdown?
7    MR. HENRICHSEN: And just an ongoing, all of
8 this is confidential information, designated under the
9 protective order.
10    THE WITNESS: I'm aware. It's not fun to talk
11 about.
12 BY MS. KAHN:
13    Q. I know.
14    A. I was brought to a dual diagnosis treatment
15 center because they did not have just strict, you know,
16 like trauma center, so my mother took me to one. And I
17 had my breakdown there. And I could not be treated for
18 anything because I needed to be put into a mental
19 hospital.
20    Q. So you did inpatient treatment?
21    A. It was.
22    Q. Were you Baker Acted?
23    A. No. Well, I don't -- no, I wasn't because Baker
24 Act is Florida. No.
25    Q. Okay. So you voluntarily --

23 (Pages 86 - 89)

CONFIDENTIAL

"Object to 90:6-14
- Foundation; FRE
402 (not relevant
evidence);
FRE 404
(inadmissible
character
evidence); FRE
403 (unduly
prejudicial and
confusing)"

"Object to 92:7-10
FRE 402 (not
relevant evidence);
FRE 404
(inadmissible
character
evidence); FRE
403 (unduly
prejudicial and
confusing)"

"Object to 92:17
96.9 - FRE 402
(not relevant
evidence);
FRE 404
(inadmissible
character
evidence); FRE
403 (unduly
prejudicial and
confusing)"

Page 90

1    A.  I was not in Florida.  Yes.  Yeah.
2    Q.  Okay.  How long were you in the hospital?
3    A.  I don't know the exact amount of time.  It was
4  for -- it was a good while.  I want to say at least
5  three weeks to a month.
6    Q.  Okay.  Was that the first time you were diagnosed
7  with bipolar disorder?
8    A.  It was, due to the psychotic break.
9    Q.  And you say you had your break at the center but
10  what did the break look like?
11    A.  Out of touch with reality, thought things were
12  happening that weren't, increased mania, grandiose
13  thinking, level of paranoia, really standard to
14  psychosis.
15    Q.  So after you were released, what did you do
16  between the remaining time between Rutgers and Rollins?
17    A.  There's a lot that happened in between then.  I'm
18  trying to spend some time kind of in and out
19  of, you know, treatment centers dealing with traumas, as
20  well as my bipolar disorder.  I had -- which ended me up
21  in Central Florida at the time.  At that point, I spent
22  about a year and a half, you know, in a treatment
23  center.  Not a year and a half.  It was about exactly a
24  year.  At that time, I started working and treated, you
25  know, my illness.

Page 91

1        And then I left there, had a few odd jobs, got my
2  insurance license.  Bought a home.  Was planning on
3  going to -- what was it -- UCF, because I was living in
4  Oviedo.  And I was looking for a pickup lacrosse league
5  and it popped up that Rollins' first ever lacrosse
6  program was forming.  At the time I was 25, I contacted
7  Dennis Short, we contacted and I was at Rollins in 2008.
8    Q.  Was the one year in the treatment center
9  inpatient?
10    A.  No.
11    Q.  It was like a day program?
12    A.  It was more like a community that had counseling.
13    Q.  Like, I don't want to call it a group home but...
14    A.  It wasn't a group home.  Like I stayed with
15  people, like in the community and, honestly, it was
16  quite strange.  But -- yeah, it was a community of
17  people, were counseling, you know, that's the best way I
18  can describe it.
19    Q.  Okay.  So in that period, you did treatment?
20    A.  Um-hmm.
21    Q.  You worked odd jobs?
22    A.  Um-hmm.
23    Q.  And bought a house.  Do you still own that house?
24    A.  I do not.
25    Q.  And started at Rollins in 2008?

Page 92

1    A.  I did.
2    Q.  Okay.  So between 2003, when you left Rutgers,
3  and 2008, were you arrested?
4    A.  2003 and 2008?  No.
5    Q.  So the first time you were arrested, then, was
6  when?
7    A.  Well, I did get arrested when I was 18 in
8  Baltimore.
9    Q.  What did you do?
10    A.  It was for a DUI.
11    Q.  For a DUI?
12    A.  Right after what happened at Rutgers.
13    Q.  Was that in Townsville (phonetic), Maryland?
14    A.  No.  That was in Baltimore City.
15    Q.  And that was in 2003?
16    A.  It would have -- yes.
17    Q.  So in October 2010, you were arrested on four
18  charges --
19    A.  Um-hmm.
20    Q.  -- right?  Trespassing, burglary, resisting
21  arrest?
22    A.  Um-hmm.
23    Q.  And breaking or injuring fences?
24    A.  Um-hmm.  I know the event.
25    Q.  Okay.  Tell me what happened.

Page 93

1    A.  Well, it was quickly thrown out.  It never went
2  anywhere.  I was -- I was with my teammates from my
3  Rollins team.  It was around Halloween.  The girls had
4  had a party at their house.  It got broken up by the
5  Winter Park police because of a noise violation.
6  Because of that, the party dispersed and myself and my
7  teammates went to -- I can't recall the name of the bar
8  in Winter Park.  But right over the railroad tracks.  I
9  think it started at Finnegan's --
10    Q.  Is that downtown Orlando?
11    A.  No, no, no, Winter Park.  Like right off Park
12  Avenue.  I want to say it was Finnegan's.  It's an Irish
13  pub.
14        And one of my teammates got into an altercation
15  with another female in the bar.  And she had been
16  drinking very heavily.  I interjected, and we were -- I
17  want to say -- the police were called and we were
18  trespassed from there.  And --
19    Q.  From a house?
20    A.  No, no, no, from the bar --
21    Q.  Okay.
22    A.  -- because of the altercation.
23        From that point, it was the same police officers
24  that had broken up, so they had, you know, known who we
25  were.  And while we were being trespassed, they left.

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1 Well, when they left, turned down the street, Gainey, my
2 teammate, started running. So she started running. I
3 started running. I didn't know we were being
4 apprehended or that we did anything wrong.
5      So anyway, we both got met by those same police
6 officers at the house that Gainey lived at, which was
7 where the party was at earlier that night. And they
8 arrested us right there. And from my recollection --
9 yeah. And then there -- it got thrown out. They wrote
10 us up for four different charges separately, which they
11 mentioned that their dislike for Rollins students, the
12 police officers.
13      And it was thrown out. Nothing ever came of it.
14 It never went to court, never went to -- you know, that
15 was it. That was the incidence.
16   Q. Just trying to understand, you left the bar after
17 you'd been trespassed?
18   A. No. They said that the trespassing was because I
19 scaled a wall and jumped over it and was in someone
20 else's backyard. Because Gainey got arrested on her
21 front porch and I got arrested in the back of -- like
22 running through the yard. So they arrested me there.
23   Q. Did -- okay. So you didn't know that you were
24 being followed by the cops?
25   A. No.

Page 95

1   Q. Did you have, like, ear buds or something in?
2   A. No. But it was a part of Winter Park, very dark
3 and -- I mean, no, I didn't know that.
4   Q. You didn't hear any screaming?
5   A. Screaming? I wasn't screaming.
6   Q. No, not you.
7   A. Oh.
8   Q. The police.
9   A. Can you repeat your question?
10   Q. Yeah. I guess you said that they were chasing
11 you but you didn't know, right?
12   A. Yes.
13   Q. Okay. So were they yelling behind you?
14   A. No.
15   Q. And you broke someone's fence?
16   A. No.
17   Q. You scaled the fence?
18   A. Nothing -- they said I scaled the fence. I did
19 not.
20   Q. Were you drinking that night?
21   A. I -- I was. But not a lot. Not -- and I believe
22 when the altercation happened, I had had two beers.
23   Q. You were able to get the 2010 arrest sealed?
24   A. I have trouble remembering what was sealed and
25 what was not. It wasn't -- it never went anywhere. So

"Object to 97:10-16 -
FRE 402 (not
relevant evidence);
FRE 404
(inadmissible
character
evidence); FRE
403 (unduly
prejudicial and
confusing)"

Page 96

1 to my recollection, I don't know if it was sealed or
2 not, which one was or which one wasn't.
3   Q. Was that the result of anything that you believe
4 is related to bipolar?
5   A. That incident?
6   Q. Yes.
7   A. No.
8   Q. Okay. When was the next time you were arrested?
9   A. That was in 2012.
10   Q. Why were you -- you were at the South Seminole
11 Hospital?
12   A. I believe so. That time is incredibly foggy.
13   Q. Tell me what you do remember.
14   A. I remember that I was trying to get into the
15 South Seminole Hospital for care. I knew that I was not
16 mentally well and they turned me away. I was then
17 stranded there, no phone, in a full-blown psychosis.
18 And going, kind of, in and out of buildings, you could
19 say, there was a building that I went in and out of.
20 Like I said, it's -- the events of that night are very,
21 very foggy.
22   Q. What did the hospital tell you as to why they
23 would not help you?
24      MR. HENRICHSEN: Form objection. Go ahead.
25      THE WITNESS: I have no idea.

Page 97

1 BY MS. KAHN:
2   Q. You don't remember?
3   A. No.
4   Q. Do you remember being trespassed?
5   A. I remember being trespassed from a building. I
6 remember a building that I was in. Don't know how I got
7 in there. But I remember, you know, cops coming and,
8 like, arresting me in that building. Why I was in that
9 building? I'm not really sure.
10   Q. And then after your trespass, you went back to
11 the building?
12      MR. HENRICHSEN: Form objection. Go ahead.
13      THE WITNESS: I think I was arrested, I mean,
14   from what I -- what I remember, like I mentioned,
15   there was many situations that were going on and, you
16   know, chain of events is very difficult for me.
17 BY MS. KAHN:
18   Q. Do you remember screaming obscenities in the
19 women's bathroom at the hospital when you were arrested?
20   A. No.
21   Q. You were -- in 2012, you were arrested and you
22 got bond, right?
23   A. Yes. My mother posted bond.
24   Q. And did there come a time where she turned you
25 in to the bail bondsman?

25 (Pages 94 - 97)

CONFIDENTIAL

"Object to 100:20 22 - FRE 402 (not relevant evidence); FRE 404 (inadmissible character evidence); FRE 403 (unduly prejudicial and confusing)"

Page 98

1    A. She did.
2    Q. What do you remember about that?
3    A. That she revoked my bond and I got arrested and
4  went back to jail.
5    Q. Do you remember why she revoke -- she wanted to
6  revoke your bond?
7    A. She was scared for my safety.
8    Q. Do you remember what you were doing that she was
9  scared for your safety?
10       MR. HENRICHSEN: Form objection. Go ahead.
11       THE WITNESS: Not specifically. But certainly
12  behavior caused for concern.
13  BY MS. KAHN:
14    Q. Were you threatening suicide?
15    A. No. I don't think at that time.
16    Q. At another time?
17    A. I don't know if I ever verbally voiced it. But
18  I've certainly felt it.
19    Q. When was that?
20    A. That was following my 2012 psychosis when I came
21  out of it and realized how -- everything that I lost.
22    Q. After you had to go back to jail, it was worked
23  out that you could to go to -- you were Baker Acted, right?
24       MR. HENRICHSEN: Form objection. Go ahead and
25  answer.

Page 99

1       THE WITNESS: I'm not really sure when the
2  Baker Act occurred. I just know that it happened.
3  BY MS. KAHN:
4    Q. Do you remember how long you were in the
5  hospital?
6    A. I was in and out of the hospital. Taken back and
7  forth between jail and the mental hospital, so I don't
8  know exact times.
9    Q. Was it like a weekday thing where you would --
10    A. Oh, no. It would be maybe a week at a time in
11  the jail and then three weeks in the hospital and then
12  another few weeks in the jail and it went along like
13  that for about six months.
14    Q. So you were in the jail for about six months?
15    A. No. It was multiple times. I don't know the
16  exact amount each per time. So I would be treated for
17  my bipolar and they would get me on medicine and then as
18  soon as I was okay, they'd bring me back to the jail and
19  take me off the medicine. And then bring me back, take
20  me back again. And that went on a long time.
21       MR. HENRICHSEN: Do you want to take a break?
22       THE WITNESS: I'm okay.
23       MR. HENRICHSEN: Okay.
24  BY MS. KAHN:
25    Q. Tell me if you change your mind, okay?

Page 100

1    So how did you -- did you eventually get released
2  from treatment? Is that --
3    A. No. I eventually got -- eventually made it to
4  Lakeside, which is a mental health facility, I believe
5  in Orlando. And they were treating me for the right --
6  they weren't treating my bipolar. And I wasn't allowing
7  my mother to speak to me to give them my health
8  background. So my mother got guardianship of me and was
9  able to remove me from that horrible facility. And so
10  that's when that ended.
11    However, I was then put in another dual diagnosis
12  because I was still in my psychosis. In Laguna Beach,
13  California. It was there that I finally saw a nurse
14  practitioner, put me on mood stabilizer and I came out
15  of my psychosis.
16    Q. So how long would you estimate you were in that
17  state of psychosis?
18    A. From March of 20 -- I'm sorry -- March of 2002
19  till August of 2002.
20    Q. Okay. So you're saying you were doing the jail
21  and the treatment center from October to March then?
22    A. March -- no, no. March till August. March, yes.
23    Q. That's when you were in -- no, were you in -- let
24  me start over.
25    A. Okay.

Page 101

1    Q. You were arrested in October 2012, right?
2    A. I don't believe that was the date. No, I was
3  arrested in March of 2012.
4    Q. Okay. October was when you had the -- was the
5  Halloween party. Okay.
6    A. That's in 2010.
7    Q. Yes. My apologies.
8    A. That's all right.
9    Q. So let's start over. In March of 2012, you were
10  arrested and we established in and out of the
11  prison/hospital from March to August?
12       MR. HENRICHSEN: Form objection. Go ahead.
13       THE WITNESS: Yes.
14  BY MS. KAHN:
15    Q. Okay. And then after that, you went to
16  California?
17    A. It was in -- it was August that I was in
18  California. And that's when I saw the nurse
19  practitioner and came out of it. So I don't know the
20  exact date that I got out to California. I just know
21  that that's when I came out of it.
22    Q. Okay. Do you know when you left prison care --
23  or, I'm sorry, jail care and then went to -- when that
24  ended with the jail care and the, like, day treatment
25  place?

26 (Pages 98 - 101)

CONFIDENTIAL

**Left margin annotation:** "Object to 104:5-13 - FRE 402 (not relevant evidence); FRE 404 (inadmissible character evidence); FRE 403 (unduly prejudicial and confusing)" The questions are about probation in 2012 for a mental health diversion program.

---

Page 102

1    MR. HENRICHSEN: Form objection. Go ahead.
2    THE WITNESS: I need more clarification.
3 BY MS. KAHN:
4    Q. Okay.
5    A. Because I know there was a lot of back and forth,
6 so...
7    Q. You said you were in prison and --
8    A. I was in jail.
9    Q. Jail. My apologies.
10   A. That's okay.
11   Q. You were in jail and then for maybe a week, you
12 were there and three weeks you would go back and forth,
13 be transported to a facility for care.
14   A. Um-hmm. Um-hmm.
15   Q. When were you released from jail and the
16 facility?
17   A. Okay. Thank you. I don't know the exact date I
18 was released to jail because I went from jail to
19 Lakeside, or -- hold on -- I was -- I was out for a
20 little bit. They released me from jail and I was out
21 for a little bit. And then that's when I got Baker
22 Acted, I think, and they brought me to Lakeside.
23   Q. What did you -- do you remember what happened
24 that initiated the Baker Act?
25   A. I really don't. It had something to do with my

---

Page 103

1 mother calling someone and getting the Baker Act. She
2 arranged it somehow. But I don't -- I showed up
3 somewhere to talk to somebody and they -- I was -- that
4 was it. That's what I remember.
5    Q. And you said she, after that, took you to
6 California?
7    A. After Lakeside.
8    Q. And then when did you get out of California
9 treatment center?
10   A. In August of 2013 -- I mean, 2012. Sorry.
11   Q. August 2012?
12   A. Yes.
13   Q. Okay. After the 2012 arrest, have you been
14 arrested since then?
15   A. Uh-uh. No, I haven't.
16   Q. No? So no arrests since leaving Embry-Riddle?
17   A. Correct.
18   Q. And you said no suicide attempts since you left
19 Embry-Riddle?
20   A. I've never made a suicide attempt.
21   Q. In 2012, was that the only time that you had
22 thought about it?
23   A. As intensely as that, yes.
24   Q. Give me one moment.
25   A. Okay.

---

Page 104

1    Q. Do you have a close family?
2    A. I do.
3    Q. You're fortunate.
4    A. I am.
5    Q. Do you remember being on probation for about a
6 year and a half?
7    A. At what time? During that 2012?
8    Q. Yes.
9    A. It's my recollection it was a mental health
10 diversion program.
11   Q. Do you remember having a probation officer?
12   A. I did. I don't remember her name or what she
13 looks like, really, but I remember her.
14   Q. And that lasted about a year and a half?
15   A. Sounds right. I was released early from it.
16   Q. From probation?
17   A. Yes.
18   Q. In -- when you were a coach at Rollins, was there
19 a problem with alcohol with the student athletes?
20   A. When I was a coach?
21   Q. Yes.
22   A. Not that I was aware.
23   Q. Were there instances?
24   MR. HENRICHSEN: Hold on. Form objection. Go
25 ahead.

---

Page 105

1    THE WITNESS: Instances with the students?
2 BY MS. KAHN:
3    Q. Yes.
4    A. While I was coaching?
5    Q. Yes.
6    A. Not that I was aware.
7    Q. I'm going to put a little piece of tape over
8 their face.
9    I'm showing you what's been marked as Exhibit 17.
10   (Defendant's Exhibit No. 17 was marked for
11 identification.)
12 BY MS. KAHN:
13   Q. One of the --
14   A. This was at Embry-Riddle, not Rollins.
15   Q. Yes.
16   A. You said coaching at Rollins.
17   Q. I'm sorry.
18   A. That's okay.
19   Q. When you were coaching at Embry-Riddle, do you
20 remember instances where students would get in trouble
21 for drinking alcohol?
22   A. I do.
23   Q. And posting pictures with alcohol?
24   A. I do.
25   Q. And there would be consequences for doing that,

---

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

1 right?
2    A. There could be. Depending on the situation.
3    Q. I marked that as 17.
4    A. Um-hmm.
5    Q. I'll show you what's marked as 18.
6        (Defendant's Exhibit No. 18 was marked for
7    identification.)
8 BY MS. KAHN:
9    Q. And I'm going to point you to the bottom three
10 messages. Are you having a conversation in this text
11 message with Leah Peppelman?
12    A. It seems so.
13    Q. In the third to the last texts are -- are you
14 talking about the underage drinking pictures that we
15 just looked at?
16    A. I have absolutely no idea.
17    Q. Okay.
18    A. I mean, unless I know number 6 and number 18,
19 can't really give you context.
20    Q. Well, if you look at Exhibit 17 --
21    A. Number 6?
22    Q. -- are they the same numbers?
23    A. They are.
24    Q. Okay.
25    A. But I can't see the picture.

Page 107

1    Q. I'm going to give you a list to refer to.
2    A. That would be great. Thank you.
3        MS. KAHN: I'm sorry, Neil I -- oh, I do have
4    No, I don't. I think it's in my other folder.
5        Let's go off the record for one minute.
6        THE VIDEOGRAPHER: Going off the record at
7    1:29.
8        (A brief recess was taken.)
9        THE VIDEOGRAPHER: Going back on the record at
10 1:34. This is media unit 2, letter C.
11 BY MS. KAHN:
12    Q. We were talking about whether that -- before we
13 went off the record, we were talking about whether that
14 text message that we just looked at, Exhibit 17, was
15 related to the conversation that you were having with
16 Leah the next day.
17    A. It was.
18    Q. And you said that those two students weren't
19 showing any remorse, right?
20    A. I did.
21    Q. But they wanted some sort of consequence so they
22 can move on, right?
23    A. I'm not really sure in what context. Take the
24 consequence and move on. You know, I really can't speak
25 to that. I know what happened. I can talk to you about

Page 108

1 that. But I don't know what that means exactly because
2 I don't remember the exact conversations I had with
3 them.
4    Q. Okay. And your next sentence was: I'm fucking
5 pissed. Right?
6    A. Yes. I was very disappointed.
7    Q. And then Leah said: I think we just have to
8 bring them in together and really scare them.
9        Is that right?
10    A. I can't -- yes. I can't speak to what Leah felt.
11 However, it was a -- it was a major infraction, what
12 they did. It was against our player agreement directly.
13 They were underage drinking. They put it on social
14 media. And then they were comparing it to a way lesser
15 infraction, would you say, of missing a study hall hour.
16        So yes. I was very disappointed.
17    Q. Okay. What is a punishment run?
18    A. I don't call them punishment runs. I call them
19 consequences. But it was -- a consequence is a --
20 depends. Consequences could vary, it could be running,
21 it could be other things. So depending on -- depending
22 on whatever happened, you know, it was addressed
23 accordingly.
24    Q. If it wasn't running, can you give me another
25 example of something it might be as a consequence?

Page 109

1    A. I'm trying to think. It could be not starting a
2 game because of a -- you know, because of doing
3 something that had happened before. Like I said, it
4 could be extra -- one time we gave them extra study
5 hours. Really, there was no standard consequence for
6 every single situation.
7    Q. I'm going to show you what's been marked as
8 Defendant's Exhibit 19.
9        (Defendant's Exhibit No. 19 was marked for
10 identification.)
11        THE WITNESS: Okay. Sure.
12 BY MS. KAHN:
13    Q. Is that your phone number in the top line, the --
14 I don't want to say it on record.
15    A. Yes. It is.
16    Q. The one that starts with 407?
17        THE VIDEOGRAPHER: Could you put that on the
18 lapel? Because I keep hearing things bump into it.
19 BY MS. KAHN:
20    Q. I was asking if that was your phone number, the
21 407.
22    A. It was.
23    Q. Okay. And is this conversation, again, with
24 Leah?
25    A. Um-hmm.

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1  Q.  Yes?
2  A.  Yes.
3  Q.  And you said:  Do you want to run them yourself?
4      Right?
5  A.  Um-hmm.
6  Q.  And that was in response to something someone or
7  multiple people had done, right?
8  A.  This was in 2018, I -- I can't speak to that.
9  Q.  Well, that would be the only reason you'd have
10 somebody run, right, because they had done something
11 that required a consequence?
12 A.  Yes.
13 Q.  Okay.  So --
14 A.  You also run -- ran for conditioning.  So it
15 wasn't all -- running was not -- running is a part of
16 our entire sport.  We condition, we -- running is used
17 for consequences, running is used in practice all day
18 long.  So yes.  Running is done all the time.  For all
19 the different reasons.
20 Q.  Okay.  But the next line from Leah says:  Do you
21 want me to do their punishment run today or just do
22 conditioning?
23 A.  Again, did the -- seemingly, and I don't want to
24 assume, because this was in 2018.  I have no
25 recollection of what she's talking about.

Page 111

1  Q.  Okay.  Go a couple lines down.
2  A.  Sure.
3  Q.  And you respond to her:  We can do the punishment
4  running on Wednesday.
5      Right?
6  A.  Yeah.
7  Q.  Okay.  And I'm going to ask you if that causes
8  some sort of anger with the student or students who
9  caused the run --
10     MR. HENRICHSEN:  Form objection.  Go ahead, if
11 you can answer.
12     MS. KAHN:  I haven't finished the question.
13     MR. HENRICHSEN:  Oh, I thought you did.
14 BY MS. KAHN:
15 Q.  So I'm going to show you Defendant's Exhibit 20.
16     (Defendant's Exhibit No. 20 was marked for
17 identification.)
18     THE WITNESS:  Sure.
19 BY MS. KAHN:
20 Q.  Is this on the same day as the e-mail that we
21 were just looking at in Exhibit 19?
22 A.  I'm sorry, I'm reading --
23 Q.  Go ahead.
24 A.  -- was reading.  Could you repeat that?
25 Q.  Is this text message string the same day as the

Page 112

1  Exhibit 19?  It was the one on top.  It was -- yeah.
2  They're both November 20, 2018, right?  Oh, never mind.
3  One's 26.  Never mind.  Okay.
4      But in Exhibit 20, you agree that the girls were
5  bickering over having to do consequences for other
6  people's mistakes, right?
7      MR. HENRICHSEN:  Form objection.  Go ahead.
8      THE WITNESS:  Yes.  I mean, I remember this
9  situation very clearly.  The team was upset that they
10 had to run for the decisions of some of their
11 teammates that they believed were in the wrong.  So --
12 but my feeling was, we win as a team, we lose as a
13 team and when one makes a bad decision, it affects all
14 of us and therefore, we all have to accept that
15 consequence.
16 BY MS. KAHN:
17 Q.  Are you personal friends with Tiffany Jones?
18 A.  I don't know if I would say personal friends.
19 More colleagues.
20 Q.  You'd reach out to her for advice?
21 A.  I would.
22 Q.  Okay.  I'll show you what's been marked as
23 Defendant's Exhibit 21.
24     (Defendant's Exhibit No. 21 was marked for
25 identification.)

Page 113

1  BY MS. KAHN:
2  Q.  Just confirming you were reaching out to her for
3  advice.
4  A.  Yes.  What is -- I'm sorry, what is the question?
5  Q.  That was the whole question.  Did you reach out
6  to Tiffany for advice on December 5, 2018?
7  A.  Yes.
8  Q.  I somehow lost the top page to that.  So --
9      MR. HENRICHSEN:  Marissa, can I just take a
10 look at the first page?  No, no, no, don't rip it.
11     THE WITNESS:  Sorry.
12     MR. HENRICHSEN:  Let me just see.  Thanks.
13     (Defendant's Exhibit No. 22 was marked for
14 identification.)
15 BY MS. KAHN:
16 Q.  Okay.  Exhibit 22, I'll give you a second to look
17 at it.  But do you agree it's another student who got in
18 trouble for alcohol?
19 A.  I've read it now.  Could you repeat the question?
20 Q.  Exhibit 22 is a discussion on another student who
21 got in trouble for having alcohol, right?
22 A.  Yes.
23 Q.  That was against policy, to have it in your dorm
24 room?
25 A.  Yes.

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1    Q. So was that student going to get a consequence,
2  if you know?
3    A. I don't know if she got a consequence or what it
4  was. I know the student. But I do know the situation
5  was is that she didn't reach out to me first to tell me,
6  and that was our policy, was that I could help you. And
7  I had to hear about it from -- I forget -- I had to hear
8  about it from somebody else. So I couldn't -- I
9  couldn't help her in that situation. That's what I'm
10  referring to.
11   Q. You wanted the students to be forthright?
12   A. Yeah.
13   Q. All right. I'm going to show you what's been
14  marked as Defendant's Exhibit 23.
15      (Defendant's Exhibit No. 23 was marked for
16   identification.)
17 BY MS. KAHN:
18   Q. And my only question on this one is whether this
19  is another interaction that you had with Tiffany that
20  same day of December 6, 2018?
21   A. I mean, if that's her number, then yes.
22   Q. Will you agree with me it says December 16th,
23  that the text was sent?
24   A. Yes.
25      MR. HENRICHSEN: Wait, wait, wait. I think you

Page 115

1  said -- I think it was 6th.
2      MS. KAHN: That's what I said.
3      THE WITNESS: It's December 6th. You said
4  16th.
5 BY MS. KAHN:
6    Q. My apologies. December 6, 2018.
7    A. Yes.
8    Q. I'm going to show you what's going to be marked
9  as Defendant's Exhibit 24.
10      (Defendant's Exhibit No. 24 was marked for
11   identification.)
12 BY MS. KAHN:
13   Q. I'll just give you a second to look at it, if you
14  can see it.
15      Have you had a minute to review it?
16   A. I'm not finished yet.
17   Q. Okay. Tell me when you are.
18   A. Okay.
19   Q. And this student was upset about a conditioning
20  test, right?
21      MR. HENRICHSEN: Form objection. Go ahead, if
22   you can answer.
23      THE WITNESS: No.
24 BY MS. KAHN:
25   Q. What was -- what was the student upset about?

Page 116

1      MR. HENRICHSEN: Form objection. Go ahead.
2      THE WITNESS: This student wasn't upset at all.
3  It was a reflection. In fact, it was all positive.
4 BY MS. KAHN:
5    Q. Okay. So I guess looking at Exhibit 24, you and
6  Leah are commenting on student 37's -- her comments
7  about whether another student deserves to be there?
8    A. No. You would have to ask another question.
9  This is -- this is 37, writing this reflection.
10   Q. Okay. At the top, you said: Interesting.
11   A. Um-hmm.
12   Q. And then redaction, 37.
13   A. Yeah.
14   Q. Think she deserves to be here. Hmm.
15      What does that mean?
16   A. This student athlete is 37.
17   Q. Let's try not to use names. But go ahead. We
18  can redact it. It's okay.
19   A. Okay. This student had a -- she was not -- she
20  was not performing very well in comparison to her
21  teammates. She suffered, you know, in every area. And
22  we were working really hard to help her. But we felt
23  like her view of herself was not a realistic view of her
24  performance.
25   Q. And then at the bottom, you wrote: She's

Page 117

1  absolutely delusional.
2    A. Yes.
3    Q. Okay. Showing you what's being marked as
4  Exhibit 25.
5      (Defendant's Exhibit No. 25 was marked for
6   identification.)
7 BY MS. KAHN:
8    Q. And Exhibit 25 is you reaching out to Tiffany for
9  support?
10   A. I wouldn't call it support. She was coming to
11  work with the team and I was talking to her about those
12  plans.
13   Q. You agreed to reach out to her, though, right?
14   A. Yes.
15   Q. Were you close with the head female soccer coach,
16  Sam?
17   A. I was.
18   Q. Are you still close with her?
19   A. We haven't talked in about a year. But I feel
20  like if I reached out, it would be a warm welcome.
21   Q. Okay. Showing you what's been marked as
22  Defendant's Exhibit 26.
23      (Defendant's Exhibit No. 26 was marked for
24   identification.)
25      THE WITNESS: Um-hmm.

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

1 BY MS. KAHN:
2     Q. Is this a conversation that you had with her on
3 January 1st, 2019?
4     A. So January 14, 2019?
5     Q. Yes.
6     A. Yes.
7     Q. And Sam is talking about how six out of ten
8 players had passed out from spring fitness, right?
9         MR. HENRICHSEN: Form objection. Go ahead, if
10 you can answer.
11        THE WITNESS: She's talking about her players.
12 BY MS. KAHN:
13    Q. Yes.
14    A. Yes.
15    Q. And Sam said: I made them run it again right
16 then.
17        Right?
18    A. Yes.
19    Q. And you said: I would have done the same?
20    A. Yes.
21    Q. So you're saying that you would have made
22 students run for passing out?
23        MR. HENRICHSEN: Hold it. Form objection.
24 Plus, just it didn't say passed out. It says passed
25 our.

Page 119

1         THE WITNESS: It says passed our spring fitness
2 test.
3         MR. HENRICHSEN: Spring fitness test.
4         THE WITNESS: Two different things.
5         MS. KAHN: I'll wear my glasses. Sorry about
6 that. Okay.
7         MR. HENRICHSEN: I have the same issue at
8 times.
9 BY MS. KAHN:
10    Q. And then if we go down a line, you're just
11 talking about how you reached out to Tiffany for some
12 direction, right?
13    A. Oh, no. Actually, I was asking for Sam's
14 direction. Said: Talked to Tiff. Need some of your
15 direction.
16    Q. Why were you going to Sam about this?
17    A. I have no idea exactly what context it was in.
18 Sam and I were good friends. She was a coaching mentor
19 for me. And I ran a lot by her.
20    Q. And I'll let you look at Defendant's Exhibit 27.
21        (Defendant's Exhibit No. 27 was marked for
22 identification.)
23 BY MS. KAHN:
24    Q. And just want you to confirm whether you're
25 reaching out to Sam for guidance in this text.

Page 120

1     A. I read it. Could you repeat the question, just
2 like it happened?
3     Q. Well, I just wanted you to confirm whether you're
4 reaching out to Tiffany for some guidance.
5     A. Is this Tiffany or Sam? I'm sorry. I don't know
6 the numbers by --
7     Q. It says on the front page, Tiffany Jones.
8     A. Yes. I was reaching out to her for guidance.
9     Q. I'm showing you what's being marked as
10 Defendant's Exhibit 28.
11        (Defendant's Exhibit No. 28 was marked for
12 identification.)
13        THE WITNESS: Sure.
14 BY MS. KAHN:
15    Q. And --
16    A. I've seen this before.
17    Q. Tell me what your understanding is of what this
18 student was upset about.
19    A. Sure. 37 -- I'm sorry -- this student did not
20 pass her conditioning test when she came back from the
21 semester. Prior to going home for fall break, we had
22 talked about it as a team and the way that we do
23 conditioning tests is actually a sliding scale. So we
24 don't expect everybody to have the same scores. It's
25 based of like your own performance. So we allow them to

Page 121

1 drop like four -- it's a point system. We allow them to
2 drop four points or a certain amount of points, which is
3 reasonable to drop when you're not training every day.
4        So, you know, the fastest player on the team
5 isn't being held to the same exact standard as maybe
6 the, you know, a less fast person. We talked about what
7 those consequences would be, you know, should you come
8 back and not pass your conditioning test. And those
9 were that you couldn't practice with a stick, you know,
10 until you passed your conditioning test. Everybody
11 passed except for three students. All three of them
12 were put on the same probationary period of, you know,
13 this was the expectation.
14       Long story short, 37 was actually only point away
15 from getting it. None of this that she had -- talks
16 about was ever brought to my attention or did she have a
17 conversation with me directly about how she was feeling.
18 And this was a result of her pretty much getting pulled
19 out of school and deciding to transfer over it.
20    Q. Other than, I guess, this text message, you were
21 not aware that this student was making complaints
22 that -- she said: I don't think I deserve to be
23 tormented.
24    A. 37 -- she never came to me once and discussed any
25 complaints, concerns, or anything of that nature.

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

1   Q. Did -- we'll talk about that in the next one.
2      This student went to JP, though, right?
3   A. I don't know. I know her father did. I don't
4   know if the student did.
5   Q. I'm showing you what's been marked as Exhibit 29.
6      (Defendant's Exhibit No. 29 was marked for
7   identification.)
8   BY MS. KAHN:
9   Q. Is this just an excuse note from JP to excuse her
10  from practice?
11  A. Yes. But I did not know what it was about.
12  Q. Okay. So when was the first time that you found
13  out that this student's father had contacted
14  Embry-Riddle?
15  A. I'm not sure the exact dates but it was in
16  January of 2019.
17  Q. Were you asked to go to a meeting?
18  A. Can you be more specific? I was asked to go to a
19  lot of meetings.
20  Q. Were you asked to attend an initial meeting to
21  talk about the letter?
22  A. What letter?
23  Q. The letter from the -- from the father.
24      MR. HENRICHSEN: Form objection. Go ahead.
25  BY MS. KAHN:

Page 123

1   Q. Do you know if he sent a letter, if he called?
2   A. No, I don't.
3   Q. Okay.
4   A. I was left out in the dark of that completely.
5      MS. KAHN: Can we go off the record for a
6   second?
7      THE VIDEOGRAPHER: Going off the record at
8   2:02.
9      (A brief recess was taken.)
10      THE VIDEOGRAPHER: Going back on the record at
11  2:09. This is media unit 3, letter A.
12  BY MS. KAHN:
13  Q. I know you said that you weren't sure how student
14  37's parents communicated with Embry-Riddle.
15  A. Um-hmm.
16  Q. But did there come a time where you are aware
17  that he was posting about you in a family chat?
18  A. Yes.
19  Q. Tell me about that.
20  A. Donna Jo Toney reached out to me and had sent me
21  screenshots, you know, kind of the communication
22  regarding him, her husband, I believe, and what he was
23  saying to other parents. So I was aware of that.
24      THE VIDEOGRAPHER: Ms. Kahn, do you have your
25  microphone on?

Page 124

1      MS. KAHN: No.
2   BY MS. KAHN:
3   Q. So you got to see the screenshots then?
4   A. I believe so, from Donna Jo.
5   Q. Okay. Donna Jo was a good ally to you?
6      MR. HENRICHSEN: Form objection. Go ahead.
7      THE WITNESS: Ally, I would describe her as a
8   good friend and a parent of a player that I care very
9   deeply about.
10  BY MS. KAHN:
11  Q. I'll show you what's been marked as Defendant's
12  Exhibit 30.
13      (Defendant's Exhibit No. 30 was marked for
14  identification.)
15  BY MS. KAHN:
16  Q. Is this an e-mail or text message that the parent
17  sent you to check in on you after -- after student 37
18  sent the text message?
19  A. I'm looking for number 74 and it's not on here.
20  Actually, it skips number 74. So I don't know who --
21  I'll make this short. 74 tells me you're trying to
22  relax with your parents. Who's 74?
23  Q. Okay. Let's skip 30.
24      All right. I'm going to show you what's been
25  marked as Exhibit 30.

Page 125

1      MR. HENRICHSEN: I think we're on 31.
2      THE WITNESS: This one's, yeah, 31.
3      MS. KAHN: Yes.
4      (Defendant's Exhibit No. 31 was marked for
5   identification.)
6   BY MS. KAHN:
7   Q. Okay. I'll give you a second to look at it.
8   A. So there's got to be something wrong with the
9   student numbers because 23 in here is 23 and she was not
10  present in 2019. So, I -- did 23 fill you in at all? I
11  mean --
12  Q. Okay. If you want to use the correct name, then,
13  go ahead and we will ask the court reporter to redact.
14  A. Okay. Well, I don't know who 23 is because it's
15  not this person. It's not possible.
16  Q. It's -- is it 35?
17  A. I really can't speak to that because you have 23
18  and 35 is 35.
19  Q. Do you know who this e-mail is with?
20  A. I mean, it's with Tiff.
21      MR. HENRICHSEN: I'm sorry. Text message?
22  Just so we're clear.
23      THE WITNESS: Yeah. Text message, sorry. That
24  this text is with Tiff.
25  BY MS. KAHN:

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1  Q.  Okay.  And in that first paragraph, you're
2  saying:  I could use some support.
3     Right?
4  A.  Yes.
5  Q.  I think we should clear up the student numbers.
6  All right.  We're on 31?
7  A.  32.
8  Q.  32.
9     (Defendant's Exhibit No. 32 was marked for
10  identification.)
11 BY MS. KAHN:
12 Q.  Is 32 text messages with Tiffany again?
13 A.  Yes.
14 Q.  And she's telling you that she doesn't meet with
15 individual players in a counseling role, right?
16 A.  Yes.  That's what she's saying.
17 Q.  That's it.
18    33.  Just let you look at it for a second and
19 then I'm going to ask you if that's a text message with
20 Tiffany asking to meet up with her.
21    (Defendant's Exhibit No. 33 was marked for
22  identification.)
23    THE WITNESS:  Yeah, we're arranging plans to
24  get together.
25 BY MS. KAHN:

Page 127

1  Q.  You were asking her to meet to discuss ideas for
2  the team sessions, right?
3  A.  No, I was asking about her ideas for the team
4  sessions, not mine.
5  Q.  Right.
6  A.  Yeah.
7  Q.  You were asking her for her ideas for your team
8  sessions, right?
9  A.  For her team sessions that she was competing --
10 conducting with the team.  She did the sessions with my
11 team.
12 Q.  Okay.  We're on the same page.
13 A.  Okay.
14 Q.  Did there come --
15    MS. KAHN:  Are we back on the record?
16    THE VIDEOGRAPHER:  We never went off.
17    MS. KAHN:  Oh.
18 BY MS. KAHN:
19 Q.  Oh.  Did there come a time in January where
20 Brandon Young called you into his office to talk about
21 the messages from student 37's father?
22 A.  I -- well, when -- are you talking about 2019?
23 Q.  Yes.
24 A.  In January of 2019?  I was contacted by Brandon
25 Young to come into the office.

"Object to 129:14-25; 130:1-18 - FRE 402 (not relevant evidence); FRE 404 (inadmissible character evidence); FRE 403 (unduly prejudicial and confusing)"

Page 128

1  Q.  Were you first contacted by JP?
2  A.  I don't recall.
3  Q.  Okay.
4  A.  But JP was in that meeting that Brandon Young
5  requested.
6     MS. KAHN:  All right.  I'm going to mark this
7  one as Exhibit 34.
8     (Defendant's Exhibit No. 34 was marked for
9  identification.)
10 BY MS. KAHN:
11 Q.  Is this the e-mail and your -- from Brandon Young
12 and your response?
13 A.  I -- I was asked to meet with Brandon Young two
14 different times.  So I'm not sure if this is the first
15 or the second time.
16 Q.  Were both meetings with JP and Brandon?
17 A.  They were.
18 Q.  And when you went into this meeting that's being
19 discussed on Exhibit 34, on January 28th, did Brandon
20 tell you about a complaint from this particular student?
21 A.  Again, there were two different meetings.  There
22 were two different things discussed in those meetings.
23 So I'm going to need clarification on which meeting
24 you're talking about, the first one or the second one.
25    MS. KAHN:  Okay.  Why don't we take a break so

Page 129

1  I can print something real quick, okay?
2     THE VIDEOGRAPHER:  Going off the record at
3  2:25.
4     (A brief recess was taken.)
5     THE VIDEOGRAPHER:  Going on the record at 2:46.
6  This is media unit 3, letter B.
7  BY MS. KAHN:
8  Q.  So --
9     THE VIDEOGRAPHER:  Microphone.
10 BY MS. KAHN:
11 Q.  Thank you for your patience.  I wanted to pull
12 these so you can see them.
13 A.  I appreciate that.
14 Q.  Did you -- you said you had never seen the
15 communications.  So I wanted you to see them.  And
16 you're going to get them today, once they're stamped.
17    MS. KAHN:  Okay.  We're at 35.
18    (Defendant's Exhibit No. 35 was marked for
19  identification.)
20 BY MS. KAHN:
21 Q.  I'll just give you a minute to look at it.  If
22 you --
23 A.  Yeah, of course.
24 Q.  -- start in the back.
25    Just tell me when you're ready.  I'm just giving

33 (Pages 126 - 129)

Page 130

1  you a chance to process and look.
2    A.  Well, it's quite a bit to process.
3    Q.  Giving you a chance to look.
4    A.  On more than one...
5    Q.  On Exhibit 35, can we agree --
6    A.  I'm not done reading.  I'm going to have to go
7  through all of this for me to comprehend.
8        MR. HENRICHSEN:  Just so we're clear,
9  Exhibit 35, that has not been produced in the case?
10       MS. KAHN:  No.  Doesn't have a Bates stamp.
11  Hasn't been produced.  We'll run out of depo time if
12  we read all these.
13       THE WITNESS:  I'm not answering any questions
14  until I read all of them about this.
15       MS. KAHN:  Let's go off the record.
16       THE VIDEOGRAPHER:  Going off the record at
17  2:54.
18       (A brief recess was taken.)
19       THE VIDEOGRAPHER:  Going back on the record at
20  2:58.  This is media unit 3, letter C.
21  BY MS. KAHN:
22    Q.  If you look at Defendant's Exhibit 35.
23    A.  Sure.
24    Q.  And you go to the third page.
25    A.  One, two, three.  Yes.

Page 131

1    Q.  Okay.  Is that a picture from your Baker Act or a
2  mugshot?
3        MR. HENRICHSEN:  Form objection.  Go ahead, if
4  you can answer.
5        THE WITNESS:  I believe that it was -- it was a
6  mugshot during that time that I was Baker Acted in and
7  out of the hospitals.
8  BY MS. KAHN:
9    Q.  Okay.  That's all for that exhibit.
10    A.  Oh, okay.
11    Q.  And did you know that -- I'll show you what's
12  been marked as Defendant's 36.
13       (Defendant's Exhibit No. 36 was marked for
14  identification.)
15  BY MS. KAHN:
16    Q.  And I know you want to have a second to read
17  this, but --
18       MR. HENRICHSEN:  Let me -- was Exhibit 36
19  produced?
20       MS. KAHN:  Does it have a Bates stamp?
21       MR. HENRICHSEN:  Does not.
22       MS. KAHN:  No.  You'll get it today, then.
23       THE WITNESS:  Again, I'm not going to answer
24  questions on something I can't read thoroughly.
25       MR. HENRICHSEN:  Okay.

Page 132

1  BY MS. KAHN:
2    Q.  Okay.  So you know what, I'm just going to tell
3  you -- let's see, how many pages is it?
4    A.  Do we get a list of employee numbers too?
5    Q.  Here you go.
6    A.  Thank you.
7    Q.  That's not marked, so...
8    A.  Okay.
9        MR. HENRICHSEN:  Could I have that?
10       THE WITNESS:  Is there two of them?  I don't
11  know.
12       MS. KAHN:  That one's not for marking.
13       THE WITNESS:  Okay.
14       MS. KAHN:  He can see it, it's just not --
15       MR. HENRICHSEN:  Oh, there are two.
16       THE WITNESS:  Okay.  What's your question?
17  BY MS. KAHN:
18    Q.  I was going to --
19       MS. KAHN:  Are we on the record?
20       THE VIDEOGRAPHER:  Yes.
21  BY MS. KAHN:
22    Q.  Okay.  If I could just get you to look at the
23  February 6, 2019, e-mail at the top from Charlie
24  Sevastos and I wanted you to read the second sentence
25  through the end.

Page 133

1    A.  I have examined all the information you provided
2  about Marissa and the events leading to your daughter's
3  decision to leave the university and the university has
4  investigated your claims.
5    Q.  What else does it say?
6    A.  Thank you again for providing the information but
7  we do not agree to your demand for payment of $15,000,
8  even with the further justification you offered below.
9    Q.  Okay.  When you got called in to speak to Brandon
10  and JP, did they ask you about this particular student
11  and what had happened?
12       MR. HENRICHSEN:  Form objection.  Go ahead.
13       THE WITNESS:  Again, you have to clarify.
14  There were two separate meetings, discussions of two
15  different things.
16  BY MS. KAHN:
17    Q.  Let's start with the first one.
18    A.  Okay.  The first meeting.
19       MR. HENRICHSEN:  Well --
20  BY MS. KAHN:
21    Q.  Do you remember -- yeah, I've got to ask you a
22  question.
23    A.  Yeah.  Sure.  Go for it.
24    Q.  Do you remember when the first meeting was?
25    A.  It was in -- exact date, no, probably mid to late

34 (Pages 130 - 133)

Page 134

1 January.
2    Q.  Okay.  Do you remember, after that meeting,
3 sending JP information about this particular student?
4    A.  No.
5    Q.  Do you --
6    A.  Wait.  Documentation, like about kind of the
7 student as a whole?
8    Q.  Yes.
9    A.  Yeah.  I do.
10    Q.  Okay.  I'm going to show you what's being marked
11 as Defendant's 37.
12       (Defendant's Exhibit No. 37 was marked for
13    identification.)
14       THE WITNESS:  Okay.
15 BY MS. KAHN:
16    Q.  Tell me if this is your e-mail.
17    A.  Okay.  I'm really confused.  These are two
18 completely nonrelated situations.
19    Q.  Okay.  So is this not -- is this not an e-mail
20 for student 37 who was making comments at a rotunda
21 about Middle Eastern students?
22    A.  Honestly, I don't know if student number 37 was
23 involved in the group of people that was --
24    Q.  Okay.
25    A.  -- having that conversation.

Page 135

1    Q.  Okay.
2    A.  That happened in 2018.
3    Q.  Let me show you what's being marked as --
4    A.  I don't even think she was in school until 2019,
5 actually, so it couldn't have been.
6    Q.  Okay.  Let me show you.  Let me show you what's
7 being marked as Defendant's 38.
8       (Defendant's Exhibit No. 38 was marked for
9    identification.)
10       THE WITNESS:  Okay.  What's the question?
11 BY MS. KAHN:
12    Q.  Does this remind you that you provided
13 information to JP about -- about the student in terms of
14 her character?
15    A.  JP asked me for every document, piece of
16 documentation I had on 37.  I believe I even wrote him a
17 timeline, so this would have been included with the
18 documentation that I gave to him that was requested.
19    Q.  And this particular student did not rate very
20 high among her peers, did she?
21    A.  I would have to look at her performance reviews
22 that we did.
23    Q.  I'm showing you Defendant's 39.
24       (Defendant's Exhibit No. 39 was marked for
25    identification.)

Page 136

1       THE WITNESS:  Great.
2 BY MS. KAHN:
3    Q.  Let's see if that refreshes your memory.
4    A.  I think they were mixed reviews from her peers.
5 She was a freshman, so she had so much to prove and
6 people believed in her.  And I think that the -- you
7 know, that reflects that.
8    Q.  So when Brandon and JP called you in at the end
9 of January, did they show you a criminal report?
10    A.  We're talking about the first meeting?
11    Q.  Yes.
12    A.  I don't know if they showed it to me or they
13 asked me about it.  But it was discussed.
14    Q.  Okay.  Tell me about that conversation.
15    A.  Well, first and foremost, I was really
16 uncomfortable with that conversation.  I had had a
17 background check prior to my employment.  The -- I've
18 never been convicted of anything.  My arrest record
19 was -- it wasn't an appropriate time to discuss after
20 being employed for several years.  I answered their
21 question but I didn't feel comfortable as to why it was
22 relevant.
23    Q.  You would agree with me that 37 was accusing you
24 of tormenting her?
25    A.  No.  I wasn't.  I had not had a discussion with

Page 137

1 anyone about 37's complaints towards me.
2    Q.  I'm not saying you were.  I'm asking you, from
3 that e-mail we looked at earlier from 37, she was
4 complaining, right?
5       MR. HENRICHSEN:  Hold it.  Form objection.  Go
6    ahead if you can.
7       THE WITNESS:  I don't know if I found that out
8    prior, before meeting with them or after meeting with
9    them.
10 BY MS. KAHN:
11    Q.  Okay.  So you're saying you didn't think it was
12 fair that you were called in to be asked about the
13 criminal report?
14    A.  No.  I'm saying it was inappropriate to be asking
15 me about something that they had already asked me about
16 during my employment hiring position or my time of
17 hiring -- or hiring, excuse me.
18    Q.  Didn't the report that you saw at the end of
19 January 2019 in that meeting, though, wasn't the arrest
20 record longer in terms of including more things than the
21 original discussions?
22       MR. HENRICHSEN:  Form objection.  Go ahead.
23       THE WITNESS:  Yes, it was.  However, it is my
24    understanding that I did not have to disclose anything
25    in regards to my mental health diagnosis in which

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1  that -- those arrests were. Felt very uncomfortable
2  with that and I was under the impression from -- I
3  know that is a right to choose and that's --
4  withholding that information is not lying. I had a
5  right to not disclose my mental health, nor did I want
6  to.
7  BY MS. KAHN:
8  Q. That's not what I'm asking.
9  A. Okay.
10 Q. I'm asking --
11 A. Rephrase your question, please.
12 Q. When they hired you, they knew about a portion of
13 your arrest record.
14 A. Um-hmm.
15 Q. Isn't it fair to at least ask when they find out
16 more?
17     MR. HENRICHSEN: Form objection. Go ahead.
18     THE WITNESS: I was provided a copy of my
19 background report. And I was asked about questions
20 regarding that in which I answered. And there was
21 nothing else on there in my background report that I
22 was asked about or was discussed.
23 BY MS. KAHN:
24 Q. But that's not what I'm asking. In terms of this
25 parent who sent an arrest record, right, to JP,

"Object to 140:18
141:4 - Relevance -
The fact that she
consulted with an
attorney after
meeting with
ERAU is not
relevant."

Page 139

1  complaining about you; is that correct?
2      MR. HENRICHSEN: Objection. Form. Go ahead if
3  you know.
4      THE WITNESS: It appears so.
5  BY MS. KAHN:
6  Q. Okay. So based on the allegations that this
7  parent was making, don't you think it was fair that they
8  asked you about your additional record?
9      MR. HENRICHSEN: Form objection. Go ahead.
10     THE WITNESS: No, I don't think anything about
11 it was fair. A normal procedure for a complaint from
12 a student athlete would come directly from your
13 support supervisor, not being called in by HR.
14 BY MS. KAHN:
15 Q. You have HR experience; you understand, don't
16 you, that when allegations are serious enough, they are
17 elevated to HR, right?
18     MR. HENRICHSEN: Form objection. Go ahead.
19     THE WITNESS: Yes.
20 BY MS. KAHN:
21 Q. Okay. So I understand you do not think it was
22 fair you were called in. Was there -- during this
23 discussion, did you disclose that you had bipolar
24 disorder?
25 A. Not in that meeting.

Page 140

1  Q. Was there anything else discussed during that
2  meeting other than seeking explanations for the report?
3  A. I -- I can't recall.
4  Q. Do you remember how long the meeting was?
5  A. No, I do not.
6  Q. After that meeting, did you go back and send JP
7  the documents we were just looking at?
8  A. I'm not sure.
9  Q. The documents about 37?
10 A. I don't know when they were sent.
11 Q. Okay. You don't remember -- you don't have any
12 recollection of going back?
13 A. It all happened -- there was a lot going on at
14 that time.
15 Q. Is there anything else that happened at that
16 first meeting that you think was improper?
17 A. Not that I can recall.
18 Q. Okay. After you were called in, did you seek out
19 the advice of a lawyer?
20 A. I don't know if that -- it was after the first or
21 the second meeting.
22 Q. After the first meeting, what happened, if
23 anything?
24     MR. HENRICHSEN: Form objection. Go ahead.
25     THE WITNESS: I did -- I did consult Samantha

Page 141

1  Ekstrand at some point but I'm not really sure if that
2  was before or after the first or second meeting. I
3  didn't -- there was nothing to be done.
4  BY MS. KAHN:
5  Q. Okay. Were you called in for a second meeting
6  with Brandon and JP?
7  A. I was.
8  Q. Okay. And tell me about that meeting.
9      MR. HENRICHSEN: Form objection. Go ahead.
10     THE WITNESS: Well, I was very upset that I had
11 to go in for a second time because I didn't know what
12 it was about. And after the last meeting, I felt
13 uncomfortable going into another meeting with them
14 alone. I had conversations with my mother in regards
15 to that if I'm asked any, you know, questions in
16 regards to my mental health or what happened during
17 the time that I need to ask for an attorney and stop
18 the conversation.
19     I can't remember if Leah was like in the car
20 with me or I asked her to come with me. But
21 regardless, she was with me. And we had our second
22 meeting and Leah sat outside and they asked me in
23 regards to my Baker Act, direct questions in regards
24 to that. At that point, I did say, I feel very
25 uncomfortable with this line of questioning. I think

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1  I need to come back with an attorney.  I really -- I
2  wasn't granted that courtesy.
3       At that point, when they continued to, you
4  know, coerce and pressure me and questions, I broke
5  down and I revealed that, you know, those arrests were
6  surrounding a psychosis and that I am bipolar.  But I
7  have not had any instances in, you know, an extended
8  period of time.  I remember telling them that it's
9  easier for people to think that you had a few drinks
10 than to treat you or discriminate against you because
11 you have mental health issues.
12 BY MS. KAHN:
13 Q.  Mr. 37 mentions the Baker Act in his
14 communication to JP, correct?
15     MR. HENRICHSEN:  Form objection.  Go ahead, if
16 you know.
17     THE WITNESS:  Maybe.  It's a lot.  I haven't
18 even been able to process what you -- maybe.
19 BY MS. KAHN:
20 Q.  Okay.  So if Mr. 37 had raised that issue, is it
21 fair that they asked?
22 A.  Absolutely not.  I mean, absolutely not.  That's
23 why we have an ADA in place to protect you for your
24 civil rights, not answer questions about your mental
25 health, to be discriminated against, just like this.

Page 143

1  Q.  Just by asking?
2  A.  That's not what I said.
3  Q.  Oh.  Okay.  Well, clarify, then, please.
4  A.  What do you want me to clarify?
5  Q.  I asked you -- you said it was discrimination
6  just by him asking about the Baker Act; is that what you
7  said?
8      MR. HENRICHSEN:  Form objection.  Go ahead.
9      THE WITNESS:  Let me clarify.  If they ask me
10 about a Baker Act, I am allowed to not disclose.  It
11 is a choice under the ADA.  To then know about it and
12 treat me differently is discrimination.
13 BY MS. KAHN:
14 Q.  You did not get an -- you did not have any
15 discipline as a result of these events, did you?
16 A.  Not those -- not that, in 2019.
17 Q.  Okay.  So, then, you weren't treated differently
18 as a result of being talked to about the Baker Act, were
19 you?
20 A.  I believe I was.
21 Q.  How so?
22 A.  Well, after I disclosed my disability, I believe
23 that I was treated differently than other coaches in
24 similar situations that don't have disabilities.  I
25 believe -- yeah.  Period.

Page 144

1  Q.  Okay.  You're talking about 2021, right?
2  A.  No.  I'm talking about from 2019, all of those --
3  no.  I'm not talking about 2021.  I'm talking about
4  starting in 2019.
5  Q.  Okay.  We'll get to that in a minute, then.
6  A.  Okay.
7  Q.  So during that second meeting that you had with
8  Brandon and JP, other than asking questions about the
9  Baker Act, did they ask you anything else?
10 A.  I can't recall.  I was way too upset.
11 Q.  And since you do HR, you understand that, you
12 know --
13 A.  I wasn't doing HR at the moment.  I have
14 background in HR.
15 Q.  Right.
16 A.  Yes.
17 Q.  But you were told that you don't have the right
18 to have an advocate with you when your employer wants to
19 talk to you, right?
20 A.  No.
21 Q.  Do you understand --
22 A.  Not in 2019.
23 Q.  Do you understand that?
24 A.  No.
25 Q.  Okay.  So after you -- after you had this meeting

Page 145

1  with JP and Brandon, the second one, what did they tell
2  you was going to happen next?
3      MR. HENRICHSEN:  Form objection.  Go ahead.
4      THE WITNESS:  As I stated before, after I
5  started crying and was upset, I don't know what
6  happened.  I did request a meeting with Charlie
7  Sevastos and Brandon Young following up with that, but
8  I don't remember what they told me was going to happen
9  next.
10 BY MS. KAHN:
11 Q.  Okay.  So let's go back to -- let's go back to
12 some of your text messages, because I think it'll help
13 sort some of this out.
14 A.  Sure.
15     MS. KAHN:  We're on 39.
16     THE VIDEOGRAPHER:  40.
17     MS. KAHN:  We're on 40?  Okay.
18     (Defendant's Exhibit No. 40 was marked for
19 identification.)
20 BY MS. KAHN:
21 Q.  I don't have a stamp on that, do I?  Here you go.
22 A.  What's the question?
23 Q.  Does Defendant's Exhibit 40 refresh your memory
24 as to when you went to meet with Brandon?
25 A.  Yes.

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1  Q. And that was January 30, 2019?
2  A. Seems that way. This would have been the second
3  meeting.
4  Q. So I want to show you what's being marked as
5  Exhibit 41.
6     (Defendant's Exhibit No. 41 was marked for
7  identification.)
8     THE WITNESS: Okay.
9  BY MS. KAHN:
10 Q. What's the Bates stamp on the bottom of that one?
11 44?
12 A. 44.
13 Q. Is this a communication, Defendant's Exhibit 41,
14 that you had with Leah Peppelman?
15 A. Yes.
16 Q. Okay. So does seeing the timeline of finding out
17 that Mr. 37 posted your mugshot refresh your memory as
18 to whether this was the first or second meeting with
19 Brandon?
20 A. No, it does not. Because this -- no, it does
21 not. I had -- I had a meeting that day but -- this text
22 came through about -- from Donna Jo at 10:21 p.m., so
23 the meeting had already stopped or was over, I should
24 say.
25 Q. That was on January 30, 2019?

Page 147

1  A. Correct.
2  Q. If I could get you to look at Defendant's
3  Exhibit 40.
4  A. I think this is 40.
5  Q. We're looking at 41.
6  A. Oh, well, this is 40. This is 41. Okay.
7  Q. Okay. Looking back at Defendant's Exhibit 40.
8  A. Okay.
9  Q. You spoke to -- Brandon asked you to come see him
10 on January 30th around noonish, right?
11 A. Yes.
12 Q. Okay. So Defendant's Exhibit 41 would be after
13 you had already found out about Mr. 37's post, right?
14 A. No. Found out about Mr. 37's post on the same
15 day at 10:21 p.m. and my meeting was at 1:00 p.m.
16 Q. When you first met with Brandon and JP, didn't
17 they talk to you about the communications that they had
18 gotten directly from Mr. 37?
19 A. No.
20    I'm getting tired. Can I have a little break?
21 Q. Sure. Go ahead.
22    THE WITNESS: Thanks.
23    THE VIDEOGRAPHER: Going off the record at
24 3:35.
25    (Luncheon recess was taken.)

Page 148

1     THE VIDEOGRAPHER: Going back on the record at
2  3:42. This is media unit 3, letter D.
3  BY MS. KAHN:
4  Q. We were talking earlier about whether JP asked
5  you to provide him some information on this particular
6  student. Do you remember that?
7  A. I do.
8  Q. I'm going to show you what's being marked as 42.
9     (Defendant's Exhibit No. 42 was marked for
10 identification.)
11    THE WITNESS: Okay.
12    MR. HENRICHSEN: Thank you.
13 BY MS. KAHN:
14 Q. Have you ever seen this e-mail before? I'll let
15 you look at it before you answer that.
16 A. I have seen this document before.
17 Q. Could I get you to read that second paragraph?
18 It's only one sentence.
19 A. There's a lot here to process but I don't see any
20 red flags at all regarding Marissa or her behavior
21 toward 37 even in student 37 personal reflections.
22 Q. So JP was explaining that he did not think you
23 did anything wrong, right?
24    MR. HENRICHSEN: Form objection. Go ahead.
25    THE WITNESS: He doesn't say that. He says

Page 149

1  there's a lot here to process but I don't see any red
2  flags. So I'm not going to assume what he meant by
3  that, except for what he said.
4  BY MS. KAHN:
5  Q. Okay. But you'll agree with me he said there's
6  no red flags?
7  A. Yes.
8  Q. I'm going to skip some of these.
9     You told me earlier that at some point during
10 this process, you did reach out to an attorney; do you
11 remember that?
12 A. Yes, I believe at some point. I was scared of
13 Mr. 37, 37 and the things that he was doing. And I was
14 wondering if I -- you know, I should be -- if I should
15 have some legal counsel represent me.
16 Q. You were also scared about your job, right?
17 A. No.
18 Q. Okay. Take a look Defendant's Exhibit 43.
19    (Defendant's Exhibit No. 43 was marked for
20 identification.)
21    THE WITNESS: Okay.
22 BY MS. KAHN:
23 Q. I'll let you look at it, but can you tell me who
24 this text is with?
25 A. Yes. It's with Samantha Ekstrand.

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1    Q. So read it one more time, if you would,
2  because -- and tell me whether you believe that
3  Exhibit 43 is someone providing you the attorney's
4  contact information --
5    A. Oh, I'm sorry. This is -- this is with Dennis
6  Short from Rollins.
7    Q. Who is it?
8    A. Dennis Short from Rollins.
9    Q. How did Dennis Short, if you know, know the
10  attorney?
11   A. So Samantha Ekstrand is appointed by our
12  governing body, the IWLCA, that provides counsel to all
13  of its coaches. So she's accessible to any coach at any
14  time. And Dennis and her worked on committees together
15  and he suggested I get in contact with her, just to get
16  some guidance.
17   Q. So Exhibit 43, you'll agree was February 3, 2019?
18   A. Yes.
19   Q. Okay. Did there come a time after these two
20  meetings with JP and Brandon that you also met with
21  Charlie?
22   A. Yes. I met with Charlie and Brandon a few days
23  following the meetings with, yeah.
24   Q. So the day after you reached out to the attorney,
25  you got this text message from Brandon, right,

Page 151

1  Exhibit 44?
2      (Defendant's Exhibit No. 44 was marked for
3    identification.)
4      THE WITNESS: Yes.
5  BY MS. KAHN:
6    Q. Okay. So can you read me the sentence that
7  starts with: I mean it, nothing to -- nothing to stress
8  about.
9    A. Well, that's actually in regard to how much I
10  was -- I wouldn't call it stress, I would call it
11  distress, experienced in those meetings with Brandon
12  Young, that he felt the need to assure me. That's what
13  this message is about, that it -- no new surprises.
14   Q. You prefer to not go to meetings alone,
15  regardless of the person's gender that you're meeting
16  with, right?
17   A. From 2019 forward, yes.
18   Q. Tell me about this meeting with Charlie.
19   A. It was fairly informal, pretty enjoyable.
20  Charlie and I went to Rollins, we talked about that. He
21  assured me that he's confident in my ability to do my
22  job and that I don't have anything to worry about moving
23  forward. And that he supported me. I do believe we
24  talked a little bit about my -- I know we talked a
25  little bit about my bipolar disorder and that I walked

Page 152

1  away from that feeling confident but weary, like
2  confident in what Charlie said, but untrusting due to
3  the nature of the questioning that I was in for the
4  meetings with JP and Brandon Young.
5    Q. Is there anything other than what we've talked
6  about -- let's go back to the first meeting. Is there
7  anything other than what we have already discussed about
8  the meeting with JP and Brandon that you found to be
9  inappropriate?
10     MR. HENRICHSEN: Form objection. Go ahead.
11     THE WITNESS: From 2019 on?
12  BY MS. KAHN:
13   Q. No, from --
14   A. Or just -- I'm sorry.
15   Q. -- the first meeting with Brandon and JP?
16   A. Well, I had another encounter with JP in -- it
17  would have been April of 2019.
18   Q. Okay. Right now, let's stick with --
19   A. I don't know what date you're talking about. You
20  said 2019. I'm giving you details of 2019.
21   Q. The first meeting --
22   A. Okay.
23   Q. -- that you had with JP and Brandon towards the
24  end of January --
25   A. Okay.

Page 153

1    Q. -- 2019. Other than them bringing up your Baker
2  Act and the information provided by Mr. 37, was there
3  anything else that happened at that meeting that you
4  thought was inappropriate?
5      MR. HENRICHSEN: Form objection. Go ahead.
6      THE WITNESS: After I started crying and that
7    was all brought up, I don't really remember much so I
8    couldn't -- I have to say no. I really don't recall.
9  BY MS. KAHN:
10   Q. Okay. So after you sent JP the information about
11  that particular student and you met again with JP and
12  Brandon, was there -- other than not wanting to talk to
13  them alone, was there anything else that you thought was
14  inappropriate?
15     MR. HENRICHSEN: Form objection. Go ahead.
16     THE WITNESS: I'm not -- I'm not sure I follow
17   the question.
18  BY MS. KAHN:
19   Q. Was there anything about that conversation, that
20  second conversation that you had with JP and Brandon
21  that was inappropriate?
22     MR. HENRICHSEN: Form objection. Go ahead.
23     THE WITNESS: I thought the entirety of the
24   conversation was inappropriate.
25  BY MS. KAHN:

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

1   Q.  So tell me why.
2   A.  Because I was being forced to disclose my mental
3   health diagnosis when I had asked to leave and come back
4   with an attorney.
5   Q.  I understand that you wanted an attorney.  But
6   other than them not allowing you to bring an attorney in
7   to talk to your employer, was there anything else that
8   happened that was inappropriate?
9       MR. HENRICHSEN:  Form objection.  Go ahead.
10      THE WITNESS:  I feel like I've answered the
11  question.  I'm not really sure.  I thought the
12  entirety of the conversation was inappropriate.  I did
13  not want to answer their questions.  I told them that
14  and I didn't have to, which is protected under the
15  American with disabilities act for people that suffer
16  from mental health so that they aren't discriminated
17  against.
18  BY MS. KAHN:
19  Q.  What questions did they ask you?
20  A.  Anything in regarding to my Baker Act.
21  Q.  Okay.  But you understand that they, again, were
22  asking you about that because Mr. 37 had brought it up
23  and had alleged that, you know, you had been bullying
24  his daughter?
25      MR. HENRICHSEN:  Form objection.  Go ahead.

Page 155

1       THE WITNESS:  I understand that they were
2   asking it.  I also understand that I didn't have to
3   answer it.
4   BY MS. KAHN:
5   Q.  Fair enough.  Was there anything other than the
6   fact that they brought up the Baker Act that you thought
7   was inappropriate during that second conversation with
8   JP and Brandon?
9       MR. HENRICHSEN:  Form objection.  Go ahead.
10      THE WITNESS:  Not that I can recall.
11  BY MS. KAHN:
12  Q.  Okay.  So after that meeting with Charlie, did
13  you go back to doing your job?
14  A.  I did.
15  Q.  Okay.  And I'm sure there was lots of stuff going
16  on with the student athletes that you needed to tend to,
17  right?
18  A.  Always is.
19  Q.  I'm showing you what's been marked as 45.
20      (Defendant's Exhibit No. 45 was marked for
21  identification.)
22  BY MS. KAHN:
23  Q.  Have you had a chance to look at it?
24  A.  Student 45 is missing.  So...
25  Q.  That's the exhibit number, 45, that you're

Page 156

1   saying?
2   A.  Oh, I see.
3   Q.  Oh, I see.  45.
4   A.  Yeah.  It says:  45 didn't go see Hayley today.
5       And there's no 45.  The rest of -- the rest of
6   the conversation is with, obviously, Leah Peppelman.
7   Q.  What does it mean, the last text message you
8   said, Fucking all conference player?  What's that mean?
9   A.  I couldn't tell you because I don't know who 45
10  is.
11  Q.  I'm showing you what's been marked as
12  Defendant's 46.
13      (Defendant's Exhibit No. 46 was marked for
14  identification.)
15      THE WITNESS:  Yeah.
16  BY MS. KAHN:
17  Q.  Is this -- let me ask the question first.
18  A.  Sure.
19  Q.  Is Exhibit 46 a text exchange you had with
20  Tiffany Jones?
21  A.  Yes.
22  Q.  And were you reaching out to her to talk about
23  all the issues going on with what had happened with
24  student 37?
25  A.  This has nothing to do with student number 37.

Page 157

1   Q.  Okay.  Do you remember what it has to do with?
2   A.  No.  Not specifically.  I know who number 16 is.
3   Q.  Okay.  Did there come a time after you had this
4   conversation with Charlie and Brandon where either one
5   of them checked in with you to see how you were doing?
6   A.  They did.
7   Q.  Okay.  I'm showing you what's been marked as
8   Defendant's 47.
9       (Defendant's Exhibit No. 47 was marked for
10  identification.)
11  BY MS. KAHN:
12  Q.  Is that a copy of the e-mail --
13  A.  It is.
14  Q.  -- from Brandon?
15  A.  It is.
16  Q.  Okay.  And did you, later that summer, run into
17  Charlie on campus and talk to him about what had
18  happened?
19  A.  Possibly.
20  Q.  Okay.  Do you remember telling him how
21  appreciative you were of how the situation was handled?
22  A.  I don't remember it specifically, but I'm not
23  surprised I did.
24  Q.  Okay.  I'm going to show you what's been marked
25  as Defendant's Exhibit 48.

40 (Pages 154 - 157)

Page 158

1      (Defendant's Exhibit No. 48 was marked for
2   identification.)
3 BY MS. KAHN:
4   Q. Are you doing okay?
5   A. Yeah.
6   Q. Tell me if you need a break.
7   A. I will.
8   Q. Do you know who this --
9   A. No, this is 45 again.
10   Q. Okay.
11   A. This is something that I would send a lot of the
12 players. I mean -- so I can't speak to it if I don't
13 know who it is.
14   Q. Do you know what the tough things are that are
15 mentioned in the text?
16   A. No. I don't even know who it is.
17   Q. Okay. And we talked about Brandon and Charlie
18 checking up with you --
19   A. Um-hmm.
20   Q. -- after the meeting. And I want to show you
21 Defendant's Exhibit 49.
22      (Defendant's Exhibit No. 49 was marked for
23   identification.)
24      THE WITNESS: I think this is the same exhibit
25 as the one you just showed me, because -- yeah, it's

Page 159

1 the same thing.
2 BY MS. KAHN:
3   Q. If you look at the top e-mail --
4   A. Oh, okay.
5   Q. -- instead of being from Brandon, this one's from
6 Charlie, right?
7   A. Gotcha. Yes.
8   Q. Trying to cut out some of this.
9      This would be a good time for -- if you need to
10 use the restroom, I'm going to grab my next file.
11   A. Okay.
12      MS. KAHN: Let's go off the record.
13      THE VIDEOGRAPHER: Going off the record at
14   4:05.
15      (A brief recess was taken.)
16      THE VIDEOGRAPHER: Going back on the record at
17   4:22. This is media unit 4, letter A.
18 BY MS. KAHN:
19   Q. Do you remember a little earlier, I asked you if
20 you wanted to have someone with you even if you were
21 going to speak with a female, like a work female?
22   A. Are you asking if I wanted someone with me when I
23 spoke to a work female? Is that --
24   Q. No.
25   A. I'm confused. Sorry.

Page 160

1   Q. That's okay. Earlier, I thought you said that
2 after 2019 that you wanted to have someone with you when
3 you went to any sort of work meetings like this.
4      MR. HENRICHSEN: Form objection. Go ahead.
5      THE WITNESS: Can you define like this? Just
6   because I had a lot of meetings with a lot of people.
7 BY MS. KAHN:
8   Q. Okay. If you were going to talk about discipline
9 or performance, after 2019, that you wanted to have
10 someone with you?
11   A. I did.
12   Q. Okay.
13   A. Although I didn't know all the time that I was
14 being talked to about discipline and performance.
15   Q. Okay. Do you have the list?
16   A. Which list? I'm sorry.
17   Q. This one.
18      Okay. I don't think we have him on the list yet.
19 So we'll make 38 number 38.
20   A. Okay. But there already is -- for employees?
21   Q. For employees.
22   A. Oh, okay. I see. Sure.
23   Q. And from your copy, I just -- if you want to look
24 at it.
25   A. Uh-huh.

Page 161

1   Q. I just redacted out his name and put a 37.
2   A. 38.
3   Q. That last person on that list is --
4      MR. HENRICHSEN: Oh, wait. 37 employee?
5      MS. KAHN: Yes.
6      MR. HENRICHSEN: Maybe just note employee, like
7   so we're -- I'm trying to catch up here.
8      THE WITNESS: So many numbers.
9      MS. KAHN: Way too many numbers.
10      MR. HENRICHSEN: Yeah.
11      MS. KAHN: Okay. This is Exhibit 50.
12      (Defendant's Exhibit No. 50 was marked for
13   identification.)
14      MS. KAHN: Are you ready?
15      THE VIDEOGRAPHER: Yeah, we're on the record.
16 BY MS. KAHN:
17   Q. Oh, okay.
18      So I'm going to show you what's been marked as
19 Defendant's Exhibit 50.
20   A. Okay. Have I seen this before?
21   Q. No. Well, I mean, you wrote it but --
22   A. Oh. I see.
23   Q. -- take a look at it.
24   A. I see. Okay.
25   Q. And the question I'm going to ask you is that

41 (Pages 158 - 161)

CONFIDENTIAL

Page 162

1 even back in 2017, you wanted to take someone with you
2 for support to meetings.
3    A. Yes. However, I was advised by -- the reason why
4 I asked is different from the reason why I asked after
5 2019. I was told by athletic leadership to, when having
6 conversations with anyone over on the other side of the
7 street, you should bring someone from the athletic
8 administration with you. And Sonja was my support
9 supervisor and the meeting was with somebody in HR,
10 Andrea Hooper.
11    Q. If you could look at page 2 for me.
12    A. Okay.
13    Q. Did you tell Andrea you'd be more comfortable
14 having someone else there during the meeting to support
15 you?
16    A. I did write that, yes.
17    Q. All right. And to end out 2019, talk about COVID
18 a little.
19    A. Okay.
20    Q. You mentioned that COVID was particularly hard.
21    A. For me or just in general?
22    Q. For you.
23    A. I would say for my whole team, yes. We were also
24 a new program, so that really stopped our momentum.
25 Being a new program, you're really building up and that

Page 163

1 put a -- that was our third season and we were cut right
2 in the middle of the season and with a winning record
3 and really a strong team, and that really, really hurt
4 our program.
5    Q. Okay. So I guess 2020, you're still considered a
6 new team. You're still considering the women's lacrosse
7 a new team?
8    A. Oh, yeah, I mean, we had only completed two and a
9 half seasons.
10    Q. Okay. And COVID didn't lock things down until
11 March 2020, right?
12    A. Yes.
13    Q. So did you not get to finish the spring season?
14    A. We did not.
15    Q. Did you get to do any of the spring season?
16    A. Like I said, we played -- we were five and two so
17 we had played seven games.
18    Q. How many games were left?
19    A. Usually we play 17 in a season. I'm not sure if
20 our schedule was 16 or 17 and that doesn't include
21 conference playoffs and/or NCAA playoffs, so I can't --
22 the schedule's normally 17 and we were seven games in.
23 But then there's a conference tournament and then
24 post-NCAA play. I can't predict how far we would have
25 gone, even though I thought we would have.

Page 164

1    Q. Okay. So I want to show you this document.
2    A. Okay.
3    Q. It's marked as Defendant's Exhibit 51.
4        (Defendant's Exhibit No. 51 was marked for
5 identification.)
6        THE WITNESS: All right. Is this an employee
7 or a player? Okay. Is this --
8 BY MS. KAHN:
9    Q. Your attorney redacted this, so ask him. I don't
10 know.
11        MS. KAHN: Neil, is it --
12        MR. HENRICHSEN: I don't know.
13        THE WITNESS: Yes. I know who this is. What
14 about it?
15 BY MS. KAHN:
16    Q. What is this conversation about?
17    A. There was something, 34 -- no, I'm sorry, I can't
18 say the name. It was something to do with a sign on one
19 of the bathrooms in one of the buildings that 34 had
20 seen that really offended her. And she -- I encouraged
21 her to verbalize why. And, you know, she ended up
22 sending the e-mail to the president, explaining why
23 it offended her, why it wasn't right. And then the
24 president acted immediately and she was like really,
25 really happy about that.

Page 165

1    Q. Right. And the second from the bottom, did you
2 say: I think it speaks volumes of our president and
3 that is a really positive thing?
4    A. I did. I was really happy to see that he handled
5 it that way and so was she.
6    Q. So in light of the fact that COVID had so many
7 activities restricted, tell me what, you know, you did
8 as head coach from day to day.
9    A. Well, I mean, it certainly changed, you know,
10 from 2019. I need a little bit more perspective of like
11 how long. Are we -- of a period of time.
12    Q. Let's say March 2020 --
13    A. Okay.
14    Q. -- for the next -- until January of '21.
15    A. March 2020 until January '21? Which I wasn't
16 there in January of '21 but up until my termination is
17 what you're asking? Or January '21 -- I'm sorry.
18    Q. March -- okay. I got confused by the dates.
19    A. Yeah. Please.
20    Q. All right. And I know you already expressed, you
21 know, anger over not getting, you know, the students to
22 play.
23    A. I wouldn't say anger. I'd say frustration,
24 sadness, feeling of loss, getting what we've worked so
25 hard ripped away, you know, made me angry in the

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1 beginning but it was a lot bigger than that.
2   Q. Did you appreciate at all that, you know, the
3 university was concerned for, you know, the students and
4 the employees?
5       MR. HENRICHSEN: Form objection. Go ahead.
6       THE WITNESS: I mean, absolutely. I think it
7 was a responsibility to keep, you know, their students
8 and faculty safe during that time, yes.
9 BY MS. KAHN:
10   Q. Okay. So were you more frustrated at the
11 situation or at the university?
12   A. I think it's twofold. The situation was created
13 by the university by not allowing us to play our second
14 season. That was a decision made directly by the
15 university while everybody else played. I felt that
16 could have been avoidable, and everybody needed to go
17 back to playing. Not only that, we couldn't even
18 practice with contact, where everyone across the country
19 was playing contact games. My kids were -- and myself,
20 were sitting around while everyone played around us and
21 we couldn't do anything but play catch and throw.
22   Q. So you disagreed with their decision?
23   A. 100 percent. So did pretty much everyone.
24   Q. We talked earlier about Donna Jo reaching out to
25 tell you that she was going to send -- her husband

Page 167

1 was going to send a letter to Dr. Butler, right?
2   A. Um-hmm. I think it's important to note that
3 Donna Jo was a mother of a senior that was graduating
4 that lost two seasons and was a part of the inaugural
5 team. And that team was incredibly close. And they
6 lost two seasons and weren't ever going to play again.
7 So it was very passionate parent.
8   Q. The students could have red shirted, right, and
9 stayed another year?
10   A. Some of them did. It wasn't a red shirt. You
11 were just given back the year because you never played
12 it. So they technically had two years of eligibility
13 left but they were all graduating, so that made it
14 difficult.
15   Q. I'm going to show you what's been marked as
16 Defendant's 52.
17       (Defendant's Exhibit No. 52 was marked for
18 identification.)
19       THE WITNESS: Okay. (Descriptive sound.)
20 BY MS. KAHN:
21   Q. And I can -- I can show you the --
22   A. Yeah, the actual one, that would be -- that would
23 be great because I can't read this.
24   Q. Yeah. That's --
25   A. I have read it before. I know the gist of it.

Page 168

1   Q. Yeah. That was your production. I was just
2 going to ask you --
3   A. Sure.
4   Q. -- if that looks like a text that Donna -- Donna
5 Jo sent you with --
6   A. Here's the letter to Butler. I'll forward you
7 his response tomorrow.
8   Yes, it is.
9   Q. Were you looking forward to the response from
10 Dr. Butler?
11   A. I wouldn't use the words looking forward, if he
12 ever responded. Most of the time, he just didn't
13 respond to people.
14   Q. I'm talking about in this instance, were you
15 excited to know that he had responded?
16   A. I don't know that I have an emotion to put to it.
17   Q. I'm going to show you what's been marked as 52.
18       MR. HENRICHSEN: I think -- is this 53?
19       MS. KAHN: Yes. That's 53.
20       (Defendant's Exhibit No. 53 was marked for
21 identification.)
22       THE WITNESS: Okay.
23 BY MS. KAHN:
24   Q. Is that a communication that you had with Donna
25 Jo about the letter?

Page 169

1   A. Seems as though.
2   Q. Okay. I'm going to show you what's being marked
3 as just Defendant's Exhibit 54.
4       (Defendant's Exhibit No. 54 was marked for
5 identification.)
6       THE WITNESS: Absolutely.
7 BY MS. KAHN:
8   Q. Is this a copy of the letter that Donna Jo told
9 you she got back from Dr. Butler?
10   A. Yes.
11       MS. KAHN: How is everyone doing, okay?
12       MR. HENRICHSEN: Um-hmm.
13 BY MS. KAHN:
14   Q. A moment ago, you told me you weren't still
15 working at Embry-Riddle in January 2021. But I think
16 you're -- did you mean January 2022?
17   A. Yes. Because -- yes. Thank you.
18       THE VIDEOGRAPHER: Ms. Kahn, do you have your
19 microphone on?
20 BY MS. KAHN:
21   Q. What was -- we talked about how hard it was for
22 you and the athletes to not be able to play. How was --
23 how were you doing personally during that time?
24   A. I think I was devastated for them. You know, it
25 was difficult. I went from kind of a full-time head

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

1 lacrosse coach to almost a glorified PE teacher because
2 we couldn't have regular practices. It made it
3 difficult to not be able to build relationships with my
4 new players because I didn't -- I couldn't coach them.
5 And I focused on their person and their student side of
6 things because we couldn't play.
7    Q. How did you do that?
8    A. We still maintained kind of our academic progress
9 cards and check-ins. We had meetings quite often. We
10 tried to do our team building. During COVID, we watched
11 the -- oh, gosh -- the Michael Jordan docuseries with
12 Scotty Pippen about the greatest team, you know, of all
13 time. And so I would put them in virtual groups and ask
14 them reflection questions and keep them engaged.
15    Every summer, we kept our Jersey days, which was
16 a check-in day that on their Jersey number of the day of
17 the month, they would call me. Sometimes I'd pick it
18 up, sometimes I wouldn't. I always, at some point,
19 touch base with them in the summer, each one of them to
20 get an update.
21    And really, my focus was keeping them all
22 together, not having them transfer. Because they were
23 losing more than their counterparts were, which were
24 other, you know, their friends that played in other
25 programs. So keeping the team united as best as I could

Page 171

1 without having the resources and being separated from my
2 colleagues.
3    Q. You'd agree that COVID was hard for most people,
4 right?
5    A. Absolutely.
6    MR. HENRICHSEN: Form objection. Go ahead.
7 BY MS. KAHN:
8    Q. We're on 55. I'm going to show you what's being
9 marked as Defendant's Exhibit 55. If you could just
10 take a look, let me know when you've looked at it.
11    (Defendant's Exhibit No. 55 was marked for
12    identification.)
13    THE WITNESS: Okay. I mean, I get the gist of
14 the conversation. What's your question?
15 BY MS. KAHN:
16    Q. Are you -- in this exhibit, Exhibit 55, are you
17 and Mea talking about COVID?
18    A. I think we -- I mean, it's a very long
19 conversation. I think we're talking about a bunch of
20 things. I think we're talking about COVID. We are
21 talking about the environment that we were put in. We
22 were talking about coaching a team when you can't be a
23 team. We were supporting each other. We were great
24 friends. She -- as you can see, she relates on a lot of
25 areas.

Page 172

1    Q. Okay. Let's take one topic at a time. If I
2 could get you to look at Bates stamp 217.
3    A. Okay.
4    Q. All right. On the second text, what was that
5 last full -- or, I'm sorry, the two last sentences that
6 you said to Mea?
7    A. I feel like this semester has stolen my soul. A
8 bit heavy, I know but I also k or you get it. Also know
9 you get it.
10    Is that what you're talking about?
11    Q. Yes.
12    A. What am I referring to?
13    Q. No, I asked you to read it.
14    A. Oh, I'm sorry.
15    Q. You're talking about --
16    A. Amongst other things, I feel like this semester
17 has stolen my soul. A bit heavy, I know but I also k or
18 you get it. Also know you get it.
19    Q. Are you talking about COVID here?
20    A. I think it might be confusing COVID with like the
21 environment of the team and the culture that COVID
22 created. So I don't know -- I'm talking about what was
23 going on with the team, keeping them together because of
24 the situation we were in, to not be able to coach, build
25 relationships, team building, practice with contact. It

Page 173

1 wasn't -- it wasn't fun for anyone to go out to practice
2 every day. It was demoralizing. That's what I'm
3 talking about.
4    Mea even says it right here. This has been a
5 negative year. We have been so restricted that we
6 haven't been able to enjoy life, not just about work,
7 life in general. It will get better. We have to make
8 it better. One step at a time.
9    And this is a director of -- this is an assistant
10 athletic director of compliance saying the exact same
11 thing.
12    Q. All right. So let's go a little further back up.
13 You said: My heart hurts so bad. Having trouble
14 getting out of the dark spot.
15    Do you see that?
16    A. I'm sorry, are we on the same page?
17    Q. Yes.
18    A. Okay. Where -- what part of the page? Okay.
19    My heart hurts so bad. Having trouble getting
20 out of the dark spot.
21    It's all related to the same thing.
22    Q. And you said: I feel lost. Confused.
23 Frustrated, unsure of what I'm supposed to do. Hurting.
24    A. Yeah. Yeah. I mean, I couldn't help them. I
25 couldn't help my team. They were having -- they were

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

1 fighting with each other because we were -- we couldn't
2 team build.  You know, they were just as lost and I'm
3 trying to guide them and I have no answers.  I have -- I
4 have nothing to give them because of the -- there was
5 nothing to give, except for to accept a really horrible
6 situation we were -- we were gifted.
7    Q.  Which I know you don't agree with the decision
8 for the season to not go on.  But you acknowledge there
9 was a pandemic, too?
10    A.  This was for the second season that we could have
11 played and our president was the only one in the entire
12 conference that didn't let us play, including the
13 country, so no, they're different.  Everybody lost their
14 season in the year of the pandemic.  Not everybody lost
15 their second season.  In fact, we were the only one.
16    Q.  You did play until March, you said, though,
17 right?  The year before?
18    A.  That was March of that year, so we lost half a
19 season, then the next season came, everyone else played
20 and we didn't.  And not only that, we couldn't even
21 practice with contact.
22    Q.  Were you starting to feel depressed during this
23 time?
24    A.  I really can't speak to that, as far as, you
25 know, I think it was a tough time.  To say depressed,

"Object to 175:2-20 FRE 402 (not relevant evidence); FRE 404 (inadmissible character evidence); FRE 403 (unduly prejudicial and confusing)" These questions are regarding Plaintiff's relationship with a prior boyfriend.

Page 175

1 I -- I don't really feel comfortable saying that.
2    Q.  When did you start dating Wade Hastings?
3    A.  It was I think around the fall of 2017.
4    Q.  So you dated him for a while?
5    A.  I did.
6    Q.  Where did you meet him?
7    A.  Bumble.
8    Q.  Was it a good relationship in the beginning?
9    A.  Maybe the very, very beginning.
10    Q.  Okay.  Were things exacerbated with Wade during
11 COVID?
12    A.  I -- I -- yes.  I think it made it way more
13 discriminate because I wasn't going into the office and,
14 you know, that was my outlet.  So, you know, being stuck
15 at home together for extended periods of time, I think
16 was hard on everyone, not just, you know, Wade and I.
17    Q.  Was he working from the house too?
18    A.  Yes.
19    Q.  You guys were living together?
20    A.  Yes.
21    Q.  Would you agree with me that Brandon, Andrea and
22 Charlie are not coaches?
23    A.  Yes.
24    Q.  They have inside office jobs, right?
25    A.  Yes.

"Object to 175:21 176:12 (not relevant evidence).  Questions inquire of Plaintiff what other individuals, , i.e., Young, Hooper and Sevastos know or understand about the lacrosse season.

"Object to 176:23-177:1-6 FRE 402 (not relevant evidence); FRE 404 (inadmissible character evidence); FRE 403 (unduly prejudicial and confusing)" These questions involve Plaintiff's relationship with a prior boyfriend.

Page 176

1    Q.  They're not out there pushing young men and women
2 to be their best athletically, right?
3    A.  Yes.
4    Q.  So would you agree with me, then, that they may
5 not understand how you were feeling about the season?
6        MR. HENRICHSEN:  Form objection.  Go ahead.
7        THE WITNESS:  Yes.
8 BY MS. KAHN:
9    Q.  And would you also agree with me that they may
10 not understand some of your coaching strategies?
11        MR. HENRICHSEN:  Form objection.  Go ahead.
12        THE WITNESS:  100 percent.
13 BY MS. KAHN:
14    Q.  Okay.  All right.  Let's talk about August 2021.
15    A.  Okay.  Can we just take a quick bathroom break?
16    Q.  Absolutely.  Go ahead.
17        THE VIDEOGRAPHER:  Going off the record at
18 4:59.
19        (A brief recess was taken.)
20        THE VIDEOGRAPHER:  Going back on the record at
21 5:05.  This is media unit 4, letter B.
22 BY MS. KAHN:
23    Q.  By August 2021, things with Wade had really
24 broken down, right?
25    A.  Yes.  They had broken down way before that.

Page 177

1    Q.  All right.  You were in the process of breaking
2 up?
3    A.  I tried to break up with Wade every week of my
4 life for years.  And he wouldn't leave my home.
5    Q.  Are you saying he was abusive?
6    A.  I am.
7    Q.  You felt like you couldn't leave?
8    A.  Well, I lived there.  Eventually, I did leave to
9 get him out of my house.  That was the way to do it.
10 But...
11    Q.  You rented an Airbnb?
12    A.  I did.
13    Q.  And then --
14    A.  But that was -- that wasn't in August of 2021,
15 though.  That was -- I don't know exact date but it was
16 later.
17    Q.  You stayed with Mea one night right after you had
18 the break-up with Wade?
19    A.  I did.  That was the night after my -- the
20 Atlanta trip, I think.  It was right around that time.
21    Q.  Was it October?
22    A.  Yes.
23    Q.  All right.  I'm going to show you what's been
24 marked as Defendant's 56.
25        (Defendant's Exhibit No. 56 was marked for

45 (Pages 174 - 177)

CONFIDENTIAL

Page 178

1  identification.)
2      THE WITNESS: Okay. Okay.
3  BY MS. KAHN:
4   Q. You've seen this letter before?
5   A. I have.
6   Q. I know it's not easy to look at. But did there
7  come a time where Brandon wanted to meet with you about
8  this?
9   A. Yes.
10   Q. Did he ask you to come to human resources?
11   A. He did.
12   Q. Did you ask to take Mea with you?
13   A. I don't believe for that meeting. It was
14  after -- it was a second meeting, I asked to bring Mea
15  with, with Charlie Sevastos and Brandon Young.
16   Q. Tell me about the -- how Brandon let you know to
17  come to wherever you met.
18   A. I'm not really sure exactly how this time.
19  Sometimes he e-mailed me, sometimes he texted me. It
20  could have been either.
21      MS. KAHN: Can we go off the record for one
22  minute, please? Sorry, guys.
23      THE VIDEOGRAPHER: Going off the record at
24  5:11.
25      (A brief recess was taken.)

Page 179

1      THE VIDEOGRAPHER: Going back on the record at
2  5:14. This is media unit 4, letter C.
3  BY MS. KAHN:
4   Q. Okay. We were talking about the August 2021
5  e-mail. When you went to meet with Brandon, JP was
6  there also?
7   A. No. It was just Brandon.
8   Q. So you don't remember JP or Mea being there?
9   A. They were not present in that meeting.
10   Q. Did Brandon share the e-mail with you during that
11  meeting?
12   A. No. He did not give it to me. I didn't see it
13  till after I got home when he forwarded it to me upon my
14  request.
15   Q. And when you spoke to him, did he tell you that
16  it's not unusual -- that they sometimes -- strike that.
17      Did he tell you that sometimes parents complain
18  about coaches?
19   A. I don't recall him directly saying something like
20  that.
21   Q. Okay. What do you recall him saying?
22   A. I recall him telling me that there was an e-mail,
23  anonymous e-mail, and that there were accusations.
24  Can't recall if he told me those accusations or I read
25  them in the e-mail afterwards. But what I did say was,

Page 180

1  I was a little -- I was shocked by the conversation
2  because we hadn't even had a practice yet. And
3  furthermore, we hadn't had a season in two seasons. So
4  I was like, how could we possibly have an accusation
5  when we just had our team meeting the other day and we
6  haven't even been on the field yet?
7      And that's -- you know, that's pretty much what I
8  remember the exchange to be. He did, at the end of it,
9  tell me to be -- why don't you try being less intense.
10  He then also told me that he suggested asking somebody
11  from athletic leadership to observe my practices. That
12  made me incredibly uncomfortable because I truly
13  believed the context in which he was displaying that was
14  in regards to discriminating against me based off my
15  disability.
16   Q. You told me before that you have a big
17  personality, right?
18   A. Sure.
19   Q. Okay. So you're saying that you interpreted less
20  intense to be a comment on your disability?
21   A. Absolutely.
22   Q. Okay. Did he say that, you know, you need to be
23  less intense because of your disability?
24   A. He didn't say those words.
25   Q. He just said you need to be less intense?

Page 181

1   A. Correct.
2   Q. Okay. And does --
3   A. Brandon Young is not a coaching professional. If
4  I was -- if there was a problem with my intensity, that
5  would be coming from my support supervisor. That point,
6  there would be training, there would be conversations.
7  He has no relationship with me outside of questioning me
8  one or two times. So to determine how Brandon Young
9  knew my personality would not be true.
10   Q. Well, based on his -- I'll call him a layperson,
11  since he's not in the coaching world -- you would -- if
12  you look at Defendant's Exhibit 56 --
13   A. Oh, okay.
14   Q. Do you have it in front of you?
15   A. Yeah, sure.
16   Q. You see that this parent is complaining about
17  your coaching style, right?
18      MR. HENRICHSEN: Form objection. Go ahead, if
19  you could answer that.
20      THE WITNESS: I mean, they don't -- it doesn't
21  say coaching style exactly.
22  BY MS. KAHN:
23   Q. Fourth paragraph from the bottom.
24   A. Okay. Coaching style. Yes. I see that.
25      Describe Ms. Giannerini. These characteristics

46 (Pages 178 - 181)

CONFIDENTIAL

Page 182

1 are consistent with how our daughters and their
2 teammates describe Ms. Giannerini's coaching style.
3    Q. Okay.
4    A. Okay.
5    Q. And the words that this -- whoever this e-mail
6 person is, refers to you as giving emotional abuse,
7 right, to the students?
8    A. Accused, which I adamantly denied. This type of
9 thing would also normally have been treated by a support
10 supervisor and a conversation directly with the coach.
11 It wouldn't have gone directly to HR. And I believe
12 that that was handled that way because of the events
13 that happened in 2019 when they found out about my
14 disability and they treated me differently than every
15 other coach after that.
16    Q. We'll get to that in a minute.
17        In the "to" line at the top of this, you see
18 there are some pretty high-level people in there, right?
19 Charlie Sevastos, Barry Butler?
20    A. That was retracted when it was sent to me, but I
21 do see that now.
22    Q. So you don't think it should have gone to HR; you
23 thought it should have stayed in athletics?
24    A. Absolutely. It did with every other coach in
25 similar-situated situations.

Page 183

1    Q. When they received a letter like this?
2    A. From an anonymous parent, that you don't know the
3 name of, yes.
4    Q. Have you seen any of the other letters that have
5 come in from anonymous parents?
6    A. I have not.
7    Q. Okay. So you told me before that Brandon
8 forwarded you -- what exhibit are we on?
9    A. 56.
10       MS. KAHN: No.
11       THE VIDEOGRAPHER: 57.
12       THE WITNESS: Oh, the next one, I'm sorry.
13       (Defendant's Exhibit No. 57 was marked for
14    identification.)
15 BY MS. KAHN:
16    Q. All right. I'm showing you what's being marked
17 as Defendant's 57.
18    A. Okay.
19    Q. Is the bottom part the e-mail that Brandon
20 forwarded to you?
21    A. It -- yes, it appears to be so.
22    Q. Okay. And you wrote back: Thank you, Brandon.
23 I appreciate you.
24    A. Yes.
25    Q. Okay. So if you said that, why would you say

Page 184

1 that if you felt like the meeting did not go well?
2    A. It's common courtesy.
3    Q. So aside from less intense, you were offended
4 that he wanted to have someone observe your practice?
5 Is that what you said?
6    A. Offended wouldn't be the word I would describe.
7 I found it inappropriate to be asking of me. If that
8 was -- if I was under some investigation, then there
9 would -- that would be coming from an improvement plan,
10 a probationary period but he was asking me, not my
11 support supervisor, which was not a normal thing to do.
12    Q. He was asking to have someone come out to --
13    A. He was suggesting.
14    Q. He was suggesting that someone should --
15    A. Sure.
16    Q. -- maybe come out and watch?
17    A. Um-hmm.
18    Q. Is that a yes?
19    A. Yes.
20    Q. You have supervisors, right, as a head lacrosse
21 coach?
22    A. I had a supervisor. He wasn't very active with
23 me.
24    Q. Okay. Well, supervisors typically monitor their
25 employees, right?

Page 185

1    A. Yes.
2    Q. Okay. All right. After -- is -- when the
3 August 2021 e-mail came out, is that when you reached
4 out to Sam Ekstrand the second time?
5    A. No.
6    Q. Did you reach out to a lawyer after the
7 August 2021?
8    A. No.
9    Q. I'm going to show you what's being marked as
10 Exhibit 58.
11       (Defendant's Exhibit No. 58 was marked for
12    identification.)
13       THE WITNESS: Okay. Okay.
14 BY MS. KAHN:
15    Q. Is this a conversation or a text message
16 conversation that you had with Donna Jo after you met
17 with Brandon?
18    A. Yes.
19    Q. Okay. In the second line with the Bates stamp
20 162.
21    A. Um-hmm.
22    Q. Did she say -- or did you ask her to send
23 additional information to your personal Gmail account?
24    A. I mean, I don't recall -- I don't recall what I
25 asked of her or if she offered it.

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

1   Q. Read the first line.
2   A. So already have some prelim info for you. Gonna
3 put it in an e-mail and send it. Easier than texting.
4      Again, I don't know the context. I could have
5 asked her -- I don't know the context.
6   Q. Well, if you look at the rest of the text
7 message --
8   A. Sure.
9   Q. -- you're talking about, you know, what is
10 happening at the moment at work, aren't you?
11  A. I am.
12  Q. Okay. And so you said: Can you send it to my
13 personal e-mail?
14  A. Um-hmm.
15  Q. You have not produced that e-mail, though?
16  A. If I didn't, I didn't know I was asked for it.
17 Donna Jo Toney is not an attorney or a lawyer.
18  Q. And then I guess she's -- Donna Jo's telling you
19 not to talk to the athletes about it, correct?
20  A. Correct.
21  Q. Okay. And she said that because you said you had
22 talked to a few girls without crying.
23     MR. HENRICHSEN: Form objection. Go ahead.
24 BY MS. KAHN:
25  Q. Right?

Page 187

1   A. Yes. I was doing a check-in, like, so caught off
2 guard.
3   Q. Did you have another meeting regarding the
4 August 2021 text message?
5   A. I mean, the e-mail, August --
6   Q. E-mail. Yes.
7   A. Yes. I had requested one. I had requested one
8 because at the time, I was afraid that it could have
9 been 37 again because it was an anonymous e-mail and I
10 wanted to touch base with Charlie Sevastos and Brandon
11 Young about where we stood.
12  Q. Brandon offered you that meeting, didn't he?
13  A. I believe we might have talked about setting it
14 up, but I -- he offered me a meeting with Charlie and I
15 don't know if he offered it. I don't -- I don't recall.
16  Q. That meeting went well, I assume?
17     MR. HENRICHSEN: Form objection. Go ahead.
18     THE WITNESS: I felt like it did.
19 BY MS. KAHN:
20  Q. Okay. What happened at the meeting?
21  A. Well, I did ask Mea to attend. Mea had told me
22 that, you know, she was included on the e-mail and that
23 they get this type of e-mail all the time and to not
24 worry about it. She mentioned something about JP not
25 being concerned. And we went to the meeting. And I

Page 188

1 brought up my concerns about it being the potential
2 father, you know, harassing because it was still yet
3 again, it was anonymous.
4   Q. Right.
5   A. Most parents are never -- want to be anonymous.
6 And they assured -- I mean, there was no cause for
7 concern. We hadn't even started practices, so they said
8 it was warranted. And that -- that was it.
9   Q. Okay. I'm going to show you what's being marked
10 as Defendant's Exhibit 59.
11     (Defendant's Exhibit No. 59 was marked for
12 identification.)
13     THE WITNESS: Okay.
14 BY MS. KAHN:
15  Q. Is this another text exchange that you had with
16 Donna Jo?
17  A. Yes.
18  Q. And you said that they had thrown out the letter
19 as not having credibility?
20  A. Correct.
21  Q. And that they said it was meant -- they thought
22 it was meant to injure you, right?
23  A. That's what the text says, yes.
24  Q. And that you were trying to focus on excitement
25 and positivity for the new year?

Page 189

1   A. Yes.
2   Q. During that meeting, did you tell Charlie that
3 you had been having a hard time because Wade was being
4 abusive?
5      MR. HENRICHSEN: Form objection. Go ahead.
6      THE WITNESS: No. That was in -- that was in
7   the November 1st meeting.
8 BY MS. KAHN:
9   Q. I'm going to show you what's being marked as
10 Exhibit 60.
11     (Defendant's Exhibit No. 60 was marked for
12 identification.)
13     THE WITNESS: Okay.
14     MS. KAHN: I'll let your lawyer look at it
15 first because I don't know if I have another copy.
16     MR. HENRICHSEN: Can I give it to her?
17     MS. KAHN: Yes, please.
18 BY MS. KAHN:
19  Q. Here's a copy of it, a different copy, same
20 letter.
21  A. Okay.
22  Q. So tell me how you found out about this letter.
23  A. I was called directly by Brandon Young on Monday,
24 November 1st, and had asked me to come into the office.
25 Due to the nature of my other encounters in 2019 and

48 (Pages 186 - 189)

CONFIDENTIAL

Page 190

1 others, I pleaded with him to tell me what it was about.
2 He refused. From -- I also went on to explain, like,
3 Brandon, like, I have like PTSD from all of this, you
4 know, stresses me out. I -- I'm really two hours away.
5 Please let me -- give me at least an idea. And he
6 refused.
7    Q. Okay.
8    A. From that point forward, you know, my distress
9 started and I sat there for two hours wondering what
10 this was about. And I reached out to some of my -- I
11 reached out to Mea asking her if she knew what it was
12 about. I told her I was having a panic attack. I
13 reached out to JP. He wouldn't -- he didn't respond.
14 And I went into the meeting to -- I talked to Leah.
15 Leah, you know, assured me, Marissa, you have nothing to
16 worry about. Like, we haven't done anything wrong.
17    So anyway, went into the meeting and that's when
18 I saw this letter. And I was slid it across the table.
19 And I started reading it and I went from the distressed
20 state I was in for two hours to a then more elevated
21 state. And to give you an idea what that looks like,
22 like, I sweat, my palms are sweaty, I talk fast, my
23 heart rate increases. It's -- it's a prolonged state of
24 distress.
25    So anyway, at that point, I asked for what I

Page 191

1 assumed was a reasonable accommodation based off their
2 knowledge that they did, in fact, have -- they did have
3 knowledge that I was, in fact, bipolar, and it was from
4 my understanding that I -- that that was my right. And
5 I was refused that right. And honestly, at that point,
6 it's kind of a fog.
7    (Reporter request for clarification.)
8    THE WITNESS: A fog.
9 BY MS. KAHN:
10    Q. Since you felt like you were more comfortable
11 having someone with you in meetings, did you ever think
12 of going to formally request an accommodation and get it
13 approved and say, you know, because of my bipolar, you
14 know, I need somebody in the meetings?
15    A. No. Because I feared retaliation.
16    Q. That was not something that you were warned
17 about, right? That was something that you felt, right?
18    A. No.
19    Q. Okay. Why did you fear retaliation?
20    A. Because of the way they treated me and the events
21 that occurred in 2019, a similar situation happened with
22 JP later that year in 2019 that furthered that fear and
23 was real in regards to continuing this distressful
24 situation and begging to have an accommodation with
25 them, knowing that I had bipolar.

Page 192

1    Q. You agree with me you didn't say to Brandon, I
2 need to bring someone with me because I have bipolar?
3    A. I didn't say that. I asked for that in the
4 meeting. My bipolar was mentioned in the e-mail that
5 they slid across from me. Due to the fact that my
6 mental -- it was right there. So no, I did not feel
7 comfortable continuing a line of questioning that was
8 directly related about my disability.
9    Q. Okay. So let's look at the line that mentions
10 bipolar.
11    A. Sure.
12    Q. It says: These attacks on the players, use of
13 vulgarity and her being bipolar. And then it says in
14 parens: (I apologize. I do not know another term to
15 describe her) has got to stop immediately.
16    So you took this to mean that they were saying
17 you actually have bipolar; is that what you're saying?
18    A. That -- no. I am saying that the mention of
19 bipolar, along with other accusations and the state that
20 I was in, was not -- I was requesting an accommodation
21 because of the way I was feeling, which I expressed to
22 Brandon about these causing me extreme elevation in
23 anxiety, fear, heart rate. It felt -- I believed that I
24 was asking for it and was denied.
25    Q. Okay. But again, as we were just talking about,

Page 193

1 you didn't say you need someone there because you were
2 bipolar, right?
3    A. No, I said, I feel very uncomfortable with this
4 line of questioning and I would like to return with a
5 support advocate.
6    Q. You would agree with me that there's a difference
7 between acting bipolar and being bipolar, right?
8    A. I don't understand your question.
9    Q. Somebody who does not have bipolar might have
10 excessive mood swings, right?
11    MR. HENRICHSEN: Form objection. Go ahead if
12 you can answer.
13    THE WITNESS: I suppose, if they're not
14 medicated.
15 BY MS. KAHN:
16    Q. I'm talking about somebody who doesn't have
17 bipolar. So someone who does not have bipolar, they
18 could still have very intense mood swings, right?
19    MR. HENRICHSEN: Form objection. Go ahead.
20    THE WITNESS: Sure.
21 BY MS. KAHN:
22    Q. So in this letter, you are accused of body
23 shaming, being intoxicated and taking your frustration
24 out on players; is that right?
25    A. That's what the e-mail says.

49 (Pages 190 - 193)

CONFIDENTIAL

Page 194

1  Q. Okay. Well, I know -- will you agree that in
2  light of your break-up with Wade, you were maybe not
3  feeling yourself?
4       MR. HENRICHSEN: Form objection. Go ahead.
5       THE WITNESS: The break-up was stressful.
6  BY MS. KAHN:
7  Q. Did you talk to the students about what was going
8  on?
9  A. I did. We had a session -- well, Tiff Jones came
10  back in and we had a session with her about -- about a
11  week and a half before this happened. And said -- Tiff
12  had the opportunity to sit down and interview several of
13  my players one on one. In one of our team building
14  sessions, which I was a little caught off guard that she
15  put me in that position because I might not have shared
16  that with them. However, she made them aware of my
17  break-up. And in the context of, your coach is human
18  and she's -- you know, she goes through things too. You
19  might not know this, but, you know, blah, blah, blah,
20  blah. And then I spoke to that, you know, in front of
21  the team. Then it was pretty emotional for me. I was
22  not prepared to share that with them.
23  Q. It's hard when someone else breaks your news and
24  forces you to tell your story, right?
25  A. Correct.

Page 195

1  Q. Okay. So I'm going to show you -- I'm going to
2  show you what's being marked as Exhibit 61.
3       (Defendant's Exhibit No. 61 was marked for
4       identification.)
5  BY MS. KAHN:
6  Q. Is this a text message that you sent to Mea after
7  you got off the phone with Brandon?
8  A. It is.
9  Q. And I guess Brandon had said Charlie would be
10  there too?
11  A. I'm not sure if he said that on the phone.
12  Q. All right. Second-to-last text.
13  A. Okay.
14  Q. You said: Charlie will be there, it must be bad.
15  A. Oh, okay. Then, yeah, he told me on the phone.
16  Q. So you had a feeling that this was going to be
17  bad?
18  A. Usually when the general counsel of a university
19  is going to be at a meeting with you, and from my
20  experience with them prior, yeah, I didn't expect it was
21  going to be good.
22  Q. When you met with Charlie and Brandon and you
23  were asked about drinking on the away game, you told
24  them that you had not been drinking, right?
25       MR. HENRICHSEN: Form objection. Go ahead.

Page 196

1       THE WITNESS: I was slid in this paper and then
2  asked a series of questions. As I mentioned, I
3  know -- like, I know ideas of what things we talked
4  about. I don't know specific questions. I was -- I
5  was not in a normal state of mind to be -- to -- yeah,
6  to recall something like that.
7  BY MS. KAHN:
8  Q. You had been -- you had had drinks, though,
9  right?
10       MR. HENRICHSEN: Form objection. Go ahead.
11       THE WITNESS: When?
12  BY MS. KAHN:
13  Q. At the -- on one of the away games while you were
14  at a restaurant?
15  A. No. I wasn't at a game.
16  Q. You were with the students on an away trip,
17  right?
18  A. It was an away trip, yes.
19  Q. Okay. I'm not a sports person either.
20  A. Sure.
21  Q. So forgive me inarticulate description.
22  A. Um-hmm.
23  Q. But you and Leah had drinks, right?
24       MR. HENRICHSEN: Form objection. Go ahead.
25       THE WITNESS: Yes.

Page 197

1  BY MS. KAHN:
2  Q. Okay. And then when you got -- after your
3  meeting with Charlie and Brandon, when you got back to
4  the office, you sent an e-mail telling him that you had,
5  in fact, been drinking, right?
6  A. No. I wasn't at the office. I was at my home
7  because I was put on administrative leave.
8  Q. Okay. So you sent the e-mail from home?
9  A. I did.
10  Q. Okay. But in the e-mail, you admitted that you
11  had been drinking?
12  A. I was providing clarification on the e-mail that
13  it said intoxicated.
14  Q. Okay. But when you met with Charlie and Brandon,
15  Charlie asked you, is there something that the students
16  could have misinterpreted as alcohol?
17       MR. HENRICHSEN: Form objection.
18  BY MS. KAHN:
19  Q. Do you remember that?
20       MR. HENRICHSEN: Form objection. Go ahead.
21       THE WITNESS: I don't. I don't.
22  BY MS. KAHN:
23  Q. And Charlie asked you, was it water? Did you
24  have a cup?
25       Do you remember any of that?

50 (Pages 194 - 197)

CONFIDENTIAL

Page 198

1    A.  I really don't.
2    Q.  So you sent the e-mail, telling him that you had
3  had drinks.  And then what happened after that?
4        MR. HENRICHSEN:  Form objection.  Go ahead, you
5  can answer.
6        THE WITNESS:  What happened?  Well, I was put
7  on administrative leave.
8  BY MS. KAHN:
9    Q.  Okay.
10   A.  And I was -- yeah.  In the clear e-mail told that
11 I couldn't talk to anybody.
12   Q.  You still called Leah, though, didn't you?
13   A.  I called Leah after my meeting with him.  Like I
14 called Leah on the way home from my meeting and we had
15 practice that day.  She had no idea what was going on.
16 And I had to let her know that I wasn't going to be
17 there.
18   Q.  And you did that even though you had been told
19 not to contact anyone, right?
20       MR. HENRICHSEN:  Form objection.  Go ahead.
21       THE WITNESS:  I don't recall being told not to
22 contact anyone.  They told me I was on administrative
23 leave.
24 BY MS. KAHN:
25   Q.  You just told me --

Page 199

1    A.  I was asked in an e-mail by Charlie that said,
2  and please -- you know, something along the lines, I
3  haven't seen it, don't reach out to anyone and if you
4  have, to let me know.  And I wrote back, I said, I did
5  reach out to Leah.
6    Q.  Okay.  You told me before you don't remember a
7  lot from that meeting, right?
8    A.  No, I really don't.  I remember topics, not exact
9  words or context.
10   Q.  Okay.  After you were put on administrative
11 leave, you started texting people that you cared about,
12 right?
13   A.  I did.
14   Q.  And you were mad?
15   A.  I don't know if mad is the word.  That level of
16 distrust that I told you lasted for quite a long time.
17   Q.  Are you doing better now?
18   A.  Talking about it brings it back up.
19   Q.  Yeah.  Do you need a minute?
20   A.  I'm okay.
21   Q.  Okay.
22       MS. KAHN:  Let's go off the record for one
23 second.
24       THE VIDEOGRAPHER:  Going off the record at
25 5:52.

"Object to 199:6-9 - FRE 402 (not relevant evidence); FRE 404 (inadmissible character evidence); FRE 403 (unduly prejudicial and confusing)"

Page 200

1        (A brief recess was taken.)
2        THE VIDEOGRAPHER:  Going back on the record at
3  5:59.  This is media unit 5, letter A.
4  BY MS. KAHN:
5    Q.  I'm going to show you what's being marked as
6  Exhibit 62.
7        (Defendant's Exhibit No. 62 was marked for
8  identification.)
9        THE WITNESS:  Okay.
10 BY MS. KAHN:
11   Q.  And tell me if that refreshes your memory about
12 which meeting Mea attended.
13   A.  I -- well, I know what meeting I've asked Mea to
14 attend.  And it was the meeting with Brandon Young and
15 Charlie Sevastos following the first e-mail in August of
16 2021.
17   Q.  Okay.  I earlier thought you said it was
18 November.  But you agree it was August 2021?
19   A.  Yes.
20   Q.  Okay.  And I know you don't know what, you know,
21 happened during the investigation because you weren't
22 there.  But I think it's -- have you had a chance to
23 look at the e-mails -- or, I'm sorry, the interview
24 notes?
25   A.  I have.

Page 201

1    Q.  Okay.  I'm sure those were hard to read.
2        MR. HENRICHSEN:  Form objection.  Go ahead.
3        THE WITNESS:  Not really because, number one, I
4  didn't know who the player was, you know, because they
5  were redacted; and, number two, I didn't know what the
6  context was.  So to take it personally would have
7  meant that I knew these players and what they were
8  speaking of and what they were being prompted and
9  asked.
10 BY MS. KAHN:
11   Q.  Okay.  Did you see that there were four set-out
12 questions?
13   A.  I did.
14       THE VIDEOGRAPHER:  Microphone?
15 BY MS. KAHN:
16   Q.  In the notes, you saw that students accused you
17 of things like body shaming?
18       MR. HENRICHSEN:  Form objection.  Go ahead.
19       THE WITNESS:  I don't -- I don't know if I saw
20 that directly.  I mean...
21 BY MS. KAHN:
22   Q.  Was there anything that -- did you -- do you
23 disagree that you did the things that the students said
24 in the letter?
25       MR. HENRICHSEN:  Form objection.

51 (Pages 198 - 201)

Page 202

1    THE WITNESS: I can't even speak to it because
2  player and context and the way the question was
3  prompted, I wouldn't be able to answer that question.
4 BY MS. KAHN:
5  Q. Okay. So you don't have any reason to believe
6 that they lied then?
7    MR. HENRICHSEN: Form objection. Go ahead.
8    THE WITNESS: No.
9 BY MS. KAHN:
10  Q. Okay.
11  A. But again, I don't know the context.
12  Q. Because you weren't there?
13  A. I wasn't there. I wasn't -- I was excluded from
14 the investigation altogether.
15  Q. So if I understand correctly, are you saying that
16 the fact that you were excluded made it a not-fair
17 investigation?
18  A. 100 percent.
19  Q. Okay. Is there anything else that made it not
20 fair?
21  A. I was never allowed to address the complaints
22 directly made by players to provide context, the people
23 that I put forth regarding the investigation were never
24 interviewed, including parents. And considering it was
25 an anonymous e-mail from a parent, I thought that that

Page 203

1 was left out of the investigation. And that a sports
2 psychologist who just worked from the team was not
3 interviewed about the state of the team. So no, I don't
4 think it was a thorough investigation or fair.
5  Q. Other than the things that you've just mentioned,
6 is there anything else that you think makes the
7 investigation not thorough?
8    MR. HENRICHSEN: Form objection. Go ahead.
9    THE WITNESS: Never one of those complaints
10  were ever brought to my attention. The first time I
11  was reading them was in the interview notes. And
12  again, I never got asked about them directly at all.
13 BY MS. KAHN:
14  Q. Other than that, is there anything else that --
15  A. No.
16  Q. I have to ask, for the record. Is there anything
17 else that you think makes the investigation --
18  A. No.
19    MR. HENRICHSEN: Hold on.
20    THE WITNESS: Oh, sorry.
21    MR. HENRICHSEN: You have to let her finish.
22    THE WITNESS: Okay.
23    MR. HENRICHSEN: I know it's late. Just relax.
24  We're almost there.
25    THE WITNESS: I'm tired.

Page 204

1 BY MS. KAHN:
2  Q. Other than what we have already discussed, is
3 there anything else that you think makes the
4 investigation not fair?
5    MR. HENRICHSEN: Form objection. Go ahead.
6    THE WITNESS: No.
7 BY MS. KAHN:
8  Q. And you would have handled the investigation
9 differently?
10    MR. HENRICHSEN: Form objection. Go ahead.
11    THE WITNESS: I don't know how to answer that
12  question. I think a normal procedure from a coach
13  under investigation did not entail what this
14  investigation entailed, especially since my direct
15  supervisor never spoke to me once about any of these
16  complaints.
17 BY MS. KAHN:
18  Q. Isn't it better to get information firsthand from
19 somebody instead of -- even say here -- do you think
20 it's better that Embry-Riddle got the information
21 straight from the source, straight from the students
22 instead of one spot removed by going to the parents?
23    MR. HENRICHSEN: Form objection. Go ahead.
24    THE WITNESS: No. I think that both were
25  pertinent. Especially since the investigation was

Page 205

1  supposedly started due to parent e-mails, wouldn't you
2  investigate and talk to parents during an
3  investigation involving them?
4 BY MS. KAHN:
5  Q. That's how you would have handled it, right?
6  A. That is one of the things I would have worked
7 into a thorough investigation.
8  Q. Okay. Anything else?
9    MR. HENRICHSEN: Form objection. Go ahead.
10 BY MS. KAHN:
11  Q. That you would have worked into a thorough
12 investigation?
13    MR. HENRICHSEN: Form objection. Go ahead.
14    THE WITNESS: Questions that didn't just ask
15  negative -- prompt negative answers. If you're
16  investigating, you investigate the whole coach.
17  You're not prompting certain responses based off of
18  formed questions.
19 BY MS. KAHN:
20  Q. Well, doesn't the fact that the questions are
21 formed make it fair?
22  A. Negative? I don't think the questions were fair.
23  Q. Okay. When you said that you were asked for --
24 when you asked for certain items to be investigated --
25 I'm going to show you a letter, you tell me if that's

52 (Pages 202 - 205)

CONFIDENTIAL

1 it, okay? I think we're on 63.

2 A. Okay.

3 (Defendant's Exhibit No. 63 was marked for

4 identification.)

5 BY MS. KAHN:

6 Q. Is this the letter you sent?

7 A. This is one of the letters I sent.

8 Q. Okay. Is this the letter that you sent with your

9 ideas for the investigation?

10 A. It is.

11 Q. And you told me before that you spoke to the

12 lawyer, Sam Ekstrand, when you were put on leave for

13 this incident, right?

14 A. I did.

15 Q. Okay. So -- let's see. Other than making

16 suggestions on who they should speak with, and they did

17 not, is there anything else within this letter that you

18 believe shows that the investigation was not fair?

19 A. Well, in part. I state: Lastly, I feel very

20 uncomfortable with my mental health diagnosis being

21 raised and being a part of these discussions at all. I

22 feel that my disability is being singled out and used

23 against me here and that is not at all appropriate.

24 The next day, I was called in and I was fired.

25 Q. Okay. You -- we discussed earlier, though, that

1 somebody said that you were acting bipolar in the

2 letter, right?

3 A. Acting bipolar?

4 Q. They said --

5 A. I don't recall the exact words.

6 Q. They said: I apologize for -- I don't know

7 another term, I think is what they said.

8 A. It says: Vulgarity and her being bipolar.

9 Q. Okay. But that's not -- that's not Brandon and

10 Charlie bringing it up, right? That's --

11 MR. HENRICHSEN: Form objection. Oh, sorry.

12 BY MS. KAHN:

13 Q. That's in the letter?

14 MR. HENRICHSEN: Form objection. Go ahead.

15 THE WITNESS: Yes, it's in the letter.

16 BY MS. KAHN:

17 Q. Right. Okay. But they never said to you that

18 they were putting you on leave because you have bipolar

19 disorder, right?

20 A. Not that I recall.

21 Q. You probably would remember something like that,

22 right?

23 A. Probably. I did also send a part of that e-mail

24 that I sent -- what was it -- directly following our

25 meeting, I go into detail about my mental health being

1 an issue, yet again objecting to it being a part of any

2 discussions.

3 Q. You're talking about the last paragraph of the

4 letter?

5 A. No, not of this letter.

6 Q. Oh.

7 A. It would have been --

8 Q. You're talking about the November 5th letter

9 where you said that it was an unlawful termination?

10 A. No. I am talking about the November 1 e-mail

11 that addresses the clarifications and, also, includes --

12 here it is. Yes. That's the one I'm talking about.

13 November 1. An exchange between Charlie Sevastos and

14 Brandon Young.

15 Q. We talked about that one already, right?

16 A. We didn't talk about that portion of that e-mail.

17 Q. Okay. We can go back.

18 MR. HENRICHSEN: What exhibit are we on?

19 BY MS. KAHN:

20 Q. What is the exhibit number?

21 A. I'd have to go through all of them.

22 MS. KAHN: Let's go off the record a second.

23 THE VIDEOGRAPHER: Going off the record at

24 6:13.

25 (A brief recess was taken.)

1 THE VIDEOGRAPHER: Going back on the record at

2 6:23. This is media unit 5, letter B.

3 BY MS. KAHN:

4 Q. Okay. I don't have the redacted copies with me,

5 so I'll show you for purposes of the conversation. Is

6 that okay?

7 A. Um-hmm.

8 Q. But I'm going to need both sets back.

9 A. Okay.

10 Q. All right. All right. So at the top, does it

11 have --

12 MS. KAHN: We're back on the record?

13 BY MS. KAHN:

14 Q. Does it have interview dates?

15 A. It does.

16 Q. Okay. And you said you thought the questions

17 were negative?

18 A. I did.

19 Q. Okay. The parent reported that you had been

20 intoxicated, right?

21 MR. HENRICHSEN: Form objection. Go ahead.

22 THE WITNESS: The parent -- a parent, if it was

23 a parent, could -- it was anonymous, so we don't know

24 that -- reported it but was definitely not there if

25 they were a parent.

CONFIDENTIAL

Page 210

1 BY MS. KAHN:
2    Q.  Okay.  All right.  Let me have this back.
3    A.  Okay.
4    Q.  Did you ever use the N-word towards 34?
5    A.  No.
6    Q.  Just quickly, if I could get you to identify --
7 are we on 61?
8        THE VIDEOGRAPHER:  64.
9        MS. KAHN:  I'm off.  Okay.
10       (Defendant's Exhibit No. 64 was marked for
11 identification.)
12 BY MS. KAHN:
13    Q.  Show you what's been identified as -- marked as
14 64.  And I just wanted to confirm this is the letter
15 that you put together with information about student 37
16 after the father made accusations against you?
17    A.  Okay.
18    Q.  Okay.  All right.  So you have -- did you file a
19 charge of discrimination after you were fired?  Did we
20 get -- we didn't get to the firing.  Let's go back.
21       After this November 3rd e-mail that you sent, and
22 it was sent in the evening, correct?  Nine something at
23 night.
24    A.  I don't recall what time it was sent.
25    Q.  Okay.  So the next day, were you called into HR?

Page 211

1    A.  I was.
2    Q.  Okay.  And what happened?
3    A.  I was told that I was being relieved of my
4 position as head women's lacrosse coach effective
5 immediately.
6    Q.  Okay.  And Brandon told you that it was because
7 Embry-Riddle had lost confidence in you?
8    A.  He had said that he -- that they had lost -- they
9 had a lack of trust and confidence in me.
10    Q.  Okay.  Have you -- previously, have you ever said
11 that it was just a lack of confidence?
12    A.  No.
13    Q.  Okay.  But Brandon didn't give you any other
14 reason than that?
15    A.  I asked him what he found in the investigation,
16 and he told me that it was consistent with the e-mail.
17    Q.  Okay.  Did you file a charge of discrimination
18 after your termination?
19    A.  I did.
20    Q.  And in that charge, you alleged discrimination on
21 the basis of your gender, right?
22    A.  Yes.
23    Q.  Disability?
24    A.  Yes.
25    Q.  Okay.  Is the disability that you're alleging

Page 212

1 discrimination and retaliation for is -- we're just
2 talking about bipolar?
3    A.  No.
4    Q.  What other disability were you discriminated
5 against for?
6    A.  Could you repeat your question?
7    Q.  Sure.
8    A.  Please.
9    Q.  It's getting late.
10       In your charge of discrimination, you allege
11 disability discrimination, retaliation, right?
12    A.  Yes.
13    Q.  Okay.  As far as the disability that you're
14 claiming that is bipolar, correct?
15    A.  Correct.
16    Q.  No other disabilities that you're claiming you
17 were discriminated against?
18    A.  No, no other disabilities.
19    Q.  And I -- I know this sounds obvious, but is your
20 gender female?
21    A.  Yes.
22       THE VIDEOGRAPHER:  Ms. Kahn, microphone.
23 BY MS. KAHN:
24    Q.  What actions do you believe were disability
25 discrimination?

Page 213

1    A.  That they were made aware of my disability, they
2 did not provide a reasonable accommodation when I asked
3 for it.  And then when I brought up how I felt
4 uncomfortable with my bipolar being a part of the
5 discussion, I was fired.
6    Q.  So we've talked about all those pieces already,
7 right?
8    A.  Um-hmm.
9    Q.  Yes?
10    A.  Yes.
11    Q.  Is there any other reason you believe you were
12 discriminated against because of your disability?
13    A.  No.
14    Q.  Okay.  Same question for --
15    A.  Sorry.
16    Q.  Same question for your gender.  Why do you
17 believe you were discriminated against because of your
18 disability?
19    A.  My disability or my gender?
20    Q.  I'm sorry.  Yes.  I'm going to start the question
21 all over.
22    A.  Okay.
23    Q.  What facts can you tell me that show that you
24 were discriminated against because of your gender?
25    A.  Because I was treated differently than male

54 (Pages 210 - 213)

CONFIDENTIAL

Page 214

1 coaches that were in similar -- similarly-situated
2 accusations in situations.
3    Q. Okay. What coaches?
4    A. Dave Gregson, the head men's soccer coach. Chuck
5 Pulido, assistant men's baseball coach. Brian Frank,
6 men's lacrosse coach. Chad Keller, assistant men's
7 basketball coach. Those are some examples.
8    Q. Is that it?
9    A. Yes.
10    Q. Nobody else? Okay.
11       Can you tell me any facts -- first of all,
12 there's no one named Chuck Pulido.
13    A. Randy Pulido's brother, Chuck Pulido.
14    Q. Chuck Stegall?
15    A. Stegall. I'm sorry.
16    Q. Okay. All right. So tell me how you think that
17 Dave Gregson behaved in conduct similar to yours.
18    A. Because Dave Gregson had continuous complaints
19 from his players regarding upholding the
20 student-person-player philosophy for many years in a row
21 and was put on a performance improvement plan.
22    Q. A performance improvement plan was not for
23 mistreating his students, though, was it?
24    A. I think it was for multiple reasons.
25    Q. None of those reasons were for mistreating a

Page 215

1 student, right?
2    A. No.
3    Q. Did Dave Gregson ever lie?
4    A. Not that I'm aware of.
5    Q. Has Dave Gregson -- does he have an arrest
6 record?
7    A. I don't know his past, no.
8    Q. Okay. What about Chuck Stegall? Has he, to your
9 knowledge, been accused of mistreating students?
10    A. Yes.
11    Q. Tell me about that.
12    A. He's been accused of regularly using vulgarity,
13 calling them names, specifically calling them pussies.
14    Q. So you believe that all things being equal, that
15 you're in a similar situation than those people that --
16    A. I do.
17    Q. Okay. And are the facts that you have the same
18 ones that you discussed in the complaint?
19    A. Yes.
20    Q. Okay. Nothing else?
21    A. Nothing else in regards to -- can you elaborate?
22    Q. Sure. Nothing else in regards to facts that show
23 that they were treated better?
24    A. My experience with how I was treated, versus male
25 coaches.

Page 216

1    Q. And I understand what you're saying. Is there
2 anything else?
3    A. No.
4    Q. Okay. Thank you. Tell me how you think you were
5 retaliated against.
6    A. Because when I brought up my mental health
7 diagnosis, I was fired the next day.
8    Q. Okay. You're talking about the November 3rd
9 e-mail?
10    A. I am.
11    Q. Okay. Did any of your students after being
12 interviewed, did any of them call you?
13    A. Not right away.
14    Q. Did anyone call you that day to tell you the
15 questions that were being asked?
16    A. No.
17    Q. When you wrote that letter, you didn't -- on
18 November 3rd, you did not know what questions were being
19 asked?
20    A. I did not.
21    Q. You had not spoken to a single student?
22    A. I had not.
23    Q. Who retaliated against you?
24    A. Brandon Young, Charlie Sevastos, JP Phillips.
25    Q. You told me earlier that JP wasn't involved in

Page 217

1 your termination, right?
2    A. I don't believe I told you that.
3    Q. You believe that JP was involved in your
4 termination?
5    A. Do I believe?
6    Q. Yes.
7    A. To an extent.
8    Q. What does that mean?
9    A. I know he was kept out of the investigations.
10 However, I don't know that he wasn't involved in the
11 investigation. And I've seen documents that have shown
12 otherwise.
13    Q. Didn't you send him the text message as soon as
14 you got asked to go see Brandon?
15    A. Yes.
16    Q. That's because you thought he was on your side,
17 right?
18    A. Because he was my support supervisor and I wanted
19 to know what I was walking into.
20    Q. Okay. Why do you believe that Charlie retaliated
21 against you?
22    A. Because once I brought up my disability to them,
23 I was fired the next day.
24    Q. You're talking about in the November 3rd letter?
25    A. Correct.

55 (Pages 214 - 217)

CONFIDENTIAL

Page 218

1  Q. Okay. Anything else?
2  A. No.
3  Q. I'm not saying that's not enough.
4  A. No, I know.
5  Q. It's just for the record. That's a legal issue.
6     What about Brandon, why do you believe he
7  retaliated against you?
8  A. Because I believe that Brandon targeted me
9  because of my disability and treated me differently and
10 as a result, retaliated against me and fired me because
11 of it.
12 Q. Okay. But what facts? Why would he do that?
13    MR. HENRICHSEN: Form objection. Go ahead.
14    THE WITNESS: His consistent refusal to
15 accommodate a reasonable accommodation based off his
16 knowledge of the extreme distress the situations put
17 me in.
18 BY MS. KAHN:
19 Q. You're saying because he wouldn't let you have an
20 advocate?
21 A. That's one, one of the reasons.
22 Q. Okay. What are the other reasons?
23 A. Also not let me leave the room when I refused to
24 share information in regards to my mental health
25 diagnosis when I was being questioned about the Baker

Page 219

1  Act.
2  Q. Did he stand up like against the wall, or what do
3  you mean by he wouldn't let you leave the room?
4  A. I felt -- I felt that there would be retaliation
5  if I did get up and walk out.
6  Q. Okay. But he never said, you're not allowed to
7  leave, right?
8  A. He created an environment that made me scared to.
9  Q. You felt like you couldn't go?
10 A. Correct.
11 Q. Any other reasons that Brandon would have -- you
12 believe Brandon retaliated against you?
13 A. No other reasons than I mentioned.
14 Q. Is there anyone else that you believe has
15 retaliated against you or discriminated against you in
16 your employment?
17 A. No.
18 Q. Okay. So the events that you believe were
19 adverse were the termination; is that right?
20 A. That's one of them.
21 Q. Okay. What else?
22 A. Starting in 2019 with the questioning in regards
23 to 37.
24 Q. Okay. Did you file a charge of discrimination
25 prior to the one you filed in this case?

Page 220

1  A. Like while I was still --
2  Q. Against Embry-Riddle?
3  A. While I was still employed?
4  Q. Yes.
5  A. No.
6  Q. Okay. So in January 2019, when all the 37
7  information was disclosed to you, the first time you
8  filed a charge of discrimination was in 2022, right?
9  A. That sounds correct.
10 Q. Okay. Are there any other actions besides the
11 termination and the communications regarding Mr. 37 that
12 you believe were discrimination or retaliation?
13 A. No more than I've already discussed.
14 Q. Okay. And in terms of failure to accommodate,
15 you believe that you were not accommodated because you
16 were not allowed to have an advocate, right?
17 A. That -- I've answered this question.
18 Q. Okay. Would you answer it again, please?
19 A. Could you ask it again?
20 Q. Sure. The reason you believe that you were --
21 that you were not accommodated is because you were not
22 allowed to have an advocate with you, right?
23    MR. HENRICHSEN: Form objection. Go ahead.
24    THE WITNESS: That's one of the reasons. I was
25 refused to -- you know, refused an advocate when

Page 221

1  asked. I felt, again, bullied and coerced to disclose
2  information I didn't feel comfortable with.
3  BY MS. KAHN:
4  Q. Okay. All stuff we've talked about?
5  A. Yep.
6  Q. Okay. Anything else?
7  A. No.
8  Q. Okay. Did you ever hear -- did you ever overhear
9  anyone make any kind of inappropriate comment about your
10 gender?
11 A. I think -- could you rephrase the question?
12 Q. Sure. Was there any situation where someone said
13 something negative about the fact that you were a woman?
14 A. I don't -- I don't know if it classifies as --
15 I'm having trouble understanding the question. I've
16 been -- I've been put in inappropriate situations
17 because I was a woman by a man in -- during my tenure
18 there and treated differently.
19 Q. Okay. I'm talking about in terms of your
20 treatment as it relates to your termination or towards
21 what happened with Mr. 37 in 2019. Did anyone make any
22 comments about your gender?
23 A. Not that I'm aware.
24 Q. And nobody told you that you were fired because
25 you sent the November 3rd letter complaining, right?

CONFIDENTIAL

Page 222

1  A. Correct.
2  Q. Okay. If I was going to ask you to rank the
3  reason that you think you were fired, would it be -- you
4  can rank them one to three -- do you think it was
5  disability discrimination, gender discrimination, or
6  retaliation?
7      MR. HENRICHSEN: Form objection. Go ahead if
8  you can answer.
9      THE WITNESS: I would argue all equal.
10 BY MS. KAHN:
11  Q. Okay. So you could not pick out of the three
12 which one is the most likely?
13     MR. HENRICHSEN: Form objection. Go ahead if
14 you can answer.
15     THE WITNESS: Discrimination and retaliation.
16 BY MS. KAHN:
17  Q. So which one would you place as number one?
18     MR. HENRICHSEN: Form objection. Asked and
19 answered. Go ahead.
20     THE WITNESS: Discrimination.
21 BY MS. KAHN:
22  Q. Based on gender or disability?
23  A. Disability.
24  Q. Okay. What would be the second one?
25  A. Retaliation.

Page 223

1      MR. HENRICHSEN: Form objection. Go ahead.
2      THE WITNESS: Sorry. Retaliation.
3  BY MS. KAHN:
4   Q. Retaliation for complaining about your --
5  about -- in the November 3rd letter, right?
6   A. Again, every time that I asked for an
7  accommodation and discussed how uncomfortable I was with
8  my bipolar disorder being mentioned. Those were
9  multiple times, not just on the November 3rd e-mail.
10  Q. Okay. So you believe each of those instances was
11 retaliation?
12  A. Yes.
13  Q. Okay. You weren't fired any of those instances,
14 right?
15  A. I was fired on November 3rd.
16  Q. Other than that?
17  A. No.
18  Q. Okay. Were you ever suspended without pay?
19  A. No. I was suspended with pay.
20  Q. Okay. Are there any other actions that you can
21 point to that show that there was a negative result to
22 you, other than, of course, your feelings, like an
23 employment action?
24  A. Sure.
25     MR. HENRICHSEN: Form objection. Go ahead.

Page 224

1      THE WITNESS: I mean, I think it -- I think the
2  lack of a thorough investigation, I think lack of the
3  communication between my support supervisor and me,
4  which was directly different than how other coaches
5  without disabilities were treated. I -- I think the
6  means in which I was called in and even though I
7  discussed my trauma surrounding it, the complete
8  neglect and compassion and -- was shown towards me.
9  BY MS. KAHN:
10  Q. Okay. You agree you never complained about
11 discrimination based on your gender, right, at the time?
12  A. I spoke quite often to support supervisors about
13 it. I spoke to Mea Darley, I spoke to Sonja Taylor
14 about consistently being treated differently than a man
15 in the same position.
16  Q. Did you ever -- you said that you thought it
17 was -- you were fired by Brandon, Charlie and JP.
18  A. Um-hmm.
19  Q. Did you ever complain to them about mistreatment
20 based on gender?
21  A. I did not.
22  Q. Okay. And nobody ever said that you were being
23 discriminated against because of your gender, right?
24     MR. HENRICHSEN: Form objection. Go ahead.
25     THE WITNESS: I don't recall.

Page 225

1      MR. HENRICHSEN: We've been going almost ten
2  hours. I just want to --
3      MS. KAHN: I'm almost done.
4      MR. HENRICHSEN: Okay. I just want to get a
5  time check from the videographer, which I don't
6  believe is the -- actually the actual time of the
7  deposition but go ahead, what do you have?
8      THE VIDEOGRAPHER: If we go off the record for
9  a second, I can tell you.
10     MS. KAHN: Let's go off the record.
11     THE VIDEOGRAPHER: Going off the record at
12 6:51.
13     (A brief recess was taken.)
14     THE VIDEOGRAPHER: Going back on the record at
15 6:53. This is media unit 5, letter C.
16 BY MS. KAHN:
17  Q. We talked a little bit about how you like to be
18 outdoors?
19  A. I do.
20  Q. Okay. What else do you like to do for fun?
21     MR. HENRICHSEN: Form objection. Go ahead.
22     THE WITNESS: I love to travel. I am really
23 enjoying renovating our house and working on my
24 business. I play a lot of Pool, billiards, which has
25 been really great because I am still so competitive,

57 (Pages 222 - 225)

CONFIDENTIAL

Page 226

1  so it keeps me in that, playing games.  And I like
2  binge watching Netflix.
3  BY MS. KAHN:
4    Q.  What's your show?
5    A.  Currently I'm watching for the second time,
6  because my fiance hasn't seen it before, the Walking
7  Dead, all, like, 13 seasons.  I know.  Well, before we
8  go to sleep.  It's really morbid.
9    Q.  All right.  So would you say that you're feeling
10  better now than you were when you were first terminated?
11    A.  Absolutely.
12    Q.  Okay.  You're getting married?
13    A.  I am.
14    Q.  Are you having a wedding?
15    A.  I am.
16    Q.  Are you planning the wedding?
17    A.  Trying to.
18    Q.  It's fun, right?
19    A.  Sometimes.
20    Q.  Sometimes it's fun?
21    A.  Yes.
22    Q.  Have you looked for a dress?
23    A.  Not yet.
24    Q.  Okay.  Is that something you're looking forward
25  to?

Page 227

1    A.  I am.
2    Q.  Yeah.  Okay.  Are you noticing any difficulty in
3  your day-to-day activities?
4    A.  More so, I see it in my sleep.  I suffer from
5  nightmares.
6    Q.  Okay.  When did that start?
7    A.  Right after this.
8    Q.  Okay.  And is there a specific nightmare?
9    A.  No, they're all different, but surrounded around
10  the same thing.
11    Q.  For your depression, do you take any kind of
12  medication for sleep?
13    A.  Well, I'm not depressed.  I have the bipolar and
14  I take carbamazepine as my drug.  I don't -- I did take
15  another drug for a while called olanzapine to help me
16  sleep but it didn't really do a great job.
17    Q.  Okay.  So I guess part of bipolar is having, I
18  guess, mania and depressive disorder, right?
19    A.  So there's three types of bipolar disorder.
20  There's type one --
21    Q.  Is that the type you are?
22    A.  -- which is -- I am actually a third.  I am type
23  one with psychotic manic episodes.
24    Q.  Okay.  But you're not experiencing -- you said
25  you had nightmares, but you're not experiencing any

Page 228

1  depression right now?
2    A.  Not severe, no.  Nothing I'd characterize as
3  depression.
4    Q.  Just normal stuff?
5    A.  As of recent, the anxiety has increased going
6  through all of this, you know, I've spent 14 months
7  trying to move on and heal.  So it's definitely
8  exacerbated.
9    Q.  So the litigation causes anxiety?
10    A.  Yeah.
11    Q.  Okay.
12    A.  Talking about it at all, reliving it hurts a lot.
13    Q.  Okay.  And you're getting married.  Do you
14  have -- I'm sorry, I have to ask this.  Do you have sex
15  with your fiance?
16    A.  I do.
17    Q.  Okay.  And no problems feeling up to doing that?
18    A.  Aside from being too busy.  No.
19    Q.  All right.  Any other things that -- is there
20  anything you can tell me that you were doing before you
21  were fired that you are unable to do now in terms of
22  life activities?
23    A.  Well, that's a bit difficult to answer because my
24  whole life was my career.  So I don't have the
25  relationships that I do with players anymore.  I don't

Page 229

1  have the constant communication.  I don't have the
2  identity of being an athlete from as far as I can
3  remember.  I have a major gap in who I am because of the
4  loss of that.
5    Q.  Okay.  Have you had any mental health treatment
6  in the last ten years?
7    A.  Could you clarify what -- what kind of mental
8  health treatment.
9    Q.  All right.  Let me -- just -- let me speed this
10  up since we're -- it's getting late.
11        Other than Dr. Goodman, Dr. Aly and Dr. Chappell,
12  are there any other mental health doctors you have seen
13  in the last --
14    A.  No.
15    Q.  You have not had a psychosis episode --
16    A.  Correct.
17    Q.  -- since you left Embry-Riddle, right?
18    A.  Correct.
19    Q.  Okay.  And in terms of your physical health, it
20  looks -- are you having trouble managing your diabetes?
21    A.  Sometimes.
22    Q.  Do you -- is your endocrinologist telling you
23  that your diabetes is controlled?
24    A.  Semi.  He'd like my A1C to be lower and go on a
25  pump.

58 (Pages 226 - 229)

CONFIDENTIAL

Page 230

1  Q. You don't want to do those things?
2  A. I can't afford it.
3  Q. Do you have health insurance?
4  A. I do.
5  Q. What is it through?
6  A. It's through United, I believe, healthcare.
7  Q. Okay. Is it similar to the plan that you had
8  when you were at Embry-Riddle?
9  A. I wish.
10 Q. What's different about it?
11 A. It doesn't accept any of my doctors.
12 Q. So you would have to go to different doctors?
13 A. I chose not to go to different doctors because I
14 established relationships so I pay out of pocket for
15 them.
16 Q. Okay. So to use your insurance, you would have
17 to make that change?
18 A. I'm sorry, could you repeat the question?
19 Q. Sure. To use your insurance, you would have to
20 change to different doctors?
21 A. Correct.
22 Q. Okay.
23 A. And I also tried and there's none in the network.
24 Q. Have you called United to see if they can find
25 someone for you?

Page 231

1  A. No, I have not because I really have established
2  a great relationship with my doctors and they're hard to
3  find.
4  Q. Okay. So how does the diabetes affect you
5  physically?
6  A. Well, I have a nonworking pancreas so --
7  Q. Other than the --
8  A. I have to monitor it every day. I take five to
9  seven shots a day to manage it and prick my finger about
10 five times a day.
11 Q. Do you feel like it makes you tired?
12 A. Sometimes. If my sugars are high.
13 Q. Anything else?
14 A. If you fall low, I have to manage it because
15 that's how -- that's how I could go into a coma and die.
16 So falling low would require me to get sugar as quickly
17 as possible into my body. So that's a big management of
18 it.
19 Q. Is there -- I'm sorry, I'm going fast now.
20 A. That's okay.
21 Q. Is there anything else health related, other than
22 the diabetes you have going on?
23 A. Outside of my normal psychotherapy and, you know,
24 seeing the psychiatrist, no.
25 Q. And I have to ask these questions, but from, you

Page 232

1  know, your doctor's notes, did you have -- you started
2  taking drugs pretty young, right?
3  A. I did.
4  Q. Mushrooms at 12? Is that right?
5  A. 12? No. That's not right.
6  Q. Okay. How old?
7  A. 18.
8  Q. Okay. And cocaine?
9  A. I did that, yes. Probably around 14 was the
10 first time.
11 Q. Are you an alcoholic?
12 A. No.
13 Q. Do you drink alcohol?
14 A. I do.
15 Q. How often?
16 A. Depending on the week and what we have going on,
17 maybe a few nights a week.
18 Q. Is one of -- you said you enjoy renovating your
19 house. Is that something that your fiance does with
20 you?
21 A. It is.
22 Q. When you get married, will you be able to go on
23 his insurance?
24 A. Yes.
25 Q. What type of insurance does he have?

Page 233

1  A. I believe it's Blue Cross Blue Shield.
2  Q. A PPO?
3  A. Not sure about that.
4  Q. Okay. What type of medication are you currently
5  on?
6  A. Well, I take my short-acting insulin; I take my
7  long-acting insulin and then I take my carbamazepine.
8  Q. Okay. And is that -- that's what you're taking
9  for bipolar?
10 A. Correct.
11 Q. So just those three medications?
12 A. Uh-huh.
13 Q. Okay. And did you lose someone that you cared
14 about when you were in high school in a motor vehicle
15 accident?
16 A. I did.
17 Q. It was a boyfriend?
18 A. My best girlfriend.
19 Q. Your best girlfriend.
20 A. Yeah.
21 Q. Sorry. You own other homes, correct, than the
22 one that you're living in?
23 A. I do.
24 Q. Okay. What are -- is that Derbyshire?
25 A. No. I had to sell Derbyshire.

59 (Pages 230 - 233)

CONFIDENTIAL

Page 234

1    Q. Okay. Is that the house you got $300,000 for?
2    A. No.
3    Q. Did you ever tell anyone you got $300,000 in
4  profit?
5    A. I didn't get $300,000 in profit.
6    Q. Okay. How much profit did you make on that?
7    A. I've had multiple properties so you have to be
8  more -- way more specific.
9    Q. On Derbyshire.
10    A. Derbyshire, I probably -- I definitely didn't
11  make close to 300,000. Maybe 35,000 from the point in
12  which I bought it and sold it.
13    Q. Okay. Do you still own Lewis Drive, Daytona
14  Beach?
15    A. I do not.
16    Q. Did you sell that at a profit?
17    A. Same, around the same property that I got,
18  probably around 35, $40,000.
19    Q. Okay. And what about La Paloma?
20    A. I bought La Paloma in -- yeah, I bought La Paloma
21  and I own it now.
22    Q. Is that the house that you're renovating?
23    A. No. That is a house I did renovate. It's
24  finished being renovated.
25    Q. Okay. And are you renting it out?

Page 235

1    A. I am.
2    Q. How much are you renting it out for?
3    A. It's like an algorithm that's through Airbnb. So
4  depending on, like, the price, it changes.
5    Q. Do you get paid through your Piccolo LLC?
6    A. I don't -- Piccolo doesn't pay myself.
7  Everything just goes through the business.
8    Q. Okay. And do you take any money out of the
9  business?
10    A. I might have from time to time but I don't
11  recall. Mostly it's been at a loss for a while, so it's
12  been paying off renovations and all of the bills that I
13  spent or all the money that I spent renovating it.
14    Q. Okay. So you put the money, I guess, into the
15  house?
16    A. I did.
17    Q. Okay. Do you own any other properties?
18    A. I do. I just bought a property from the sale of
19  all three of those properties in September.
20    Q. What's the address, the street name?
21    A. It's 2908 South Peninsula Avenue in Daytona
22  Beach, Florida.
23    Q. Okay. And what are you going to do with that
24  house?
25    A. We're renovating that right now.

Page 236

1    Q. That's the house you're renovating?
2    A. Correct.
3    Q. Did you and Chris buy that house together?
4    A. No.
5    Q. Okay. Are you -- you're not taking a paycheck
6  out of Piccolo; is that right?
7    A. I'm not.
8    Q. Okay. How are you supporting yourself?
9    A. Through my consulting job with Elite.
10    Q. Okay. Is Chris taking money out of Piccolo?
11    A. God no.
12       MS. KAHN: Let's stop for a second.
13       THE VIDEOGRAPHER: Going off the record at
14  7:08.
15       (A brief recess was taken.)
16       THE VIDEOGRAPHER: Going back on the record at
17  7:09. This is media unit 5, letter D.
18  BY MS. KAHN:
19    Q. Did you apply for unemployment insurance?
20    A. I started to. But never finished the process.
21    Q. So you've never received any money from
22  unemployment?
23    A. I didn't.
24    Q. Okay. What about Social Security Disability?
25    A. I do not.

Page 237

1    Q. Okay. Do you have any private insurance policies
2  that you're getting money from?
3    A. No.
4    Q. Did -- have you borrowed any money from anyone
5  that you're expected to return?
6    A. No.
7    Q. What type of car do you drive?
8    A. Well, depends on the day.
9    Q. Okay. So how many cars do you have?
10    A. My father gave me an old BMW Z3 that I drive.
11  And then I have a beaten-up truck that hasn't been
12  renovated that I will -- will be driving. But most of
13  the time, I drive the BMW.
14    Q. Is the BMW a 2022?
15    A. Oh, God, no. It's an antique. It's 1993.
16    Q. Okay. So you don't own a 2022 car?
17    A. No.
18    Q. Tell me what you have done to look for -- oh, you
19  know what?
20       Was there a time that you took a job for a few
21  months at VITAS?
22    A. Veritas.
23    Q. Veritas?
24    A. Um-hmm.
25    Q. Yes?

60 (Pages 234 - 237)

CONFIDENTIAL

1   A. It was two days.
2   Q. Two days a week?
3   A. No, two days total that I took the job.
4   Q. You offer -- you were offered the job in
5   February, right, 2022?
6   A. That sounds about right.
7   Q. Okay. And then you resigned, right?
8   A. Two days after I started.
9   Q. Okay. Did you send a resignation e-mail?
10  A. I did.
11  Q. Okay. And in the e-mail, you said that you
12  didn't understand the time commitment, right?
13  A. I don't know the exact words around it. But
14  there was multiple reasons why it wasn't a good fit.
15  Q. Okay. You said you wanted to pursue your
16  passion, lacrosse, is what you said at the time?
17  A. Again, I was very passionate about my renovations
18  and Airbnbs, too. So I think I was -- you know, it was
19  running my own business; it was continuing to be able to
20  be involved with lacrosse. There was multiple reasons
21  that it didn't allow for and originally, they made me
22  believe that it would.
23  Q. Okay. And that was a part-time job, right?
24  A. I think so. Like 30 hours a week.
25  Q. Okay. Were you offered full-time?

1   A. There was discussions about once the season was
2   over at Rollins, to pick up full-time after, you know,
3   after the season ended.
4   Q. Okay. Not something you were interested in,
5   though, right?
6   A. To pick up, you know, for 40 hours?
7   Q. No.
8   A. Oh.
9   Q. Yeah. You -- you did not want to work 40 hours?
10  A. I did not want to work there.
11  Q. Okay.
12  A. No, I didn't want to work for Veritas. I would
13  have loved a full-time job. I just didn't want to work
14  for them.
15  Q. Okay. Have you had -- tell me what other efforts
16  you've made to look for jobs.
17  A. I believe I -- I applied for a few positions on
18  LinkedIn. I applied on Indeed. Well, I had hopes that
19  I was going to be offered a paid position at Rollins
20  following the season because I came in halfway through.
21  Dennis had said there was a potential possibility that I
22  could be brought on full-time, or brought on as a paid
23  position in the fall. However, he told me that he
24  talked to them and that wasn't an option. So when that
25  happened, I stopped coaching. There weren't, at the

1   time, any other positions in coaching in Florida. And I
2   didn't look out of the state because I wasn't willing to
3   move.
4   Q. Okay. So other than those efforts, is there
5   anything else you've done to try to find a job?
6   A. I think that's about it.
7   Q. Okay. You're enjoying doing the home
8   renovations?
9   A. I'm enjoying when they'd be done and they make me
10  money.
11  Q. Okay. I had a subpoena served on you --
12  A. Okay.
13  Q. -- for your records for Piccolo.
14  A. Um-hmm.
15  Q. Did you receive that subpoena?
16  A. I did.
17  Q. Okay. Did you provide those documents to your
18  attorney?
19  A. I did.
20  Q. Okay. How did you find your lawyers?
21  A. I called every lawyer in town. I'm just kidding.
22  I mean, I did.
23  Q. All right. Let's see. Two things. Just want to
24  show you your tax returns and --
25  A. Yeah.

1   Q. -- and I just want you to take a look at. It's
2   Giannerini 2114 through 2186. Do you want a copy?
3   A. Sure.
4   Q. Just want you to --
5   A. Yeah.
6   Q. -- confirm that those are your tax returns.
7   A. Where's the date? They look like them.
8   Q. Okay. You don't have any reason to believe that
9   they're not your tax returns, right?
10  A. No.
11  Q. Okay.
12  A. These are -- I mean, these are mine.
13  Q. I'm almost done.
14     Okay. Two more questions.
15  A. Okay.
16     THE VIDEOGRAPHER: Two minutes.
17     MS. KAHN: Why don't you go off the record for
18  one minute, then?
19     THE VIDEOGRAPHER: Going off the record at
20  7:17.
21     (A brief recess was taken.)
22     THE VIDEOGRAPHER: Going back on the record at
23  7:17. This is media unit 5, letter E.
24     MS. KAHN: You're taking my two minutes. Are
25  you okay?

61 (Pages 238 - 241)

CONFIDENTIAL

Page 242

1    THE VIDEOGRAPHER: I'm good.
2 BY MS. KAHN:
3    Q. I found some pictures that I want to show you.
4    A. Okay.
5    Q. I'm marking them as Defendant's Exhibit 64.
6    THE VIDEOGRAPHER: 65.
7    MS. KAHN: Oh, 65.
8    (Defendant's Exhibit No. 65 was marked for
9    identification.)
10 BY MS. KAHN:
11    Q. Could I have that back, please?
12    That's you?
13    A. I love these pictures. Yes.
14    Q. That's why you decide to put them on the
15    internet?
16    A. Correct.
17    Q. Let me change that to a 65. And so this is going
18    to be Defendant's 66.
19    (Defendant's Exhibit No. 66 was marked for
20    identification.)
21 BY MS. KAHN:
22    Q. And you'll just confirm that's yours. Your
23    social media account. Is that your --
24    A. Yes.
25    Q. -- social media account? Okay. And for 67, if

Page 243

1 you could just confirm that's your social media account.
2    (Defendant's Exhibit No. 67 was marked for
3    identification.)
4    THE WITNESS: Okay.
5 BY MS. KAHN:
6    Q. Is that your social media account?
7    A. It is.
8    Q. Okay. That's all I have. Thank you.
9    CROSS-EXAMINATION
10 BY MR. HENRICHSEN:
11    Q. Ms. Giannerini, in response to counsel's
12 questions, earlier, you had responded by reading part of
13 a November 3rd e-mail you sent to Mr. Young and
14 Mr. Sevastos. You read: Lastly, I feel very
15 uncomfortable with my healthcare diagnosis being raised
16 and being part of these discussions at all. I feel that
17 my disability is being singled out and used against me
18 here and that it is not at all appropriate.
19    Do you remember that testimony?
20    A. Yes.
21    Q. Okay.
22    MS. KAHN: Object to form.
23 BY MR. HENRICHSEN:
24    Q. Did you believe that was an objection to the way
25 you were being treated on account of your disability?

Page 244

1    A. Absolutely.
2    Q. Prior to November 3rd, 2021, had you made other
3 objections about how you were being treated on account
4 of your disability --
5    A. Yes.
6    Q. -- at other meetings? Can you tell us which
7 ones?
8    A. In the August meetings.
9    Q. The August 2021 meetings?
10    A. Correct.
11    Q. Tell us what you did.
12    MS. KAHN: Objection.
13 BY MR. HENRICHSEN:
14    Q. Go ahead.
15    A. Well, I was objecting to even disclosing any
16 information in regards to my mental health.
17    Q. Okay. How about in January of 2019,
18 February 2019, did you make any objections about how you
19 were being treated on account of your disability, when
20 you were being asked about the Baker Act?
21    MS. KAHN: Object to form.
22    THE WITNESS: Yes.
23 BY MR. HENRICHSEN:
24    Q. What did you -- how did you object?
25    A. Same way that I just said. I'm sorry, I'm

Page 245

1 getting really confused.
2    Q. Okay. All right. So --
3    A. Could you ask me again?
4    Q. Sure. 2019 --
5    A. Yes.
6    Q. -- did you feel that you objected to Mr. Young or
7 anyone in the administration of the defendant in this
8 case regarding your disability and how they were
9 treating you?
10    A. I did because I asked Mr. Young to let me know
11 what it was about because of the stress that it caused.
12    Q. Right. And -- and prior to November 3rd, but
13 after you were shown the October 30, 2021, anonymous
14 e-mail, which mentioned bipolar, did you, before the
15 November 3rd e-mail -- and I read you that section from
16 it -- did you object to how you were being treated on
17 account of your disability?
18    MS. KAHN: Object to form.
19    THE WITNESS: No.
20 BY MR. HENRICHSEN:
21    Q. Okay. So did you, on November 1st, when you were
22 meeting with Mr. Sevastos and Mr. Young, did you say
23 anything about how you were being treated on account of
24 your disability?
25    A. In the meeting?

62 (Pages 242 - 245)

CONFIDENTIAL

Page 246

1  Q. Yeah.
2  A. No. I just asked for the accommodation, to come
3  back at a later time.
4  Q. Okay. And did you object when they refused that
5  accommodation?
6  A. No.
7  Q. Okay. You just went along with it?
8  MS. KAHN: Object to form.
9  THE WITNESS: Well, I was in a pretty
10  distressed state, so I -- at the time, I didn't really
11  feel like I had a choice.
12  MR. HENRICHSEN: Okay. I have nothing further.
13  MS. KAHN: Two follow-ups.
14  THE WITNESS: Yeah.
15  REDIRECT EXAMINATION
16 BY MS. KAHN:
17  Q. When you say you wanted to come back later,
18 during the meeting with Brandon, are there any facts
19 other than what we've already talked about in terms of
20 you wanting to leave and worried that you would be
21 retaliated against if you left?
22  A. You're talking about November 3rd and when they
23 asked -- when I asked for the accommodation and -- what
24 was the rest of that question?
25  Q. I'm sorry. Are we -- we're talking about

Page 247

1 November 1st?
2  A. November 1st. Okay.
3  Q. Hold on.
4  A. November 1st meeting.
5  Q. Right. So on the -- in the November 1st meeting,
6 when you say that you wanted to come back later, do you
7 mean that you wanted to leave but you were worried you
8 were going to be retaliated against?
9  A. I wanted to leave because I felt I was -- I was
10 in an extreme level of distress and I felt uncomfortable
11 with answering any other questions till, one, I calmed
12 down; and, two, I returned with a support person.
13  Q. Okay. So that is why you wanted to come back
14 later with a support person?
15  A. Yes.
16  Q. Okay. And -- one more -- and your attorney asked
17 you about whether you objected to disclosing your mental
18 health in the August 2021 meeting. Other than what
19 we've -- about --
20  A. I --
21  MR. HENRICHSEN: Hold on.
22  THE WITNESS: Sorry.
23  MR. HENRICHSEN: You have to let her finish the
24  question.
25 BY MS. KAHN:

Page 248

1  Q. In the November -- I'm sorry -- in the
2 August 2021 meeting, when you just told your counsel
3 that you were objecting to disclosing your mental
4 health, are there any facts that you can point to, other
5 than what we've already discussed?
6  MR. HENRICHSEN: Form objection. Go ahead.
7  THE WITNESS: I was forced to disclose my
8  mental health in 2019. Not in -- in January of 2019,
9  not August of 2021.
10 BY MS. KAHN:
11  Q. Okay. So we're talking -- so you're saying that
12 because Mr. 37 bringing to the forefront that you had
13 been Baker Acted, that you had -- were asked questions
14 about your mental health; is that what you're saying?
15  MR. HENRICHSEN: Form objection. Go ahead.
16  THE WITNESS: I'm not following the question.
17 BY MS. KAHN:
18  Q. I know it's getting late.
19  MS. KAHN: How do I go back to his question?
20  THE COURT REPORTER: Just scroll or you can do
21  a word search.
22 BY MS. KAHN:
23  Q. Okay. So on November 1, when you met with
24 Charlie and Brandon, you -- you said that you objected
25 to how you were being treated because of your

Page 249

1 disability?
2  A. Yes.
3  Q. Okay. Tell me what you said.
4  A. What exactly I said or -- I mean, I objected, not
5 even going -- wanting to go to that meeting without
6 knowing what it was and pleaded with Brandon Young to
7 tell me what it was, so -- because of the extreme stress
8 and PTSD and anxiety that I was experiencing, he refused
9 that.
10  Q. Okay. So you wanted to know ahead of time what
11 you were going to talk about, right?
12  A. No, I just wanted to know the nature of why I was
13 being brought in.
14  Q. Okay. So is that the reason that you believe you
15 were being discriminated against in the November 1st
16 meeting, based on your mental health?
17  A. That was one of the reasons. The other reason
18 was when I was -- when I asked for the accommodation
19 because of the elevated distress I was in, and return
20 with a support person and then that was denied.
21  Q. Okay. So that was the accommodation you asked
22 for?
23  A. Yes.
24  Q. Is there anything else?
25  A. No.

CONFIDENTIAL

Page 250

1    MS. KAHN:  Okay.  I'm done.
2    MR. HENRICHSEN:  We will read.
3    THE VIDEOGRAPHER:  This concludes the
4 deposition.  Going off the record at 7:29.
5    THE COURT REPORTER:  Are you ordering a copy of
6 the transcript, Mr. Henrichsen?
7    MR. HENRICHSEN:  Yeah, regular, just
8 electronic.
9    (The deposition was concluded at 7:29 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 251

1        CERTIFICATE OF OATH
2

STATE OF FLORIDA)
3 COUNTY OF ORANGE)
4
5    I, MAE FISHER, Registered Merit Reporter,
6 Certified Realtime Reporter and Notary Public, State of
7 Florida, certify that MARISSA GIANNERINI personally
8 appeared before me on January 16, 2024, and was duly
9 sworn/affirmed.
10
11    WITNESS my hand and official seal this 22nd day
12 of January, 2024.
13
14
15       _Mae Fisher_
16       MAE FISHER, RMR, CRR
         Notary Public - State of Florida
17       Commission HH 443649
         Expires:  January 8, 2028
18
19
20        Personally known _____
21     OR Produced Identification X_____
22     Type of Identification Produced Driver's license
23
24
25

Page 252

1        TRANSCRIPT CERTIFICATE
2 STATE OF FLORIDA)
 COUNTY OF ORANGE)
3
4    I, MAE FISHER, Registered Merit Reporter,
 Certified Realtime Reporter and Notary Public, State of
5 Florida, certify that I was authorized to and did
 stenographically report the deposition of Marissa
6 Giannerini; that a review of the transcript was
 requested; and the foregoing transcript, pages 9 through
7 250, is a true record of my stenographic notes.
8    I FURTHER CERTIFY that I am not a relative,
 employee, attorney, or counsel of any of the parties,
9 nor am I a relative or employee of any of the parties'
 attorney or counsel connected with the action, nor am I
10 financially interested in the action.
11
12    DATED this 22nd day of January, 2024, at Orlando,
 Orange County, Florida.
13
14
15
16
17       _Mae Fisher_
         _____
18       MAE FISHER, Notary Public
         State of Florida
19
20
21
22
23
24
25

Page 253

1 Neil Henrichsen, Esquire          January 22, 2024
   Nhenrichsen@hslawyers.com
2
   RE: Giannerini v. Embry-Riddle Aeronautical University
3    Deposition of: Marissa Giannerini
     Date: 1/16/24
4    Job No. 6392193
5    The above-referenced transcript is available for
6 review.
7    The witness should read the testimony to verify its
8 accuracy. If there are any changes, the witness should
9 note those with the reason on the attached Errata Sheet.
10    The witness should, please, date and sign the Errata
11 Sheet and email to the deposing attorney as well as to
12 Veritext at Transcripts-fl@veritext.com and copies will
13 be emailed to all ordering parties.
14    It is suggested that the completed errata be
15 returned 30 days from receipt of testimony, as
16 considered reasonable under Federal rules*, however,
17 there is no Florida statute to this regard.
18    If the witness fails to do so, the transcript may be
19 used as if signed.
20        Yours,
21        Veritext Legal Solutions
22 *Federal Civil Procedure Rule 30(e)/Florida Civil
23 Procedure Rule 1.310(e).
24
25 cc:  Allison Kahn, Esquire

64 (Pages 250 - 253)

CONFIDENTIAL

Page 254

1  RE: Giannerini v. Embry-Riddle Aeronautical University
    Deposition of: Marissa Giannerini
2    Date: 1/16/24
3        E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19
20  Under penalties of perjury, I declare that I have
    read the foregoing document and that the facts
21  stated in it are true.
22
23  _____  _____
      Marissa Giannerini            DATE
24
25  cc: Allison Kahn, Esquire

Veritext Legal Solutions

CONFIDENTIAL

**[& - 125]**                                                              Page 255

| **&** | **00000181**  6:1 | **0000150-000...** | **10**   4:3 5:4 40:4,5 |
|---|---|---|---|
| **&**   2:24 5:2,4 7:1 | **00000183**  6:12 | 5:3 | 40:9,13 41:16 |
| **0** | **00000184**  6:13 | **0000219-000...** | **100**   60:8 69:12 |
| | **00000188-00...** | 5:9 | 83:3 166:23 |
| **00000008**   5:14 | 7:7 | **0000321-000...** | 176:12 202:18 |
| **00000011**   6:9 | **00000196-00...** | 5:8 | **1000**   1:19 9:9 |
| **00000025**   6:10 | 6:4 | **0000339**   8:3 | **105**   5:14 |
| **00000029**   5:16 | **00000205-00...** | **0000341**   7:21 | **106**   5:16 |
| **00000031**   5:25 | 7:6 | **0000354-000...** | **109**   5:17 |
| **00000036**   6:6 | **00000216-00...** | 4:17 | **10:05**   42:10 |
| **00000043-00...** | 7:20 | **0000407-000...** | **10:16**   42:13 |
| 6:24 | **00000223-00...** | 7:9 | **10:21**   146:22 |
| **00000050**   6:7 | 8:4 | **0000604-001-...** | 147:15 |
| **00000092**   5:17 | **00000231-00...** | 7:1 | **11**   5:5 45:15 |
| **00000093-00...** | 6:3 | **0000609-000...** | 57:19 |
| 5:22 | **00000235-00...** | 6:18 | **111**   5:19 |
| **00000105-00...** | 7:10 | **0000610**   6:19 | **112**   5:20 |
| 7:14 | **00000246**   4:15 | **0000613-001-...** | **113**   5:22 |
| **00000110**   5:1 | **00000247-00...** | 6:21 | **114**   5:23 |
| **00000127**   5:19 | 7:3 | **0000629-000...** | **115**   5:25 |
| **00000144-00...** | **0000028-000...** | 6:15 | **116**   46:8 |
| 6:22 | 4:18 | **0000666-001-...** | **117**   6:1,3 |
| **00000146-00...** | **0000032-000...** | 8:8 | **119**   6:4 |
| 7:4 | 5:13 | **02075**   1:3 | **11:04**   72:6 |
| **00000153-00...** | **0000066-000...** | **1** | **11:09**   72:9 |
| 7:17 | 4:25 | | **11:31**   84:21 |
| **00000158-00...** | **0000090**   4:23 | **1**   2:17 4:15 9:4 | **12**   5:6 41:21,21 |
| 7:15 | **0000092-000...** | 20:22,23 21:14 | 41:22 47:7 50:3 |
| **00000160**   7:18 | 5:11 | 27:13 29:5 | 50:4 232:4,5 |
| **00000161-00...** | **0000103**   4:20 | 42:13 55:5,24 | **120**   6:6 |
| 7:24 | **0000108-000...** | 208:10,13 | **1200**   2:13 16:6 |
| **00000163-00...** | 4:22 | 248:23 | **122**   6:7 |
| 8:1 | **0000111-000...** | **1,200**   16:20 | **124**   6:9 |
| **00000173**   5:20 | 5:5 | **1.310**   253:23 | **125**   6:10 |
| **00000175**   5:23 | | **1/16/24**   253:3 | |
| | | 254:2 | |

**[126 - 2021]**                                                                    Page 256

| | | | |
|---|---|---|---|
| **126**  6:12,13 | **162**  185:20 | 54:8 72:9 84:24 | 114:20 115:6 |
| **128**  6:15 | **164**  7:14 | 107:10 162:11 | 135:2 |
| **129**  6:16 | **165**  35:1 | **20**  4:15 5:18 | **2018-2019** |
| **12:51**  84:24 | **167**  7:15 | 35:24 100:18 | 78:10 |
| **13**  5:7 51:3,16 | **168**  7:17 | 111:15,16 112:2 | **2019**  6:20 77:22 |
| 51:17 52:15 | **169**  7:18 | 112:4 | 78:13,23 79:9 |
| 226:7 | **16th**  27:10 | **200**  1:19 8:5 9:9 | 79:19 80:25 |
| **131**  6:17 | 114:22 115:4 | **2000**  28:17 77:9 | 81:3 84:2,6 |
| **134**  6:18 | **17**  5:14 105:9,10 | 87:17 | 118:3,4 122:16 |
| **135**  6:19,21 | 106:3,20 107:14 | **2002**  87:17,18 | 125:10 127:22 |
| **14**  5:9 52:16,17 | 163:19,20,22 | 100:18,19 | 127:24 132:23 |
| 118:4 228:6 | **171**  7:20 | **2003**  87:11,11 | 135:4 137:19 |
| 232:9 | **178**  7:21 | 89:5 92:2,4,15 | 143:16 144:2,4 |
| **1400**  2:4 | **18**  5:15 64:21 | **2008**  91:7,25 | 144:22 146:1,25 |
| **145**  6:22 | 92:7 106:5,6,18 | 92:3,4 | 150:17 151:17 |
| **146**  6:24 | 232:7 | **2008-9**  87:12 | 152:11,17,20,20 |
| **148**  7:1 | **183**  7:22 | **2010**  85:16 | 153:1 160:2,9 |
| **149**  7:3 | **185**  7:24 | 86:13,19 92:17 | 162:5,17 165:10 |
| **15**  5:10 28:18,24 | **188**  8:1 | 95:23 101:6 | 182:13 189:25 |
| 30:2,14 32:18 | **189**  8:3 | **2011**  17:11 | 191:21,22 |
| 35:2 47:12 | **19**  5:17 109:8,9 | **2012**  17:15 86:8 | 219:22 220:6 |
| 72:12,14 | 111:21 112:1 | 96:9 97:21 | 221:21 244:17 |
| **15,000**  133:7 | **195**  8:4 | 98:20 101:1,3,9 | 244:18 245:4 |
| **151**  7:4 34:17 | **1993**  237:15 | 103:10,11,13,21 | 248:8,8 |
| **155**  7:6 | **1:00**  147:15 | 104:7 | **2020**  32:22 |
| **156**  7:7 | **1:29**  107:7 | **2013**  103:10 | 79:20 80:25 |
| **157**  7:9 | **1:34**  107:10 | **2016**  28:18,24 | 81:2 82:9,19 |
| **158**  7:10,11 | **1st**  82:15 118:3 | 29:2 30:3,14,21 | 163:5,11 165:12 |
| **15th**  28:10 | 189:7,24 245:21 | 32:8 | 165:15 |
| **16**  1:15 5:12 9:3 | 247:1,2,4,5 | **2016-2017**  77:3 | **2020-21**  5:5,12 |
| 29:2 74:22,23 | 249:15 | **2017**  77:10 | **2021**  4:24 32:17 |
| 157:2 163:20 | | 162:1 175:3 | 32:18 39:16 |
| 251:8 | **2** | **2018**  77:9,10,22 | 81:3 82:1,4,5,10 |
| **161**  7:12 | **2**  4:16 25:16 | 78:13 110:8,24 | 82:19 83:10 |
| | 45:25 46:6 | 112:2 113:6 | 144:1,3 169:15 |
| | 50:20 53:20 | | |

**[2021 - 39]**

176:14,23
177:14 179:4
185:3,7 187:4
200:16,18 244:2
244:9 245:13
247:18 248:2,9
**2022**   17:6
169:16 220:8
237:14,16 238:5
**2023**   16:16 17:6
**2024**   1:15 9:3
251:8,12 252:11
253:1
**2028**   251:17
**206**   8:6
**21**   5:20 32:22
37:20 49:6
112:23,24
165:14,15,16,17
**210**   8:8
**2114**   241:2
**217**   172:2
**2186**   241:2
**22**   5:21 14:14
36:11 49:9
64:21 113:13,16
113:20 253:1
**225**   53:18
**22714**   251:15
252:16
**22nd**   251:11
252:11
**23**   5:23 38:7
42:20 114:14,15
125:9,9,10,14

125:17
**230**   54:20
**231**   54:23
**24**   5:24 115:9,10
116:5
**2400**   16:7
**242**   8:9,10
**243**   4:4 8:11
**246**   4:5
**25**   4:17 6:1
42:25 43:1 91:6
117:4,5,8
**250**   252:7
**251**   4:6
**252**   4:7
**253**   4:8
**254**   4:9
**26**   6:2 30:21
112:3 117:22,23
**27**   6:4 49:12
119:20,21
**28**   6:5 32:8
120:10,11
**28th**   128:19
**29**   4:18 6:7
122:5,6
**2908**   235:21
**2:02**   123:8
**2:09**   123:11
**2:25**   129:3
**2:46**   129:5
**2:54**   130:17
**2:58**   130:20

**3**

**3**   4:18 18:18
29:11,12 50:22
51:5,6,8 53:5
107:4 123:11
129:6 130:20
148:2 150:17
**30**   4:20 6:8
49:19 124:12,13
124:23,25 146:1
146:25 238:24
245:13 253:15
253:22
**300,000**   234:1,3
234:5,11
**301**   2:3
**30th**   147:10
**31**   4:22 6:10
125:1,2,4 126:6
**32**   4:23,25 6:11
43:5 126:7,8,9
126:12
**32068-9007**   2:8
**32114-3910**
2:18
**32176**   13:8
**32202-5100**   2:4
**323-8812**   2:18
**32801**   1:20 9:10
**33**   5:1 6:13
126:18,21
**33401**   2:14
**34**   5:3 6:14
128:7,8,19
164:17,19 210:4

**35**   6:16 125:16
125:18,18
129:17,18 130:5
130:9,22 234:18
**35,000**   234:11
**36**   6:17 131:12
131:13,18
**37**   6:18 8:7
44:23 81:24
83:7 116:9,12
116:16 120:19
121:14,24
124:17 134:11
134:12,20,22
135:16 136:23
137:3 140:9
142:13,20
146:17 147:18
148:21,21
149:13,13 153:2
154:22 156:24
156:25 161:1,4
187:9 210:15
219:23 220:6,11
221:21 248:12
**37's**   116:6
123:14 127:21
137:1 147:13,14
**38**   6:19 83:9
135:7,8 160:19
160:19 161:2
**381-8183**   2:5,9
**386**   2:18
**39**   6:20 135:23
135:24 145:15

**[3:35 - a1c]**

**3:35**  147:24
**3:42**  148:2
**3rd**  210:21
   216:8,18 217:24
   221:25 223:5,9
   223:15 243:13
   244:2 245:12,15
   246:22

**4**

**4**  4:19 30:8,9
   49:14 56:2
   73:25 159:17
   176:21 179:2
**40**  5:4 6:22
   145:16,17,18,23
   147:3,4,6,7
   239:6,9
**40,000**  234:18
**407**  109:16,21
**41**  6:23 146:5,6
   146:13 147:5,6
   147:12
**4179**  2:8
**42**  7:1 81:4
   148:8,9
**43**  7:2 149:18,19
   150:3,17
**44**  7:4 146:11,12
   151:1,2
**443649**  251:17
**45**  5:5 7:5
   155:19,20,24,25
   156:3,4,5,9
   158:9

**46**  7:7 81:7,22
   81:22 156:12,13
   156:19
**47**  7:8 77:23
   78:13 157:8,9
**47,500**  30:17
**48**  7:10 157:25
   158:1
**480**  13:8
**49**  7:11 158:21
   158:22
**4:05**  159:14
**4:22**  159:17
**4:59**  176:18

**5**

**5**  4:21 31:5
   50:25 55:3
   73:21 113:6
   200:3 209:2
   225:15 236:17
   241:23
**50**  5:6 7:12
   161:11,12,19
**51**  5:8 7:13
   164:3,4
**52**  5:9 7:15
   167:16,17
   168:17
**525**  2:13
**53**  7:16 78:6
   168:18,19,20
**54**  7:18 78:14
   169:3,4
**55**  7:19 77:10
   171:8,9,11,16

**56**  7:21 177:24
   177:25 181:12
   183:9
**561**  2:14
**57**  7:22 183:11
   183:13,17
**58**  7:23 185:10
   185:11
**59**  8:1 188:10,11
**5:05**  176:21
**5:11**  178:24
**5:14**  179:2
**5:52**  199:25
**5:59**  200:3
**5th**  208:8

**6**

**6**  4:23 32:2,3
   106:18,21
   114:20 115:6
   132:23
**60**  8:2 189:10,11
**61**  8:4 77:14
   195:2,3 210:7
**62**  8:5 75:17
   200:6,7
**63**  8:6 206:1,3
**6392193**  253:4
**64**  8:7 210:8,10
   210:14 242:5
**65**  8:9 242:6,7,8
   242:17
**659-7070**  2:14
**66**  8:10 242:18
   242:19

**67**  8:11 242:25
   243:2
**6:13**  208:24
**6:22**  1:3
**6:23**  209:2
**6:51**  225:12
**6:53**  225:15
**6th**  115:1,3

**7**

**7**  4:24 18:18
   32:12,13 51:6,8
**72**  5:11
**74**  5:13 124:19
   124:20,21,22
**7:08**  236:14
**7:09**  236:17
**7:17**  241:20,23
**7:29**  1:16 250:4
   250:9

**8**

**8**  5:1 33:23,24
   251:17
**865**  54:18

**9**

**9**  5:2 34:7,8 38:4
   42:3,16 86:8
   252:6
**9/10**  86:7
**904**  2:5,9
**9:11**  1:16 9:3

**a**

**a.m.**  1:16 9:3
**a1c**  229:24

**ability**  60:6
  151:21
**able**  11:5 60:8
  60:11,11 64:12
  95:23 100:9
  142:18 169:22
  170:3 172:24
  173:6 202:3
  232:22 238:19
**above**  77:17
  253:5
**absolutely**
  61:17,23 62:1,3
  64:18 65:10
  69:10,14 70:17
  106:16 117:1
  142:22,22 166:6
  169:6 171:5
  176:16 180:21
  182:24 226:11
  244:1
**abuse**  36:3,15
  37:8 47:21,24
  48:1,8 54:1,19
  55:8,10,20,25
  56:4,9 182:6
**abusive**  54:25
  177:5 189:4
**academic**  38:19
  38:20 55:21
  64:11 65:3 68:1
  170:8
**academics**
  38:22

**accept**  55:19
  112:14 174:5
  230:11
**accepted**  30:21
**accessible**
  150:13
**accident**  233:15
**accommodate**
  218:15 220:14
**accommodated**
  220:15,21
**accommodation**
  191:1,12,24
  192:20 213:2
  218:15 223:7
  246:2,5,23
  249:18,21
**accommodati...**
  31:13
**account**  185:23
  242:23,25 243:1
  243:6,25 244:3
  244:19 245:17
  245:23
**accountability**
  50:19
**accountable**
  64:8
**accuracy**  253:8
**accusation**
  180:4
**accusations**
  179:23,24
  192:19 210:16
  214:2

**accused**  182:8
  193:22 201:16
  215:9,12
**accusing**  136:23
**acknowledge**
  174:8
**acknowledge...**
  49:23 52:6
**act**  45:11 82:7
  89:24 99:2
  102:24 103:1
  131:1 141:23
  142:13 143:6,10
  143:18 144:9
  153:2 154:15,20
  155:6 219:1
  244:20
**acted**  89:22
  98:23 102:22
  131:6 164:24
  248:13
**acting**  193:7
  207:1,3 233:6,7
**action**  56:11
  223:23 252:9,10
**actions**  212:24
  220:10 223:20
**active**  184:22
**activities**  74:18
  165:7 227:3
  228:22
**actual**  52:14
  167:22 225:6
**actually**  29:15
  32:16 74:25

78:14 119:13
  120:23 121:14
  124:20 135:5
  151:9 192:17
  225:6 227:22
**ada**  142:23
  143:11
**adamantly**
  182:8
**additional**
  139:8 185:23
**address**  13:7
  202:21 235:20
**addressed**
  108:22
**addresses**  38:22
  208:11
**addressing**  54:3
**adjustments**
  55:22,22
**adkinson**  20:1
**administration**
  78:18 81:13,15
  162:8 245:7
**administrative**
  197:7 198:7,22
  199:10
**administrator**
  70:7 80:9
**administrators**
  78:25,25
**admitted**  197:10
**adverse**  219:19
**advice**  112:20
  113:3,6 140:19

**[advised - anonymous]** Page 260

advised   162:3
advocate   144:18
  193:5 218:20
  220:16,22,25
aeronautical
  1:8 2:17,24 49:4
  253:2 254:1
aerospace   2:17
affect   11:24
  231:4
affects   112:13
affirm   10:1
affirmed   251:9
afford   230:2
afraid   187:8
agaston   2:15
ago   19:12 23:12
  25:12 64:15
  88:12 169:14
agree   28:3,8,23
  29:1 45:12 63:9
  64:16 71:20
  73:14 112:4
  113:17 114:22
  130:5 133:7
  136:23 149:5
  150:17 171:3
  174:7 175:21
  176:4,9 192:1
  193:6 194:1
  200:18 224:10
agreed   8:15
  117:13
agreement   4:25
  32:18 38:15,17

39:2,10 40:1,15
  40:19,22 41:3
  108:12
agreements
  38:5,13,14
  39:25 42:22
ahead   22:19
  24:2,8,11,17
  26:12 43:18
  44:17 48:20,25
  49:16 50:9
  51:25 52:9,23
  53:6 54:5 55:2
  55:13 57:12
  61:16 62:8 63:1
  63:12 64:6,23
  65:9,15,20 66:5
  66:9 69:23
  70:16 71:22
  75:23 79:15
  80:13,20 82:23
  83:20 96:24
  97:12 98:10,24
  101:12 102:1
  104:25 111:10
  111:23 112:7
  115:21 116:1,17
  118:9 122:24
  124:6 125:13
  131:3 133:12
  137:6,22 138:17
  139:2,9,18
  140:24 141:9
  142:15 143:8
  145:3 147:21

148:24 152:10
  153:5,15,22
  154:9,25 155:9
  160:4 166:5
  171:6 176:6,11
  176:16 181:18
  186:23 187:17
  189:5 193:11,19
  194:4 195:25
  196:10,24
  197:20 198:4,20
  201:2,18 202:7
  203:8 204:5,10
  204:23 205:9,13
  207:14 209:21
  218:13 220:23
  222:7,13,19
  223:1,25 224:24
  225:7,21 244:14
  248:6,15 249:10
airbnb   177:11
  235:3
airbnbs   238:18
akahn   2:15
al   9:8
alana   2:12
alcohol   37:18,21
  38:11 48:14,19
  49:2 54:4,10
  104:19 105:21
  105:23 113:18
  113:21 197:16
  232:13
alcoholic   232:11

algorithm   235:3
allegations
  139:6,16
allege   212:10
alleged   154:23
  211:20
alleging   211:25
allison   2:11 9:18
  253:25 254:25
allow   120:25
  121:1 238:21
allowed   39:8
  143:10 202:21
  219:6 220:16,22
allowing   100:6
  154:6 166:13
ally   124:5,7
altercation
  93:14,22 95:22
altogether
  202:14
aly   229:11
american
  154:15
amount   62:14
  90:3 99:16
  121:2
andrea   162:10
  162:13 175:21
anger   111:8
  165:21,23
angerer   2:2
angry   165:25
anonymous
  57:6 179:23

**[anonymous - asking]**                                                    Page 261

183:2,5 187:9
188:3,5 202:25
209:23 245:13
**answer**  10:23
11:7 22:19 24:2
24:8,11 44:17
48:23 52:23
62:17 64:24
71:25 88:21
98:25 111:11
115:22 118:10
131:4,23 142:24
148:15 154:13
155:3 181:19
193:12 198:5
202:3 204:11
220:18 222:8,14
228:23
**answer's**  57:17
**answered**  24:1
136:20 138:20
154:10 220:17
222:19
**answering**
39:10 130:13
247:11
**answers**  174:3
205:15
**antique**  237:15
**anxiety**  36:16
37:8 192:23
228:5,9 249:8
**anybody**  9:20
198:11

**anymore**  58:2
60:22 84:5
228:25
**anyway**  73:17
94:5 190:17,25
**apologies**  101:7
102:9 115:6
**apologize**
192:14 207:6
**apparently**  23:6
**appeared**  251:8
**appears**  50:10
139:4 183:21
**applicable**
50:25
**application**
25:25 27:6
**applied**  19:24
23:4 239:17,18
**apply**  236:19
**applying**  33:18
**appms**  31:21
**appointed**
150:11
**appreciate**
129:13 166:2
183:23
**appreciative**
157:21
**apprehended**
94:4
**appropriate**
35:15 44:9
74:11 136:19
206:23 243:18

**appropriately**
74:16
**approved**  54:14
191:13
**april**  152:17
**area**  116:21
**areas**  37:23
54:14 171:25
**argue**  222:9
**arranged**  103:2
**arranging**
126:23
**arrest**  23:3
26:11,13 27:25
28:19 85:13,16
85:17 92:21
95:23 103:13
136:18 137:19
138:13,25 215:5
**arrested**  86:20
87:5,8,12 92:3,5
92:7,17 94:8,20
94:21,22 96:8
97:13,19,21
98:3 101:1,3,10
103:14
**arresting**  97:8
**arrests**  22:2
86:23 87:2
103:16 138:1
142:5
**aside**  42:2 51:14
70:3 184:3
228:18

**asked**  21:11,16
22:11 23:25
27:3,17,19
122:17,18,20
128:13 135:15
136:13 137:12
137:15 138:19
138:22 139:8
141:15,20,22
142:21 143:5
147:9 148:4
154:3 159:19
162:4,4 172:13
178:14 185:25
186:5,16 189:24
190:25 192:3
195:23 196:2
197:15,23 199:1
200:13 201:9
203:12 205:23
205:24 211:15
213:2 216:15,19
217:14 221:1
222:18 223:6
244:20 245:10
246:2,23,23
247:16 248:13
249:18,21
**asking**  28:17
29:8 65:7
109:20 119:13
126:20 127:1,3
127:7 137:2,14
138:8,10,24
143:1,6 144:8

**[asking - back]**                                                        Page 262

154:22 155:2
159:22 165:17
180:10 184:7,10
184:12 190:11
192:24
**aspect** 35:12
**assist** 14:7
**assistant** 26:9
173:9 214:5,6
**assume** 10:23
110:24 149:2
187:16
**assumed** 191:1
**assure** 151:12
**assured** 151:21
188:6 190:15
**athlete** 5:5
33:16 35:12,14
45:22 47:9
60:19 61:10
62:6 65:10
67:21 68:6 69:4
116:16 139:12
229:2
**athletes** 33:11
36:6 43:11 44:7
46:24 48:18
59:12 60:12
61:15 62:5 64:7
66:4 67:19
68:25 70:13
73:22 104:19
155:16 169:22
186:19

**athletic** 33:6
35:13 43:23
46:14 49:3 70:6
81:13,15 84:13
162:5,7 173:10
180:11
**athletically**
176:2
**athletics** 5:1
34:3 182:23
**atlanta** 177:20
**attached** 83:4
253:9
**attachment**
40:16
**attachments** 5:4
7:1
**attack** 190:12
**attacks** 192:12
**attempt** 103:20
**attempts** 103:18
**attend** 122:20
187:21 200:14
**attended** 200:12
**attention**
121:16 203:10
**attest** 18:22
19:3 28:20
**attorney** 141:17
142:1 149:10
150:10,24 154:4
154:5,6 164:9
186:17 240:18
247:16 252:8,9
253:11

**attorney's** 150:3
**attracted** 33:18
**august** 14:14
17:6 30:14
100:19,22
101:11,17
103:10,11
176:14,23
177:14 179:4
185:3,7 187:4,5
200:15,18 244:8
244:9 247:18
248:2,9
**authority** 55:11
84:16
**authorized**
252:5
**available** 253:5
**avenue** 1:19 9:9
93:12 235:21
**avoidable**
166:16
**aware** 12:2,6,7
66:25 89:10
104:22 105:6
121:21 123:16
123:23 194:16
213:1 215:4
221:23

**b**

**b** 4:11 42:13
53:20 84:24
129:6 176:21
209:2

**bachelor's** 17:8
**back** 20:16
23:23 26:2
27:12 38:3 39:8
42:2,12,15
53:14 58:1
65:25 72:8,19
72:24 75:7
76:25 77:7,15
78:2 80:2 81:6
81:22 84:23
87:11 94:21
97:10 98:4,22
99:6,18,19,20
102:5,12 107:9
120:20 121:8
123:10 127:15
129:24 130:19
140:6,12 142:1
145:11,11 147:7
148:1 152:6
154:3 155:13
159:16 162:1
166:17 167:11
169:9 173:12
176:20 179:1
183:22 194:10
197:3 199:4,18
200:2 208:17
209:1,8,12
210:2,20 225:14
236:16 241:22
242:11 246:3,17
247:6,13 248:19

CONFIDENTIAL

**[background - bipolar]**

**background**
20:12,15,17
21:6,12 22:12
26:1 27:17 28:9
100:8 136:17
138:19,21
144:14
**backyard** 94:20
**bad** 80:14
112:13 173:13
173:19 195:14
195:17
**bail** 97:25
**baker** 89:22,23
98:23 99:2
102:21,24 103:1
131:1,6 141:23
142:13 143:6,10
143:18 144:9
153:1 154:20
155:6 218:25
244:20 248:13
**ball** 39:19
**baltimore** 26:21
92:8,14
**bar** 93:7,15,20
94:16
**barely** 60:10
**barry** 66:23
182:19
**base** 170:19
187:10
**baseball** 214:5
**based** 61:6
120:25 139:6

180:14 181:10
191:1 205:17
218:15 222:22
224:11,20
249:16
**basic** 50:17
**basis** 69:6
211:21
**basketball**
214:7
**bates** 34:15,25
40:9 46:6,8
53:18 54:20,23
75:17 77:10,14
77:23 78:4,6,13
81:4,7,22,24
130:10 131:20
146:10 172:2
185:19
**bathroom** 42:4
97:19 176:15
**bathrooms**
164:19
**bay** 2:3
**beach** 2:14,18
13:8 58:6,7
100:12 234:14
235:22
**beaten** 237:11
**beers** 95:22
**begging** 191:24
**beginning** 39:4
80:8 166:1
175:8,9

**begins** 77:10,23
**begun** 14:13
39:9
**behalf** 9:16,18
**behaved** 214:17
**behavior** 38:20
44:8 49:3 53:22
98:12 148:20
**behavioral**
74:16
**believe** 11:16
25:2,21 28:4,14
30:15 31:16
77:5 86:21
95:21 96:3,12
100:4 101:2
123:22 124:4
131:5 135:16
143:20,22,25
149:12 150:2
151:23 178:13
182:11 187:13
202:5 206:18
212:24 213:11
213:17 215:14
217:2,3,5,20
218:6,8 219:12
219:14,18
220:12,15,20
223:10 225:6
230:6 233:1
238:22 239:17
241:8 243:24
249:14

**believed** 21:12
59:3,5 112:11
136:6 180:13
192:23
**benefit** 64:4
**benefits** 31:20
**best** 11:16 69:24
70:14 72:17
91:17 170:25
176:2 233:18,19
**better** 33:13,14
48:18,19 80:7
173:7,8 199:17
204:18,20
215:23 226:10
**beyond** 74:14
**bickering** 112:5
**big** 75:3 80:17
180:16 231:17
**bigger** 166:1
**biggest** 22:21
**billiards** 225:24
**bills** 13:18
235:12
**binge** 226:2
**bipolar** 86:22
88:25 89:1 90:7
90:20 96:4
99:17 100:6
139:23 142:6
151:25 191:3,13
191:25 192:2,4
192:10,13,17,19
193:2,7,7,9,17
193:17 207:1,3

**[bipolar - bullying]**                                        Page 264

207:8,18 212:2
212:14 213:4
223:8 227:13,17
227:19 233:9
245:14

**bit** 35:23 57:8
102:20,21 130:2
151:24,25
165:10 172:8,17
225:17 228:23

**biweekly** 16:7

**blackout** 73:13

**blah** 194:19,19
194:19,20

**blown** 96:17

**blue** 233:1,1

**bmw** 237:10,13
237:14

**body** 150:12
193:22 201:17
231:17

**bond** 97:22,23
98:3,6

**bondsman**
97:25

**borrowed** 237:4

**bottom** 30:20
34:15 35:1
37:15 46:1
50:12 51:6
53:18,20 54:20
54:23 74:8
106:9 116:25
146:10 165:1
181:23 183:19

**bought** 91:2,23
234:12,20,20
235:18

**boulevard** 2:13
2:17

**boyfriend**
233:17

**brandon** 2:23
79:8 127:20,24
128:4,11,13,16
128:19 133:9
136:8 141:6
144:8 145:1,7
145:24 146:19
147:9,16 150:20
150:22,25
151:11 152:4,8
152:15,23
153:12,20 155:8
157:4,14 158:17
159:5 175:21
178:7,15,16
179:5,7,10
181:3,8 183:7
183:19,22
185:17 187:10
187:12 189:23
190:3 192:1,22
195:7,9,22
197:3,14 200:14
207:9 208:14
211:6,13 216:24
217:14 218:6,8
219:11,12
224:17 246:18

248:24 249:6

**break** 10:14
11:14 30:23
42:4 71:24 72:4
84:18 90:8,9,10
99:21 120:21
128:25 147:20
158:6 176:15
177:3,18 194:2
194:5,17

**breakdown**
88:25 89:1,6,17

**breaking** 92:23
177:1

**breaks** 11:14
194:23

**brian** 214:5

**brief** 42:11 72:7
87:16 107:8
123:9 129:4
130:18 159:15
176:19 178:25
200:1 208:25
225:13 236:15
241:21

**bring** 99:18,19
108:8 154:6
162:7 178:14
192:2

**bringing** 153:1
207:10 248:12

**brings** 199:18

**broad** 61:12

**broke** 95:15
142:4

**broken** 93:4,24
176:24,25

**brother** 214:13

**brother's** 14:17
14:18

**brought** 61:10
61:11 70:4
75:25 79:7
89:14 102:22
121:16 153:7
154:22 155:6
188:1 203:10
213:3 216:6
217:22 239:22
239:22 249:13

**buds** 95:1

**build** 69:8 170:3
172:24 174:2

**building** 17:24
76:15 96:19
97:5,6,8,9,11
162:25 170:10
172:25 194:13

**buildings** 96:18
164:19

**built** 57:10

**bulk** 17:25

**bullet** 36:2
37:12 43:9,16
44:12 45:9
46:18,19 73:14

**bullied** 221:1

**bullying** 53:11
154:23

CONFIDENTIAL

**[bumble - characterize]**                                              Page 265

**bumble** 175:7
**bump** 109:18
**bunch** 30:25
    64:20 171:19
**burglary** 92:20
**bus** 45:7
**business** 14:15
    14:17,18 225:24
    235:7,9 238:19
**busy** 228:18
**butler** 66:24
    167:1 168:6,10
    169:9 182:19
**buy** 236:3

**c**

**c** 2:1 3:1 9:1
    107:10 130:20
    179:2 225:15
**california**
    100:13 101:16
    101:18,20 103:6
    103:8
**call** 20:3,8 41:10
    80:19 91:13
    108:18,18
    117:10 151:10
    151:10 170:17
    181:10 216:12
    216:14
**called** 14:7
    34:15 93:17
    123:1 127:20
    133:9 136:8
    137:12 139:13
    139:22 140:18

141:5 189:23
198:12,13,14
206:24 210:25
224:6 227:15
230:24 240:21
**calling** 80:21
    103:1 215:13,13
**calls** 22:18
    31:21
**calmed** 247:11
**camaraderie**
    61:21,22
**campus** 20:4
    35:15 76:2
    157:17
**cancel** 59:24
**caps** 41:9,13,18
    41:20
**car** 141:19
    237:7,16
**carbamazepine**
    227:14 233:7
**cards** 52:6
    64:11 170:9
**care** 96:15
    101:22,23,24
    102:13 124:8
**cared** 199:11
    233:13
**career** 228:24
**careful** 11:11
**carlton** 1:18
    2:12
**carltonfields.c...**
    2:15,15

**cars** 237:9
**carson** 67:17
**carson's** 67:13
**case** 1:3 12:3
    23:7,10,18,24
    69:6,6 130:9
    219:25 245:8
**cases** 23:22
**catch** 161:7
    166:21
**caught** 187:1
    194:14
**cause** 10:2
    188:6
**caused** 66:18
    98:12 111:9
    245:11
**causes** 111:7
    228:9
**causing** 192:22
**cc** 253:25
    254:25
**cedar** 13:8
**cell** 12:19
**center** 43:3
    49:20 89:15,16
    90:9,23 91:8
    100:21 103:9
**centers** 90:19
**central** 90:21
**certain** 121:2
    205:17,24
**certainly** 60:17
    98:11,18 165:9

**certificate** 4:6,7
    251:1 252:1
**certifications**
    19:6
**certified** 19:7
    251:6 252:4
**certify** 251:7
    252:5,8
**chad** 214:6
**chain** 97:16
**challenged**
    80:10
**chance** 28:1
    130:1,3 155:23
    200:22
**change** 59:2,13
    59:14,15 79:22
    85:7 99:25
    230:17,20
    242:17 254:4,7
    254:10,13,16
**changed** 19:1
    78:23 84:4
    165:9
**changes** 68:5,7
    235:4 253:8
**chappell** 229:11
**character** 21:23
    25:1 28:1,19
    29:2 135:14
**characteristics**
    181:25
**characterize**
    228:2

CONFIDENTIAL

**[charge - come]**

Page 266

**charge** 210:19
211:17,20
212:10 219:24
220:8
**charges** 23:18
92:18 94:10
**charlie** 2:16
79:8 132:23
145:6 150:21,22
151:18,20 152:2
155:12 157:4,17
158:17 159:6
175:22 178:15
182:19 187:10
187:14 189:2
195:9,14,22
197:3,14,15,23
199:1 200:15
207:10 208:13
216:24 217:20
224:17 248:24
**charlie.sevastos**
2:19
**chasing** 95:10
**chat** 123:17
**check** 16:7,8
20:12,15,17
21:6 22:12 26:1
27:17 28:9 31:9
124:17 136:17
170:9,16 187:1
225:5
**checked** 157:5
**checking** 158:18

**chief** 2:24
**choice** 143:11
246:11
**choices** 48:18,19
49:1 66:13
**choose** 138:3
**chose** 65:2
230:13
**chris** 236:3,10
**chronological**
28:11
**chuck** 214:4,12
214:13,14 215:8
**circulated** 88:7
**circumstances**
70:14
**city** 92:14
**civil** 142:24
253:22,22
**claiming** 212:14
212:16
**claims** 133:4
**clarification**
102:2 128:23
191:7 197:12
**clarifications**
208:11
**clarify** 22:3
32:23 133:13
143:3,4,9 229:7
**class** 67:18
**classes** 17:23,23
17:24,25 18:2
18:20

**classifies** 221:14
**classroom** 33:13
**clear** 62:16,18
62:22 125:22
126:5 130:8
198:10
**clearly** 112:9
**climate** 46:22
**close** 38:24
104:1 117:15,18
167:5 234:11
**closer** 26:17
**club** 26:4 57:25
**coach** 19:17,20
20:7 26:8,9,16
43:21 45:4 60:6
69:8 70:7,20
71:15 73:4
84:14 104:18,20
117:15 150:13
165:8 170:1,4
172:24 182:10
182:15,24
184:21 194:17
204:12 205:16
211:4 214:4,5,6
214:7
**coached** 26:3
**coaches** 35:13
35:15 44:8 64:5
65:14 143:23
150:13 175:22
179:18 214:1,3
215:25 224:4

**coaching** 41:19
58:23,25 59:3,4
60:3 61:15
105:4,16,19
119:18 171:22
176:10 181:3,11
181:17,21,24
182:2 239:25
240:1
**cocaine** 232:8
**code** 4:24 5:6
32:17,21 36:1
43:22 47:9 50:8
**cody** 3:3
**coerce** 142:4
**coerced** 221:1
**colleagues**
112:19 171:2
**collection** 8:11
**college** 18:16
64:1 68:4,5 87:7
87:9,9,12
**collegiate** 60:13
64:16 71:4
**coma** 231:15
**come** 59:15
97:24 121:7
123:16 127:14
127:19,25
139:12 141:20
142:1 147:9
150:19 154:3
157:3 178:7,10
178:17 183:5
184:12,16

[come - confirm]                                                          Page 267

189:24 246:2,17
247:6,13
**comfortable**
17:2 21:13
79:10 136:21
162:13 175:1
191:10 192:7
221:2
**coming** 65:25
68:14 97:7
117:10 181:5
184:9
**comma** 43:17
**commenced**
1:16
**comment**
180:20 221:9
**commented**
67:6
**commenting**
116:6
**comments** 77:17
78:17 81:12
116:6 134:20
221:22
**commission**
251:17
**commitment**
238:12
**committed**
50:15,16 56:3
**committees**
150:14
**common** 184:2

**communicated**
41:6 123:14
**communication**
123:21 142:14
146:13 168:24
224:3 229:1
**communicatio...**
129:15 147:17
220:11
**community** 56:6
91:12,15,16
**companies**
14:10,11
**company** 14:7,9
14:13
**comparable**
70:24
**compare** 70:9
70:22
**comparing**
108:14
**comparison**
116:20
**compassion**
224:8
**competing**
127:9
**competition**
39:20
**competitive**
65:11 225:25
**complain**
179:17 224:19
**complained**
224:10

**complaining**
137:4 139:1
181:16 221:25
223:4
**complaint** 18:7
128:20 139:11
215:18
**complaints**
121:21,25 137:1
202:21 203:9
204:16 214:18
**complete** 224:7
**completed**
163:8 253:14
**completely**
81:10 123:4
134:18
**compliance**
50:25 173:10
**complicated**
83:21
**complying**
34:20
**composite** 75:1
**comprehend**
130:7
**conceptualize**
61:7
**concern** 21:25
98:12 188:7
**concerned**
166:3 187:25
**concerns** 121:25
188:1

**concluded** 1:16
250:9
**concludes** 250:3
**condition**
110:16
**conditioned**
63:6
**conditioning**
79:2 110:14,22
115:19 120:20
120:23 121:8,10
**conditions**
70:12
**conduct** 4:24
5:6 32:18,22
36:1 43:22,23
43:24 44:13
47:10 50:8
214:17
**conducting**
127:10
**conference**
59:20 156:8
163:21,23
174:12
**confidence** 69:9
211:7,9,11
**confident**
151:21 152:1,2
**confidential**
1:12 89:8
**confidentiality**
12:3
**confirm** 119:24
120:3 210:14

**[confirm - correct]**

241:6 242:22
243:1
**confirming**
113:2
**conflict** 55:7
**conform** 74:4
**confused** 134:17
159:25 165:18
173:22 245:1
**confusing**
172:20
**connected** 252:9
**connecting**
39:12
**consequence**
68:21,21,22
69:2,4 107:21
107:24 108:19
108:25 109:5
110:11 112:15
114:1,3
**consequences**
68:17,23 105:25
108:19,20
110:17 112:5
121:7
**considered**
84:11 163:5
253:16
**considering**
163:6 202:24
**consistent** 44:9
182:1 211:16
218:14

**consistently**
74:13 224:14
**constant** 68:13
229:1
**constantly**
67:20,22 68:1,8
68:9
**constructive**
74:17
**consult** 140:25
**consulting** 14:8
14:19 16:6
236:9
**consume** 37:21
**consumption**
49:2
**cont'd** 3:1
**contact** 59:25
83:24 150:4,15
166:18,19
172:25 174:21
198:19,22
**contacted** 91:6
91:7 122:13
127:24 128:1
**contest** 10:15
**context** 21:19
106:19 107:23
119:17 180:13
186:4,5 194:17
199:9 201:6
202:2,11,22
**continue** 66:19
**continued** 71:9
142:3

**continuing**
24:24 191:23
192:7 238:19
**continuous**
214:18
**contract** 14:6
**control** 61:18
**controlled**
229:23
**conversation**
28:14 80:2
106:10 107:15
109:23 118:2
121:17 134:25
136:14,16
141:18 153:19
153:20,24
154:12 155:7
156:6 157:4
164:16 171:14
171:19 180:1
182:10 185:15
185:16 209:5
**conversations**
108:2 141:14
162:6 181:6
**convicted** 23:13
136:18
**convictions** 22:1
**convinced** 81:14
**cook** 2:7
**copies** 209:4
253:12
**cops** 94:24 97:7

**copy** 34:3 72:17
85:23 138:18
157:12 160:23
169:8 189:15,19
189:19 241:2
250:5
**core** 35:7 58:16
58:17
**corner** 35:1
82:8
**correct** 14:22
16:19,21 17:7
19:19,21,23
22:12 24:16
26:19 27:10
29:6 30:19
31:13 32:8,22
32:25 35:22
36:20,25 40:16
43:4 46:10
49:20 51:24
54:16 58:9
59:11 60:5
62:13 64:5
67:24 69:19
82:2,11 103:17
125:12 139:1
142:14 147:1
181:1 186:19,20
188:20 194:25
210:22 212:14
212:15 217:25
219:10 220:9
222:1 229:16,18
230:21 233:10

[correct - decision]                                          Page 269

233:21 236:2
242:16 244:10
**correction**
53:21
**correctly** 202:15
**counsel** 2:10,20
2:22 8:15 9:15
149:15 150:12
195:18 248:2
252:8,9
**counsel's**
243:11
**counseling** 43:3
49:20 91:12,17
126:15
**counterparts**
170:23
**country** 59:20
71:9 166:18
174:13
**county** 251:3
252:2,12
**couple** 10:20
22:14 111:1
**course** 85:10
129:23 223:22
**courses** 19:2
**court** 1:1 9:11
9:13,22,24
11:12 94:14
125:13 248:20
250:5
**courtesy** 142:2
184:2

**covers** 82:9
**covid** 59:16
60:22 70:3,4
162:17,20
163:10 165:6
170:10 171:3,17
171:20 172:19
172:20,21
175:11
**coworkers**
74:15
**crane** 2:8
**create** 69:21
**created** 66:12
166:12 172:22
219:8
**creating** 63:15
**credibility**
188:19
**criminal** 136:9
137:13
**crista** 25:23
26:3
**criticism** 74:17
**cross** 4:4 233:1
243:9
**crr** 1:21 251:16
**crying** 145:5
153:6 186:22
**culture** 50:25
59:23 60:19
63:16 172:21
**cultures** 70:23
**cup** 197:24

**current** 18:16
18:24
**currently** 56:24
60:20 226:5
233:4
**curriculum**
17:21 18:16
**cut** 159:8 163:1
**cv** 1:3

**d**

**d** 4:1 9:1 53:14
148:2 236:17
**d1** 65:1
**dame** 57:21
**dark** 95:2 123:4
173:14,20
**darley** 224:13
**data** 8:11
**date** 1:15 19:11
19:12 27:10
30:14,15 72:20
73:1 101:2,20
102:17 133:25
152:19 177:15
241:7 253:3,10
254:2,23
**dated** 175:4
252:11
**dates** 33:4 89:3
122:15 165:18
209:14
**dating** 87:25
175:2
**daughter** 67:9
154:24

**daughter's**
133:2
**daughters** 182:1
**dave** 214:4,17
214:18 215:3,5
**day** 29:3 67:6
91:11 101:24
107:16 110:17
111:20,25
114:20 121:3
146:21 147:15
150:24 165:8,8
170:16,16 173:2
180:5 198:15
206:24 210:25
216:7,14 217:23
227:3,3 231:8,9
231:10 237:8
251:11 252:11
**days** 150:22
170:15 238:1,2
238:3,8 253:15
**daytona** 2:18
234:13 235:21
**dead** 226:7
**deal** 68:7
**dealing** 64:20
90:19
**december** 113:6
114:20,22 115:3
115:6
**decide** 242:14
**deciding** 121:19
**decision** 59:24
71:10 112:13

133:3 166:14,22
174:7
**decisions**
112:10
**declare** 254:20
**deeply** 124:9
**defendant** 1:9
1:17 2:20 9:19
245:7
**defendant's**
4:14 20:22,23
25:16 29:10,12
30:7,9 31:5 32:3
32:11,12,13
33:23,24 34:8
40:4,5 45:15
50:4 51:16,17
52:17 72:12,14
74:23 105:10
106:6 109:8,9
111:15,16
112:23,24
113:13 114:14
114:15 115:9,10
117:5,22,23
119:20,21
120:10,11 122:6
124:11,13 125:4
126:9,21 128:8
129:18 130:22
131:12,13
134:11,12 135:7
135:8,23,24
145:18,23 146:6
146:13 147:2,7

147:12 148:9
149:18,19 151:2
155:20 156:12
156:13 157:8,9
157:25 158:1,21
158:22 161:12
161:19 164:3,4
167:16,17
168:20 169:3,4
171:9,11 177:24
177:25 181:12
183:13,17
185:11 188:10
188:11 189:11
195:3 200:7
206:3 210:10
242:5,8,18,19
243:2
**define** 55:10
160:5
**defines** 48:1
**definitely**
209:24 228:7
234:10
**definition** 55:7
**degree** 17:8
**deleted** 88:11
**delusional**
117:1
**demand** 133:7
**demands** 68:1,1
74:2
**demoralizing**
173:2

**denied** 182:8
192:24 249:20
**dennis** 21:2,21
22:16 24:15
27:4,8,17,19
28:12,18 29:1
91:7 150:5,8,9
150:14 239:21
**department**
70:6
**depended** 69:3
**dependent** 15:4
16:2,2
**depending** 69:3
106:2 108:21,21
232:16 235:4
**depends** 60:17
60:18,18,19,20
60:25 108:20
237:8
**depo** 130:11
**deponent** 8:16
**deposing** 253:11
**deposition** 1:14
4:7 8:16 9:4
10:17 225:7
250:4,9 252:5
253:3 254:1
**depressed** 66:4
174:22,25
227:13
**depression**
227:11 228:1,3
**depressive**
227:18

**derbyshire**
233:24,25 234:9
234:10
**describe** 58:25
80:12 91:18
124:7 181:25
182:2 184:6
192:15
**described** 60:3
**description** 5:10
72:23 73:3
196:21
**descriptive**
167:19
**deserve** 121:22
**deserves** 116:7
116:14
**designated**
37:23 54:14
89:8
**desirable** 71:2
**detail** 207:25
**details** 152:20
**determine** 181:8
**devastated**
169:24
**developed** 80:6
**development**
17:23
**diabetes** 229:20
229:23 231:4,22
**diagnosed** 90:6
**diagnosis** 89:14
100:11 137:25
154:3 206:20

216:7 218:25
243:15
**dictate** 19:2
**die** 231:15
**difference** 68:19
193:6
**different** 19:2
27:21 35:19
39:23 58:22
61:9 64:10
68:18 76:18
86:11 87:10
94:10 110:19
119:4 128:14,21
128:22 133:15
162:4 174:13
189:19 224:4
227:9 230:10,12
230:13,20
**differently**
143:12,17,23
182:14 204:9
213:25 218:9
221:18 224:14
**difficult** 59:17
59:17 86:21,25
97:16 167:14
169:25 170:3
228:23
**difficulty** 227:2
**direct** 4:3 10:8
82:6,17 141:23
204:14
**direction**
119:12,14,15

**directly** 38:25
83:25 108:12
121:17 139:12
147:18 166:14
179:19 182:10
182:11 189:23
192:8 201:20
202:22 203:12
207:24 224:4
**director** 84:14
173:9,10
**disabilities** 5:7
52:13 143:24
154:15 212:16
212:18 224:5
**disability** 4:21
31:4,10 51:21
51:24 143:22
180:15,20,23
182:14 192:8
206:22 211:23
211:25 212:4,11
212:13,24 213:1
213:12,18,19
217:22 218:9
222:5,22,23
236:24 243:17
243:25 244:4,19
245:8,17,24
249:1
**disagree** 201:23
**disagreed**
166:22
**disappointed**
108:6,16

**disarray** 59:22
**disciplinary**
36:7 56:11
**discipline** 43:7
43:14 44:5
53:19,21 143:15
160:8,14
**disclose** 137:24
138:5 139:23
143:10 154:2
221:1 248:7
**disclosed**
143:22 220:7
**disclosing** 21:13
244:15 247:17
248:3
**discourteous**
53:16
**discriminate**
142:10 175:13
**discriminated**
142:25 154:16
212:4,17 213:12
213:17,24
219:15 224:23
249:15
**discriminating**
180:14
**discrimination**
18:3,8 36:4 57:3
143:5,12 210:19
211:17,20 212:1
212:10,11,25
219:24 220:8,12
222:5,5,15,20

224:11
**discuss** 127:1
136:19
**discussed**
121:24 128:19
128:22 136:13
138:22 140:1
152:7 204:2
206:25 215:18
220:13 223:7
224:7 248:5
**discussion**
79:24 113:20
136:25 139:23
213:5
**discussions** 67:1
133:14 137:21
206:21 208:2
239:1 243:16
**disgruntled**
70:6
**dislike** 94:11
**disorder** 90:7
90:20 139:24
151:25 207:19
223:8 227:18,19
**dispersed** 93:6
**displaying**
180:13
**distress** 151:11
190:8,24 218:16
247:10 249:19
**distressed**
190:19 246:10

[distressful - elaborate]                                Page 272

**distressful**
191:23
**district** 1:1,1
9:11
**distrust** 199:16
**diversion**
104:10
**diversity** 35:4,7
46:24 47:1,4
49:7,9
**division** 1:2
9:11
**doctor's** 232:1
**doctors** 229:12
230:11,12,13,20
231:2
**document** 12:7
27:12,13 40:22
42:15 44:16
45:21 135:15
148:16 164:1
254:20
**documentation**
8:7 134:6
135:16,18
**documents** 12:8
47:18 140:7,9
217:11 240:17
**docuseries**
170:11
**doing** 14:19
69:19,19 70:13
98:8 100:20
105:25 109:2
144:13 149:13

155:13 157:5
158:4 169:11,23
187:1 199:17
228:17,20 240:7
**donna** 67:1
123:20 124:4,5
146:22 166:24
167:3 168:4,4
168:24 169:8
185:16 186:17
186:18 188:16
**door** 88:2
**dorm** 113:23
**doubt** 52:12
**downtown**
93:10
**dr** 167:1 168:10
169:9 229:11,11
229:11
**dread** 68:13
**dress** 226:22
**drink** 232:13
**drinking** 93:16
95:20 105:21
106:14 108:13
195:23,24 197:5
197:11
**drinks** 142:9
196:8,23 198:3
**drive** 234:13
237:7,10,13
**driver's** 251:22
**driving** 237:12
**drop** 121:1,2,3

**drug** 227:14,15
**drugs** 232:2
**dual** 89:14
100:11
**due** 71:14 90:8
152:2 189:25
192:5 205:1
**dui** 92:10,11
**duly** 10:6 251:8

**e**

**e** 2:1,1 3:1,1 4:1
4:11,16 5:4 6:14
6:17,18 7:1,8,11
7:12,18,21,22
8:2,5,6 9:1,1
15:23 40:14
80:3 111:20
124:16 125:19
128:11 132:23
134:16,19 137:3
148:14 157:12
159:3 164:22
178:19 179:5,10
179:22,23,25
182:5 183:19
185:3 186:3,13
186:15 187:5,6
187:9,22,23
192:4 193:25
197:4,8,10,12
198:2,10 199:1
200:15,23
202:25 205:1
207:23 208:10
208:16 210:21

211:16 216:9
223:9 238:9,11
241:23 243:13
245:14,15
253:22,23 254:3
254:3,3
**ear** 95:1
**earlier** 46:4
49:22 94:7
137:3 148:4
149:9 159:19
160:1 166:24
200:17 206:25
216:25 243:12
**early** 104:15
**easier** 35:2 75:2
142:9 186:3
**eastern** 134:21
**easy** 178:6
**educate** 76:19
**education** 56:19
69:16
**educators** 2:22
**effective** 211:4
**efforts** 239:15
240:4
**either** 41:5
60:24 62:23
157:4 178:20
196:19
**ekstrand** 141:1
149:25 150:11
185:4 206:12
**elaborate**
215:21

**[electronic - ethical]**

electronic  250:8
electronically
  30:21 32:7,17
elevated  139:17
  190:20 249:19
elevation
  192:22
eligibility
  167:12
elite  14:7,9,10
  14:11,20,20,23
  15:3,18 16:15
  17:1 236:9
else's  94:20
email  253:11
emailed  253:13
embarrassment
  36:15 37:8 48:2
  48:8
embodied  33:11
embry  1:8 2:17
  2:24 9:8,19
  12:25 13:5
  19:15 23:3
  25:11 27:16
  30:2 31:21 33:6
  33:18 35:4,22
  36:3 43:22,23
  44:14 46:14
  49:4 50:14
  52:12,21 57:6
  59:1,3 65:2
  67:10,16,21
  103:16,19
  105:14,19

122:14 123:14
169:15 204:20
211:7 220:2
229:17 230:8
253:2 254:1
emotion  168:16
emotional  36:15
  37:7 46:23
  47:21,24 48:1,7
  182:6 194:21
emphasis  41:10
employed  14:1
  14:2,3 136:20
  220:3
employee  12:4
  31:20 53:22
  74:4 76:23
  77:17 78:17,24
  132:4 161:4,6
  164:6 252:8,9
employees  5:7
  51:23 52:13
  53:12 160:20,21
  166:4 184:25
employer
  144:18 154:7
employers  24:6
  24:16 42:1
employment  5:9
  26:11 52:21
  56:12 136:17
  137:16 219:16
  223:23
encounter
  152:16

encounters
  189:25
encourage
  66:22
encouraged
  35:13 164:20
ended  90:20
  100:10 101:24
  164:21 239:3
endocrinologist
  229:22
endure  10:15
enforcing  43:22
  56:4
engage  36:6
engaged  170:14
enhances  46:23
enjoy  173:6
  232:18
enjoyable  84:1
  151:19
enjoying  225:23
  240:7,9
entail  204:13
entailed  204:14
entire  59:20,21
  71:11 81:15
  88:3 110:16
  174:11
entirety  153:23
  154:12
entities  14:24
  15:1
entitled  55:25

environment
  19:2 66:12
  69:21,25 171:21
  172:21 219:8
episode  229:15
episodes  227:23
equal  5:9 52:21
  215:14 222:9
erau  4:17,18,20
  4:22,23,25 5:1,3
  5:5,8,9,11,13,14
  5:16,17,19,20
  5:22,23,25 6:15
  6:18,19,21 7:1,9
  7:21 8:3,8
erau.edu  2:19
errata  4:9 253:9
  253:10,14
error  68:25
especially  39:12
  66:11 77:19
  204:14,25
esquire  2:2,2,7
  2:11,12,16,22
  253:1,25 254:25
essentially
  38:19
established
  101:10 230:14
  231:1
estimate  100:16
et  9:8
ethical  4:24 5:6
  32:17,21 43:23
  50:8

**evaluation**  6:20
  75:16 77:1,5,15
  77:23 78:3,10
  78:12,14 79:13
  79:20 81:1,1,2,7
  81:9,16,19 82:1
  82:9,19,20
**evaluations**
  55:21
**evening**  210:22
**event**  87:22
  88:21 92:24
**events**  28:11
  37:24 54:15
  96:20 97:16
  133:2 143:15
  182:12 191:20
  219:18
**eventually**
  100:1,3,3 177:8
**everybody**
  68:21 71:9
  120:24 121:10
  166:15,16
  174:13,14
**exacerbated**
  175:10 228:8
**exact**  47:17 89:2
  90:3 99:8,16
  101:20 102:17
  108:2 121:5
  122:15 133:25
  173:10 177:15
  199:8 207:5
  238:13

**exactly**  19:3
  20:6 23:11 30:1
  38:18 81:11
  86:25 90:23
  108:1 119:17
  178:18 181:21
  249:4
**examination**  4:3
  4:4,5 10:8 243:9
  246:15
**examined**  10:7
  133:1
**example**  37:13
  70:19,20 108:25
**examples**  214:7
**except**  121:11
  149:3 174:5
**exception**  54:14
**excessive**  37:13
  48:10 193:10
**exchange**  21:1
  23:21 156:19
  180:8 188:15
  208:13
**excited**  33:19
  168:15
**excitement**
  188:24
**excluded**  202:13
  202:16
**excuse**  122:9,9
  137:17
**exercise**  37:13
  48:10 62:13,14
  62:15,21 63:3

**exhibit**  4:15,16
  4:18,19,21,23
  4:24 5:1,2,4,5,6
  5:7,9,10,12,14
  5:15,17,18,20
  5:21,23,24 6:1,2
  6:4,5,7,8,10,11
  6:13,14,16,17
  6:18,19,20,22
  6:23 7:1,2,4,5,7
  7:8,10,11,12,13
  7:15,16,18,19
  7:21,22,23 8:1,2
  8:4,5,6,7,9,10
  8:11 20:22,23
  21:14 25:16
  29:5,11,12 30:8
  30:9 31:5 32:3
  32:11,12,13,16
  33:23,24 34:7,8
  38:4 40:4,5 42:3
  42:16 45:15
  50:3,4 51:16,17
  52:15,17 72:12
  72:14 74:21,23
  75:1 86:14
  105:9,10 106:6
  106:20 107:14
  109:8,9 111:15
  111:16,21 112:1
  112:4,23,24
  113:13,16,20
  114:14,15 115:9
  115:10 116:5
  117:4,5,8,22,23

  119:20,21
  120:10,11 122:5
  122:6 124:12,13
  124:25 125:4
  126:9,21 128:7
  128:8,19 129:18
  130:5,9,22
  131:9,13,18
  134:12 135:8,24
  145:18,23 146:5
  146:6,13 147:3
  147:7,12 148:9
  149:18,19 150:3
  150:17 151:1,2
  155:20,25
  156:13,19 157:9
  157:25 158:1,21
  158:22,24
  161:11,12,19
  164:3,4 167:17
  168:20 169:3,4
  171:9,11,16,16
  177:25 181:12
  183:8,13 185:10
  185:11 188:10
  188:11 189:10
  189:11 195:2,3
  200:6,7 206:3
  208:18,20
  210:10 242:5,8
  242:19 243:2
**exhibiting**  74:16
**exhibits**  4:12,14
**exists**  12:7

**[expect - felt]**                                                                    Page 275

**expect**  120:24
  195:20
**expectation**
  121:13
**expectations**
  50:17
**expected**  44:8
  74:4 237:5
**expecting**  13:19
**expedition**
  58:12
**expelled**  88:17
**experience**
  139:15 195:20
  215:24
**experienced**
  151:11
**experiencing**
  61:8 227:24,25
  249:8
**expires**  251:17
**explain**  61:5
  190:2
**explaining**
  39:10 148:22
  164:22
**explanations**
  140:2
**exploring**  58:13
**expressed**
  165:20 192:21
**extended**  70:5
  142:7 175:15
**extent**  12:11
  53:23 217:7

**extra**  109:4,4
**extreme**  192:22
  218:16 247:10
  249:7
**extremes**  74:16
**eyes**  51:6

**f**

**f**  15:23,23
**face**  69:1 80:22
  105:8
**facebook**  67:6
**facility**  100:4,9
  102:13,16
**fact**  60:7 78:17
  116:3 155:6
  165:6 174:15
  191:2,3 192:5
  197:5 202:16
  205:20 221:13
**facts**  213:23
  214:11 215:17
  215:22 218:12
  246:18 248:4
  254:20
**faculty**  166:8
**fails**  253:18
**failure**  220:14
**fair**  15:2 44:9
  58:3 77:5,7
  78:10,14 81:1,9
  81:18 82:19
  83:15 137:12
  138:15 139:7,11
  139:22 142:21
  155:5 202:16,20

203:4 204:4
  205:21,22
  206:18
**fairly**  76:13
  79:14,17 151:19
**fall**  6:20 39:14
  39:19,19 40:1
  87:17 120:21
  175:3 231:14
  239:23
**falling**  231:16
**familiar**  18:20
  18:21 30:12
  31:24 35:21
  45:23 57:2,4,5
**family**  26:20
  67:9 104:1
  123:17
**far**  163:24
  174:24 212:13
  229:2
**fast**  121:6
  190:22 231:19
**faster**  75:13
**fastest**  121:4
**father**  122:3,13
  122:23 127:21
  188:2 210:16
  237:10
**favorite**  58:6
  62:20
**fear**  65:24
  191:19,22
  192:23

**feared**  191:15
**february**  32:18
  132:23 150:17
  238:5 244:18
**federal**  253:16
  253:22
**fee**  16:6
**feel**  17:2 21:13
  61:15,21 62:2
  64:17,22 65:8
  66:4,8 67:19,25
  68:13 77:18
  79:10 84:4
  117:19 136:21
  141:24 154:10
  172:7,16 173:22
  174:22 175:1
  192:6 193:3
  206:19,22 221:2
  231:11 243:14
  243:16 245:6
  246:11
**feeling**  77:7
  112:12 121:17
  152:1 165:24
  176:5 192:21
  194:3 195:16
  226:9 228:17
**feelings**  223:22
**feels**  65:11
**felt**  63:19 67:22
  76:13 78:17
  98:18 108:10
  116:22 138:1
  141:12 151:12

**[felt - form]**

166:15 177:7
184:1 187:18
191:10,17
192:23 213:3
219:4,4,9 221:1
247:9,10
**female** 93:15
117:15 159:21
159:21,23
212:20
**fence** 95:15,17
95:18
**fences** 92:23
**fiance** 13:11,15
226:6 228:15
232:19
**fiance's** 12:22
**field** 78:23
180:6
**fielders** 63:5
**fields** 1:18 2:12
**fiery** 80:19,22
**fighting** 174:1
**file** 159:10
210:18 211:17
219:24
**filed** 219:25
220:8
**fill** 125:10
**finally** 100:13
**financially**
252:10
**find** 138:15
230:24 231:3
240:5,20

**finding** 146:16
**fine** 72:4
**finger** 231:9
**finish** 163:13
203:21 247:23
**finished** 71:8
111:12 115:16
234:24 236:20
**finnegan's** 93:9
93:12
**fired** 25:9 26:22
206:24 210:19
213:5 216:7
217:23 218:10
221:24 222:3
223:13,15
224:17 228:21
**firing** 210:20
**first** 10:6 21:17
27:22,23 28:5
29:15,17 33:12
34:19 35:10
36:23,24 39:7
43:9,16 46:3
55:15 56:2
58:25 68:4 69:6
73:7 75:16,19
75:25 86:19
87:5,7 88:25
89:1 90:6 91:5
92:5 113:10
114:5 122:12
126:1 128:1,14
128:24 133:17
133:18,24

136:10,15
140:16,20,22
141:2 146:18
147:16 152:6,15
152:21 156:17
186:1 189:15
200:15 203:10
214:11 220:7
226:10 232:10
**firsthand**
204:18
**fisher** 1:21 9:13
251:5,16 252:4
252:17
**fit** 238:14
**fitness** 118:8
119:1,3
**five** 163:16
231:8,10
**fix** 29:22
**fl** 253:12
**flags** 148:20
149:2,6
**flip** 72:19
**florida** 1:1,20
2:4,8,14,18 9:10
9:11 13:8 89:24
90:1,21 235:22
240:1 251:2,7
251:16 252:2,5
252:12,18
253:17,22
**focus** 46:24
170:21 188:24

**focused** 170:5
**fog** 191:6,8
**foggy** 88:24
96:12,21
**folder** 107:4
**follow** 153:16
246:13
**followed** 94:24
**following** 26:1
50:17 74:5 89:2
98:20 145:7
150:23 200:15
207:24 239:20
248:16
**follows** 10:7
**font** 40:24 41:9
**forced** 37:13
48:10 154:2
248:7
**forces** 194:24
**forefront**
248:12
**foregoing** 252:6
254:20
**foremost** 33:12
136:15
**forget** 114:7
**forgive** 196:21
**form** 16:7 22:18
23:25 24:7,10
24:17 26:12
31:4 44:15
48:11,20 49:16
50:9 51:25 52:8
52:23 53:6 54:5

**[form - getting]**

55:2,13,20 60:9
61:16 62:8 63:1
63:12 64:6,23
65:9,15,20 66:5
68:11 69:23
70:16 71:22
75:23 79:15
80:13,20 82:21
82:23 83:20
96:24 97:12
98:10,24 101:12
102:1 104:24
111:10 112:7
115:21 116:1
118:9,23 122:24
124:6 131:3
133:12 137:5,22
138:17 139:2,9
139:18 140:24
141:9 142:15
143:8 145:3
148:24 152:10
153:5,15,22
154:9,25 155:9
160:4 166:5
171:6 176:6,11
181:18 186:23
187:17 189:5
193:11,19 194:4
195:25 196:10
196:24 197:17
197:20 198:4,20
201:2,18,25
202:7 203:8
204:5,10,23

205:9,13 207:11
207:14 209:21
218:13 220:23
222:7,13,18
223:1,25 224:24
225:21 243:22
244:21 245:18
246:8 248:6,15
**formally**  191:12
**formed**  66:17
205:18,21
**forming**  79:25
91:6
**forth**  99:7 102:5
102:12 202:23
**forthright**
114:11
**fortunate**  104:3
**forward**  79:9
151:17,23 168:6
168:9,11 190:8
226:24
**forwarded**
179:13 183:8,20
**found**  52:2 81:7
122:12 137:7
147:13,14 152:8
182:13 184:7
189:22 211:15
242:3
**four**  92:17
94:10 121:1,2
201:11
**fourth**  181:23

**frame**  23:12
41:14 86:24
**frank**  214:5
**free**  55:25
**freshman**  39:12
67:15 136:5
**friend**  84:12,13
124:8
**friendly**  84:14
**friends**  112:17
112:18 119:18
170:24 171:24
**front**  94:21
120:7 181:14
194:20
**frustrated**
64:17 166:10
173:23
**frustration**
165:23 193:23
**frustrations**
76:14
**fucking**  108:4
156:8
**full**  10:10 78:15
96:17 169:25
172:5 238:25
239:2,13,22
**fun**  62:7,9,10
89:10 173:1
225:20 226:18
226:20
**furious**  67:2
**further**  133:8
173:12 246:12

252:8
**furthered**
191:22
**furthermore**
180:3
**future**  69:13

**g**

**g**  9:1 53:10
**gainey**  94:1,6,20
**game**  63:5,6
65:14 109:2
195:23 196:15
**games**  39:21
60:7 163:17,18
163:22 166:19
196:13 226:1
**gap**  229:3
**gaston**  2:12
25:20
**gears**  85:7
**gender**  151:15
211:21 212:20
213:16,19,24
221:10,22 222:5
222:22 224:11
224:20,23
**general**  162:21
173:7 195:18
**getting**  69:16
103:1 121:15,18
147:20 165:21
165:24 173:14
173:19 212:9
226:12 228:13
229:10 237:2

245:1 248:18
**gia** 9:5
**giannerini** 1:5
1:14 4:2,17,18
4:20,22,23,25
5:1,3,5,8,9,11
5:13,14,16,17
5:19,20,22,23
5:25 6:15,18,19
6:21 7:1,9,21
8:3,8 9:6,7,8
10:5,12 29:16
181:25 241:2
243:11 251:7
252:6 253:2,3
254:1,1,23
**giannerini's**
182:2
**giannerinitexts**
4:15 6:1,3,4,6,7
6:9,10,12,13,22
6:24 7:3,4,6,7
7:10,14,15,17
7:18,20,24 8:1,4
**gifted** 174:6
**gig** 66:1
**girlfriend**
233:18,19
**girls** 64:20 93:3
112:4 186:22
**gist** 167:25
171:13
**give** 10:2 12:15
19:11,12 25:19
35:19 75:7 78:4

100:7 103:24
106:19 107:1
108:24 113:16
115:13 125:7
129:21 174:4,5
179:12 189:16
190:5,21 211:13
**given** 12:14 16:3
28:16 41:4
167:11
**gives** 51:23
**giving** 17:2
74:14 129:25
130:3 152:20
182:6
**glasses** 119:5
**glorified** 170:1
**gmail** 185:23
**go** 15:15 22:14
22:19 24:2,8,11
24:17 26:2,5,12
27:12 31:17
34:25 35:18,24
37:15 38:3
41:16 42:2,8,15
42:18 43:18
44:12,17 45:25
46:7 47:2 48:20
48:25 49:14,16
49:19 50:9 51:5
51:25 52:8,23
53:1,6,14,20
54:5,8,18 55:2
55:13 57:12
61:16 62:8 63:1

63:6,12 64:6,23
65:9,15,20 66:5
66:9 69:23
70:16 71:22
73:19,25 75:8
75:11,23 76:2
79:15 80:13,20
82:23 83:20
85:13 88:18
96:24 97:12
98:10,22,23,24
101:12 102:1,12
104:24 107:5
111:1,10,23
112:7 115:21
116:1,17 118:9
119:10 122:17
122:18,24 123:5
124:6 125:13
130:6,15,24
131:3 132:5
133:12,23 137:5
137:22 138:17
139:2,9,18
140:6,24 141:9
141:11 142:15
143:8 145:3,11
145:11,21
147:21 148:24
151:14 152:6,10
153:5,15,22
154:9,25 155:9
155:13 156:4
159:12 160:4
166:5,16 171:6

173:1,12 174:8
176:6,11,16
178:21 181:18
184:1 186:23
187:17 189:5
193:11,19 194:4
195:25 196:10
196:24 197:20
198:4,20 199:22
201:2,18 202:7
203:8 204:5,10
204:23 205:9,13
207:14,25
208:17,21,22
209:21 210:20
217:14 218:13
219:9 220:23
222:7,13,19
223:1,25 224:24
225:7,8,10,21
226:8 229:24
230:12,13
231:15 232:22
241:17 244:14
248:6,15,19
249:5
**goal** 67:23 69:8
**goals** 46:14
83:10,11,14
**god** 236:11
237:15
**goes** 38:12
194:18 235:7
**going** 9:20
10:23 12:15

**[going - handbook]**

18:11,11 20:21
21:5 22:10
23:14,16,17
25:13 32:1
33:22 34:6 38:3
38:24 40:3 41:3
42:9,12,15
43:25 44:5 45:6
45:14 47:20
49:25 50:2
51:16 52:15
60:20 61:12
72:5,8,11 74:21
74:25 75:1,7
80:3 84:3,20,23
91:3 96:18
97:15 105:7
106:9 107:1,6,9
109:7 111:7,15
114:1,13 115:8
115:8 119:16
120:21 123:7,10
124:24 126:19
128:6,23 129:2
129:5,16 130:6
130:16,19
131:23 132:2,18
134:10 140:12
140:13 141:13
145:2,8 147:23
148:1,8 149:2,8
155:15 156:23
157:24 159:10
159:13,16,21
160:8 161:18,25

166:25 167:1,6
167:15 168:2,17
169:2 171:8
172:23 175:13
176:17,20
177:23 178:23
179:1 185:9
188:9 189:9
191:12 194:7
195:1,1,16,19
195:21 198:15
198:16 199:24
200:2,5 204:22
205:25 208:23
209:1,8 213:20
222:2 225:1,11
225:14 228:5
231:19,22
232:16 235:23
236:13,16
239:19 241:19
241:22 242:17
247:8 249:5,11
250:4
**gonna** 186:2
**good** 23:12
24:22 25:5
36:19 37:10
47:22 51:7 61:2
80:4,11 83:19
84:17 90:4
119:18 124:5,8
159:9 175:8
195:21 238:14
242:1

**goodman**
229:11
**gosh** 170:11
**gotcha** 12:16
159:7
**gotten** 147:18
**governing**
150:12
**grab** 159:10
**graded** 79:14,17
**grades** 55:21
64:2,5,8
**graduated**
17:15,18 67:17
87:17
**graduating**
167:3,13
**grandiose** 90:12
**granted** 142:2
**great** 40:17
76:10 107:2
136:1 167:23
171:23 225:25
227:16 231:2
**greatest** 170:12
**greatly** 80:10
**gregson** 214:4
214:17,18 215:3
215:5
**grew** 76:9
**ground** 10:20
**grounds** 56:10
**group** 2:3,7
39:3 91:13,14
134:23

**groups** 170:13
**guard** 187:2
194:14
**guardianship**
100:8
**guess** 17:3 61:2
95:10 116:5
121:20 163:5
186:18 195:9
227:17,18
235:14
**guidance**
119:25 120:4,8
150:16
**guide** 174:3
**guidelines** 38:13
**guy** 87:25
**guys** 175:19
178:22

**h**

**h** 4:11 15:23
254:3
**hair** 86:4
**half** 90:22,23
104:6,14 163:9
174:18 194:11
**halfway** 239:20
**hall** 64:11
108:15 109:4
**halloween** 93:3
101:5
**hand** 9:25 35:1
82:8 251:11
**handbook** 5:5
42:3 45:14,22

| | | | |
|---|---|---|---|
| 47:4,9,16 48:13 | 48:7 | 231:21 244:16 | 40:13,17 44:15 |
| **handing** 30:7 | **hard** 62:4,7 | 247:18 248:4,8 | 46:8,11 48:20 |
| **handled** 157:21 | 64:16 73:12 | 248:14 249:16 | 48:25 49:16 |
| 165:4 182:12 | 116:22 162:20 | **healthcare** | 50:6,9 51:25 |
| 204:8 205:5 | 165:25 169:21 | 230:6 243:15 | 52:8,23 53:6 |
| **hang** 22:16,21 | 171:3 175:16 | **healthy** 69:22 | 54:5 55:2,13 |
| **happen** 65:23 | 189:3 194:23 | 69:25 87:23 | 57:12 61:16 |
| 145:2,8 | 201:1 231:2 | **hear** 20:16 | 62:8 63:1,12 |
| **happened** 20:14 | **harm** 36:15 | 63:25 70:10,10 | 64:6,23 65:9,15 |
| 22:22 28:21 | 37:8 48:1,8 | 95:4 114:7,7 | 65:20 66:5,9 |
| 59:19 68:23 | **harmony** 53:15 | 221:8 | 68:11 69:23 |
| 78:23 87:24 | **hastings** 175:2 | **heard** 9:10 | 70:16 71:22 |
| 89:6 90:17 | **hayley** 156:4 | **hearing** 109:18 | 75:23 79:15 |
| 92:12,25 95:22 | **hazing** 36:12,25 | **heart** 173:13,19 | 80:13,20 82:21 |
| 99:2 102:23 | 37:6,7,13 47:14 | 190:23 192:23 | 82:23 83:20 |
| 107:25 108:22 | 47:24 48:1,11 | **heavily** 93:16 | 84:19 85:23,25 |
| 109:3 120:2 | **head** 11:3 19:20 | **heavy** 172:8,17 | 86:14 89:7 |
| 133:11 135:2 | 26:8,16 43:21 | **held** 64:8 121:5 | 96:24 97:12 |
| 140:13,15,22 | 44:8 45:4 62:19 | **help** 49:15 | 98:10,24 99:21 |
| 141:16 145:6 | 69:8 71:15 73:4 | 62:18 64:13 | 99:23 101:12 |
| 153:3 154:8 | 117:15 165:8 | 85:19 96:23 | 102:1 104:24 |
| 156:23 157:18 | 169:25 184:20 | 114:6,9 116:22 | 111:10,13 112:7 |
| 182:13 187:20 | 211:4 214:4 | 145:12 173:24 | 113:9,12 114:25 |
| 191:21 194:11 | **heal** 228:7 | 173:25 227:15 | 115:21 116:1 |
| 198:3,6 200:21 | **health** 12:3 | **helped** 64:9 | 118:9,23 119:3 |
| 211:2 221:21 | 21:12 35:11,14 | **helpful** 12:16 | 119:7 122:24 |
| 239:25 | 35:19 49:15 | 85:22 | 124:6 125:1,21 |
| **happening** | 66:17 100:4,7 | **helping** 62:16 | 130:8 131:3,18 |
| 90:12 186:10 | 104:9 137:25 | **henderson** 3:3 | 131:21,25 132:9 |
| **happens** 36:9 | 138:5 141:16 | **henrichsen** 2:2 | 132:15 133:12 |
| **happy** 37:4 | 142:11,25 154:3 | 2:3,7 4:4 9:16 | 133:19 137:5,22 |
| 164:25 165:4 | 154:16 206:20 | 9:16 22:18 | 138:17 139:2,9 |
| **harassing** 188:2 | 207:25 216:6 | 23:25 24:7,11 | 139:18 140:24 |
| **harassment** | 218:24 229:5,8 | 24:17 26:12 | 141:9 142:15 |
| 36:3,14 37:7 | 229:12,19 230:3 | 29:19 40:8,11 | 143:8 145:3 |

**[henrichsen - husband]**                                        Page 281

148:12,24
152:10 153:5,15
153:22 154:9,25
155:9 160:4
161:4,6,10
164:12 166:5
168:18 169:12
171:6 176:6,11
181:18 186:23
187:17 189:5,16
193:11,19 194:4
195:25 196:10
196:24 197:17
197:20 198:4,20
201:2,18,25
202:7 203:8,19
203:21,23 204:5
204:10,23 205:9
205:13 207:11
207:14 208:18
209:21 218:13
220:23 222:7,13
222:18 223:1,25
224:24 225:1,4
225:21 243:10
243:23 244:13
244:23 245:20
246:12 247:21
247:23 248:6,15
250:2,6,7 253:1
**heritage** 14:7,9
14:10,20 15:3
15:18 16:10,12
16:12

**hey** 24:9
**hh** 251:17
**high** 65:2 87:17
135:20 182:18
231:12 233:14
**highest** 44:14
**highly** 65:22
**hiking** 58:13
**hinges** 88:2
**hire** 4:23 28:13
28:16,21 30:14
31:15 32:24
**hired** 19:17
30:17 31:1
75:19 138:12
**hiring** 24:24
73:5 137:16,17
137:17
**hmm** 13:3 19:16
21:22 22:15
26:6 27:2 34:5
34:22 37:17
41:17 42:23
45:1 50:13 54:2
54:9 55:9 56:15
56:21 72:18
73:20 77:2
79:21 91:20,22
92:19,22,24
102:14,14 106:4
109:25 110:5
116:11,14
117:25 123:15
138:14 158:19
167:2 169:12

184:17 185:21
186:14 196:22
209:7 213:8
224:18 237:24
240:14
**hold** 24:18 52:8
102:19 104:24
118:23 137:5
203:19 247:3,21
**home** 15:9
88:18,21 91:2
91:13,14 120:21
175:15 177:4
179:13 197:6,8
198:14 240:7
**homes** 233:21
**honestly** 12:22
16:24 28:11
38:23 91:15
134:22 191:5
**honesty** 11:16
**hooper** 162:10
**hope** 61:14,17
62:15
**hopes** 239:18
**horrible** 70:11
100:9 174:5
**hospital** 89:19
90:2 96:11,15
96:22 97:19
99:5,6,7,11
101:11
**hospitals** 87:2
131:7

**hour** 108:15
**hours** 15:2,24
109:5 190:4,9
190:20 225:2
238:24 239:6,9
**house** 13:14,15
87:5 91:23,23
93:4,19 94:6
175:17 177:9
225:23 232:19
234:1,22,23
235:15,24 236:1
236:3
**hr** 31:16 139:13
139:15,17
144:11,13,14
162:9 182:11,22
210:25
**hslawyers.com**
2:5,6,9 253:1
**huh** 38:10 46:2
160:25 233:12
**human** 2:24
17:17,20,22
19:5 56:20,24
178:10 194:17
**hundred** 65:16
**hungry** 10:15
**hurt** 163:3
**hurting** 173:23
**hurts** 173:13,19
228:12
**husband** 123:22
166:25

**i**

**idea** 96:25
106:16 119:17
190:5,21 198:15
**ideas** 127:1,3,7
196:3 206:9
**identification**
4:21 20:24
25:17 29:13
30:10 31:3,6
32:4,14 33:25
34:9 40:6 45:16
50:5 51:18
52:18 72:15
74:24 105:11
106:7 109:10
111:17 112:25
113:14 114:16
115:11 117:6,24
119:22 120:12
122:7 124:14
125:5 126:10,22
128:9 129:19
131:14 134:13
135:9,25 145:19
146:7 148:10
149:20 151:3
155:21 156:14
157:10 158:2,23
161:13 164:5
167:18 168:21
169:5 171:12
178:1 183:14
185:12 188:12
189:12 195:4

200:8 206:4
210:11 242:9,20
243:3 251:21,22
**identified**
210:13
**identify** 210:6
**identity** 229:2
**illness** 90:25
**immediately**
164:24 192:15
211:5
**implying** 22:4,7
**important** 33:17
33:20 35:12
167:2
**impression**
138:2
**improper**
140:16
**improvement**
184:9 214:21,22
**inappropriate**
137:14 152:9
153:4,14,21,24
154:8,12 155:7
184:7 221:9,16
**inarticulate**
196:21
**inaugural** 67:18
167:4
**incidence** 94:15
**incident** 96:5
206:13
**include** 163:20

**included** 135:17
187:22
**includes** 55:19
208:11
**including** 55:21
56:11 59:20
64:10 137:20
174:12 202:24
**inclusion** 35:4,7
46:25 47:1 49:7
49:10
**increased** 90:12
228:5
**increases**
190:23
**increasingly**
35:11
**incredible** 62:14
**incredibly**
59:16,17 96:12
167:5 180:12
**individual**
48:18,19 50:18
56:9 78:22
126:15
**individualized**
61:6
**individuals**
45:10
**info** 186:2
**informal** 151:19
**information**
12:4 49:20
51:23 89:8
133:1,6 134:3

135:13 138:4
148:5 150:4
153:2,10 185:23
204:18,20
210:15 218:24
220:7 221:2
244:16
**infraction** 53:15
108:11,15
**infractions** 53:4
53:9
**inherent** 55:1
**initial** 122:20
**initially** 26:10
**initiated** 66:23
66:25 102:24
**injure** 63:6
188:22
**injured** 65:18
65:22
**injuries** 58:1
65:22
**injuring** 92:23
**injury** 65:19,24
**inpatient** 89:20
91:9
**ins** 170:9
**inside** 175:24
**insinuating**
22:10
**instance** 168:14
**instances** 86:11
104:23 105:1,20
142:7 223:10,13
**institution** 65:1

[instructing - joy]                                                    Page 283

**instructing**
74:18
**instructions**
74:15
**insulin** 233:6,7
**insurance** 91:2
230:3,16,19
232:23,25
236:19 237:1
**intense** 180:9,20
180:23,25 184:3
193:18
**intensely** 103:23
**intensity** 181:4
**intent** 36:20
37:10 47:23
**interact** 74:15
**interaction**
114:19
**interest** 55:8
**interested** 239:4
252:10
**interesting**
75:24 116:10
**interfering**
53:11
**interjected**
93:16
**internal** 31:23
**internet** 18:14
242:15
**interpreted**
180:19
**interview** 19:24
20:1 194:12

200:23 203:11
209:14
**interviewed**
20:4,11 202:24
203:3 216:12
**interviewing**
20:7
**intimidating**
55:11
**intimidation**
36:4
**intolerant** 36:3
**intoxicated**
193:23 197:13
209:20
**introduce** 9:15
**introduced**
57:20,21
**investigate**
205:2,16
**investigated**
133:4 205:24
**investigating**
205:16
**investigation**
79:6,9 84:2
88:16 184:8
200:21 202:14
202:17,23 203:1
203:4,7,17
204:4,8,13,14
204:25 205:3,7
205:12 206:9,18
211:15 217:11
224:2

**investigations**
217:9
**involved** 69:4
134:23 216:25
217:3,10 238:20
**involving** 49:1
205:3
**irish** 93:12
**issue** 27:16 28:8
119:7 142:20
208:1 218:5
**issues** 24:23
57:3 66:17 68:3
142:11 156:23
**it'll** 145:12
**items** 50:14
205:24
**iwlca** 150:12

**j**

**jacksonville** 2:4
**jail** 98:4,22 99:7
99:11,12,14,18
100:20 101:23
101:24 102:8,9
102:11,15,18,18
102:20
**january** 1:15
9:3 118:3,4
122:16 127:19
127:24 128:19
134:1 136:9
137:19 146:1,25
147:10 152:24
165:14,15,16,17
169:15,16 220:6

244:17 248:8
251:8,12,17
252:11 253:1
**jealous** 64:19
**jersey** 170:15,16
**jo** 67:2 123:20
124:4,5 146:22
166:24 167:3
168:5,25 169:8
185:16 186:17
188:16
**jo's** 186:18
**job** 19:22 25:10
55:22 69:15,17
69:21 70:13
73:10,15 149:16
151:22 155:13
227:16 236:9
237:20 238:3,4
238:23 239:13
240:5 253:4
**jobs** 91:1,21
175:24 239:16
**jog** 85:21
**john** 20:1,4,8
75:19 76:8
77:12,19,25
79:25
**joining** 66:4
**jones** 112:17
120:7 156:20
194:9
**jordan** 170:11
**joy** 61:6,10,11
61:14,18

[joyful - kahn]                                                    Page 284

**joyful**  60:13
  61:3
**jp**  20:9,17 27:25
  28:8,18,22 29:2
  79:8 82:6 83:19
  83:25 122:2,9
  128:1,4,16
  133:10 134:3
  135:13,15 136:8
  138:25 140:6
  141:6 142:14
  144:8 145:1
  147:16 148:4,22
  150:20 152:4,8
  152:15,16,23
  153:10,11,20
  155:8 179:5,8
  187:24 190:13
  191:22 216:24
  216:25 217:3
  224:17
**judgment**  69:1
**july**  27:10 28:10
  28:17,18,24
  29:2 30:21
**jumped**  94:19
**june**  30:2 82:15
**juniors**  60:10
**justification**
  133:8

**k**

**k**  172:8,17
**kahn**  2:11 4:3,5
  9:18,18 10:9
  20:21,25 22:23

24:4,9,14,19
25:18,22 26:14
29:14,21 30:11
31:8 32:6,15
34:2,10 40:10
40:12,16,20
42:14 44:19,21
44:22 45:18
46:10,13 48:22
49:5,18 50:2,7
50:11 51:20
52:4,11,20,25
53:7 54:7 55:4
55:14 57:15
61:20 62:12
63:8,21 64:14
65:6,12,17 66:2
66:7,21 68:12
70:2,18 71:23
71:25 72:3,10
72:16 74:21,25
75:4 76:12
79:18 80:16,24
83:1,22 84:17
84:25 85:24
86:1,4,6,9,16,18
89:12 97:1,17
98:13 99:3,24
101:14 102:3
105:2,12 106:8
107:3,11 109:12
109:19 111:12
111:14,19
112:16 113:1,15
114:17 115:2,5

115:12,24 116:4
117:7 118:1,12
119:5,9,23
120:14 122:8,25
123:5,12,24
124:1,2,10,15
125:3,6,25
126:11,25
127:15,17,18
128:6,10,25
129:7,10,17,20
130:10,15,21
131:8,15,20,22
132:1,12,14,17
132:19,21
133:16,20
134:15 135:11
136:2 137:10
138:7,23 139:5
139:14,20 141:4
142:12,19
143:13 145:10
145:15,17,20
146:9 148:3,13
149:4,22 151:5
152:12 153:9,18
153:25 154:18
155:4,11,22
156:16 157:11
158:3 159:2,12
159:18 160:7
161:5,9,11,14
161:16 164:8,11
164:15 166:9
167:20 168:19

168:23 169:7,11
169:13,18,20
171:7,15 176:8
176:13,22 178:3
178:21 179:3
181:22 183:10
183:15 185:14
186:24 187:19
188:14 189:8,14
189:17,18 191:9
193:15,21 194:6
195:5 196:7,12
197:1,18,22
198:8,24 199:22
200:4,10 201:10
201:15,21 202:4
202:9 203:13
204:1,7,17
205:4,10,19
206:5 207:12,16
208:19,22 209:3
209:12,13 210:1
210:9,12 212:22
212:23 218:18
221:3 222:10,16
222:21 223:3
224:9 225:3,10
225:16 226:3
236:12,18
241:17,24 242:2
242:7,10,21
243:5,22 244:12
244:21 245:18
246:8,13,16
247:25 248:10

**[kahn - lacrosse]**                                                                 Page 285

248:17,19,22
250:1 253:25
254:25
**kathy** 26:7,8
**keep** 21:20
59:18 63:10
64:2,9 109:18
166:7 170:14
**keeping** 170:21
170:25 172:23
**keeps** 226:1
**keller** 214:6
**kept** 71:10
170:15 217:9
**kicked** 39:13
**kidding** 240:21
**kids** 13:24 67:25
166:19
**kind** 11:8 12:6
13:17 14:9
55:19 58:16
76:17,23 85:7
90:18 96:18
123:21 134:6
169:25 170:8
191:6 221:9
227:11 229:7
**knew** 45:2 96:15
138:12 181:9
190:11 201:7
**know** 10:14
11:3,15 14:25
19:5 21:19
23:11,13,17,18
23:19 24:21,23

25:15 28:11,12
28:13 33:15,16
39:19 43:2
58:12 60:11
61:6 62:17,18
62:21,22 64:12
65:3,3 67:9 68:6
68:24 71:4 75:5
76:2,5,9,16,21
76:22 78:22,22
80:7,8,10 81:11
81:13 85:9,17
86:22 88:11,12
89:2,13,15 90:3
90:19,22,25
91:17 92:24
93:24 94:3,14
94:23 95:3,11
96:1 97:6,7,16
98:17 99:2,8,15
101:19,20,22
102:5,17 106:18
107:24,25 108:1
108:22 109:2
112:18 114:2,3
114:4,4 116:21
120:5 121:4,6,7
121:9,12 122:3
122:3,4,11
123:1,13,21
124:20 125:14
125:19 131:11
131:16 132:2,11
134:22 136:7,12
137:7 138:3

139:3 140:10,20
141:11,15 142:4
142:5,7,16
143:11 144:12
145:5 149:14
150:9,9 151:24
152:19 154:23
156:9 157:2
158:8,13,14,16
160:13 164:10
164:12,13,21
165:7,9,20,21
165:21,25 166:2
166:3,7 167:25
168:15,16
169:24 170:12
170:24 171:10
172:8,8,17,18
172:22 174:2,7
174:25 175:14
175:14,16
177:15 178:6,16
180:7,22 183:2
186:4,5,9,16
187:15,22 188:2
189:15 190:4,8
190:15 191:13
191:14 192:14
194:1,18,19,19
194:20 196:3,3
196:4 198:16
199:2,4,15
200:13,20,20,20
201:4,4,5,19
202:11 203:23

204:11 207:6
209:23 212:19
215:7 216:18
217:9,10,19
218:4 220:25
221:14 226:7
228:6 231:23
232:1 237:19
238:13,18 239:2
239:6 245:10
248:18 249:10
249:12
**knowing** 34:20
191:25 249:6
**knowledge**
88:16 191:2,3
215:9 218:16
**known** 93:24
251:20

**l**

**l** 8:14
**la** 234:19,20,20
**lack** 78:21 211:9
211:11 224:2,2
**lacrosse** 6:20
19:17 57:13,18
57:23 59:5
60:13 61:1
63:10 64:1,16
66:3 67:23
68:25 69:8
71:15 73:4
76:16 87:25
88:4 91:4,5
163:6 170:1

**[lacrosse - little]**                                                        Page 286

184:20 211:4
214:6 238:16,20
**laguna**  100:12
**lakeside**  100:4
102:19,22 103:7
**language**  47:15
**lapel**  109:18
**lapse**  19:8,10
**lasted**  87:1
104:14 199:16
**lastly**  206:19
243:14
**late**  133:25
203:23 212:9
229:10 248:18
**law**  2:3,7 17:23
18:2
**lawyer**  22:25
23:2 29:6 30:2
140:19 185:6
186:17 189:14
206:12 240:21
**lawyers**  240:20
**layperson**
181:10
**lead**  49:2
**leader**  71:18,20
**leaders**  69:13
**leadership**
84:15 162:5
180:11
**leading**  133:2
**league**  91:4
**leah**  106:11
107:16 108:7,10

109:24 110:20
116:6 141:19,22
146:14 156:6
190:14,15
196:23 198:12
198:13,14 199:5
**leave**  25:8 26:15
87:21 133:3
154:3 177:4,7,8
197:7 198:7,23
199:11 206:12
207:18 218:23
219:3,7 246:20
247:7,9
**leaving**  103:16
**led**  85:15
**left**  25:6 42:24
79:3 82:14 91:1
92:2 93:25 94:1
94:16 101:22
103:18 123:4
163:18 167:13
203:1 229:17
246:21
**legal**  9:14
149:15 218:5
253:21
**lesser**  108:14
**lessons**  59:6
**letter**  4:8,18,19
9:4 21:4,21
25:23 26:5 27:7
27:25 28:12,15
28:20 29:1 30:2
30:5 42:13

66:23 67:1,3
72:9 84:24
107:10 122:21
122:22,23 123:1
123:11 129:6
130:20 148:2
159:17 167:1
168:6,25 169:8
176:21 178:4
179:2 183:1
188:18 189:20
189:22 190:18
193:22 200:3
201:24 205:25
206:6,8,17
207:2,13,15
208:4,5,8 209:2
210:14 216:17
217:24 221:25
223:5 225:15
236:17 241:23
**letters**  25:14
183:4 206:7
**letting**  43:2
**level**  60:18,25
61:2 90:13
182:18 199:15
247:10
**lewis**  234:13
**lhp**  1:3
**license**  91:2
251:22
**lie**  215:3
**lied**  202:6

**lieu**  26:24
**life**  59:6 73:23
73:23 173:6,7
177:4 228:22,24
**light**  60:7 70:12
70:14 165:6
194:2
**liked**  64:8 76:8
**likely**  65:22
222:12
**line**  24:20 28:21
109:13 110:20
119:10 141:25
182:17 185:19
186:1 192:7,9
193:4 254:4,7
254:10,13,16
**lines**  111:1
199:2
**linkedin**  239:18
**lisa**  20:5
**list**  12:15 27:5
37:12 48:10
107:1 132:4
160:15,16,18
161:3
**litigation**  228:9
**little**  34:14 51:6
57:8 64:19 85:7
102:20,21 105:7
147:20 151:24
151:25 159:19
162:18 165:10
173:12 180:1
194:14 225:17

CONFIDENTIAL

**[live - mail]**

Page 287

| | | | |
|---|---|---|---|
| **live** 13:14 26:20 | 119:20 125:7 | **lost** 37:2 59:18 | **lynn** 10:12 |
| **lived** 13:9 94:6 | 126:18 129:21 | 65:4 98:21 | **m** |
| 177:8 | 130:1,3,22 | 113:8 167:4,6 | **ma'am** 71:17 |
| **living** 26:21 | 132:22 135:21 | 173:22 174:2,13 | **mad** 199:14,15 |
| 87:4 91:3 | 147:2 148:15 | 174:14,18 211:7 | **made** 16:8 62:6 |
| 175:19 233:22 | 149:18,23 | 211:8 | 68:25 100:3 |
| **llc** 14:6 235:5 | 155:23 159:3 | **lot** 18:1 23:14 | 103:20 118:15 |
| **llp** 1:18 | 160:23 161:23 | 23:16,17 58:1 | 118:21 165:25 |
| **located** 15:7 | 162:11 171:10 | 58:14 62:5 64:7 | 166:14 167:13 |
| **lock** 163:10 | 172:2 178:6 | 66:18 75:7 | 170:2 175:12 |
| **long** 13:9 19:12 | 181:12 186:6 | 78:22 80:11 | 180:12 194:16 |
| 20:16 23:11 | 189:14 192:9 | 86:23 90:17 | 202:16,19,22 |
| 87:1,14 88:12 | 200:23 237:18 | 95:21 102:5 | 210:16 213:1 |
| 88:23 90:2 99:4 | 239:16 240:2 | 119:19 122:19 | 219:8 238:21 |
| 99:20 100:16 | 241:1,7 | 140:13 142:17 | 239:16 244:2 |
| 110:18 121:14 | **looked** 38:23 | 148:19 149:1 | **mae** 1:21 9:13 |
| 140:4 165:11 | 47:15 106:15 | 158:11 160:6,6 | 11:5 28:5 251:5 |
| 171:18 199:16 | 107:14 137:3 | 166:1 171:24 | 251:16 252:4,17 |
| 233:7 | 171:10 226:22 | 199:7 225:24 | **mail** 7:18,21 8:2 |
| **longer** 137:20 | **looking** 23:23 | 228:12 | 40:14 80:3 |
| **look** 18:18,20 | 77:6 78:12 91:4 | **lots** 155:15 | 111:20 124:16 |
| 18:21 25:19 | 111:21 116:5 | **loud** 11:7 27:23 | 125:19 128:11 |
| 27:12 30:12,20 | 124:19 140:7 | **love** 61:24 | 132:23 134:16 |
| 31:12 38:3,4 | 147:5,7 168:9 | 225:22 242:13 | 134:19 137:3 |
| 44:5 46:17 | 168:11 226:24 | **loved** 61:25 | 148:14 157:12 |
| 47:14,18,25 | **looks** 31:11 | 66:20 239:13 | 159:3 164:22 |
| 48:16 50:12 | 47:17,18 104:13 | **low** 231:14,16 | 179:5,10,22,23 |
| 53:10,19,19 | 168:4 190:21 | **lower** 229:24 | 179:25 182:5 |
| 56:2 72:24 | 229:20 | **lunch** 20:5,6 | 183:19 185:3 |
| 76:25 77:9,14 | **lose** 112:12 | 79:1 84:9,18 | 186:3,13,15 |
| 77:22 79:19 | 233:13 | 85:1 | 187:5,6,9,22,23 |
| 80:25 81:4,24 | **losing** 170:23 | **luncheon** 84:22 | 192:4 193:25 |
| 82:8 90:10 | **loss** 165:24 | 147:25 | 197:4,8,10,12 |
| 106:20 113:10 | 229:4 235:11 | **lying** 138:4 | 198:2,10 199:1 |
| 113:16 115:13 | | | 200:15 202:25 |

**[mail - mean]**                                                        Page 288

207:23 208:10
208:16 210:21
211:16 216:9
223:9 238:9,11
243:13 245:14
245:15
**mailed** 178:19
**mails** 4:16 5:4
6:14,17,18 7:1,8
7:11,12,22 8:5,6
200:23 205:1
**maintain** 74:11
**maintained**
170:8
**major** 108:11
229:3
**majority** 14:12
76:3
**make** 60:11
69:15 70:13
74:25 75:1,1
124:21 160:19
173:7 205:21
221:9,21 230:17
234:6,11 240:9
244:18
**makes** 112:13
203:6,17 204:3
231:11
**making** 16:20
16:23 17:1
30:17 33:13
48:18,18 121:21
134:20 139:7
206:15

**male** 213:25
215:24
**man** 221:17
224:14
**manage** 231:9
231:14
**management**
17:17,20 231:17
**managing**
229:20
**mania** 90:12
227:18
**manic** 227:23
**manner** 44:10
**mantra** 59:8
**manual** 5:2
34:12,21 35:5
37:7 38:4,21
**march** 16:16
17:6 100:18,18
100:21,22,22,22
101:3,9,11
163:11 165:12
165:15,18
174:16,18
**marissa** 1:5,14
4:2 9:5 10:5,12
113:9 133:2
148:20 190:15
251:7 252:5
253:3 254:1,23
**mark** 18:12
20:1,21 50:2
74:21 75:19
76:9 77:20,25

80:1 128:6
**marked** 20:23
25:16 27:13
29:10,12 30:7,9
31:5 32:2,3,10
32:13 33:22,24
34:6,8 40:3,5
42:16 45:15
50:4 51:17
52:17 72:11,14
74:23 105:9,10
106:3,5,6 109:7
109:9 111:16
112:22,24
113:13 114:14
114:15 115:8,10
117:3,5,21,23
119:21 120:9,11
122:5,6 124:11
124:13,25 125:4
126:9,21 128:8
129:18 131:12
131:13 132:7
134:10,12 135:3
135:7,8,24
145:18 146:4,6
148:8,9 149:19
151:2 155:19,20
156:11,13 157:7
157:9,24 158:1
158:22 161:12
161:18 164:3,4
167:15,17
168:17,20 169:2
169:4 171:9,11

177:24,25
183:13,16 185:9
185:11 188:9,11
189:9,11 195:2
195:3 200:5,7
206:3 210:10,13
242:8,19 243:2
**marking** 86:15
132:12 242:5
**married** 13:22
226:12 228:13
232:22
**maryland** 15:8
15:15 16:1
26:18 87:5
92:13
**massive** 63:2
**master's** 17:12
17:16,20
**materialize**
14:15
**matter** 9:7
36:19 37:9
47:22
**maxient** 57:5
**mea** 171:17
172:6 173:4
177:17 178:12
178:14 179:8
187:21,21
190:11 195:6
200:12,13
224:13
**mean** 11:5
13:11 18:21

CONFIDENTIAL

**[mean - message]**                                                    Page 289

| | | | |
|---|---|---|---|
| 19:3 23:16 | 130:20 148:2 | 162:9,14 178:13 | 99:7 100:4 |
| 24:21 33:10 | 159:17 176:21 | 178:14 179:9,11 | 104:9 137:25 |
| 41:10 52:2 61:1 | 179:2 200:3 | 180:5 184:1 | 138:5 141:16 |
| 69:5 71:7 78:20 | 209:2 225:15 | 187:3,12,14,16 | 142:11,24 154:2 |
| 79:14,16 83:23 | 236:17 241:23 | 187:20,25 189:2 | 154:16 192:6 |
| 84:14 95:3 | 242:23,25 243:1 | 189:7 190:14,17 | 206:20 207:25 |
| 97:13 103:10 | 243:6 | 192:4 195:19 | 216:6 218:24 |
| 106:18 112:8 | **medicated** | 197:3 198:13,14 | 229:5,7,12 |
| 114:21 116:15 | 193:14 | 199:7 200:12,13 | 244:16 247:17 |
| 125:11,20 | **medication** | 200:14 207:25 | 248:3,8,14 |
| 142:22 151:7 | 227:12 233:4 | 245:22,25 | 249:16 |
| 156:7,8 158:12 | **medications** | 246:18 247:4,5 | **mentally**   96:16 |
| 161:21 163:8 | 11:21,24 233:11 | 247:18 248:2 | **mention**   192:18 |
| 165:9 166:6 | **medicine**   99:17 | 249:5,16 | **mentioned**   84:2 |
| 169:16 171:13 | 99:19 | **meetings**   79:7 | 94:11 97:14 |
| 171:18 173:24 | **meet**   126:14,20 | 122:19 128:16 | 158:15 162:20 |
| 181:20 185:24 | 127:1 128:13 | 128:21,22 | 187:24 192:4 |
| 187:5 188:6 | 145:24 175:6 | 133:14 150:20 | 196:2 203:5 |
| 192:16 201:20 | 178:7 179:5 | 150:23 151:11 | 219:13 223:8 |
| 217:8 219:3 | **meeting**   39:4,8 | 151:14 152:4 | 245:14 |
| 224:1 240:22 | 39:13 76:6 | 160:3,6 162:2 | **mentions** |
| 241:12 247:7 | 122:17,20 128:4 | 170:9 191:11,14 | 142:13 192:9 |
| 249:4 | 128:18,23 | 244:6,8,9 | **mentor**   22:20 |
| **meaning**   23:17 | 133:18,24 134:2 | **members**   56:5 | 73:22 119:18 |
| **means**   108:1 | 136:10 137:8,8 | **memory**   11:25 | **merit**   251:5 |
| 224:6 | 137:19 139:25 | 27:15 85:21 | 252:4 |
| **meant**   39:10 | 140:2,4,6,16,21 | 136:3 145:23 | **message**   6:19 |
| 45:3 61:5 67:13 | 140:22 141:2,5 | 146:17 200:11 | 21:1,5,17 23:21 |
| 80:1 149:2 | 141:8,12,13,22 | **men**   176:1 | 27:23 28:10,23 |
| 188:21,22 201:7 | 144:7,25 145:6 | **men's**   88:3 | 106:11 107:14 |
| **media**   8:10 9:4 | 146:3,18,21,23 | 214:4,5,6,6 | 111:25 121:20 |
| 42:13 71:23 | 147:15 151:15 | **mental**   21:12 | 124:16,18 |
| 72:9 84:24 | 151:18 152:6,8 | 35:11,14,19 | 125:21,23 |
| 107:10 108:14 | 152:15,21 153:3 | 49:15 66:17 | 126:19 150:25 |
| 123:11 129:6 | 155:12 158:20 | 74:2 87:2 89:18 | 151:13 156:7 |

CONFIDENTIAL

**[message - need]**

185:15 186:7
187:4 195:6
217:13
**messages**  4:15
5:14,15,17,18
5:20,21,23,24
6:1,2,4,5,7,8,10
6:11,13,16,22
6:23 7:2,4,5,7
7:10,13,15,16
7:19,23 8:1,4,9
106:10 126:12
127:21 145:12
**met**  94:5 147:16
150:20,22
153:11 178:17
185:16 195:22
197:14 248:23
**mic**  86:2
**michael**  3:2
9:12 170:11
**microphone**
44:20 123:25
129:9 169:19
201:14 212:22
**mid**  63:4 133:25
**middle**  1:1 9:11
40:25 57:22
134:21 163:2
**middleburg**  2:8
**mike**  15:21 16:3
**miles**  63:5
**mind**  10:10
23:12 41:14
42:4 62:16,18

62:22 68:24
84:4 86:24
99:25 112:2,3
196:5
**mindful**  35:13
**mine**  51:9 127:4
241:12
**minute**  29:22
64:15 107:5
115:15 129:21
144:5 178:22
182:16 199:19
241:18
**minutes**  241:16
241:24
**misconduct**
36:7 44:9
**misinterpreted**
197:16
**missing**  108:15
155:24
**mission**  5:1 34:3
**mistakes**  112:6
**mistreating**
214:23,25 215:9
**mistreatment**
224:19
**mixed**  136:4
**moment**  25:12
103:24 144:13
169:14 186:10
**momentum**
162:24
**monday**  189:23

**money**  235:8,13
235:14 236:10
236:21 237:2,4
240:10
**monitor**  184:24
231:8
**monitoring**  64:5
**month**  13:18
15:16 90:5
170:17
**months**  99:13
99:14 228:6
237:21
**mood**  100:14
193:10,18
**morbid**  226:8
**morning**  56:19
**mother**  12:21
89:16 97:23
100:7,8 103:1
141:14 167:3
**mothers**  41:25
**motor**  233:14
**move**  26:17
107:22,24 228:7
240:3
**moved**  13:10
**moving**  151:22
**mugshot**  131:2
131:6 146:17
**multiple**  14:10
99:15 110:7
214:24 223:9
234:7 238:14,20

**mushrooms**
232:4

**n**

**n**  2:1 3:1 4:1
8:14 9:1 210:4
**name**  9:12
10:10 15:21
93:7 104:12
125:12 161:1
164:18 183:3
235:20
**named**  214:12
**names**  12:4,4,9
12:12,14,17
116:17 215:13
**natural**  70:8
**nature**  39:22
65:21,23 76:17
79:9 121:25
152:3 189:25
249:12
**navigating**  57:2
68:2
**ncaa**  43:22
163:21,24
**necklace**  86:2
**need**  10:14
11:14 30:23
51:23 71:23
85:17 102:2
119:14 128:23
141:17 142:1
151:12 158:6
159:9 165:10
180:22,25

CONFIDENTIAL

**[need - objection]**                                                    Page 291

191:14 192:2
193:1 199:19
209:8
**needed**  69:19
89:18 155:16
166:16
**needs**  11:5
49:15
**negative**  53:22
173:5 205:15,15
205:22 209:17
221:13 223:21
**negatively**  49:3
**neglect**  224:8
**negotiating**
74:18
**neil**  2:2 9:16
24:9 107:3
164:11 253:1
**neither**  14:18
**nervous**  22:17
**netflix**  226:2
**network**  230:23
**never**  23:13
52:1 68:24
84:13 93:1
94:14,14 95:25
103:20 112:2,3
121:24 127:16
129:14 136:18
167:11 188:5
202:21,23 203:9
203:12 204:15
207:17 219:6
224:10 236:20

236:21
**new**  4:23 19:22
28:16,21 31:15
32:23 39:12
151:13 162:24
162:25 163:6,7
170:4 188:25
**news**  194:23
**nhenrichsen**  2:5
253:1
**nice**  85:1
**night**  94:7 95:20
96:20 177:17,19
210:23
**nightmare**
227:8
**nightmares**
227:5,25
**nights**  232:17
**nine**  210:22
**noise**  93:5
**nonrelated**
134:18
**nonretaliation**
51:3
**nonworking**
231:6
**noonish**  147:10
**normal**  39:20
59:23,23 60:1
70:22 71:11
76:22,23 139:11
184:11 196:5
204:12 228:4
231:23

**normally**
163:22 182:9
**notary**  251:6,16
252:4,17
**note**  122:9
161:6 167:2
253:9
**notes**  41:2,5
83:11,16 200:24
201:16 203:11
232:1 252:7
**notice**  40:24
41:9
**noticing**  227:2
**notification**  4:8
**notified**  80:2
**notre**  57:21
**november**  32:8
112:2 189:7,24
200:18 208:8,10
208:13 210:21
216:8,18 217:24
221:25 223:5,9
223:15 243:13
244:2 245:12,15
245:21 246:22
247:1,2,4,5
248:1,23 249:15
**number**  13:4
17:2 27:13 32:2
34:15 41:21,22
49:14 50:19,20
50:22 51:5 53:5
53:18 54:8,19
55:3,5,24 56:2

106:18,18,21
109:13,20
114:21 124:19
124:20 134:22
155:25 156:25
157:2 160:19
170:16 201:3,5
208:20 222:17
**numbers**  40:9
41:22 106:22
120:6 125:9
126:5 132:4
161:8,9
**numerous**  64:10
79:7
**nurse**  100:13
101:18
**nurture**  69:11
69:13

**o**

**o**  8:14 9:1
**oath**  4:6 11:18
251:1
**object**  24:9
243:22 244:21
244:24 245:16
245:18 246:4,8
**objected**  245:6
247:17 248:24
249:4
**objecting**  208:1
244:15 248:3
**objection**  22:18
23:25 24:7,17
26:12 44:15

**[objection - okay]**                                                    Page 292

| | | | |
|---|---|---|---|
| 48:20 49:16 | 201:2,18,25 | 238:25 239:19 | 237:15,18 239:8 |
| 50:9 51:25 52:8 | 202:7 203:8 | **offers**  55:23 | 242:7 |
| 53:6 54:5 55:2 | 204:5,10,23 | **office**  15:5,12 | **okay**  9:22 10:15 |
| 55:13 61:16 | 205:9,13 207:11 | 15:13 76:5 | 10:20,24,25 |
| 62:8 63:1,12 | 207:14 209:21 | 127:20,25 | 11:1,11,15 12:8 |
| 64:6,23 65:9,15 | 218:13 220:23 | 175:13,24 | 12:11,13,14,16 |
| 65:20 66:5,9 | 222:7,13,18 | 189:24 197:4,6 | 12:24 13:4,15 |
| 68:11 69:23 | 223:1,25 224:24 | **officer**  2:24 | 13:19 14:17,19 |
| 70:16 71:22 | 225:21 243:24 | 104:11 | 14:23 15:9,17 |
| 75:23 79:15 | 244:12 248:6,15 | **officers**  93:23 | 16:14,25 17:4 |
| 80:13,20 82:21 | **objections** | 94:6,12 | 17:16 18:5,7,15 |
| 82:23 83:20 | 24:10 244:3,18 | **official**  251:11 | 18:17,19 19:5,8 |
| 96:24 97:12 | **obscenities** | **oglethorpe** | 19:14 20:8,18 |
| 98:10,24 101:12 | 97:18 | 24:22,25 25:6 | 20:20 22:8 |
| 102:1 104:24 | **observe**  180:11 | **oh**  11:4 12:16 | 23:23 25:7 26:2 |
| 111:10 112:7 | 184:4 | 16:13 27:14 | 27:7,12,22 28:6 |
| 115:21 116:1 | **obvious**  11:9 | 29:18 43:16 | 28:17 29:18,25 |
| 118:9,23 122:24 | 212:19 | 44:3 45:19 46:6 | 30:23,24 31:3,9 |
| 124:6 131:3 | **obviously**  156:6 | 46:12 48:24 | 32:10,20 33:3,5 |
| 133:12 137:5,22 | **occur**  87:22 | 55:6 60:8 74:13 | 33:22 34:1,16 |
| 138:17 139:2,9 | **occurred**  99:2 | 78:15 86:5 | 35:17 36:11 |
| 139:18 140:24 | 191:21 | 88:20 95:7 | 37:5 38:8 39:1 |
| 141:9 142:15 | **occurring**  88:1 | 99:10 107:3 | 40:3,7,13 41:16 |
| 143:8 145:3 | **october**  92:17 | 111:13 112:2 | 41:22 42:2,7,17 |
| 148:24 152:10 | 100:21 101:1,4 | 119:13 127:17 | 42:21 43:1,6,15 |
| 153:5,15,22 | 177:21 245:13 | 127:19 131:10 | 43:21 44:1,4,24 |
| 154:9,25 155:9 | **odd**  91:1,21 | 132:15 143:3 | 45:9,14,17,20 |
| 160:4 166:5 | **offended**  164:20 | 147:6 150:5 | 45:25 46:17,22 |
| 171:6 176:6,11 | 164:23 184:3,6 | 156:2,3 159:4 | 47:7,8,13,20,22 |
| 181:18 186:23 | **offer**  21:18 22:4 | 160:22 161:4,17 | 48:5,24 49:13 |
| 187:17 189:5 | 22:5,6 30:5 | 161:22 163:8 | 49:25 50:2,12 |
| 193:11,19 194:4 | 238:4 | 170:11 172:14 | 50:18 51:14,15 |
| 195:25 196:10 | **offered**  133:8 | 181:13 183:12 | 51:19,22 52:7 |
| 196:24 197:17 | 185:25 187:12 | 195:15 203:20 | 52:15,19 53:3 |
| 197:20 198:4,20 | 187:14,15 238:4 | 207:11 208:6 | 53:10,18 54:21 |

**[okay - okay]**                                                Page 293

| | | | |
|---|---|---|---|
| 54:25 56:18 | 111:7 112:3,22 | 162:12,19 163:5 | 212:13 213:14 |
| 57:9,17 59:15 | 113:16 115:17 | 163:10 164:1,2 | 213:22 214:3,10 |
| 60:22,25 61:5 | 115:18 116:5,10 | 164:7 165:13,18 | 214:16 215:8,17 |
| 63:25 64:17 | 116:18,19 117:3 | 166:10 167:19 | 215:20 216:4,8 |
| 65:7,7,13,13 | 117:21 119:6 | 168:22 169:2,11 | 216:11 217:20 |
| 66:3 67:19 | 122:12 123:3 | 171:13 172:1,3 | 218:1,12,22 |
| 71:13,18,25 | 124:5,23 125:7 | 173:18,18 | 219:6,18,21,24 |
| 72:3,13,25 73:3 | 125:12,14 126:1 | 175:10 176:14 | 220:6,10,14,18 |
| 73:7,9,25 74:1,8 | 127:12,13 128:3 | 176:15 178:2,2 | 221:4,6,8,19 |
| 75:8,10,14,22 | 128:25 129:1,17 | 179:4,21 180:19 | 222:2,11,24 |
| 76:25 77:11,14 | 131:1,9,10,25 | 180:22 181:2,13 | 223:10,13,18,20 |
| 77:22,24 78:2,7 | 132:2,8,13,16 | 181:24 182:3,4 | 224:10,22 225:4 |
| 78:10 79:1,12 | 132:22 133:9,18 | 183:7,18,22,25 | 225:20 226:12 |
| 79:19 80:25 | 134:2,10,14,17 | 184:24 185:2,13 | 226:24 227:2,6 |
| 81:5,5,9,18,21 | 134:19,24 135:1 | 185:13,19 | 227:8,17,24 |
| 81:24,25 82:8 | 135:6,10 136:14 | 186:12,21 | 228:11,13,17 |
| 82:12 83:2,13 | 137:11 138:9 | 187:20 188:9,13 | 229:5,19 230:7 |
| 83:15,19 84:10 | 139:6,21 140:11 | 189:13,21 190:7 | 230:16,22 231:4 |
| 84:17,19 85:2,3 | 140:18 141:5,8 | 191:19 192:9,25 | 231:20 232:6,8 |
| 85:4,5,7,8,14 | 142:20 143:3,17 | 194:1 195:1,13 | 233:4,8,13,24 |
| 86:10,17 87:4 | 144:1,5,6,25 | 195:15 196:19 | 234:1,6,13,19 |
| 87:14,19,21 | 145:11,17 146:8 | 197:2,8,10,14 | 234:25 235:8,14 |
| 89:25 90:2,6 | 146:16 147:6,7 | 198:9 199:6,10 | 235:17,23 236:5 |
| 91:19 92:2,25 | 147:8,12 148:11 | 199:20,21 200:9 | 236:8,10,24 |
| 93:21 94:23 | 149:5,18,21 | 200:17,20 201:1 | 237:1,9,16 |
| 95:13 96:8 | 150:19 151:6 | 201:11 202:5,10 | 238:7,9,11,15 |
| 99:18,22,23,25 | 152:18,22,25 | 202:19 203:22 | 238:23,25 239:4 |
| 100:20,25 101:4 | 153:10 154:21 | 205:8,23 206:1 | 239:11,15 240:4 |
| 101:5,15,22 | 155:12,15 157:1 | 206:2,8,15,25 | 240:7,11,12,17 |
| 102:4,10,17 | 157:3,7,16,20 | 207:9,17 208:15 | 240:20 241:8,11 |
| 103:13,25 | 157:24 158:4,10 | 208:17 209:4,6 | 241:14,15,25 |
| 105:18 106:17 | 158:17 159:4,11 | 209:9,16,19 | 242:4,25 243:4 |
| 106:24 108:4,17 | 160:1,8,12,15 | 210:2,3,9,17,18 | 243:8,21 244:17 |
| 109:11,23 | 160:18,20,22 | 210:25 211:2,6 | 245:2,21 246:4 |
| 110:13,20 111:1 | 161:11,17,20,24 | 211:10,13,17,25 | 246:7,12 247:2 |

**[okay - parent]**                                                           Page 294

247:13,16
248:11,23 249:3
249:10,14,21
250:1
**okeechobee**
2:13
**olanzapine**
227:15
**old** 232:6
237:10
**olds** 64:21
**once** 15:16
121:24 129:16
204:15 217:22
239:1
**one's** 112:3
125:2 132:12
159:5
**ones** 18:23
215:18 244:7
**ongoing** 89:7
**operate** 59:22
**operated** 33:15
**operations** 14:8
**opportunity** 5:9
26:16 52:21
194:12
**option** 239:24
**orange** 1:19 9:9
251:3 252:2,12
**order** 12:3 89:9
**ordering** 250:5
253:13
**organizational**
17:23

**orientation** 4:23
31:15
**original** 137:21
**originally**
238:21
**orlando** 1:2,20
9:9,11 88:19,20
93:10 100:5
252:11
**ormond** 13:8
**outdoors** 58:3,5
58:10,18 225:18
**outlet** 59:6
175:14
**outlining** 39:9
**outside** 141:22
181:7 231:23
**overall** 35:12
**overhear** 221:8
**overnight** 80:1
**overwhelmed**
67:20,22,25
68:7,8,9
**overwhelming**
68:4
**oviedo** 91:4
**own** 13:13,14,15
14:4,11 44:8
91:23 120:25
233:21 234:13
234:21 235:17
237:16 238:19
**owned** 14:12
**owner** 16:3

**owns** 14:10
16:12

**p**

**p** 2:1,1,12 3:1,1
8:14 9:1
**p.m.** 1:16
146:22 147:15
147:15 250:9
**pace** 74:11
**packet** 25:13
**paddleboarded**
58:13
**paddleboarding**
58:15
**page** 18:18 27:1
29:15,17 31:12
32:16,20 34:14
34:17,25 35:1,9
35:24 36:11,12
37:16 38:7
40:21,23,25
41:16,20 42:20
42:25 43:5
44:23 45:25
46:21 47:2,7,12
48:13 49:6,12
49:19 50:15
52:14 53:10,20
53:25 54:22
72:19 73:8,19
73:25 76:25
77:14 78:2,4
81:6,22 113:8
113:10 120:7
127:12 130:24

162:11 173:16
173:18 254:4,7
254:10,13,16
**pages** 40:14
53:1 78:13 83:4
132:3 252:6
**paid** 235:5
239:19,22
**palm** 2:14
**palms** 14:6 16:8
190:22
**paloma** 234:19
234:20,20
**pamela** 2:22
**pancreas** 231:6
**pandemic** 68:3
174:9,14
**panic** 190:12
**paper** 11:6
196:1
**paperwork**
30:25 33:1
**paragraph**
34:19 36:23,24
41:21 48:6,17
49:14 51:5 56:8
73:21 126:1
148:17 181:23
208:3
**paranoia** 90:13
**paraphrasing**
47:22
**parens** 192:14
**parent** 124:8,16
138:25 139:7

CONFIDENTIAL

167:7 181:16
183:2 202:25
205:1 209:19,22
209:22,23,25
**parents** 66:22
87:4 88:22,23
123:14,23
124:22 179:17
183:5 188:5
202:24 204:22
205:2
**park** 93:5,8,11
93:11 95:2
**part** 25:25 27:5
28:13,16 59:7
63:2,15 66:1
67:18 68:7 82:4
95:2 110:15
167:4 173:18
183:19 206:19
206:21 207:23
208:1 213:4
227:17 238:23
243:12,16
**particular**
46:24 128:20
133:10 134:3
135:19 148:5
153:11
**particularly**
162:20
**parties** 8:15
252:8,9 253:13
**party** 88:1,10
93:4,6 94:7

101:5
**pass** 79:2
120:20 121:8
**passed** 118:8,24
118:24 119:1
121:10,11
**passing** 118:22
**passion** 62:2
238:16
**passionate**
167:7 238:17
**past** 215:7
**patience** 129:11
**pay** 13:18 16:5
223:18,19
230:14 235:6
**paycheck** 236:5
**paying** 13:17
235:12
**payment** 133:7
**pdf** 35:2,24
36:11 38:9
42:20,25
**pe** 170:1
**peers** 74:15
135:20 136:4
**peltzman** 2:22
**penalties** 36:7
254:20
**peninsula**
235:21
**people** 12:12
20:2 41:10
62:24 71:12
74:14 76:6

80:19 91:15,17
110:7 134:23
136:6 142:9
154:15 160:6
168:13 171:3
182:18 199:11
202:22 215:15
**people's** 112:6
**peppelman**
106:11 146:14
156:6
**percent** 60:8
65:16 69:12
83:3 166:23
176:12 202:18
**perfect** 10:16
**perform** 64:22
65:8,11 74:17
**performance**
5:12 12:5 53:9
53:12 74:5
116:24 120:25
135:21 160:9,14
214:21,22
**performing**
33:12 116:20
**period** 88:18
91:19 121:12
142:8 143:25
165:11 184:10
**periods** 175:15
**perjury** 254:20
**person** 33:9,13
33:15,20 34:11
46:5 47:16

55:12 78:24
121:6 125:15
161:3 170:5
182:6 196:19
214:20 247:12
247:14 249:20
**person's** 151:15
**personal** 49:2
68:3 112:17,18
148:21 185:23
186:13
**personality**
80:17 180:17
181:9
**personally**
62:22 169:23
201:6 251:7,20
**perspective**
165:10
**persuading**
74:19
**pertinent**
204:25
**peterman** 3:2
9:12
**phillips** 20:4,9
216:24
**philosophy** 33:6
33:17 46:3
59:14 214:20
**phone** 13:4 20:1
88:8 96:17
109:13,20 195:7
195:11,15

CONFIDENTIAL

**[phonetic - position]**                                   Page 296

| | | | |
|---|---|---|---|
| **phonetic** 92:13 | 163:19,24 | **playoffs** 163:21 | **policies** 5:2 |
| **physical** 36:3,15 | 165:22 166:13 | 163:21 | 31:17,23 34:11 |
| 37:8 46:23 48:8 | 166:21 167:6 | **pleaded** 190:1 | 35:21 36:17 |
| 229:19 | 169:22 170:6 | 249:6 | 38:19,21 42:18 |
| **physically** 231:5 | 174:12,16 | **please** 9:15,22 | 49:9,23 50:1 |
| **piccolo** 14:6 | 225:24 | 9:25 15:22 | 51:1 237:1 |
| 16:8 235:5,6 | **played** 60:10 | 24:10,13 37:2 | **policy** 5:7,9 |
| 236:6,10 240:13 | 65:1 66:20 | 43:10,20 138:11 | 11:16 35:18 |
| **pick** 170:17 | 163:16,17 | 143:3 165:19 | 36:14 37:18 |
| 222:11 239:2,6 | 166:15,20 | 178:22 189:17 | 43:2 47:4,21 |
| **pickup** 91:4 | 167:11 170:24 | 190:5 199:2 | 48:14 49:7 |
| **picture** 106:25 | 174:11,19 | 212:8 220:18 | 51:21 52:13,22 |
| 131:1 | **player** 33:9 | 242:11 253:10 | 53:2,5,19,21 |
| **pictures** 105:23 | 34:11 39:1,9,25 | **pleased** 79:24 | 54:1,3,8,19,23 |
| 106:14 242:3,13 | 40:1,15,18,22 | **pllc** 2:3 | 55:24 56:4,14 |
| **piece** 105:7 | 42:22 46:5 | **plus** 118:24 | 113:23 114:6 |
| 135:15 | 47:16 61:7,7,9 | **pocket** 230:14 | **pool** 14:21 |
| **pieces** 213:6 | 108:12 121:4 | **point** 10:14 19:7 | 225:24 |
| **pippen** 170:12 | 124:8 156:8 | 36:2 37:12 43:9 | **pools** 14:11,13 |
| **pissed** 108:5 | 164:7 201:4 | 43:16 44:12 | 14:23,23 16:15 |
| **pitted** 63:22 | 202:2 214:20 | 45:9 46:18 79:9 | 16:22 17:5 |
| **place** 1:18 | **players** 60:9 | 84:11 85:10 | **poor** 49:1,2 |
| 101:25 142:23 | 63:14,18 64:25 | 90:21 93:23 | **popped** 91:5 |
| 222:17 | 118:8,11 126:15 | 106:9 121:1,14 | **porch** 94:21 |
| **plaintiff** 1:6 | 158:12 170:4 | 141:1,24 142:3 | **portion** 13:18 |
| 2:10 9:17 | 192:12 193:24 | 149:9,12 170:18 | 138:12 208:16 |
| **plaintiff's** 4:12 | 194:13 201:7 | 181:5 190:8,25 | **position** 5:10 |
| **plan** 184:9 | 202:22 214:19 | 191:5 223:21 | 19:25 21:6 23:4 |
| 214:21,22 230:7 | 228:25 | 234:11 248:4 | 55:1,11 59:3 |
| **planning** 91:2 | **playing** 39:21 | **points** 46:20 | 71:21 72:23 |
| 226:16 | 57:18 60:12 | 73:14 121:2,2 | 73:3 84:15 |
| **plans** 117:12 | 61:1,24 63:10 | **police** 93:5,17 | 137:16 194:15 |
| 126:23 | 64:1 66:19 68:2 | 93:23 94:5,12 | 211:4 224:15 |
| **play** 57:23 58:1 | 70:25 71:11,12 | 95:8 | 239:19,23 |
| 59:21 71:4,5,9 | 166:17,19 226:1 | | |

**[positions - promotions]**                                    Page 297

| | | | |
|---|---|---|---|
| **positions** 239:17 240:1 | 172:25 173:1 174:21 180:2 184:4 198:15 | **prevent** 11:21 | **procedures** 5:2 18:7 38:21 51:1 |
| **positive** 116:3 165:3 | **practices** 39:5,9 170:2 180:11 188:7 | **previously** 40:11 211:10 | **process** 24:24 25:25 28:13,16 67:14 130:1,2 142:18 148:19 149:1,10 177:1 236:20 |
| **positivity** 188:25 | **practitioner** 100:14 101:19 | **price** 235:4 | |
| **possess** 37:20 | **predict** 163:24 | **prick** 231:9 | |
| **possibility** 239:21 | **prefer** 151:14 | **print** 129:1 | |
| **possible** 125:15 231:17 | **prelim** 186:2 | **prior** 12:17 24:6 24:16 27:19 79:23 120:21 136:17 137:8 195:20 219:25 244:2 245:12 | **produced** 40:11 130:9,11 131:19 186:15 251:21 251:22 |
| **possibly** 157:19 180:4 | **prep** 57:21 | | |
| **post** 147:13,14 163:24 | **preparation** 73:23 76:6 79:24 | | **production** 168:1 |
| **posted** 97:23 146:17 | **prepared** 194:22 | **prison** 101:11 101:22 102:7 | **professional** 181:3 |
| **posting** 105:23 123:17 | **present** 2:21 8:15 13:2 70:21 125:10 179:9 | **private** 237:1 | **profit** 234:4,5,6 234:16 |
| **posts** 8:10 | **presenting** 39:1 | **probably** 19:2 38:23 57:19 81:12 85:9 133:25 207:21 207:23 232:9 234:10,18 | |
| **potential** 188:1 239:21 | **presently** 14:1 | | **program** 26:4 46:3 49:4 57:8 57:10,14 59:1 59:21,23 60:2 67:23 76:15 91:6,11 104:10 162:24,25 163:4 |
| **potentially** 80:23 | **president** 2:24 164:22,24 165:2 174:11 | | |
| **power** 54:20,25 55:1,8,10,25 56:5 | **pressure** 55:19 64:22 65:8,11 142:4 | **probation** 104:5 104:11,16 | |
| **powerful** 61:19 | **pretty** 17:22 57:2 87:16 121:18 151:19 166:23 180:7 182:18 194:21 232:2 246:9 | **probationary** 121:12 184:10 | **programs** 170:25 |
| **powerless** 66:8 66:16 | | **problem** 11:15 42:6 104:19 181:4 | **progress** 64:11 170:8 |
| **ppo** 233:2 | | **problems** 26:10 228:17 | **prohibited** 54:13 |
| **practice** 59:25 65:25 68:14 110:17 121:9 122:10 166:18 | | **procedure** 34:12 139:11 204:12 253:22 253:23 | **prolonged** 190:23 |
| | | | **promotions** 55:21 |

[prompt - quite]                                                    Page 298

prompt  205:15
prompted  201:8
  202:3
prompting
  205:17
properties  14:4
  234:7 235:17,19
property  37:25
  38:2 54:11,17
  234:17 235:18
protect  142:23
protected  21:13
  154:14
protective  89:9
protects  46:22
prove  136:5
provide  46:22
  148:5 202:22
  213:2 240:17
provided  133:1
  135:12 138:18
  153:2
provides  150:12
providing  33:14
  133:6 150:3
  197:12
psychiatrist
  231:24
psychologist
  203:2
psychology  17:9
psychosis  23:19
  90:14 96:17
  98:20 100:12,15
  100:17 142:6

229:15
psychosises
  86:23
psychotherapy
  231:23
psychotic  90:8
  227:23
ptsd  190:3
  249:8
pub  93:13
public  251:6,16
  252:4,17
pulido  214:5,12
  214:13
pulido's  214:13
pull  29:15,19,20
  129:11
pulled  18:14
  121:18
pump  229:25
punishment
  68:20 108:17,18
  110:21 111:3
punishments
  68:16,17,22
purchase  37:20
purposes  20:8
  209:5
pursue  238:15
pushback  76:20
pushing  176:1
pussies  215:13
put  19:13,22
  32:11 41:13
  42:2 51:14

63:16 88:9
89:18 100:11,14
105:7 108:13
109:17 121:12
161:1 163:1
168:16 170:13
171:21 186:3
194:15 197:7
198:6 199:10
202:23 206:12
210:15 214:21
218:16 221:16
235:14 242:14
putting  207:18

q

question  10:21
10:23 11:2
24:12 27:7 28:5
37:2 57:11
62:17 72:1
78:11 95:9
111:12 113:4,5
113:19 114:18
116:8 120:1
132:16 133:22
135:10 136:21
138:11 145:22
153:17 154:11
156:17 161:25
171:14 193:8
202:2,3 204:12
212:6 213:14,16
213:20 220:17
221:11,15
230:18 246:24

247:24 248:16
248:19
questioned
  20:17 218:25
questioning
  141:25 152:3
  181:7 192:7
  193:4 219:22
questions  11:8
  39:11 130:13
  131:24 138:19
  141:15,23 142:4
  142:24 144:8
  154:13,19
  170:14 196:2,4
  201:12 205:14
  205:18,20,22
  209:16 216:15
  216:18 231:25
  241:14 243:12
  247:11 248:13
quick  42:5
  129:1 176:15
quickly  75:12
  93:1 210:6
  231:16
quit  25:9,10
quite  12:22
  22:22 23:11
  35:23 58:13
  65:23 91:16
  130:2 170:9
  199:16 224:12

CONFIDENTIAL

**[r - recollection]**                                                   Page 299

| r |
|---|

**r**  2:1 3:1 9:1
    15:23 254:3,3
**railey**  26:7,8
**railroad**  93:8
**raise**  9:24 23:3
**raised**  21:25
    27:16 28:8
    142:20 206:21
    243:15
**ran**  110:14
    119:19
**randy**  214:13
**rangerer**  2:6
**rank**  222:2,4
**rate**  16:5 135:19
    190:23 192:23
**rather**  59:4
**ratings**  83:12
**rbd**  1:3
**rcook**  2:9
**reach**  24:25
    69:18 112:20
    113:5 114:5
    117:13 149:10
    185:6 199:3,5
**reached**  117:20
    119:11 123:20
    150:24 185:3
    190:10,11,13
**reaching**  113:2
    117:8 119:25
    120:4,8 156:22
    166:24

**read**  27:22
    32:21 35:9 43:9
    44:2 73:12 74:9
    77:21 81:10
    113:19 120:1
    130:12,14
    131:16,24
    132:24 148:17
    150:1 151:6
    167:23,25
    172:13 179:24
    186:1 201:1
    243:14 245:15
    250:2 253:7
    254:20
**reading**  8:16
    21:20 36:23
    43:19 111:22,24
    130:6 190:19
    203:11 243:12
**ready**  129:25
    161:14
**real**  42:4 129:1
    191:23
**realistic**  116:23
**reality**  90:11
**realized**  98:21
**really**  15:4 16:2
    39:21 64:8 67:8
    69:5 75:24 76:7
    80:6,6 82:6
    88:24 90:13
    97:9 99:1
    102:25 104:13
    106:19 107:23

107:24 108:8
109:5 116:22
125:17 134:17
136:15 141:1
142:1 153:7,8
154:11 162:24
162:25 163:3,3
163:3 164:20,24
164:25 165:3,4
170:21 174:5,24
175:1 176:23
178:18 190:4
198:1 199:8
201:3 225:22,25
226:8 227:16
231:1 245:1
246:10
**realtime**  251:6
252:4
**reason**  52:12
    110:9 162:3,4
    202:5 211:14
    213:11 220:20
    222:3 241:8
    249:14,17 253:9
    254:6,9,12,15
    254:18
**reasonable**
    31:13 121:3
    191:1 213:2
    218:15 253:16
**reasons**  110:19
    214:24,25
    218:21,22
    219:11,13

220:24 238:14
238:20 249:17
**recall**  16:24
    18:6,9,9 20:3,5
    21:3 23:5,23
    25:4 31:19,19
    41:4 52:14 64:3
    77:7 80:21 93:7
    128:2 140:3,17
    144:10 153:8
    155:10 179:19
    179:21,22,24
    185:24,24
    187:15 196:6
    198:21 207:5,20
    210:24 224:25
    235:11
**receipt**  253:15
**receive**  240:15
**received**  183:1
    236:21
**receiving**  74:14
    78:19
**recent**  228:5
**recess**  42:11
    72:7 84:22
    107:8 123:9
    129:4 130:18
    147:25 159:15
    176:19 178:25
    200:1 208:25
    225:13 236:15
    241:21
**recollection**
    94:8 96:1 104:9

CONFIDENTIAL

**[recollection - remaining]**                                    Page 300

110:25 140:12
**recommendati...**
55:20
**record** 9:2
10:11 24:22
26:11,13 40:8
40:14 42:8,9,12
45:3 72:5,8
84:20,23 85:13
107:5,6,9,13
109:14 123:5,7
123:10 127:15
129:2,5 130:15
130:16,19
132:19 136:18
137:20 138:13
138:25 139:8
147:23 148:1
159:12,13,16
161:15 163:2
176:17,20
178:21,23 179:1
199:22,24 200:2
203:16 208:22
208:23 209:1,12
215:6 218:5
225:8,10,11,14
236:13,16
241:17,19,22
250:4 252:7
**recorded** 1:13
**records** 240:13
**recovering**
65:19,25

**recruited** 65:1
**recruiting** 67:13
76:1,3
**recruitment**
17:24
**red** 40:24 41:18
148:20 149:1,6
167:8,10
**redact** 12:12
116:18 125:13
**redacted** 12:9
161:1 164:9
201:5 209:4
**redaction**
116:12
**redirect** 4:5
246:15
**refer** 12:11
35:14 107:1
**reference** 21:23
25:1,23 27:3,5,8
27:18,19 28:1
28:12,15,19,20
29:2
**referenced**
253:5
**references** 24:5
24:15 25:12
**referring** 39:16
79:3,5,6 81:13
114:10 172:12
**refers** 182:6
**reflect** 44:13
49:3

**reflection** 116:3
116:9 170:14
**reflections** 59:7
148:21
**reflects** 136:7
**refresh** 27:15
145:23 146:17
**refreshes** 136:3
200:11
**refusal** 218:14
**refused** 190:2,6
191:5 218:23
220:25,25 246:4
249:8
**regard** 73:22
151:9 253:17
**regarding**
123:22 138:20
148:20 154:20
187:3 202:23
214:19 220:11
245:8
**regardless**
141:21 151:15
**regards** 48:19
137:25 141:14
141:16,23,23
180:14 191:23
215:21,22
218:24 219:22
244:16
**registered** 251:5
252:4
**regular** 170:2
250:7

**regularly**
215:12
**reimbursement**
13:20
**relate** 74:13
**related** 96:4
107:15 173:21
192:8 231:21
**relates** 171:24
221:20
**relationship**
25:5 56:9 75:22
76:8,11,24
79:25 80:4,7
83:19 175:8
181:7 231:2
**relationships**
56:5 60:9,11
70:21 170:3
172:25 228:25
230:14
**relative** 252:8,9
**relax** 124:22
203:23
**relaxing** 58:8
**release** 62:24
**released** 90:15
100:1 102:15,18
102:20 104:15
**relevant** 136:22
**relieved** 211:3
**reliving** 228:12
**remaining**
90:16

**remember** 18:1
  18:23 20:6
  31:21,23 49:22
  57:5 89:3 96:13
  96:14 97:2,4,5,6
  97:7,14,18 98:2
  98:5,8 99:4
  102:23 103:4
  104:5,11,12,13
  105:20 108:2
  112:8 133:21,24
  134:2 140:4,11
  141:19 142:8
  145:8 148:6
  149:11 153:7
  157:1,20,22
  159:19 179:8
  180:8 197:19,25
  199:6,8 207:21
  229:3 243:19
**remembering**
  95:24
**remind** 41:2
  135:12
**remorse** 107:19
**remote** 15:6
**remove** 100:9
**removed** 204:22
**renee** 2:7
**renovate** 234:23
**renovated**
  234:24 237:12
**renovating**
  225:23 232:18
  234:22 235:13

235:25 236:1
**renovations**
  235:12 238:17
  240:8
**rent** 13:13,17
**rentals** 14:5
**rented** 177:11
**renting** 234:25
  235:2
**repeat** 24:12
  37:2 95:9
  111:24 113:19
  120:1 212:6
  230:18
**rephrase** 10:22
  138:11 221:11
**report** 8:11
  15:17 82:6
  88:13 136:9
  137:13,18
  138:19,21 140:2
  252:5
**reported** 1:21
  83:25 209:19,24
**reporter** 9:13
  9:22,24 11:12
  125:13 191:7
  248:20 250:5
  251:5,6 252:4,4
**reporter's** 4:7
**reporting** 57:6
**represent**
  149:15
**representatives**
  45:10

**reprisal** 55:20
**reputation** 65:3
**request** 145:6
  179:14 191:7,12
**requested** 25:14
  25:23 27:8
  28:12 30:1
  128:5 135:18
  187:7,7 252:6
**requesting**
  66:23 192:20
**require** 36:14
  231:16
**required** 53:23
  110:11
**requirement**
  74:10
**requires** 58:14
**requiring** 74:18
**reserved** 8:16
**resign** 26:24
**resignation**
  238:9
**resigned** 25:10
  238:7
**resisting** 92:20
**resolutions** 2:22
**resource** 17:17
  17:20,22 19:6
**resources** 2:24
  33:14 35:15,19
  35:23 56:20,25
  64:13 171:1
  178:10

**respect** 50:22
  51:11 80:11
**respected** 80:9
  84:15
**respective** 8:15
**respond** 44:8
  74:16 111:3
  168:13 190:13
**responded**
  168:12,15
  243:12
**response** 11:2
  110:6 128:12
  168:7,9 243:11
**responses**
  205:17
**responsibilities**
  73:15,17,22
**responsibility**
  50:19 166:7
**responsible**
  34:20 43:21
  44:7 45:4
**rest** 156:5,5
  186:6 246:24
**restaurant**
  196:14
**restricted** 165:7
  173:5
**restroom**
  159:10
**result** 36:20
  37:10 47:23
  48:7 87:23 96:3
  121:18 143:15

CONFIDENTIAL

**[result - right]**

| | | | |
|---|---|---|---|
| 143:18 218:10 223:21 | **riddle**  1:8 2:17 2:24 9:8,19 | 44:23 45:7 46:4 46:15 47:5,10 | 148:23 149:16 150:25 151:16 |
| **retaliated**  216:5 216:23 217:20 218:7,10 219:12 219:15 246:21 247:8 | 12:25 13:5 19:15 23:3 25:11 27:16 30:2 31:21 33:6 33:18 35:4,22 43:22,23 44:14 | 48:2 49:7 50:19 54:13 55:10 56:20,25 57:3 57:10 58:14,22 59:10,13 60:3,4 62:4,7,25 65:14 | 152:18 155:17 159:6 162:17 163:1,11 164:6 164:23 165:1,20 167:1,8 171:4 172:4 173:4,12 |
| **retaliation**  18:3 18:8 57:3 191:15,19 212:1 212:11 219:4 220:12 222:6,15 222:25 223:2,4 223:11 | 49:4 50:14 52:12,21 57:6 59:1,3 65:2 67:10,16,21 103:16,19 105:14,19 122:14 123:14 | 65:19 67:16 69:13,22 70:15 70:19 71:3,16 71:18,21 73:17 77:9,17 80:1,19 81:16,22 82:1,8 82:13,14,15 | 174:17 175:24 176:2,14,24 177:1,17,20,23 180:17 181:17 182:7,18 183:16 184:20,25 185:2 186:25 188:4,22 |
| **retired**  82:4 | 169:15 204:20 | 86:13,24 88:18 | 191:4,5,17,17 |
| **retracted**  182:20 | 211:7 220:2 229:17 230:8 | 92:12,20 93:8 93:11 94:8 | 192:6 193:2,7 193:10,18,24 |
| **return**  87:23 193:4 237:5 249:19 | 253:2 254:1 **riddle's**  36:3 46:14 | 95:11 97:22 98:23 100:5 101:1,8 104:15 | 194:24 195:12 195:24 196:9,17 196:23 197:5 |
| **returned**  247:12 253:15 | **ridicule**  36:16 37:9 | 106:1 107:19,22 108:5,9 110:4,7 | 198:19 199:7,12 205:5 206:13 |
| **returners**  39:13 | **right**  9:24 11:9 | 110:10 111:5 | 207:2,10,17,19 |
| **returns**  240:24 241:6,9 | 12:17 14:19 18:25 19:18 | 112:2,6 113:21 114:13 115:20 | 207:22 208:15 209:10,10,20 |
| **revealed**  142:5 | 20:18 21:6,10 | 117:13 118:8,15 | 210:2,18 211:21 |
| **review**  5:12 115:15 252:6 253:6 | 21:21,23 22:1 22:14,16 23:1 26:18 28:10 | 118:17 119:12 122:2 124:24 126:3,6,15 | 212:11 213:7 214:16 215:1 216:13 217:1,17 |
| **reviews**  12:5 135:21 136:4 | 30:1,3,18 32:1 33:2,4 34:23 | 127:2,5,8 128:6 137:4 138:3,5 | 219:7,19 220:8 220:16,22 |
| **revoke**  98:5,6 | 35:1,5 36:7 | 138:25 139:17 | 221:25 223:5,14 |
| **revoked**  98:3 | 37:21 39:15,17 | 144:1,15,17,19 | 224:11,23 226:9 |
| **ridder**  20:7 | 43:3,17,25,25 | 147:10,13 | 226:18 227:7,18 |

**[right - screenshots]**

228:1,19 229:9
229:17 232:2,4
232:5 235:25
236:6 238:5,6,7
238:12,23 239:5
240:23 241:9
245:2,12 247:5
249:11
**rights**  142:24
**rip**  113:10
**ripped**  165:25
**risk**  55:20
**rmr**  1:21 251:16
**road**  76:4
**role**  84:16
126:15
**rollins**  17:18
18:16 87:12
90:16 91:5,7,25
93:3 94:11
104:18 105:14
105:16 150:6,8
151:20 239:2,19
**ronald**  2:2
**room**  88:1
113:24 218:23
219:3
**rosedale**  15:8
**rotunda**  134:20
**rounded**  69:11
**row**  214:20
**rubbing**  86:2
**rule**  37:9 38:11
76:22 253:22,23

**rules**  10:20 18:5
18:6 31:17
38:14 53:2
56:10 253:16
**run**  63:5 64:10
108:17 110:3,10
110:14,21 111:9
112:10 118:15
118:22 130:11
157:16
**running**  60:1
62:23 94:2,2,3
94:22 108:20,24
110:15,15,16,17
110:18 111:4
238:19
**runs**  108:18
**rutgers**  87:10
87:13,15 88:13
90:16 92:2,12

**s**

**s**  2:1 3:1 4:11
8:14,14 9:1
15:23 254:3
**sacrifices**  62:5
**sadness**  165:24
**safe**  79:10 84:4
166:8
**safety**  18:5,6
98:7,9
**sailing**  22:11
**salary**  55:22
**sale**  235:18
**sam**  117:16
118:7,15 119:16

119:18,25 120:5
185:4 206:12
**sam's**  119:13
**samantha**
140:25 149:25
150:11
**samaras**  25:24
**sandhill**  2:8
**sat**  31:16 141:22
190:9
**saw**  100:13
101:18 137:18
190:18 201:16
201:19
**saying**  10:13
22:5,9,9 60:6
61:4 100:20
118:21 123:23
126:2,16 137:2
137:11,14 156:1
173:10 175:1
177:5 179:19,21
180:19 192:16
192:17,18
202:15 216:1
218:3,19 248:11
248:14
**says**  22:16 23:1
23:6 34:17 35:1
36:2,6 38:1,25
40:22 41:23,25
43:7 44:2,6,18
44:25 45:6,25
47:21,24 48:3,7
49:1 53:1,20

54:13,19,23
55:7 56:14
73:10,21 74:2,4
110:20 114:22
118:24 119:1
120:7 148:25
156:4 173:4
188:23 192:12
192:13 193:25
207:8
**scale**  120:23
**scaled**  94:19
95:17,18
**scare**  108:8
**scared**  98:7,9
149:12,16 219:8
**schedule**  39:11
55:22 163:20
**schedule's**
163:22
**scholarship**
63:11,15,17,17
63:20
**school**  39:16
57:22 87:18
121:19 135:4
233:14
**scope**  73:10
**scores**  120:24
**scotty**  170:12
**screaming**  95:4
95:5,5 97:18
**screenshots**
123:21 124:3

CONFIDENTIAL

**[screwed - separated]**                                           Page 304

**screwed** 21:17
  22:3,4,5
**scroll** 248:20
**seal** 251:11
**sealed** 23:7,10
  23:14,24 95:23
  95:24 96:1
**search** 248:21
**season** 39:14,16
  39:19,20,21
  59:19,21,24
  66:13,14 70:22
  71:11 163:1,2
  163:13,15,19
  166:14 174:8,10
  174:14,15,19,19
  176:5 180:3
  239:1,3,20
**seasons** 39:18
  39:23 163:9
  167:4,6 180:3
  226:7
**second** 25:19
  26:2 27:24
  28:15 31:12
  33:13 34:19
  44:6 45:9 47:25
  48:5,16 54:22
  69:7 74:8,12,13
  113:16 115:13
  123:6 125:7
  126:18 128:15
  128:24 131:16
  132:24 140:21
  141:2,5,11,21

144:7 145:1
146:2,18 148:17
153:20 155:7
165:1 166:13
172:4 174:10,15
178:14 185:4,19
195:12 199:23
208:22 222:24
225:9 226:5
236:12
**section** 37:6
  44:25 73:15
  75:13 245:15
**securing** 26:10
**security** 236:24
**see** 11:3 12:2,8
  23:8 32:16 36:1
  38:11 40:25
  43:7 44:6,25
  45:5 46:6,19
  51:5 53:4,8 55:9
  73:10,11,21
  74:2,6,8 80:22
  82:9 83:12
  106:25 113:12
  115:14 124:3
  129:12,15 132:3
  132:14 136:3
  147:9 148:19
  149:1 156:2,3,4
  157:5 160:22
  161:22,24 165:4
  171:24 173:15
  179:12 181:16
  181:24 182:17

182:21 201:11
206:15 217:14
227:4 230:24
240:23
**seeing** 46:5 48:3
  146:16 231:24
**seek** 140:18
**seeking** 140:2
**seemingly**
  110:23
**seems** 106:12
  146:2 169:1
**seen** 52:1 67:7
  120:16 129:14
  148:14,16
  161:20 164:20
  178:4 183:4
  199:3 217:11
  226:6 229:12
**self** 4:21 14:2,3
  31:3
**sell** 233:25
  234:16
**semester** 120:21
  172:7,16
**semi** 229:24
**seminole** 96:10
  96:15
**send** 27:18,19
  30:2 66:22
  140:6 158:11
  166:25 167:1
  185:22 186:3,12
  207:23 217:13
  238:9

**sending** 134:3
  164:22
**senior** 80:8
  167:3
**sense** 33:12
  68:13
**sensitive** 85:10
**sent** 28:9,23
  29:1 67:1
  114:23 123:1,20
  124:17,18
  138:25 140:10
  153:10 168:5
  182:20 195:6
  197:4,8 198:2
  206:6,7,8
  207:24 210:21
  210:22,24
  221:25 243:13
**sentence** 27:22
  27:24 34:19
  35:10 36:22
  43:10,16 44:6
  47:25,25 48:5
  48:17 50:15
  55:15,17,18
  56:3 108:4
  132:24 148:18
  151:6
**sentences** 172:5
**separate** 14:24
  14:25 15:1 23:7
  39:22 133:14
**separated** 171:1

**[separately - six]**                                          Page 305

**separately**
  94:10
**september**
  235:19
**series**  196:2
**serious**  139:16
**served**  240:11
**service**  12:19,23
**session**  194:9,10
**sessions**  127:2,4
  127:8,9,10
  194:14
**set**  68:13 201:11
**sets**  209:8
**setting**  187:13
**settings**  79:11
**sevastos**  2:16
  79:8 132:24
  145:7 178:15
  182:19 187:10
  200:15 208:13
  216:24 243:14
  245:22
**seven**  63:5
  163:17,22 231:9
**several**  136:20
  194:12
**severe**  228:2
**sex**  88:2 228:14
**shaffery**  15:21
  16:4
**shame**  85:10
**shaming**  193:23
  201:17

**share**  179:10
  194:22 218:24
**shared**  194:15
**sheet**  4:9 253:9
  253:11
**shield**  233:1
**shirt**  167:10
**shirted**  167:8
**shocked**  180:1
**short**  14:5 21:2
  21:21 22:16
  27:4,8 29:1 91:7
  121:14 124:21
  150:6,8,9 233:6
**shortcomings**
  53:22
**shortly**  14:14
**shots**  231:9
**show**  18:11
  25:13 32:1
  33:22 34:6 40:3
  45:14 49:25
  72:11 85:21
  106:5 109:7
  111:15 112:22
  114:13 115:8
  124:11,24
  131:11 134:10
  135:3,6,6 136:9
  146:4 148:8
  157:24 158:20
  161:18 164:1
  167:15,21
  168:17 169:2
  171:8 177:23

  185:9 188:9
  189:9 195:1,2
  200:5 205:25
  209:5 210:13
  213:23 215:22
  223:21 226:4
  240:24 242:3
**showed**  88:7
  103:2 136:12
  158:25
**showing**  29:10
  32:10 86:16
  105:9 107:19
  117:3,21 120:9
  122:5 135:23
  155:19 156:11
  157:7 183:16
**shown**  28:15
  88:3 217:11
  224:8 245:13
**shows**  206:18
**shrm**  19:7
**shut**  14:15
**side**  162:6 170:5
  217:16
**sign**  30:25 52:3
  164:18 253:10
**signature**  73:1
  77:3,15,18 78:2
  78:8 81:6,8,22
  251:15 252:16
**signed**  32:7,17
  32:20 49:23
  52:5,5 73:4
  253:19

**signing**  8:16
  31:20
**silly**  11:8
**similar**  47:14,17
  47:19 143:24
  182:25 191:21
  214:1,17 215:15
  230:7
**similarly**  214:1
**single**  61:9
  63:14,19 66:15
  109:6 216:21
**singled**  206:22
  243:17
**sit**  194:12
**site**  82:7
**sitting**  11:9 58:6
  166:20
**situated**  182:25
  214:1
**situation**  21:18
  22:3,4,6 106:2
  109:6 112:9
  114:4,9 157:21
  166:11,12
  172:24 174:6
  191:21,24
  215:15 221:12
**situations**  97:15
  134:18 143:24
  182:25 214:2
  218:16 221:16
**six**  99:13,14
  118:7

CONFIDENTIAL

**[skills - stamped]**

Page 306

skills  73:23
skip  124:23
  149:8
skips  124:20
sleep  226:8
  227:4,12,16
slid  190:18
  192:5 196:1
sliding  120:23
smooth  22:11
soccer  117:15
  214:4
social  8:10
  46:23 108:13
  236:24 242:23
  242:25 243:1,6
sold  234:12
solemnly  10:1
solutions  9:14
  253:21
somebody  31:16
  80:21 103:3
  110:10 114:8
  162:9 180:10
  191:14 193:9,16
  204:19 207:1
someone's  95:15
sonja  20:2 80:3
  80:11 81:1,2,14
  81:16,18 82:12
  82:19 83:12,16
  162:8 224:13
sonja's  82:3
soon  99:18
  217:13

sophisticated
  61:2
sorry  16:13 21:4
  22:1 27:14,23
  38:6 43:13,14
  43:17,18 44:3
  44:21 54:19
  55:6 56:17
  60:23 65:4
  72:23 73:12
  82:22 86:6 88:5
  100:18 101:23
  103:10 105:17
  107:3 111:22
  113:4,11 119:5
  120:5,19 125:21
  125:23 150:5
  152:14 159:25
  160:16 164:17
  165:17 172:5,14
  173:16 178:22
  183:12 200:23
  203:20 207:11
  213:15,20
  214:15 223:2
  228:14 230:18
  231:19 233:21
  244:25 246:25
  247:22 248:1
sort  13:19
  107:21 111:8
  145:13 160:3
soul  172:7,17
sound  31:24
  167:19

sounds  104:15
  212:19 220:9
  238:6
source  204:21
south  1:19 9:9
  26:17 96:10,15
  235:21
speak  24:24
  38:24 63:13,14
  70:8 81:11
  100:7 107:24
  108:10 110:8
  125:17 133:9
  158:12 159:21
  174:24 202:1
  206:16
speaking  24:10
  47:1 74:19
  201:8
speaks  44:16
  165:2
specific  16:11
  19:11,12 48:4
  122:18 196:4
  227:8 234:8
specifically  18:9
  18:10 98:11
  157:2,22 215:13
speculation
  22:19 24:7
speed  229:9
spell  15:22
spend  77:6
spent  76:3,9
  79:25 90:18,21

228:6 235:13,13
spoke  147:9
  159:23 179:15
  194:20 204:15
  206:11 224:12
  224:13,13
spoken  216:21
sport  61:6,24
  63:3 65:22,23
  66:4,20 68:2
  73:23 76:16
  110:16
sports  60:12,13
  66:23,25 71:5
  196:19 203:1
spot  173:14,20
  204:22
spring  39:20
  40:2 82:5 118:8
  119:1,3 163:13
  163:15
stabilizer
  100:14
staff  5:12 34:20
  35:13 41:19
stamp  40:9 46:9
  54:23 75:17
  77:10,14,23
  78:4,6,13 81:4,7
  81:24 130:10
  131:20 145:21
  146:10 172:2
  185:19
stamped  34:25
  54:20 81:22

**[stamped - students]**                                    Page 307

129:16
**stamps** 34:15
46:6
**stand** 219:2
**standard** 39:7
43:24 90:13
109:5 121:5
**standards** 43:23
44:14
**start** 10:13
14:13 16:10,15
19:15 39:5 44:6
57:18 75:16
86:13 100:24
101:9 129:24
133:17 175:2
213:20 227:6
**started** 39:16
59:1 84:3 90:24
91:25 93:9 94:2
94:2,3 145:5
153:6 188:7
190:9,19 199:11
205:1 232:1
236:20 238:8
**starting** 109:1
144:4 174:22
219:22
**starts** 109:16
151:7
**state** 36:18 70:8
100:17 190:20
190:21,23
192:19 196:5
203:3 206:19

240:2 246:10
251:2,6,16
252:2,4,18
**stated** 145:4
254:21
**statement** 5:1
34:4 35:5 61:13
**states** 1:1 9:10
**stating** 10:10
**statute** 253:17
**stayed** 91:14
167:9 177:17
182:23
**stegall** 214:14
214:15 215:8
**stenographic**
252:7
**stenographica...**
252:5
**step** 77:19 173:8
**stevenson** 24:22
26:8,11,15,18
26:22
**stick** 121:9
152:18
**sticker** 32:11
**stimulated**
88:25
**stipulated** 8:15
**stolen** 172:7,17
**stood** 187:11
**stop** 35:10,16
43:25 141:17
192:15 236:12

**stopped** 146:23
162:24 239:25
**story** 27:21
121:14 194:24
**straight** 204:21
204:21
**stranded** 96:17
**strange** 76:2,7
91:16
**strategies**
176:10
**street** 2:3 13:8
94:1 162:7
235:20
**strength** 58:14
58:16,17
**stress** 62:24
151:7,10 245:11
249:7
**stresses** 190:4
**stressful** 194:5
**strict** 89:15
**strike** 39:24
179:16
**string** 111:25
**strong** 80:6
163:3
**strongly** 63:19
**struggling**
64:12
**stuck** 175:14
**student** 5:5 8:7
12:4 33:9,11,12
34:11 35:12,14
36:6 43:11 44:7

45:22 46:5,24
47:9,16 48:17
60:12 61:14
62:5 64:7 66:3
67:19,21 79:2
104:19 111:8
113:17,20 114:1
114:4 115:19,25
116:2,6,7,16,19
120:18,19
121:21 122:2,4
123:13 124:17
125:9 126:5
127:21 128:20
133:10 134:3,7
134:20,22
135:13,19
139:12 148:6,21
153:11 155:16
155:24 156:24
156:25 170:5
210:15 214:20
215:1 216:21
**student's**
122:13
**students** 35:14
37:20 39:2 41:7
43:2 53:16
60:14 61:1,3
62:16 63:9,22
63:25 64:4,17
69:11,18 70:19
94:11 105:1,20
107:18 111:8
114:11 118:22

CONFIDENTIAL

**[students - system]**                                   Page 308

121:11 134:21
165:21 166:3,7
167:8 182:7
194:7 196:16
197:15 201:16
201:23 204:21
214:23 215:9
216:11
**study**  17:21
64:10 108:15
109:4
**stuff**  155:15
221:4 228:4
**style**  58:23,25
59:4,9,12 60:3
181:17,21,24
182:2
**submit**  20:11
**submitted**  20:14
**subpoena**
240:11,15
**substance**  54:1
**subsumed**  14:23
**sucks**  28:2
**suffer**  86:22
154:15 227:4
**suffered**  116:21
**sugar**  231:16
**sugars**  231:12
**suggest**  24:5
**suggested**  24:15
150:15 180:10
253:14
**suggesting**
184:13,14

**suggestions**
206:16
**suicide**  98:14
103:18,20
**suite**  1:19 2:4,13
9:9
**summary**  50:16
73:10
**summer**  82:18
157:16 170:15
170:19
**supervising**
74:19
**supervisor**  25:6
74:17 75:20
76:23 77:12,25
79:22 82:3,7,16
82:17 139:13
162:9 181:5
182:10 184:11
184:22 204:15
217:18 224:3
**supervisors**
75:12,15 84:1
184:20,24
224:12
**supervisory**
5:12
**support**  35:15
50:22 51:11
78:18,20 81:15
82:16 83:25
117:9,10 126:2
139:13 162:2,8
162:14 181:5

182:9 184:11
193:5 217:18
224:3,12 247:12
247:14 249:20
**supported**  70:4
77:19 151:23
**supporters**
22:21
**supporting**
171:23 236:8
**suppose**  193:13
**supposed**
173:23
**supposedly**
205:1
**sure**  10:12
12:22 18:13,21
24:15 28:7 29:9
30:6,15 31:2
32:5 33:5 42:19
58:24 64:20
65:10 69:15
70:13 71:1
73:18 78:6
82:16,18 85:12
85:20 97:9 99:1
107:23 109:11
111:2,18 120:13
120:19 122:15
123:13 128:14
130:23 133:23
140:8 141:1
145:14 147:21
153:16 154:11
155:15 156:18

160:22 163:19
168:3 178:18
180:18 181:15
184:15 186:8
192:11 193:20
195:11 196:20
201:1 212:7
215:22 220:20
221:12 223:24
230:19 233:3
241:3 245:4
**surprised**
157:23
**surprises**
151:13
**surrounded**
227:9
**surrounding**
142:6 224:7
**suspended**
223:18,19
**swear**  9:22 10:1
**sweat**  190:22
**sweaty**  190:22
**swings**  193:10
193:18
**switch**  27:1
**switched**  12:20
12:21
**sworn**  10:6
251:9
**system**  57:6
121:1

**[t - tell]**                                                              Page 309

| t | | | |
|---|---|---|---|
| **t**  4:11 8:14,14 | 107:25 122:1,21 | 118:7,11 119:11 | 44:5,25 45:4,5 |
| 254:3,3 | 127:20 144:19 | 127:22 128:24 | 57:25 59:18,19 |
| **table**   190:18 | 147:17 153:12 | 136:10 144:1,2 | 60:20 64:10 |
| **take**   11:6 72:4 | 154:7 156:22 | 144:3,3 148:4 | 66:14 69:1,5 |
| 99:19,19,21 | 157:17 160:8 | 152:19 168:14 | 70:6 71:11 76:1 |
| 107:23 113:9 | 162:17 176:14 | 171:17,19,20,21 | 76:8 87:25 88:4 |
| 128:25 149:18 | 186:19 190:22 | 171:22 172:10 | 88:9 93:3 112:9 |
| 161:23 162:1 | 194:7 198:11 | 172:15,19,22 | 112:12,13 |
| 171:10 172:1 | 205:2 208:16 | 173:3 179:4 | 117:11 120:22 |
| 176:15 178:12 | 249:11 | 186:9 192:25 | 121:4 127:2,3,7 |
| 201:6 227:11,14 | **talked**   11:14 | 193:16 199:18 | 127:9,10,11 |
| 227:14 231:8 | 22:24 23:1 29:5 | 208:3,8,10,12 | 162:23 163:3,6 |
| 233:6,6,7 235:8 | 33:4 46:4 56:19 | 212:2 216:8 | 163:7 167:5,5 |
| 241:1 | 67:7,7 117:19 | 217:24 221:19 | 170:10,12,25 |
| **taken**   1:17 9:8 | 119:14 120:22 | 228:12 246:22 | 171:22,23 |
| 10:17 42:11 | 121:6 143:18 | 246:25 248:11 | 172:21,23,25 |
| 72:7 84:22 99:6 | 151:20,24,24 | **talks**   31:12 | 173:25 174:2 |
| 107:8 123:9 | 152:5 158:17 | 34:19 38:5 | 180:5 194:13,21 |
| 129:4 130:18 | 160:14 166:24 | 46:14 50:18,22 | 203:2,3 |
| 147:25 159:15 | 169:21 186:22 | 53:4 121:15 | **team's**   45:6 |
| 176:19 178:25 | 187:13 190:14 | **tape**   105:7 | **teammate**   94:2 |
| 200:1 208:25 | 196:3 208:15 | **targeted**   218:8 | **teammates**   93:2 |
| 225:13 236:15 | 213:6 221:4 | **task**   16:3 74:5 | 93:7,14 112:11 |
| 241:21 | 225:17 239:24 | **tax**   240:24 | 116:21 182:2 |
| **talk**   11:11 21:20 | 246:19 | 241:6,9 | **teams**   45:10 |
| 21:21 36:12 | **talking**   12:5,13 | **taylor**   20:2 80:3 | **technically** |
| 48:17 49:14 | 19:15 25:12 | 81:1,2,14 | 167:12 |
| 50:14 51:11,16 | 29:16 31:20 | 224:13 | **television**   88:9 |
| 53:11 54:10,25 | 36:24 39:11,15 | **teach**   59:6 | **tell**   10:14,21 |
| 57:8 58:22 | 42:22 55:3,5 | **teacher**   170:1 | 11:18 14:3 |
| 63:18 67:5 | 57:13 60:22 | **teachers**   69:18 | 22:24 39:6 |
| 75:10,11,15 | 63:25 64:15 | **team**   17:24 | 41:14 44:2 |
| 84:8,8 85:9 | 79:2 106:14 | 19:22 38:5,13 | 72:20 85:15 |
| 89:10 103:3 | 107:12,13 | 38:14,15,17,19 | 92:25 96:13,22 |
| | 110:25 117:11 | 39:4 43:7,14 | 99:25 114:5 |

**[tell - think]**                                                                           Page 310

| | | | |
|---|---|---|---|
| 115:17 120:17 | **terminated** | 185:15 186:6 | 119:4 128:22 |
| 123:19 128:20 | 226:10 | 187:4 188:15,23 | 133:15 137:20 |
| 129:25 132:2 | **termination** | 195:6,12 217:13 | 149:13 158:14 |
| 134:16 136:14 | 26:24 56:11 | **texted** 178:19 | 163:10 170:6 |
| 141:8 145:1 | 165:16 208:9 | **texting** 186:3 | 171:20 172:16 |
| 149:23 150:2 | 211:18 217:1,4 | 199:11 | 175:10 176:23 |
| 151:18 154:1 | 219:19 220:11 | **texts** 106:13 | 194:18 196:3 |
| 156:9 158:6 | 221:20 | **thank** 10:13 | 201:17,23 203:5 |
| 162:13 165:7 | **terms** 135:13 | 12:16 35:3,18 | 205:6 215:14 |
| 166:25 178:16 | 137:20 138:24 | 40:17 46:11 | 228:19 230:1 |
| 179:15,17 180:9 | 220:14 221:19 | 50:6 72:3 74:20 | 240:23 |
| 189:2,22 190:1 | 228:21 229:19 | 75:9 79:19 | **think** 14:14 25:7 |
| 194:24 200:11 | 246:19 | 85:22,25 102:17 | 25:7 29:19 |
| 205:25 213:23 | **terrace** 2:8 | 107:2 129:11 | 41:20 58:20 |
| 214:11,16 | **test** 79:3 115:20 | 132:6 133:6 | 59:16 60:17,17 |
| 215:11 216:4,14 | 119:2,3 120:20 | 148:12 169:17 | 60:18,19,20 |
| 225:9 228:20 | 121:8,10 | 183:22 216:4 | 62:19 66:3,17 |
| 234:3 237:18 | **testified** 10:7 | 243:8 | 67:19,21 75:5,6 |
| 239:15 244:6,11 | **testimony** 4:2 | **thanks** 113:12 | 76:22,23 78:15 |
| 249:3,7 | 10:2 243:19 | 147:22 | 79:14,17 80:5 |
| **telling** 11:22 | 253:7,15 | **thanksgiving** | 81:18 82:14,17 |
| 22:21 126:14 | **tests** 120:23 | 89:4,4 | 82:22,24,24 |
| 142:8 157:20 | **text** 21:1,4 | **thereof** 78:21 | 84:17 88:17,17 |
| 179:22 186:18 | 23:21 27:23 | **thing** 11:1 12:6 | 89:5 90:18 93:9 |
| 197:4 198:2 | 28:10,23 106:10 | 31:18,19 62:11 | 97:13 98:15 |
| 229:22 | 107:14 111:25 | 62:20 68:5 | 102:22 107:4 |
| **tells** 124:21 | 114:23 119:25 | 69:25 99:9 | 108:7 109:1 |
| **ten** 18:1 19:1 | 121:20 124:16 | 159:1 165:3 | 114:25 115:1 |
| 118:7 225:1 | 124:18 125:21 | 173:11,21 182:9 | 116:14 121:22 |
| 229:6 | 125:23,24 | 184:11 227:10 | 125:1 126:5 |
| **tend** 155:16 | 126:12,19 | **things** 18:3 | 135:4 136:4,6 |
| **tenure** 221:17 | 145:12 146:21 | 38:17 58:12 | 137:11 139:7,10 |
| **term** 14:5 | 149:24 150:25 | 68:18 76:17 | 139:21 140:16 |
| 192:14 207:7 | 156:7,19 158:15 | 84:3 90:11 | 141:25 142:9 |
| | 168:4 172:4 | 108:21 109:18 | 145:12 147:4 |

**[think - told]**

| | | | |
|---|---|---|---|
| 148:22 158:24 | 153:4,13,23 | 23:21,22 26:21 | 223:6 224:11 |
| 160:18 165:2 | 154:11 155:6 | 27:17 28:9 | 225:5,6 226:5 |
| 166:6,12 167:2 | 160:1 163:25 | 57:19 59:15,16 | 232:10 235:10 |
| 168:18 169:15 | 182:23 188:21 | 65:14 68:4 69:7 | 235:10 237:13 |
| 169:24 171:18 | 200:17 202:25 | 69:7,7 70:5 76:3 | 237:20 238:12 |
| 171:19,20 | 209:16 217:16 | 76:14,15 77:6 | 238:16,23,25 |
| 172:20 174:25 | 224:16 | 77:12 81:12 | 239:2,13,22 |
| 175:3,12,15 | **threatening** | 82:12,15,15 | 240:1 246:3,10 |
| 177:20 182:22 | 98:14 | 84:17 86:19 | 249:10 |
| 191:11 200:22 | **three**  33:16 | 87:2,5,7,10 | **timeline**  135:17 |
| 203:4,6,17 | 46:19 90:5 | 88:12,24 90:3,6 | 146:16 |
| 204:3,12,19,24 | 99:11 102:12 | 90:16,18,21,24 | **times**  11:7 45:2 |
| 205:22 206:1 | 106:9 121:11,11 | 91:6 92:5 96:8 | 87:10 99:8,15 |
| 207:7 214:16,24 | 130:25 222:4,11 | 96:12 97:24 | 119:8 128:14 |
| 216:4 221:11 | 227:19 233:11 | 98:15,16 99:10 | 181:8 223:9 |
| 222:3,4 224:1,1 | 235:19 | 99:16,20 103:21 | 231:10 |
| 224:2,5 238:18 | **throw**  166:21 | 104:7 109:4 | **tired**  147:20 |
| 238:24 240:6 | **thrown**  93:1 | 110:18 122:12 | 203:25 231:11 |
| **thinking**  90:13 | 94:9,13 188:18 | 123:16 127:19 | **today**  9:3 20:8 |
| **thinks**  22:17 | **tiff**  119:14 | 128:15 130:11 | 28:2 110:21 |
| **third**  24:20 | 125:20,24 194:9 | 131:6 136:19 | 129:16 131:22 |
| 37:12 40:21,23 | 194:11 | 137:16 140:14 | 156:4 |
| 44:12 46:18,19 | **tiffany**  112:17 | 141:11,17 142:8 | **together**  19:22 |
| 69:7 106:13 | 113:6 114:19 | 150:1,14,19 | 39:2,8 45:7 |
| 130:24 163:1 | 117:8 119:11 | 157:3 159:9 | 59:18 108:8 |
| 227:22 | 120:4,5,7 | 160:13 165:11 | 126:24 150:14 |
| **thirdly**  33:15 | 126:12,20 | 166:8 168:12 | 170:22 172:23 |
| **thorough**  203:4 | 156:20 | 169:23,25 | 175:15,19 |
| 203:7 205:7,11 | **till**  82:18 100:19 | 170:13 172:1 | 210:15 236:3 |
| 224:2 | 100:22 179:13 | 173:8 174:23,25 | **told**  82:6,17 |
| **thoroughly** | 247:11 | 175:15 177:20 | 144:17 145:8 |
| 131:24 | **time**  1:16 9:3 | 178:7,18 185:4 | 149:9 154:13 |
| **thought**  65:4 | 12:25 16:18 | 187:8,23 189:3 | 162:5 169:8,14 |
| 76:10 90:11 | 19:12 20:16 | 199:16 203:10 | 179:24 180:10 |
| 103:22 111:13 | 23:11,15,18,19 | 210:24 220:7 | 180:16 183:7 |

CONFIDENTIAL

**[told - turn]**

Page 312

187:21 190:12
195:15,23
198:10,18,21,22
198:25 199:6,16
206:11 211:3,6
211:16 216:25
217:2 221:24
239:23 248:2
**tomorrow** 168:7
**toney** 67:2
123:20 186:17
**toneys** 67:11
**took** 19:4 24:21
25:10 89:16
103:5 192:16
237:20 238:3
**top** 36:2,11 38:5
38:11 40:22
55:7 62:19 73:7
82:8 83:4
109:13 112:1
113:8 116:10
132:23 159:3
182:17 209:10
**topic** 172:1
**topics** 199:8
**tormented**
121:23
**tormenting**
136:24
**total** 238:3
**totally** 14:24
27:21
**touch** 90:11
170:19 187:10

**tough** 80:9,12
158:14 174:25
**tournament**
163:23
**toward** 148:21
**towards** 13:18
50:12 137:1
152:23 210:4
221:20 224:8
**town** 240:21
**townsville** 92:13
**track** 17:22
24:22 64:9
**tracks** 93:8
**traditional**
17:22
**train** 65:4
**training** 121:3
181:6
**transactional**
59:5,10
**transcript** 250:6
252:1,6,6 253:5
253:18
**transcripts**
253:12
**transfer** 121:19
170:22
**transformatio...**
59:4,9 60:4
**transported**
102:13
**trauma** 87:22
89:16 224:7

**traumas** 90:19
**traumatic** 88:5
**travel** 44:25
45:4,6 58:11,11
225:22
**traveling** 38:20
**treat** 142:10
143:12
**treated** 76:13
79:7 89:17
90:24 99:16
143:17,23 182:9
182:14 191:20
213:25 215:23
215:24 218:9
221:18 224:5,14
243:25 244:3,19
245:16,23
248:25
**treating** 100:5,6
245:9
**treatment** 23:20
78:24 89:14,20
90:19,22 91:8
91:19 100:2,21
101:24 103:9
221:20 229:5,8
**trespass** 97:10
**trespassed**
93:18,25 94:17
97:4,5
**trespassing**
92:20 94:18
**trick** 85:6

**tried** 170:10
177:3 230:23
**trip** 177:20
196:16,18
**trips** 44:13
**trouble** 69:1
95:24 105:20
113:18,21
173:13,19
221:15 229:20
**truck** 237:11
**true** 181:9 252:7
254:21
**truly** 59:3,5
180:12
**trust** 71:21
211:9
**truth** 10:3,3,3
11:19,22
**try** 116:17 180:9
240:5
**trying** 59:17
71:4 86:12
90:18 94:16
96:14 109:1
124:21 159:8
161:7 174:3
188:24 226:17
228:7
**turn** 32:20
34:14,17 35:9
40:21 42:20,25
43:5 44:23
46:21 47:7,12
48:13 49:6,12

**[turn - unlawful]**                                                    Page 313

53:25 54:22
**turned**   94:1
  96:16 97:24
**two**   14:4 24:5
  24:16 32:16
  38:24 39:18,22
  39:22,25 40:14
  53:1 59:19 60:1
  66:11,20 68:17
  69:25 70:22
  75:5,6 83:4 84:3
  86:11 87:9
  95:22 107:18
  119:4 128:13,21
  128:22 130:25
  132:10,15
  133:14,14
  134:17 150:19
  163:8,16 167:4
  167:6,12 172:5
  180:3 181:8
  190:4,9,20
  201:5 238:1,2,3
  238:8 240:23
  241:14,16,24
  246:13 247:12
**twofold**   166:12
**type**   17:21
  31:17 58:12
  182:8 187:23
  227:20,21,22
  232:25 233:4
  237:7 251:22
**types**   38:17
  58:22 79:10

227:19
**typically**   184:24

**u**

**u**   8:14
**uber**   14:13,23
  16:22 17:5
**ucf**   91:3
**uh**   21:9,9 38:10
  46:2 103:15,15
  160:25 233:12
**ultimately**   44:7
**um**   13:3 19:16
  21:22 22:15
  26:6 27:2 34:5
  34:22 37:17
  41:17 42:23
  45:1 50:13 54:2
  54:9 55:9 56:15
  56:21 72:18
  73:20 77:2
  79:21 91:20,22
  92:19,22,24
  102:14,14 106:4
  109:25 110:5
  116:11 117:25
  123:15 138:14
  158:19 167:2
  169:12 184:17
  185:21 186:14
  196:22 209:7
  213:8 224:18
  237:24 240:14
**unable**   53:15
  228:21

**uncomfortable**
  136:16 138:1
  141:13,25
  180:12 193:3
  206:20 213:4
  223:7 243:15
  247:10
**under**   11:18
  14:5 23:19
  36:25 37:12
  38:14 41:18
  43:14 53:4,5,21
  54:8 55:24
  77:17 80:3 89:8
  138:2 143:11
  154:14 184:8
  204:13 253:16
  254:20
**underage**
  106:14 108:13
**underneath**
  76:10
**understand**
  10:21 11:10,18
  29:23 66:10
  70:25 76:19
  79:12 94:16
  139:15,21
  144:11,21,23
  154:5,21 155:1
  155:2 176:5,10
  193:8 202:15
  216:1 238:12
**understanding**
  120:17 137:24

191:4 221:15
**understood**
  10:24 32:21
**unemployment**
  236:19,22
**unfair**   78:16
**unfortunately**
  79:23
**unit**   9:4 42:13
  72:9 84:24
  107:10 123:11
  129:6 130:20
  148:2 159:17
  176:21 179:2
  200:3 209:2
  225:15 236:17
  241:23
**united**   1:1 2:22
  9:10 170:25
  230:6,24
**university**   1:8
  2:17,24 26:9
  36:16 37:9,25
  38:2 45:11 49:4
  51:1 54:3,10,17
  56:3,6,10 70:5
  71:10 76:16
  133:3,3 166:3
  166:11,13,15
  195:18 253:2
  254:1
**university's**
  59:24 66:12
**unlawful**   208:9

CONFIDENTIAL

**[unsure - want]**                                                                                    Page 314

**unsure**  173:23
**untrusting**
  152:2
**unusual**  179:16
**unwilling**  53:15
**update**  170:20
**upholding**
  214:19
**ups**  246:13
**upset**  66:14
  112:9 115:19,25
  116:2 120:18
  141:10 144:10
  145:5
**use**  54:4,10
  116:17 125:12
  126:2 159:10
  168:11 192:12
  210:4 230:16,19
**used**  14:5 35:23
  37:23 76:17
  110:16,17
  206:22 243:17
  253:19
**using**  59:5
  215:12
**usually**  38:22
  41:10 64:4
  163:19 195:18

**v**

**v**  253:2 254:1
**vacillate**  15:24
**value**  35:7
**van**  45:7

**vary**  108:20
**vehicle**  233:14
**verbal**  11:2
**verbalize**
  164:21
**verbally**  98:17
**verify**  253:7
**veritas**  237:22
  237:23 239:12
**veritext**  9:14
  253:12,21
**veritext.com**
  253:12
**verizon**  12:21
  12:24
**versus**  9:8
  215:24
**vice**  2:24
**video**  1:13
**videoconferen...**
  2:2,7,12,16,22
  2:23
**videographer**
  3:2,4 9:2,7,13
  9:20 42:9,12
  44:19 71:23
  72:5,8 84:20,23
  86:1,5 107:6,9
  109:17 123:7,10
  123:24 127:16
  129:2,5,9
  130:16,19
  132:20 145:16
  147:23 148:1
  159:13,16

161:15 169:18
176:17,20
178:23 179:1
183:11 199:24
200:2 201:14
208:23 209:1
210:8 212:22
225:5,8,11,14
236:13,16
241:16,19,22
242:1,6 250:3
**videotaped**  9:4
88:2
**view**  116:23,23
**vigorously**  56:4
**violation**  36:16
  37:9 56:10 93:5
**virtual**  170:13
**virus**  71:5,6,8,8
  71:14
**vitas**  237:21
**voice**  70:10
**voiced**  98:17
**volumes**  165:2
**voluntarily**
  89:25
**voluntary**  4:21
  31:3
**vs**  1:7
**vulgarity**
  192:13 207:8
  215:12

**w**

**wade**  175:2,10
  175:16 176:23
  177:3,18 189:3
  194:2
**wait**  114:25,25
  114:25 134:6
  161:4
**waited**  20:16
**waiting**  25:21
**walk**  219:5
**walked**  151:25
**walking**  58:6
  217:19 226:6
**wall**  94:19
  219:2
**want**  10:13 17:3
  27:22 42:18
  58:22 61:21,24
  62:2 63:22
  65:13 67:25
  75:10,11,15
  89:3,3 90:4
  91:13 93:12,17
  99:21 109:14
  110:3,21,23
  119:24 125:12
  131:16 138:5
  143:4 146:4
  154:13 158:20
  160:23 164:1
  188:5 225:2,4
  230:1 239:9,10
  239:12,13
  240:23 241:1,2

**[want - witness]**                                          Page 315

241:4 242:3
**wanted** 25:8
26:17 63:10
64:1 66:19 98:5
107:21 114:11
120:3 129:11,15
132:24 154:5
159:20,22 160:2
160:9 162:1
178:7 184:4
187:10 210:14
217:18 238:15
246:17 247:6,7
247:9,13 249:10
249:12
**wanting** 21:21
153:12 246:20
249:5
**wants** 27:25
28:18 144:18
**warm** 117:20
**warned** 191:16
**warranted**
188:8
**watch** 184:16
**watched** 170:10
**watching** 226:2
226:5
**water** 197:23
**way** 41:6 77:19
80:11,15 91:17
108:14 120:22
144:10 146:2
161:9 165:5
175:12 176:25

177:9 182:12
191:20 192:21
198:14 202:2
234:8 243:24
244:25
**ways** 64:10
**we've** 60:10
152:5 165:24
213:6 221:4
225:1 246:19
247:19 248:5
**wear** 119:5
**weary** 152:1
**web** 8:11
**wedding** 226:14
226:16
**wednesday**
111:4
**week** 15:2,4,24
16:2,6,20 99:10
102:11 177:3
194:11 232:16
232:17 238:2,24
**weekday** 99:9
**weeks** 15:4,5
90:5 99:11,12
102:12
**welcome** 117:20
**welfare** 46:23
**wellness** 35:12
**went** 49:22 87:9
87:11 88:19,21
93:1,7 94:14,14
95:25 96:19
97:10 98:4

99:12,20 101:15
101:23 102:18
107:13 122:2
127:16 128:18
145:24 151:20
160:3 169:25
179:5 187:16,25
190:2,14,17,19
246:7
**west** 2:3,14
**whatnot** 76:22
87:1,3
**willing** 240:2
**wilson** 20:5
**win** 112:12
**winning** 163:2
**winter** 93:5,8,11
95:2
**wish** 230:9
**withhold** 66:13
**withholding**
138:4
**witness** 9:6,23
10:4,6 22:20
24:3,12,18
26:13 31:7 32:5
34:1 40:7,18
44:18 45:17
46:12 48:21
49:1,17 50:10
51:19 52:1,10
52:19,24 54:6
55:3 57:11,13
61:17 62:9 63:2
63:13 64:7,25

65:10,16,21
66:6,10 69:24
70:17 72:2 75:3
75:24 79:16
80:14,21 82:22
82:24 83:21
86:7,17 89:10
96:25 97:13
98:11 99:1,22
101:13 102:2
105:1 109:11
111:18 112:8
113:11 115:3,23
116:2 117:25
118:11 119:1,4
120:13 124:7
125:2,23 126:23
130:13 131:5,23
132:10,13,16
133:13 134:14
135:10 136:1
137:7,23 138:18
139:4,10,19
140:25 141:10
142:17 143:9
145:4 146:8
147:22 148:11
148:25 149:21
151:4 152:11
153:6,16,23
154:10 155:1,10
156:15 158:24
160:5 161:8
164:6,13 166:6
167:19 168:22

169:6 171:13
176:7,12 178:2
181:20 183:12
185:13 187:18
188:13 189:6,13
191:8 193:13,20
194:5 196:1,11
196:25 197:21
198:6,21 200:9
201:3,19 202:1
202:8 203:9,20
203:22,25 204:6
204:11,24
205:14 207:15
209:22 218:14
220:24 222:9,15
222:20 223:2
224:1,25 225:22
243:4 244:22
245:19 246:9,14
247:22 248:7,16
251:11 253:7,8
253:10,18
**woman**   221:13
221:17
**woman's**   73:4
**women**   59:6
69:9 176:1
**women's**   6:20
19:17 80:9
97:19 163:6
211:4
**wonder**   66:18
**wondering**
149:14 190:9

**word**   38:18,18
184:6 199:15
210:4 248:21
**words**   168:11
180:24 182:5
199:9 207:5
238:13
**work**   15:5 16:1
18:5,6 53:2,9,15
56:25 62:4,7,9
62:10 64:16
74:11,17 76:18
117:11 159:21
159:23 160:3
173:6 186:10
239:9,10,12,13
**worked**   17:5
26:4 35:22
91:21 98:22
150:14 165:24
203:2 205:6,11
**working**   12:25
13:5 14:12 15:3
15:9 16:10,15
16:17,22 19:1
90:24 116:22
169:15 175:17
225:23
**works**   76:19
**world**   181:11
**worried**   20:18
21:5,11,16
246:20 247:7
**worry**   65:18
68:16 151:22

187:24 190:16
**write**   67:3
162:16
**writing**   116:9
**wrong**   29:8
41:20 68:20
94:4 112:11
125:8 148:23
190:16
**wrote**   41:15
79:13 94:9
116:25 135:16
161:21 183:22
199:4 216:17

| **x** |
| --- |

**x**   4:1,11 251:21

| **y** |
| --- |

**y**   15:23
**yard**   94:22
**yeah**   19:3 35:3
41:22 46:21
51:8 52:10
58:21 66:16
70:11 71:1,6
72:4,22,24
80:14 82:24
83:8 85:18 90:1
91:16 94:9
95:10 111:6
112:1 114:12
116:13 125:2,23
126:23 127:6
129:23 133:21
133:23 134:9

143:25 150:23
156:4,15 158:5
158:25 161:10
161:15 163:8
165:19 167:22
167:24 168:1
173:24,24
181:15 195:15
195:20 196:5
198:10 199:19
227:2 228:10
233:20 234:20
239:9 240:25
241:5 246:1,14
250:7
**year**   13:10
17:10,14 38:16
39:5,17,18,25
40:2,2 64:21
67:8,15 75:25
75:25 76:1,7,7
77:3,25 87:19
87:21 90:22,23
90:24 91:8
104:6,14 117:19
167:9,11 173:5
174:14,17,18
188:25 191:22
**years**   18:1 19:1
38:24 60:1
66:11,20 70:1
70:22 76:9
79:25 136:20
167:12 177:4
214:20 229:6

CONFIDENTIAL

**[yelling - zorilla]**                                              Page 317

| |
|---|
| **yelling**  41:11 |
| 95:13 |
| **yep**  40:23 221:5 |
| **young**  2:23 59:6 |
| 69:9 79:8 |
| 127:20,25 128:4 |
| 128:11,13 145:7 |
| 151:12 152:4 |
| 176:1 178:15 |
| 181:3,8 187:11 |
| 189:23 200:14 |
| 208:14 216:24 |
| 232:2 243:13 |
| 245:6,10,22 |
| 249:6 |
| **younger**  60:9 |
| **z** |
| **z3**  237:10 |
| **zoom**  9:20 |
| **zorilla**  2:12 |
| 25:20 |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 1

 1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
 2                   ORLANDO DIVISION
 3           CASE NO.: 6:22-cv-02075-RBD-LHP
 4
     MARISSA GIANNERINI,
 5
          Plaintiff,
 6
     vs.
 7
     EMBRY-RIDDLE AERONAUTICAL
 8   UNIVERSITY, INC.,
 9        Defendant.
     _____/
10
              REMOTE VIDEOCONFERENCE DEPOSITION
11                        OF
                   ROXEANNE GIANNERINI
12
13        Taken on behalf of the Defendant
14
          DATE TAKEN:   Friday, January 12, 2024
15
          TIME:         1:00 p.m. - 3:30 p.m.
16
          LOCATION:     Zoom Videoconference
17
18
19
20   STENOGRAPHICALLY REPORTED BY:
     TRACY LYN FAZIO, FPR
21   VERITEXT LEGAL SOLUTIONS
     JOB NO.: 6394020
22
23
24    Defendant's Designations
25

Page 2

1  APPEARING REMOTELY ON BEHALF OF PLAINTIFF:
2      NEIL L. HENRICHSEN, ESQ.
        RONALD P. ANGERER, II, ESQ.
3      HENRICHSEN LAW GROUP, PLLC
        301 W. Bay Street, 14th Floor
4      Jacksonville, Florida  32202
        1.904.381.8183
5      nhenrichsen@hslawyers.com
6
    APPEARING REMOTELY ON BEHALF OF DEFENDANT:
7
        ALANA ZORRILLA-GASTON, ESQ.
8      CARLTON FIELDS, P.A.
        525 Okeechobee Boulevard, Suite 1200
9      West Palm Beach, Florida  33401
        1.561.659.7070
10     agaston@carltonfields.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            I N D E X
2  ROXEANNE GIANNERINI              PAGE NO.
3    Direct by Ms. Zorrilla-Gaston:       4
4  CERTIFICATE OF OATH                   67
     CERTIFICATE OF REPORTER             68
5  NOTIFICATION LETTER                   69
     CERTIFICATE OF WITNESS              70
6  ERRATA SHEET                         71
7
8          DEFENDANT'S EXHIBITS MARKED
9  Exhibit 1 -  Subpoena for Deposition    7
     Exhibit 2 -  Subpoena for Documents    8
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1          P R O C E E D I N G S
2               - - -
3        (Thereupon, the witness, ROXEANNE
4  GIANNERINI, was duly sworn under oath and
5  testified as follows:)
6          DIRECT EXAMINATION
7  BY MS. ZORRILLA-GASTON:
8     Q   Good afternoon.  My name is Alana
9  Zorrilla-Gaston.  I'm an attorney with Carlton
10 Fields and I represent Embry-Riddle Aeronautical
11 University in this case.  Thank you for being here
12 today.
13        Would you please state your name for the
14 record.
15    A   Roxeanne Giannerini.
16    Q   Have you ever been deposed before?
17    A   Yes, I have.
18    Q   And when was that?
19    A   About 40 years ago.
20    Q   Okay.  So I'll go over briefly something
21 of the deposition ground rules just so that our
22 court reporter can get down all of my questions and
23 all of your answers and make sure we're both on the
24 same page before we get started.  Is that okay?
25    A   Yes.

Page 5

1     Q   Okay.  You understand the oath that you've
2  taken?
3     A   Yes.
4     Q   And I ask that you respond orally.  So if
5  you nod or shake your head, that's not something the
6  court reporter will be able to write down since
7  she's taking down everything we say.  So I just ask
8  that all of your answers be oral.
9     A   Okay.
10    Q   And if you have any -- if you don't
11 understand my question, please tell me so that I can
12 clarify it.  I just ask that you allow me to finish
13 my question before you start your answer so that,
14 again, we don't talk over each other, because then
15 it will be very hard for Ms. Fazio to take down what
16 we're saying.
17        We can take a break any time you like.  I
18 ask that if I do have a question pending, that you
19 answer my pending question.  But whenever you need
20 to take a break, please just ask and I'm happy to do
21 that.
22        I expect that you'll answer all of my
23 questions unless your attorney directs you not to.
24 But again, if you don't understand a question,
25 please just let me know.

2 (Pages 2 - 5)

Page 6

1     Are you taking any medication that would
2  affect your ability to tell the truth today?
3     A   No.
4     Q   Mrs. Giannerini, for clarity of the
5  record, without any disrespect, of course I would
6  typically refer to the Plaintiff in this case as
7  Ms. Giannerini, but as you are also Mrs. Giannerini,
8  is it okay if I refer to her as Marissa or the
9  Plaintiff throughout our deposition today?
10    A   Yes.
11    Q   Okay.  Thank you.
12        What, if anything, did you do to prepare
13 for your deposition today?
14    A   Well, I reviewed the subpoena and I
15 reviewed the answers to my questions.  I also have
16 spoken to Mr. Henrichsen.
17    Q   When you say you reviewed the answers to
18 your questions, what are you referring to?
19    A   Well, I was asked questions in the
20 subpoena and I just wanted to make sure that it was
21 recorded correctly, my response.
22    Q   Understood.
23        So are those the document requests that
24 you were asked to search for certain documents and
25 you responded whether or not you had documents?  Is

Page 7

1  that what you're talking about?
2     A   Correct.
3     Q   Okay.  Thank you.
4         And I'll go ahead and put the subpoena up
5  on the screen.
6         MS. ZORRILLA-GASTON:  Ms. Fazio, did you
7     receive the exhibits that we intend to use
8     today.
9         THE REPORTER:  Yes, I did.
10        MS. ZORRILLA-GASTON:  And do you prefer to
11    share those or do you want me to share my
12    screen?
13        THE REPORTER:  Whatever you would like is
14    fine with me.
15        MS. ZORRILLA-GASTON:  Okay.  If you would
16    put up Exhibit No. 1, please.
17        (Defendant's Exhibit No. 1 was marked.)
18 BY MS. ZORRILLA-GASTON:
19    Q   Ms. Giannerini you're looking at what
20 we've marked as Exhibit No. 1.  This is a subpoena.
21 I'll represent to you that there were two different
22 subpoenas.  One was for documents and one was for
23 you to appear at your deposition today.  This is the
24 subpoena to testify at deposition.
25        Did you receive this subpoena?

Page 8

1     A   Yes, I do have that.
2     Q   Okay.  And you're appearing here today
3  pursuant to the subpoena?
4     A   Yes.
5     Q   And you also received the second subpoena
6  for documents; is that correct?
7     A   Yes.
8         MS. ZORRILLA-GASTON:  Ms. Fazio, could we
9     see Exhibit No. 2, please.
10        (Defendant's Exhibit No. 2 marked.)
11 BY MS. ZORRILLA-GASTON:
12    Q   Ms. Giannerini, does this look familiar as
13 the subpoena that you received requesting that you
14 produce certain documents in this case?
15    A   Yes, that is what I have.  Yes.  Yes.
16    Q   Thank you.
17        MS. ZORRILLA-GASTON:  Okay.  We've marked
18    this as Exhibit 2.  So we have your deposition
19    subpoena as Exhibit 1, and the subpoena for
20    documents as Exhibit 2.
21 BY MS. ZORRILLA-GASTON:
22    Q   And in response to this subpoena for
23 documents which we've marked as Exhibit 2, did you
24 look for each of these categories of documents?
25    A   Yes.

Page 9

1     Q   Is it accurate that the only categories of
2  documents for which you had any responsive documents
3  are category number three, which was communications
4  with the Henrichsen Law Group, and number eight,
5  which was documents relating to the guardianship?
6     A   Yes.
7     Q   And as to the guardianship, did you only
8  have one document related to that?
9     A   Yes.
10        MS. ZORRILLA-GASTON:  All right.
11    Ms. Fazio, I think we're done with the exhibits
12    for right now.
13 BY MS. ZORRILLA-GASTON:
14    Q   So you mentioned that you reviewed the
15 subpoenas, your answers to the subpoena, and you
16 discussed this with your attorney; is that correct?
17    A   Correct.
18    Q   Have you had any communications with
19 anyone from the Henrichsen Law Group prior to them
20 serving as your attorneys?
21    A   No.
22    Q   It's my understanding that they began to
23 represent you a couple of weeks ago in connection
24 with this deposition; is that correct?
25    A   That is correct.

3 (Pages 6 - 9)

Page 10

1    Q   And prior to that time, you never had any
2  communications with that law firm; is that correct?
3    A   Correct.
4    Q   Besides the subpoenas, did you review any
5  other documents to prepare for your deposition
6  today?
7    A   No.
8    Q   Okay.  And did you bring any documents
9  with you?
10   A   No.
11   Q   Okay.  I saw you reviewing documents
12  earlier today.  Was that just copies of the
13  subpoena?
14   A   I have the subpoena sitting here on my
15  desk, yes.
16   Q   Okay.  Do you have any other documents?
17   A   No.
18   Q   Is anyone else present in the room with
19  you?
20   A   No.
21   Q   Did you speak with your daughter about the
22  deposition?
23   A   About today?  Did I speak to her about the
24  deposition?  Can you -- yes.  Yes, I did.  Yes.
25   Q   Okay.  And what did you discuss with your

Page 11

1  daughter?
2    A   Well, she told -- you know, she told me
3  that I was going to be deposed and that I would be
4  getting a subpoena.  And that's all we discussed.
5    Q   Okay.  And just for clarity of the record,
6  your daughter is the Plaintiff in this case, Marissa
7  Giannerini, correct?
8    A   Correct.
9    Q   How would you describe your relationship
10  with Marissa?
11   A   I think we have a really good
12  relationship.
13   Q   Are you close?
14   A   Yes, we are.
15   Q   How often would you say you speak?
16   A   It varies.  Some mornings I might speak to
17  her for a few minutes in the morning.  Sometimes I
18  might speak to her in the afternoon, so it varies.
19  It depends on, you know, what's happening in the
20  time.
21   Q   Would you say that you talk to her daily
22  though?
23   A   No.
24   Q   Weekly?
25   A   I would say weekly.

"Object to 11:5-14 - FRE 802 (hearsay) - Roxanne Giannerini will be present at trial."

Page 12

1    Q   Okay.  And would you say Marissa confides
2  in you?
3    A   I think for the most part.
4    Q   Do you all communicate via text message?
5    A   No.  No.  I do not like text messages.
6    Q   What about email?
7    A   No.
8    Q   So fair to say your communications with
9  Marissa would either be in person or over the phone?
10   A   Yes.
11   Q   When is the last time you saw Marissa?
12   A   Thanksgiving.
13   Q   What, if anything, has Marissa told you
14  about this lawsuit?
15   A   She told me that she had felt that she was
16  unfairly terminated and was discriminated against.
17   Q   Anything else?
18   A   No.
19   Q   Has she talked to you about her upcoming
20  deposition?
21   A   I do know that it's scheduled for, I
22  think, one day next week.  But that's all I know.
23   Q   Are you aware that she asked to have the
24  deposition occur over two days?
25   A   Yes, I do.  I think I heard that

Page 13

1  yesterday.  Yes.
2    Q   Okay.  And do you know why she wants it to
3  occur over two days?
4    A   I have not spoken to her.  So I don't know
5  what her reasoning is for that.
6    Q   Okay.  And just based on your experience
7  with your daughter, do you know of any reason
8  independently why she could not sit for a deposition
9  for a full day?
10   A   I do not.  I do not.
11   Q   What, if anything, did Marissa tell you
12  about her employment with the University?
13       For clarity, when I say the University
14  throughout this deposition, I'll be referring to
15  Embry-Riddle University?
16       MR. HENRICHSEN:  Just form objection.
17  There's no time scope.  Go ahead if you can
18  answer.
19       THE WITNESS:  So ask me the question
20  again.
21  BY MS. ZORRILLA-GASTON:
22   Q   Sure.  Did Marissa ever talk to you about
23  her employment with Embry-Riddle?
24   A   Marissa talked with me about her job and
25  what she does and what she did, yes.

4 (Pages 10 - 13)

Page 14

1    Q   Did she talk to you about her termination?
2        MR. HENRICHSEN:  Form objection in terms
3    of no time scope.  Go ahead.
4        THE WITNESS:  Could you ask me that
5    question again, please?
6    BY MS. ZORRILLA-GASTON:
7    Q   Sure.  Did Marissa ever talk to you about
8    her termination from Embry-Riddle?
9    A   Yes, she did.
10   Q   When did she first talk to you about her
11   termination from Embry-Riddle?
12   A   The day she was terminated.
13   Q   What did she tell you?
14   A   She told me that the University had let
15   her -- had terminated her.  And I asked why.  And
16   she said that because they didn't have faith in her
17   performance anymore as a coach.
18   Q   Is there anything else that she told you
19   about her termination that first time you spoke
20   about it the day she was terminated?
21   A   No, I can't -- I can't recall, no.
22   Q   And then since that day, have you spoken
23   about her termination again?
24   A   Yes.
25   Q   What was the substance of that

Page 15

1    conversation?
2    A   When you ask me what did we talk about,
3    I'm not sure what you mean.
4    Q   Sure.  So after -- I'm sorry.  Go ahead.
5    I interrupted you.
6    A   No.  Could you ask me the question again?
7    Because I'm not sure what you're asking me.
8    Q   Sure.  You said you spoke about the
9    determination the day she got terminated.  Is that
10   correct?
11   A   Correct.
12   Q   And she told you she was terminated
13   because the University had no faith in her
14   performance as a coach; is that correct?
15   A   That's correct.
16   Q   And sometime thereafter you spoke about
17   her termination again; is that correct?
18   A   Yes.
19   Q   And when was that?
20   A   I do not know the exact time, you know,
21   days, weeks after.  No, I don't recall how many days
22   or weeks after I spoke to her about that.
23   Q   When you spoke to her about it again, in
24   what context did her termination come up?
25   A   I think -- if I recall correctly, she told

Page 16

1    me that they had offered her two weeks severance,
2    and that they were going to clean out her office.
3    And that they were going to tell her team that she
4    had been terminated.
5    Q   Anything else that you can recall about
6    that conversation, what Marissa told you about her
7    termination?
8    A   I do recall her saying that there was
9    something to do with an anonymous email and that
10   there was a complaint.  Let me -- there was a
11   complaint from a parent.  I can't recall if it was a
12   parent or a student; that there was an anonymous
13   email and there was a complaint about her.  And --
14   and that's what I remember.
15   Q   Okay.  I appreciate that.  I understand
16   it's been a while.
17        Is there anything else you remember about
18   that conversation with Marissa?
19   A   I'm just trying to recall everything.  I
20   think that's -- well, there -- I think there was
21   one -- yes, there was another thing that I remember,
22   and that was something to do with her questioning or
23   being able to find out who filed the complaint.
24   Q   Can you tell me more about that?
25   A   Well, the anonymous letter, she wanted to

Page 17

1    know, you know, when did it come; who did it come
2    from?  And so she was trying to question that.
3        Oh, I know.  There was -- let me just say
4    there was one other thing.  She said that they
5    accused her of drinking at the game.
6    Q   And did she agree that she was drinking at
7    the game?
8    A   She was not drinking at the game, no.
9    Q   Did she mention any other times where
10   there was an issue with her drinking related to the
11   University?
12   A   No.
13   Q   And the issue that came up about her
14   drinking, you said that was at a game.  Was that a
15   lacrosse game?
16   A   It was after a lacrosse game.
17   Q   So not at the game, but after the game
18   there was an allegation that she was drinking?
19   A   Correct.  Correct.
20   Q   But she was not drinking as far as she
21   told you?
22   A   She said she did have a drink, but it was
23   a beer.  But it wasn't at the game.  Her and the
24   assistant coach had a beer.  And she said that it
25   wasn't uncommon for coaches to do that at the

"Object to 14:7-17 - FRE 802 (hearsay) - Roxanne Giannerini will be present at trial."

"Object to 16:17-17:8 - FRE 802 (hearsay) - Roxanne Giannerini will be present at trial."

"Object to 15:8-18 - FRE 802 (hearsay) - Roxanne Giannerini will be present at trial."

"Object to 17:13-18:4 - FRE 802 (hearsay) - Roxanne Giannerini will be present at trial."

"Object to 15:23-16:14 - FRE 802 (hearsay) - Roxanne Giannerini will be present at trial."

Page 18

1  University. She had been around other events after
2  games and, you know, a coach could walk over after a
3  game and get a beer. It was acceptable. So what
4  she did was not unusual.
5     Q   Was this in the presence of students to
6  your knowledge?
7        MR. HENRICHSEN: Form objection. Go
8  ahead.
9        THE WITNESS: I do not know. I do not
10  know.
11  BY MS. ZORRILLA-GASTON:
12    Q   I'm just trying to understand better what
13  you're telling me. It sounds like it was after the
14  game occurred. But was it still at the location
15  where the game had occurred?
16    A   I do not know that.
17    Q   Okay.
18    A   I do not know that.
19    Q   We've discussed a couple of times where
20  the termination from the University came up.
21        Are there any other instances where you
22  discussed the termination with Marissa?
23    A   In what reference?
24    Q   Did it ever come up again these couple of
25  times that you talked to her about the termination?

Page 19

1     A   We've talked about it, yes. Yes.
2     Q   Besides the things that we've already
3  discussed, is there anything else that she's told
4  you about her termination from the University?
5     A   Other than she's extremely upset and it's
6  very, very stressful, disheartening, unfairly
7  treated, those types of things. Sad.
8     Q   Anything else that she's discussed with
9  you about her termination that we haven't already
10  touched on?
11    A   Not that I can recall.
12    Q   Besides the current lawsuit that Marissa
13  has against the University, are you aware of any
14  other lawsuits by Marissa?
15    A   No.
16    Q   To your knowledge, she's never filed
17  another lawsuit against any other person or entity?
18    A   Not to my knowledge, no.
19    Q   To your knowledge, has Marissa ever
20  threatened to sue a former employer?
21    A   Not to my knowledge, no.
22    Q   Did Marissa file or threaten to file a
23  lawsuit relating to the lack of a major league
24  women's lacrosse team?
25    A   I really don't understand your question.

"Object to 19:8-11 -
FRE 802 (hearsay) -
Roxanne Giannerini
will be present at
trial."

"Object to 21:14-21
- FRE 802 (hearsay)
- Roxanne
Giannerini will be
present at trial."

Page 20

1     Q   Do you know if Marissa ever filed or
2  threaten to file a lawsuit against the Atlanta Blaze
3  or its owner, Peter Trematerra?
4     A   Not that I recall.
5     Q   Did Marissa play for the Atlanta Blaze?
6     A   What type of team -- I'm not familiar with
7  the Atlanta Blaze. Is that a club team? Is that
8  a --
9     Q   Women's lacrosse.
10    A   Pardon me?
11    Q   Women's lacrosse.
12    A   I don't -- I don't remember her playing
13  for that team unless it was a summer league or club
14  team. I really don't -- Marissa, you know, did
15  camps many times to help out with lacrosse. I don't
16  know. Maybe it was that. I don't really recall
17  that.
18    Q   We talked about what Marissa may have told
19  you about her termination specifically. My next
20  question is a little different. I'm going to ask
21  what Marissa has told you about this lawsuit?
22        Have you ever talked to Marissa about the
23  lawsuit?
24    A   Yes.
25    Q   What has she told you about the lawsuit?

Page 21

1     A   That she was -- she sought legal advice.
2  She felt that she was -- received unfair treatment.
3  She felt that she was terminated without cause. She
4  felt that she was also discriminated against. She
5  felt as if her career and livelihood was put in
6  jeopardy. So she did seek legal advice.
7     Q   Okay. Has she told you anything else
8  about the lawsuit itself?
9     A   You know, just trying to think if there
10  was anything specific that she would tell me other
11  than that she was proceeding with it and she was
12  working with the Henrichsen law firm. But other
13  than that, I really don't recall anything specific.
14    Q   Is Marissa currently employed?
15    A   She's self-employed.
16    Q   Can you tell me about that?
17    A   She is a -- I guess you can call it a --
18  she owns rental properties. And so she rents out
19  her rental properties for income.
20    Q   How many rental properties?
21    A   I think she has two.
22    Q   Are these properties that she owned and
23  rented out while she was working for the University
24  or did this happen later?
25    A   The rental -- I think this happened

6 (Pages 18 - 21)

Page 22

1  during.  During, yes.  She purchased her rental
2  property during her employment with Embry-Riddle.
3      Q    Was she renting them out while she was
4  employed with Embry-Riddle?
5      A    Not at that time, no.
6      Q    So it was after she ended her employment
7  with Embry-Riddle that she started renting out the
8  properties for income; is that correct?
9      A    Yes.  Yes, she did.
10      Q    Anything else that she does as part of
11  being self-employed?
12      A    Can I just -- I just remembered something
13  in one of her questions.  You asked about her rental
14  properties.  And she did have two rental properties
15  while she was employed with Embry-Riddle.  And then
16  she bought an additional rental property when she
17  was employed with Embry-Riddle.
18        So she would have had three.  I think I
19  said one.  But she would have had three.  She has
20  since sold them, so that's why I was trying to
21  figure out the time frame of when she had them; when
22  she didn't have them.  So I just wanted to clarify
23  that.
24      Q    Understood.  And I appreciate the
25  clarification.  Please feel free to do that whenever

Page 23

1  you remember something.  I understand we're talking
2  about things that may have occurred a little while
3  ago, so please feel free to do that.
4      A    Okay.
5      Q    You mentioned she had three properties,
6  but she since sold them.  So all three of those
7  properties are sold?
8      A    She sold two of those properties.  And now
9  she only has one.  And she sold those two properties
10  because she had lost her job.
11      Q    Do you know if she made money selling
12  those properties?
13      A    I really don't know if she did, nor do I
14  know how much, no.
15      Q    Besides renting properties, is there
16  anything else -- does Marissa have any other current
17  sources of income?
18      A    Not that I'm aware of, no.  Oh, sorry, I
19  just recalled something.  She did -- well, no, that
20  wouldn't have been income.  So, no, she doesn't.
21      I remembered something that she was doing,
22  but it didn't -- it was a volunteer position.
23      Q    And what was that?
24      A    She was volunteering for Rollins for their
25  lacrosse team.

Page 24

1      Q    So since she was terminated from the
2  University, is the only source of income that
3  Marissa has had to your knowledge the rental of her
4  investment property?
5      A    That's correct, yes.
6      Q    And does she do this through a business?
7      A    Yes, and also for a paycheck.  Yes.
8      Q    Okay.  I meant, is there -- like does she
9  own a business that buys the properties?
10      A    I mean, she has -- I know she's
11  established an LLC, yes.  If you consider that a
12  business, yes.
13      Q    Yes.  What's the name of that LLC?
14      A    I was afraid you were going to ask me
15  that.
16      Q    Is it Piccolo Palms?
17      A    Yes, it is.  Thank you.
18      Q    Sure.  Is she the sole owner of Piccolo
19  Palms?
20      A    I think so, yes.
21      Q    Do you know when Marissa owned Piccolo
22  Palms?
23      A    I do not recall that date.
24      Q    Do you know if she has any partners in
25  that business, Piccolo Palms?

Page 25

1      A    Not that I'm aware of.
2      Q    Do you know if Marissa has any other
3  businesses aside from Piccolo Palms, LLC?
4      A    Not that I'm aware of.
5      Q    The rentals that Marissa does, are those
6  short-term rentals or long-term rentals?
7      A    It's a combination of both.
8      Q    Does she also renovate properties?
9      A    Amazingly so, yes.  I never knew she was
10  so talented.
11      Q    Fantastic.
12        And did she derive any income from
13  renovating properties?
14      A    Just for her own benefit.
15      Q    When you say "for her own benefit", she's
16  renovating the property that she's renting out?
17      A    Correct.
18      Q    Besides the property that she's renting
19  out, has she renovated any other properties?
20      A    She is currently -- she had purchased a
21  property right before she was terminated and she --
22  she is renovating.  But it's not -- it's not
23  rentable.
24      Q    So is it accurate to say she has one
25  property that she rents out short-term and

7 (Pages 22 - 25)

Page 26

1 long-term, and then one property that she's
2 renovating, but is not currently being rented out?
3    A    That's correct.
4    Q    And is there a third property that she
5 lives in?
6    A    She does, but she lives with somebody else
7 there. She doesn't own that property.
8    Q    Okay. So she owns a total of two
9 properties; is that correct?
10    A    Correct.
11    Q    And who is it that she's living with?
12    A    Her boyfriend.
13    Q    And what is her boyfriend's name?
14    A    Chris. Chris.
15    Q    What's the last name?
16    A    Oh, Bevan. Bevan. But now he's her
17 fiance.
18    Q    Fantastic. Chris Bevan, B-E-V-A-N.
19    A    That's personal information.
20    Q    I'm sorry. Your microphone may have cut
21 out.
22    A    I was saying, you know, maybe that was
23 personal information. Maybe I shouldn't have said
24 that.
25    Q    I believe he's listed as a witness on her

Page 27

1 witness list. I just don't know that she identified
2 exactly who that was.
3    A    I'm happy about it, I guess. That's why
4 I -- I'm very happy about it.
5    Q    Do you know if Marissa has any affiliation
6 with FloridaRentals.com?
7    A    I really don't recall that, no. Wait a
8 second. Wait a second.
9        Is Florida Rentals who does your -- that
10 maybe she uses to rent her properties? Because
11 that's the only thing I could think of. I've never
12 heard of it before then. But I know she uses some
13 type of vehicle to rent her properties. But I don't
14 really know what they're called.
15    Q    Do you know if she uses Airbnb to rent her
16 property?
17    A    Yes, she does have Airbnb. Yes.
18    Q    Just because -- I heard you say she uses
19 some other vehicle to rent her properties, plural.
20 I just want to clarify, is it just one property that
21 she's currently renting?
22    A    There's one property that she's renting,
23 yes.
24    Q    Thank you.
25        Are you familiar with Sun State Property

Page 28

1 Management, LLC?
2    A    Sun State Property. I remember that name,
3 but you're going to have to help me with what that
4 is.
5    Q    I was just going to ask if she had any
6 affiliation with that company?
7    A    You know, she could have, but I do not
8 recall that, no.
9    Q    Do you have any involvement in Marissa's
10 business?
11    A    Absolutely not.
12    Q    Where are the two properties that she
13 currently owns? Where are those located?
14    A    I do not know their addresses.
15    Q    Are they in Florida?
16    A    Oh, yes. Yes. Yes. They're probably in
17 the Daytona area I would assume, yes.
18    Q    Besides Embry-Riddle, do you know of any
19 other employers that Marissa has had in the last 10
20 years that you can recall?
21    A    Prior to Embry-Riddle, she was at -- and I
22 always -- I always can't remember the name of the
23 University in Atlanta. She was there -- oh, gosh.
24 For some reason I just -- I have just a mental block
25 about what the name of that university was. But it

Page 29

1 was in Atlanta and she was the head lacrosse coach
2 there. And then prior to that, she was an
3 assistant -- she was an assistant head coach to
4 Stevenson University. That was in Baltimore.
5        And then she worked for a -- I think it
6 might have been an insurance company in Human
7 Resources. And that would have been in Winter Park.
8    Q    About how long ago was that?
9    A    How long was that?
10    Q    How long ago was it that she worked for
11 this insurance company in Winter Park?
12    A    It would have been -- well, that probably
13 would have been 12 years ago. So that's not within
14 10 years. Right. Okay.
15    Q    I was just trying to get a sense of the
16 time frame we're talking about.
17    A    Okay.
18    Q    And since leaving Embry-Riddle, she has
19 not had any employment other than her
20 self-employment with Piccolo Palms?
21    A    That's correct.
22    Q    After being terminated from the
23 University, do you know of any efforts Marissa made
24 to obtain new employment?
25    A    Yes, I do.

8 (Pages 26 - 29)

Page 30

1    Q    What did she do?
2    A    She reached out to Rollins to see if they
3    had any paid positions.  The coach couldn't
4    guarantee her a paid position for the end of the
5    season, but they could -- they could certainly use
6    her as an assistant coach, but it would have been
7    unpaid.
8         She did reach out to see if there was
9    other head nurse -- head nurse -- head lacrosse
10   positions available in the Florida area, but there
11   was not and she was not going to relocate.
12   Q    Okay.  So to your knowledge, she reached
13   out for coaching positions in Florida, but nothing
14   else besides that because she didn't want to
15   relocate; is that correct?
16   A    That's correct, yes.
17   Q    And did she look for any jobs besides
18   coaching?
19   A    Not that I recall.
20   Q    And then ultimately do you know if she
21   applied for any jobs since leaving the University?
22   A    Not that I recall, no.
23   Q    Do you know if she had any interviews for
24   a job since she left Embry-Riddle?
25   A    Not that I'm aware of.

"Object to 30:12-25
- FRE 802 (hearsay)
- Roxanne
Giannerini will be
present at trial."

"Object to 32:13-21
- FRE 802 (hearsay)
- Roxanne
Giannerini will be
present at trial."

Page 31

1    Q    Do you know if Marissa had any job offers
2    since she left Embry-Riddle?
3    A    No, not that I'm aware of.
4    Q    Are you familiar with recruiting
5    specialists?
6    A    Yes, I am.
7    Q    What is recruiting specialists?
8    A    It was a company that I owned.
9    Q    What did that company do?
10   A    Healthcare recruiting.
11   Q    I'm sorry?
12   A    Healthcare recruiting.
13   Q    And when you say you owned it, do you no
14   longer own it?
15   A    I no longer own it.  Correct.
16   Q    Did you sell the company?
17   A    Yes, I did.
18   Q    When was that?
19   A    2021.
20   Q    Was that before or after Marissa was
21   terminated in 2021, if you remember?
22   A    I think it was -- it was definitely after.
23   It was definitely after.
24   Q    Did Marissa ever work for Recruiting
25   Specialists?

"Object to 33:6-13 -
FRE 802 (hearsay) -
Roxanne Giannerini
will be present at
trial."

Page 32

1    A    Yes, she did.
2    Q    When was that?
3    A    I can't recall the exact dates or times,
4    but -- you know, because I owned the company for 30
5    years.  And she worked with me -- you know, there
6    were times that she worked with me part-time.  There
7    were times that she would work for me full-time.
8    There were times that she would work for me in the
9    summertime.  So it was as needed.
10   Q    Since leaving Embry-Riddle University, has
11   Marissa worked for Recruiting Specialists?
12   A    No.
13        You know, I do recall -- I do recall
14   something.  You asked me about her jobs, what she's
15   been doing, and she does have another job.  And I
16   forgot all about it and I don't know why, but she's
17   doing consulting for a company for their Human
18   Resource Department, and that is a remote position.
19   And I think she started that -- I don't know.  Time
20   slips by.  Maybe she started it a year ago.  It's
21   called Elite Pools.
22   Q    What is the name one more time, please?
23   A    Elite Pools.
24   Q    Elite Pools, E-L-I-T-E?
25   A    Yes.

Page 33

1    Q    Okay.
2    A    Yes.  I'm sorry.
3    Q    Go ahead.  Did you have something else to
4    say?
5    A    No-no.
6    Q    Okay.  So she has her rental property
7    business.  And then she also does consulting for
8    Elite Pools for their Human Resources Department; is
9    that correct?
10   A    That's correct.
11   Q    To your knowledge, is she an employee of
12   Elite Pools?
13   A    No.  No.  She's an independent contractor.
14   Q    Do you know how she's compensated by Elite
15   Pools?
16   A    I really do not know.  I really do not
17   know.
18   Q    And does she do this type of consulting
19   for any other companies to your knowledge?
20   A    Not -- I do not recall, no.  No.
21   Q    Circling back to Recruiting Specialists.
22   You said Marissa has not worked for Recruiting
23   Specialists since she left Embry-Riddle University;
24   is that correct?
25   A    Yes, that's correct.  I think so.  I think

9 (Pages 30 - 33)

Page 34

1 so, yes.
2    Q   You don't know of her taking a job with
3 Recruiting Specialists in February of 2022?
4    A   In February of 2022?  No, I'm not aware of
5 that.  No.  Because I would have sold the business.
6 So no, I do not recall that, no.
7    Q   You're saying by February 2022, you no
8 longer owned any part of Recruiting Specialists?
9    A   Well, I had sold the business at that time
10 and I still, you know -- I still have communication
11 with the people that bought it from me.  But I don't
12 have -- I do not have knowledge of day-to-day or who
13 they hire or who they work with.  It's not something
14 that I recall.
15    Q   You didn't ask them to give Marissa a job?
16    A   No, I did not.  No, I did not.
17    Q   Is it fair to say you wouldn't have any
18 knowledge of why she left Recruiting Specialists?
19       MR. HENRICHSEN:  Form objection.  Go
20    ahead.
21       THE WITNESS:  You asked me why she left,
22    do I have knowledge about why she left?  She
23    was working a full-time job.
24 BY MS. ZORRILLA-GASTON:
25    Q   When you say "she was working a full-time

Page 35

1 job", what job are you referring to?
2    A   She was working a full-time job at
3 Embry-Riddle.  She was working a full-time job at
4 her previous job in Atlanta.  She was working
5 full-time plus, plus.
6    Q   Understood.  I'm talking about a time
7 since she left Embry-Riddle.  After she left
8 Embry-Riddle.
9    A   I am not aware -- I am not aware of that,
10 no.
11    Q   I'm going to move on to a new topic.  Do
12 you need a break or would you like to continue?
13    A   No, I'm good.
14    Q   When was Marissa first diagnosed as
15 bipolar?
16    A   I would probably -- I would probably say
17 maybe 2000 -- maybe 2000 and -- geez, I know she
18 was diagnosed with it in 2012.  You know, she had
19 the diagnosis of bipolar in 2012.  Prior to that --
20 I'm sorry.  I can't remember the exact date.
21    Q   That's fine.  The way I understand your
22 answer is you know certainly by 2020 -- 2012, I'm
23 sorry.  By 2012, she had been diagnosed as bipolar.
24 You believe she was diagnosed sometime prior to
25 that, but you don't know when.  Is that correct?

Page 36

1    A   That's correct, yes.  And that's based
2 upon my recall.
3    Q   Is it your general recollection that she
4 was diagnosed as an adult versus in childhood.
5    A   She was not diagnosed in childhood with
6 bipolar, no.
7    Q   When was Marissa's first manic episode, if
8 you recall?
9       MR. HENRICHSEN:  Form objection.  Go ahead
10    if you can answer that.
11       THE WITNESS:  I guess her first manic
12    episode was maybe -- well, you know, I would --
13    I'm clearer on her first manic episode being in
14    2012.  Prior to that I'm not recalling.  I know
15    she had -- you know, she was hospitalized for
16    depression.  But was she diagnosed with
17    bipolar?  No.  No.
18 BY MS. ZORRILLA-GASTON:
19    Q   When was she hospitalized for depression?
20    A   That would have been 2000 -- maybe 2002.
21 It was right after she graduated from high school,
22 2002.
23    Q   And what were the circumstances
24 surrounding that hospitalization?
25    A   She became severely depressed.

Page 37

1    Q   How long was she hospitalized?
2    A   I really don't remember the exact amount
3 of time.
4    Q   Do you remember if it was days, weeks or
5 months?
6    A   It was at least weeks.
7    Q   To your recollection, was that
8 hospitalization in 2002 the first time she was
9 diagnosed with depression?
10    A   That's when she was diagnosed with
11 depression, yes.
12    Q   But you don't recall that at that time she
13 was diagnosed as bipolar; is that correct?
14    A   That's correct.
15    Q   Do you have an idea of how many manic
16 episodes Marissa has had?
17       MR. HENRICHSEN:  Form objection.  Go
18    ahead.  And no predicate to the question if
19    she's even aware of one.  Go ahead if you can
20    answer the question.
21       THE WITNESS:  The one I remember is in
22    2012.
23 BY MS. ZORRILLA-GASTON:
24    Q   You only remember one manic episode?
25    A   In 2012, yes.

10 (Pages 34 - 37)

Page 38

1    Q   Do you remember any manic episodes other
2  than 2012?
3        MR. HENRICHSEN: Form objection. Go
4    ahead.
5        THE WITNESS: No, I do not recall other
6    manic. No.
7  BY MS. ZORRILLA-GASTON:
8    Q   Can you tell me about the manic episode in
9  2012?
10   A   She was not -- you know, her reality was
11 distorted. She was having difficulty in her
12 workplace. She was having difficulty with her
13 relationship at the time. She was not thinking
14 clearly. You know, her thoughts were very
15 distorted. I would say she was paranoid. I guess
16 that would probably sum it up.
17   Q   When you say "she was having difficulty at
18 her workplace," what workplace was that at that time
19 in 2012?
20   A   That -- the 2012 workplace would have been
21 after -- wait a second. Let me think. Yeah, in
22 2012, she was working for that insurance company, I
23 think. Yeah. Yeah. The insurance company because
24 she had graduated -- she had finished up at Rollins.
25 Yeah, I'm pretty sure that that's where it was.

Page 39

1    Q   And then you mentioned she was having
2  difficulty with her relation -- I didn't hear if it
3  was her relationship or relationships at the time?
4    A   She was having difficulty with her
5  relationships -- her personal relationship, who she
6  was dating. So it seemed like, you know, she was
7  paranoid about a lot of things. She was very hyper,
8  manic, you know. Manic behavior.
9    Q   The difficulty with her you said who she
10 was dating at the time, do you recall who that was?
11   A   No, I do not.
12   Q   When you say she was paranoid, can you
13 give me any examples of that?
14       MR. HENRICHSEN: Form objection. Go
15   ahead.
16       THE WITNESS: You want examples of her
17   being paranoid? Is that what your question is?
18       MS. ZORRILLA-GASTON: Yes.
19       MR. HENRICHSEN: Form objection. Let me
20   ask this, counsel. How is this at all
21   relevant, examples of Ms. Giannerini in 2012
22   being relevant --
23       MS. ZORRILLA-GASTON: Keep your objections
24   to form.
25       MR. HENRICHSEN: Hold on. Let me just

Page 40

1  finish. Before I move for a protective order
2  on this, just let me know, how do you think
3  this -- examples of that? I mean, I've been,
4  you know, letting you get into things. But how
5  is that relevant to this lawsuit as a
6  discoverable item?
7        MS. ZORRILLA-GASTON: I want to understand
8    what she means by paranoid.
9        MR. HENRICHSEN: You're the one who used
10   the word and you didn't ask her what she meant
11   by paranoid. You said, give me examples of a
12   paranoid -- what she's perceiving as paranoid
13   behavior.
14       MS. ZORRILLA-GASTON: Those were her
15   words --
16       MR. HENRICHSEN: In 2012. Okay. I'm
17   directing the witness since you can't -- please
18   try to answer it. Because, otherwise, I'm
19   going to move for a protective order on that
20   because it is, I think, delving into things
21   that are harassing of a parent about their kid
22   from 2012, and it has nothing to do with the
23   case. And this is not someone who you've even
24   established has any medical knowledge to know
25   what you mean by paranoid. But go ahead. How

Page 41

1  does it relate to the claims and defenses in
2  the case just so I have a view of that?
3        MS. ZORRILLA-GASTON: You keep saying it's
4    my word. It's not my word.
5        MR. HENRICHSEN: Okay. So how does it
6    relate to the claims and defenses in the case
7    as discoverable under Rule 26?
8        MS. ZORRILLA-GASTON: Sir, I'm not here to
9    argue with you. I'm here to ask my questions.
10       MR. HENRICHSEN: I'm not arguing with you.
11   I'm asking you a question because you're
12   delving into issues that have a harassing
13   context and have no relevancy under Rule 26 to
14   the claims, defenses in this matter as far as I
15   can understand. That's why I'm trying to
16   understand better.
17       MS. ZORRILLA-GASTON: The claims are based
18   on bipolar diagnosis. That's the disability
19   that's being claimed in this case. These are
20   things that your client has put at issue
21   through the Complaint.
22       MR. HENRICHSEN: You're asking the witness
23   specifically about 2012, examples of what she
24   deems paranoid behavior or not, right? That's
25   what I understood the question.

11 (Pages 38 - 41)

Page 42

1    MS. ZORRILLA-GASTON:  Again, I don't think
2  it's appropriate for you to be leading the
3  witness in any direction about my questions the
4  way you're doing.
5    MR. HENRICHSEN:  Why don't you ask your
6  question again.  So I don't know -- because I'm
7  going to move -- we could get the magistrate
8  judge on the phone, too.  I'm not understanding
9  in, 2012, what this is about.  So maybe the
10  court reporter can read back the question.
11    (Thereupon, the previous question was read
12  back.)
13    MR. HENRICHSEN:  Don't answer that
14  question.  We'll be moving for protective order
15  on that issue.  You're asking for examples of
16  paranoid in 2012.  Go ahead.
17    And, Court Reporter, please certify, you
18  know, the page -- that question and the answers
19  forward in the colloquy.  Thank you.
20  BY MS. ZORRILLA-GASTON:
21    Q   What is your educational background,
22  Mrs. Giannerini?
23    A   I have a degree in nursing.
24    Q   A degree in nursing.  Is that what you
25  spent your career in, nursing?

Page 43

1    A   Some of it.
2    Q   When you say "some of it", what do you
3  mean?
4    A   I was a clinical nurse when I graduated.
5  I then became a regional director for a national
6  company.  And then 31 years ago I started my own
7  recruitment firm.
8    Q   I'm going to move on to another line of
9  questioning since your counsel has directed you not
10  to answer.  Maybe we'll be able to circle back to
11  this later.
12    Q   Do you know if Marissa has a criminal
13  history?
14    A   I do know that she was arrested, yes.
15    Q   When was that?
16    A   That was in 2012.
17    Q   Any other arrests that you know of other
18  than 2012?
19    A   Not that I recall, no.
20    Q   What were the circumstances of the arrest
21  in 2012?
22    A   She was exhibiting the manic behavior and
23  she was confused.  And she -- I think -- just trying
24  to recall all the circumstances.  She -- her car
25  broke down then she was looking for -- I think

*Left margin note, beside lines 12-19:*
"Object to 43:12-19
- FRE 802 (hearsay)
- Roxanne
Giannerini will be
present at trial."

Page 44

1  she was looking for some assistance.  And she walked
2  into somebody's house and thought that it was her
3  friend's house, because she was in an unfamiliar
4  area.  And the people that live there were not home,
5  and their neighbors called the police, and she was
6  arrested for entering.  That's -- that's all I
7  recall.
8    Q   When you say she was exhibiting manic
9  behavior, was this -- did this then occur before
10  that 2012 hospitalization you talked about?
11    I'm sorry.  I don't want to get your
12  testimony wrong.  I think you said there was a 2002
13  hospitalization for depression.  I don't know that
14  you said 2012 was a hospitalization.
15    A   Well, the hospitalization in 2012, that
16  was when I obtained guardianship for her.  So yes,
17  she did have a hospitalization then.
18    Q   Okay.  I wasn't sure if you said that.  I
19  just didn't want to inadvertently confuse --
20    A   All these dates are starting to make me
21  confused.
22    Q   Okay.  So there was a hospitalization in
23  2012 for depression.  And then separately in 2012,
24  there was a hospitalization that followed what you
25  say is when you obtained guardianship; is that

Page 45

1  correct?
2    A   That's correct.
3    Q   Okay.  So you mentioned the guardianship.
4    Did you petition for the appointment of a
5  guardian over Marissa?
6    A   Yes, I did.
7    Q   Why was that?
8    A   To be able to communicate with her medical
9  team.
10    Q   Any other reason?
11    A   No.
12    Q   Is there any reason you couldn't
13  communicate with her medical team without being the
14  guardian?
15    A   Prior to my guardianship, I was not the
16  guardian.
17    Q   Was Marissa not allowing you to
18  communicate with the medical team?
19    A   Based upon HIPAA laws, if somebody's over
20  the age of 18, they do not have -- the doctors do
21  not have permission to talk to a parent.  And
22  Marissa was over 18, and that is HIPAA law.
23    Q   That's unless someone gives consent,
24  correct?
25    A   That's correct.

12 (Pages 42 - 45)

Page 46

1   Q   So my understanding is that Marissa did
2   not give consent.  And so you had to obtain
3   guardianship to be involved in medical decisions; is
4   that correct?
5   A   That is correct.
6   Q   And this was in 2012?
7   A   That is correct.
8   Q   Any other times that there was a
9   guardianship for Marissa?
10   A   No.
11   Q   Based on the documents that you produced,
12   I believe you were appointed emergency temporary
13   guardian for 90 days; is that correct?
14   A   That is correct.
15   Q   Did the guardianship continue after?
16   A   No.
17   Q   When you were appointed guardian in 2012,
18   were you appointed full guardian with control over
19   her person and her estate?
20   A   Yes, I think so.  Yes.  Yes.
21   Q   What did that guardianship entail?
22   A   It allowed me to speak to her medical
23   team.  It allowed me to access her bank accounts in
24   order to pay her mortgage payments.  It allowed me
25   to pay her health insurance.  It allowed me to talk

Page 47

1   to her insurance company.  I'd say that was about
2   it.
3   Q   Was Marissa unable to do those things at
4   that time?
5   A   No, she was not.  No.  No, she was not.
6   Q   Was there an examining committee that
7   evaluated Marissa as part of that appointment of a
8   guardian?
9   A   Yes.
10   Q   And how many people were on that
11   committee?
12   A   I don't necessarily -- I don't think it
13   was a committee.  I would say it was more of a
14   hearing, because I wanted to discharge Marissa.  I
15   wanted them to discharge Marissa to me so that she
16   could go to a private facility to get the care she
17   needed.  And so there was a hearing for them to give
18   me that permission.
19   Q   Was there an independent person that
20   evaluated Marissa at the time in order to recommend
21   a guardianship for her?
22   A   I don't understand your question.  Your
23   microphone is off.
24   Q   Did she meet with a doctor, a
25   psychiatrist, a psychologist, anyone in the

Page 48

1   community that was appointed to evaluate her to see
2   if she needed a guardian?
3   A   All I know is that they would do their own
4   evaluations while she was in the psychiatric unit.
5   And at that time Marissa -- I think everybody
6   realized Marissa was not in a state to make good
7   decisions for herself.
8   Q   When you say she was not in a state to
9   make decisions for herself, is that because of the
10   attributes you listed earlier as far as her being I
11   think you said hyper, paranoid, distorted reality;
12   is that correct?
13   A   Marissa was in a bipolar, psychotic, manic
14   episode.  And I would think most medical profession
15   would agree that at that point in her illness, that
16   she was not the best advocate for her care.
17   Q   How long did that last?
18   MR. HENRICHSEN:  Form objection.  Go ahead
19   if you can answer.
20   THE WITNESS:  You know, I really don't
21   recall the length of time.  If I was -- if I
22   was to guess, it was less than -- maybe less
23   than two weeks.  Two weeks maybe.  It all
24   depends on, you know -- you know, I would say
25   less than two weeks maybe.  Maybe three weeks.

Page 49

1   I can't recall the exact time.
2   BY MS. ZORRILLA-GASTON:
3   Q   Understood.  But it wasn't a matter of
4   years?
5   MR. HENRICHSEN:  Hold it.  Hold it.  Form
6   objection.  Go ahead.
7   THE WITNESS:  Your question again?
8   BY MS. ZORRILLA-GASTON:
9   Q   You were saying you couldn't remember.  It
10   may have been two or three weeks.  And I was just
11   clarifying, it was weeks, not years, correct?
12   MR. HENRICHSEN:  Form objection.  Go
13   ahead.
14   THE WITNESS:  It was weeks at the most.
15   Maybe three weeks.  But years, absolutely not.
16   BY MS. ZORRILLA-GASTON:
17   Q   When were Marissa's rights restored?
18   A   Once I would say when she was -- when she
19   was finally discharged from the facility that we
20   sent her to.  So that would have been -- that would
21   have been 60 days, 30 days.  I think she was -- 30
22   days.  It was during that time to get her on the
23   right medication, and that happened very, very
24   quickly.
25   So I would say within two weeks she -- she

13 (Pages 46 - 49)

Page 50

1 was -- maybe even three weeks she was back home
2 living in her home.
3     Q    What was the facility that she was in?
4     A    Which time?
5     Q    I'm sorry. Were there multiple times that
6 she was in a facility?
7     A    Well, she was in a hospital. And then she
8 went to a facility for rehabilitation. So which one
9 are you referring to?
10     Q    Were those both in 2012?
11     A    That's correct.
12     Q    Okay. So what was the hospital?
13     A    It was one of the psychiatric hospitals in
14 Orlando. I don't remember what the name of it was.
15 And then she went to a -- oh, gosh. It was a short
16 period of time. I don't really remember the name.
17 She was there for maybe two weeks. She was -- you
18 know, when you -- I mean, she went to a facility
19 that understood bipolar disorder and was able to get
20 her on the right medication. She was stabilized
21 pretty quickly, pretty quickly.
22     Q    And then following the hospital, you said
23 she went to a rehab facility?
24     A    She went to a treatment care I guess you
25 could say. Treatment care for bipolar. They

Page 51

1 usually are called dual diagnosis. So she -- you
2 know, she was there for a short period of time. But
3 I do not remember -- I do not remember the name.
4     Q    Did you ever petition to have Marissa
5 determined incapacitated?
6     A    No. No.
7     Q    If the court records reflect that there
8 was a petition to determine incapacity by you along
9 with a separate case of petition for an appointment
10 of guardian, would that refresh your memory at all?
11     A    No. No, I do not recall that. All I
12 recalled was gaining guardianship. That's all I
13 recall.
14     Q    And do you have any recollection of
15 Marissa ever being determined incapacitated?
16     A    No, I really do not recall that. If
17 you're referring to being hospitalized? I don't
18 know if you consider when you're hospitalized you're
19 incapacitated. But outside of a hospitalization,
20 no. No.
21     Q    It appears that that guardianship file --
22 you provided one of the documents from that case --
23 was closed in 2021.
24        Did the guardianship continue until 2021?
25     A    Did it continue through 2021?

Page 52

1     Q    Yes.
2     A    Is that your question?
3     Q    Yes.
4     A    It was for 90 days from what I remember.
5 So I didn't -- I don't recall ever petitioning for
6 more time, no.
7     Q    To the best of your recollection, since
8 2013, Marissa has not had a guardian; is that
9 correct?
10     A    That is correct.
11     Q    Has Marissa ever been Baker Acted?
12     A    Yes, she was.
13     Q    How many times?
14     A    In 2021.
15     Q    Is that just once in 2021?
16     A    That's what I recall.
17     Q    Okay. And why was she Baker Acted?
18     A    Because of her arrest.
19     Q    Okay. We spoke about an arrest in 2012.
20 Was there another arrest in 2021?
21     A    Wait a second. I'm getting confused. You
22 said 2012, and then you changed it to 2021. What
23 did you ask me again?
24     Q    Maybe I misunderstood your answer. I
25 asked if Marissa had ever been Baker Acted, and I

Page 53

1 understood your response to be in 2021.
2     A    No-no. 2012. I'm sorry. I'm sorry.
3 That was a mistake. 2012. 2021. Trying to keep
4 all these dates and times together is really
5 difficult.
6     Q    Was 2012 the only time that she was Baker
7 Acted?
8     A    Yes, ma'am.
9     Q    Okay. And was that in connection with the
10 arrest that we already spoke about?
11     A    That's correct.
12     Q    So the arrest, the guardianship, the Baker
13 Acting, the hospitalization in 2012, those were all
14 related; is that correct?
15     A    That is correct.
16     Q    Does Marissa have a history of substance
17 abuse?
18     A    No, she does not.
19     Q    Are you aware of any arrests that Marissa
20 had in 2010?
21     A    2010? No, I don't recall that.
22     Q    Are you aware of any manic episodes that
23 Marissa had in 2010?
24     A    I don't recall. I don't recall. No, I
25 don't recall.

"Object to 53:19-21 - FRE 802 (hearsay) - Roxanne Giannerini will be present at trial."

14 (Pages 50 - 53)

Page 54

1    Q   Well, the guardianship, was there further
2  activity through the court in order to have the
3  guardianship dissolved or did it just dissolve
4  automatically after 90 days?
5    A   It dissolved after 90 days.
6    Q   So in other words, there weren't any
7  further hearings to determine that she no longer
8  needed a guardian; is that correct?
9    A   That's correct.
10   Q   And how is Marissa's health today?
11   A   She -- you know, she does have Type I
12 diabetes, so always has to take care of herself.
13 But as of today, she's doing well.  I think her
14 health is well.
15   Q   Has Marissa had any hospitalizations since
16 she was terminated from Embry-Riddle?
17   A   No.
18   Q   Has she been Baker Acted since she was
19 terminated from Embry-Riddle?
20   A   No.
21   Q   Has Marissa had any arrests since she was
22 terminated from Embry-Riddle?
23   A   No.
24   Q   Has Marissa had any manic episodes since
25 she was terminated from Embry-Riddle?

"Object to
54:11-55:16 - FRE
802 (hearsay) -
Roxanne Giannerini
will be present at
trial."

Page 55

1    A   No.
2    Q   Is Marissa now in a stable relationship?
3    A   Yes.
4    Q   You mentioned she was engaged?
5    A   Yes.
6    Q   Is she planning a wedding?
7    A   Yes.
8    Q   Sounds like something you're very excited
9  about?
10   A   Yes.
11   Q   The renovations, that sounds like
12 something she enjoys?
13   A   Yes, she does.  Yes, she does.
14   Q   You say she currently enjoys her work with
15 Piccolo Palms?
16   A   Yes, she does.  Yes, she does.
17   Q   Would you say she's happier than you've
18 seen her in a while?
19       MR. HENRICHSEN:  Form objection.  Go
20 ahead.
21       THE WITNESS:  I think she is happy to be
22 in such a good relationship.  She has a very
23 nice man.
24       She's with a very nice man.  She doesn't
25 have.

"Object to 57:20-22
- FRE 802 (hearsay)
- Roxanne
Giannerini will be
present at trial."

Page 56

1  BY MS. ZORRILLA-GASTON:
2    Q   Understood.
3        If Marissa's medical providers noted that
4  she's doing well, sleeping normally, happy, would
5  you have any reason to contest that?
6    A   Say it again.
7    Q   If Marissa's medical providers have noted
8  that she's doing well, sleeping normally, happy,
9  would you have any reason to contest that?
10   A   The only thing that I do know is that she
11 has had repeated nightmares since the termination.
12 And so she has -- I know she's working with her
13 doctors as far as working with the nightmares.  I
14 guess you would call it stress, stress-related.
15   Q   I'm sorry.  You broke up when you were
16 talking about the nightmares.  You said she was
17 working with?
18   A   I think she -- well, I know she works with
19 her therapist on the nightmares and how it relates
20 to the stress that she's been experiencing since her
21 termination.
22   Q   What are the nightmares?
23   A   I don't really know what happens in the
24 nightmares.  I just know that she wakes up and she
25 said it's just not a good night's sleep.  Let's put

Page 57

1  it that way.
2    Q   Does the therapy seem to be working?
3        MR. HENRICHSEN:  Form objection.  Go
4  ahead.
5        THE WITNESS:  I think that they are
6  continuing to work with her in regards to her
7  nightmares.  They have continued.  They have
8  not gone away.
9  BY MS. ZORRILLA-GASTON:
10   Q   Did she have nightmares before her
11 employment with Embry-Riddle?
12   A   Not that I'm aware of.
13   Q   And besides telling you that the
14 nightmares don't allow for a good night's sleep and
15 she's working in therapy about this, has Marissa
16 told you anything else about the nightmares?
17   A   Nothing specific, no.
18   Q   Anything general?
19   A   No.
20   Q   Would you say Marissa is functioning well
21 in interpersonal relationships?
22   A   Yes, I do.
23   Q   Would you say she is functioning well in
24 occupational settings?
25   A   What do you mean by an occupational

15 (Pages 54 - 57)

"Object to 58:3-8 - FRE 802 (hearsay) - Roxanne Giannerini will be present at trial."

Page 58

1 setting? Okay. You mean in a job setting when you
2 say occupational? Okay.
3     In a job setting, is she functioning well
4 in a job setting?
5   Q   Yes.
6   A   Is that what you mean?
7   Q   Yes.
8   A   Yes, I think she does function well.
9   Q   Ms. Giannerini, are you married?
10   A   Yes, I am.
11   Q   And what is your spouse's name?
12   A   Michael.
13   Q   Is that Michael Giannerini?
14   A   Michael Giannerini, yes.
15   Q   Yes. I understand that Mr. Giannerini may
16 have some health issues that prevent him from
17 sitting for a deposition; is that correct?
18   A   That is correct.
19   Q   What is the nature of the issues that
20 prevent him from sitting for a deposition?
21   A   Short-term memory loss.
22   Q   I'm sorry to hear that. Anything else?
23   A   And even though he has hearing aides, he
24 doesn't hear correctly all the time.
25   Q   Have you ever heard Marissa talk about

Page 59

1 conspiracy theories?
2   A   No.
3   Q   Have you heard her talking about being
4 persecuted?
5   A   No. No.
6   Q   When you were Marissa's guardian, did you
7 have full access to her medical records?
8   A   Yes.
9   Q   Since that time, do you continue to have
10 any involvement in Marissa's medical care?
11   A   No.
12   Q   Do you meet with her doctors?
13   A   No.
14   Q   Do you know how long Marissa has been
15 seeing a psychiatrist?
16   A   It would be since 2021. I mean, 2012.
17 2012.
18   Q   And do you know if that continued while
19 she was employed with Embry-Riddle?
20   A   Yes. Yes. As far as I know, yes.
21   Q   And it continued thereafter?
22   A   Yes, it has. Yes.
23   Q   To your knowledge, has the treatment by
24 the psychiatrist been effective?
25     MR. HENRICHSEN: Form objection. Go

Page 60

1 ahead.
2     THE WITNESS: Yes, it has in my opinion.
3 BY MS. ZORRILLA-GASTON:
4   Q   Do you know who Marissa's psychiatrist is?
5   A   I know she said his name. But I really
6 don't recall. I really don't recall his name.
7   Q   Dr. Aly ring a bell?
8   A   How do you spell that?
9   Q   A-L-Y.
10   A   Yes, I think that is it. Yes.
11   Q   Do you know of any other psychiatrist that
12 Marissa has seen?
13   A   No, I'm not aware.
14   Q   You mentioned Marissa goes to therapy, is
15 that with Dawn Parr Chappel?
16   A   Yes. Yes, that's correct.
17   Q   Do you know how long she has been seeing
18 Ms. Chappel?
19   A   I really don't recall, no, how long. No.
20   Q   Do you ever attend therapy with Marissa?
21   A   No, I do not.
22   Q   Do you know of anyone else who attends
23 therapy with Marissa?
24   A   Not that I'm aware.
25   Q   Do you know how long Marissa has been

Page 61

1 seeing a therapist?
2   A   I'm just -- I guess I don't understand
3 your question.
4   Q   Do you know when Marissa first started
5 seeing a therapist?
6   A   Are you referring to Dawn, her therapist?
7   Q   Any therapist.
8   A   Well, you know, after her hospitalization
9 she did see a therapist. She continued to see a
10 therapist, yes. She saw a therapist, yes.
11   Q   Would that be since the hospitalization we
12 discussed in 2002?
13   A   You know, in 2002, yes, she did seek a
14 therapist. Yes, she did.
15   Q   Do you know if she continued to see a
16 therapist while she was employed at Embry-Riddle?
17   A   Yes, she did. Yes, she did.
18   Q   She continued to see a therapist after she
19 was employed at Embry-Riddle? After she
20 terminated. I'm sorry.
21   A   Yes, she did.
22   Q   In your opinion, has the therapy treatment
23 been helpful?
24     MR. HENRICHSEN: Form objection. Go ahead
25 if you can answer.

16 (Pages 58 - 61)

Page 62

1      THE WITNESS: From what she has said,
2   she's very happy with the therapist.
3   BY MS. ZORRILLA-GASTON:
4      Q   Besides Dawn Chappel, are you aware of any
5   other therapists that Marissa has seen?
6      A   You know, what time frame?
7      Q   In the last 10 years.
8      A   So in the last 10 years, that would be
9   2013. Is that what -- that time?  She -- after she
10  was hospitalized and came home, she did come back to
11  Baltimore. And there she did see a psychiatrist by
12  the name of Dr. Goodman, David Goodman.  And she was
13  also seeing a therapist that he referred to her.  I
14  really don't remember his -- for some reason I want
15  to say his first name was John, but I could be
16  wrong. I really don't recall his name.
17     Q   To your knowledge, has Marissa always
18  taken her medications as prescribed?
19     A   Yes, she has.
20     Q   Do you know of any times when she did not?
21     A   I would say that during -- since her
22  hospitalization in 2012, I do not know of any time
23  that she hasn't taken her medication.
24     Q   To your knowledge, has Marissa always gone
25  to see her doctors as needed?

Page 63

1      A   As far as I know, yes, she had.  Yes.
2      Q   All right. I'm going to take a break.  I
3   don't think we have too much longer.  But if we can
4   just take 10 minutes.
5          (Off the record.)
6   BY MS. ZORRILLA-GASTON:
7      Q   Ms. Giannerini, I really appreciate your
8   time. I don't think we have too much longer.  I
9   want to ask you a little more about that 2012
10  hospitalization that you said was the only manic
11  episode that you know of.
12         Do you know leading up to that manic
13  episode if there was any environmental,
14  circumstantial things that may have caused that
15  episode?
16         MR. HENRICHSEN:  Objection to form on the
17     predicate, first part of the question.  Go
18     ahead if you can answer.
19         THE WITNESS:  I really don't recall.  I
20     don't recall.
21  BY MS. ZORRILLA-GASTON:
22     Q   Does Marissa have a history of any trauma,
23  traumatic events in her life that you know of?
24     A   Yes.  She did have a traumatic event I
25  would say in 2002, maybe.  Yeah, 2002.

Page 64

1      Q   What was that?
2      A   She was -- she was videotaped having sex
3   with her boyfriend.
4      Q   Any other traumatic events that you can
5   think of?
6      A   No, I don't recall.
7      Q   Who is Wade -- might take me a minute to
8   find his last name.  Unless you know who I'm talking
9   about when I say Wade.  I'm just going to pull up
10  the email from Ron Angerer.
11         Wade Hastings.  Do you know who Wade
12  Hastings is?
13     A   Yes, I do.
14     Q   Who is that?
15     A   He was a past boyfriend of Marissa's.
16     Q   Do you know the general time frame?
17     A   No.  I would say she maybe dated him for
18  maybe a year, maybe two years, if I can recall
19  correctly.
20     Q   Was this during the time that she worked
21  at Embry-Riddle?
22     A   Yes.  Yes, it was.  Yes.
23     Q   You mentioned the last time you saw
24  Marissa was for Thanksgiving.  You didn't see her at
25  all over the winter holidays then?

Page 65

1      A   No, I did not.
2      Q   Do you have an understanding of what
3   Marissa does sort of day-to-day to fill her time?
4      A   I'm pretty sure she spends most of her
5   time rehabbing her home.
6      Q   Fair enough.  Would you say she has a lot
7   of friends?
8      A   Yes.  I think she has a fair amount of
9   friends.  Yes.
10     Q   What does she do for fun?
11         MR. HENRICHSEN:  Form objection.  Go
12     ahead.
13         THE WITNESS:  She likes to play pool.
14  BY MS. ZORRILLA-GASTON:
15     Q   Billiards?
16     A   Yes, billiards.
17     Q   Do you have any idea if Marissa is making
18  more or less now than when she worked at
19  Embry-Riddle?
20     A   I am unaware of what Marissa makes.
21     Q   Has she ever talked to you about how she's
22  paying her attorneys?
23     A   No, she has not.
24         MS. ZORRILLA-GASTON:  I don't have anymore
25     questions for you.  Your attorney might.  And,

17 (Pages 62 - 65)

Page 66

1    of course, that's subject to the protective
2    order he would be filing as far as the question
3    he directed you not to answer.
4        MR. HENRICHSEN:  I have no questions.
5    We'll read.
6        THE REPORTER:  Ms. Zorrilla-Gaston, I
7    already know your order.
8        Mr. Henrichsen, would you like to order a
9    copy?
10       MR. HENRICHSEN:  Yes.  Thank you.
11       (Thereupon, the deposition concluded at
12   3:30 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 68

1           C E R T I F I C A T E
2
3    THE STATE OF FLORIDA
4    COUNTY OF PALM BEACH
5
6        I, Tracy Lyn Fazio, Florida Professional
     Reporter and Notary Public in and for the State of
7    Florida at Large, do hereby certify that the
     aforementioned witness was by me first duly sworn to
8    testify the whole truth; that I was authorized to and
     did report said deposition in stenotype; and that the
9    foregoing pages 1 thru 66 are a correct transcription
     of my shorthand notes of said deposition.
10
         I further certify that said deposition was
11   taken at the time and place hereinabove set forth and
     that the taking of said deposition was commenced and
12   completed as hereinabove set out.
13       I further certify that I am not attorney or
     counsel of any of the parties, nor am I a relative or
14   employee of any attorney or counsel of party
     connected with the action, nor am I financially
15   interested in the action.
16       The foregoing certification of this
     transcript does not apply to any reproduction of the
17   same by any means unless under the direct control
     and/or direction of the certifying reporter.
18
         Dated this 17th day of January, 2024.
19
20
21
22   _____
     Tracy Lyn Fazio, FPR
23   Notary Public - State of Florida
     My Commission Expires: 2/25/2025
24   My Commission No.: HH 089243
25

Page 67

1           C E R T I F I C A T E
2
3    THE STATE OF FLORIDA )
4    COUNTY OF PALM BEACH )
5
6        I, the undersigned authority, certify that
7    ROXEANNE GIANNERINI appeared before me and was duly
8    sworn.
9        WITNESS my hand and official seal this 17th day
10   of January, 2024.
11
12
     _____
13   Tracy Lyn Fazio, FPR
     Notary Public - State of Florida
14   Commission No. HH 089243
     Expires: 02/25/2025
15
16
17
18
19
20
21
22
23
24
25

Page 69

1    January 17, 2024
2    TO:  Roxeanne Giannerini
     C/O  Neil L. Henrichsen, Esq.
3    Henrichsen Law Group, PLLC
     nhenrichsen@hslawyers.com
4
     IN RE:  Giannerini v. Embry-Riddle
5    1-12-24/Roxeanne Giannerini/Job No. #6394020
6    Dear Ms. Giannerini:
7        The above-referenced transcript is available for
     review.  You should read the testimony to verify its
8    accuracy. If there are any changes, you should note
     those with the reason on the attached Errata Sheet.
9
         You should, please, date and sign the Errata
10   Sheet and email to the deposing attorney as well as
     to Veritext at Transcripts-fl@veritext.com and
11   copies will be emailed to all ordering parties.
12       It is suggested that the completed Errata Sheet
     be returned in 30 days from receipt of testimony, as
13   considered reasonable under Federal Rules*, however,
     there is no Florida Statute to this regard.
14
         If you fail to do so, the transcript may be
15   used as if signed.
16   Yours,
17   Veritext Legal Solutions
18
19   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e).
20
21
22
23
24
25

18 (Pages 66 - 69)

Veritext Legal Solutions
800-726-7007                                     305-376-8800

Page 70

```
 1            C E R T I F I C A T E
 2
 3  THE STATE OF FLORIDA
 4  COUNTY OF PALM BEACH
 5
 6       I hereby certify that I have read the
 7  foregoing deposition by me given, and that the
 8  statements contained herein are true and correct
 9  to the best of my knowledge and belief, with the
10  exception of any corrections or notations made on
11  the errata sheet, if one was executed.
12       Dated this _____ day of _____,
13  2024.
14
15  _____
16  ROXEANNE GIANNERINI
17
18
19
20
21
22
23
24
25
```

Page 71

```
 1  GIANNERINI V. EMBRY-RIDDLE AERONAUTICAL UNIVERSITY
 2  JANUARY 12, 2024/ROXEANNE GIANNERINI
 3       E R R A T A  S H E E T
 4  PAGE____LINE_____CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE_____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19
20      Under penalties of perjury, I declare that I
    have read the foregoing document and that the facts
21  stated in it are true.
22
23  SIGNATURE OF DEPONENT:_____
24  DATE:_____
25
```

19 (Pages 70 - 71)

**0**

**02/25/2025**  67:14
**02075**  1:3
**089243**  67:14
68:23

**1**

**1**  3:9 7:16,17,20
8:19 68:9
**1-12-24**  69:5
**1.310**  69:19
**1.561.659.7070**
2:9
**1.904.381.8183**
2:4
**10**  28:19 29:14
62:7,8 63:4
**12**  1:14 29:13
71:2
**1200**  2:8
**14th**  2:3
**17**  69:1
**17th**  67:9 68:18
**18**  45:20,22
**1:00**  1:15

**2**

**2**  3:9 8:9,10,18
8:20,23
**2/25/2025**  68:23
**2000**  35:17,17
36:20
**2002**  36:20,22
37:8 44:12
61:12,13 63:25

63:25
**2010**  53:20,21
53:23
**2012**  35:18,19
35:22,23 36:14
37:22,25 38:2,9
38:19,20,22
39:21 40:16,22
41:23 42:9,16
43:16,18,21
44:10,14,15,23
44:23 46:6,17
50:10 52:19,22
53:2,3,6,13
59:16,17 62:22
63:9
**2013**  52:8 62:9
**2020**  35:22
**2021**  31:19,21
51:23,24,25
52:14,15,20,22
53:1,3 59:16
**2022**  34:3,4,7
**2024**  1:14 67:10
68:18 69:1
70:13 71:2
**26**  41:7,13
**28137**  67:12
68:21

**3**

**30**  32:4 49:21,21
69:12,19
**301**  2:3
**31**  43:6

**32202**  2:4
**33401**  2:9
**3:30**  1:15 66:12

**4**

**4**  3:3
**40**  4:19

**5**

**525**  2:8

**6**

**60**  49:21
**6394020**  1:21
69:5
**66**  68:9
**67**  3:4
**68**  3:4
**69**  3:5
**6:22**  1:3

**7**

**7**  3:9
**70**  3:5
**71**  3:6

**8**

**8**  3:9

**9**

**90**  46:13 52:4
54:4,5

**a**

**ability**  6:2
**able**  5:6 16:23
43:10 45:8
50:19

**above**  69:7
**absolutely**
28:11 49:15
**abuse**  53:17
**acceptable**  18:3
**access**  46:23
59:7
**accounts**  46:23
**accuracy**  69:8
**accurate**  9:1
25:24
**accused**  17:5
**acted**  52:11,17
52:25 53:7
54:18
**acting**  53:13
**action**  68:14,15
**activity**  54:2
**additional**
22:16
**addresses**  28:14
**adult**  36:4
**advice**  21:1,6
**advocate**  48:16
**aeronautical**
1:7 4:10 71:1
**affect**  6:2
**affiliation**  27:5
28:6
**aforementioned**
68:7
**afraid**  24:14
**afternoon**  4:8
11:18

**agaston** 2:10
**age** 45:20
**ago** 4:19 9:23
    23:3 29:8,10,13
    32:20 43:6
**agree** 17:6
    48:15
**ahead** 7:4 13:17
    14:3 15:4 18:8
    33:3 34:20 36:9
    37:18,19 38:4
    39:15 40:25
    42:16 48:18
    49:6,13 55:20
    57:4 60:1 61:24
    63:18 65:12
**aides** 58:23
**airbnb** 27:15,17
**alana** 2:7 4:8
**allegation** 17:18
**allow** 5:12
    57:14
**allowed** 46:22
    46:23,24,25
**allowing** 45:17
**aly** 60:7
**amazingly** 25:9
**amount** 37:2
    65:8
**angerer** 2:2
    64:10
**anonymous**
    16:9,12,25
**answer** 5:13,19
    5:22 13:18

35:22 36:10
37:20 40:18
42:13 43:10
48:19 52:24
61:25 63:18
66:3
**answers** 4:23
    5:8 6:15,17 9:15
    42:18
**anymore** 14:17
    65:24
**appear** 7:23
**appeared** 67:7
**appearing** 2:1,6
    8:2
**appears** 51:21
**applied** 30:21
**apply** 68:16
**appointed** 46:12
    46:17,18 48:1
**appointment**
    45:4 47:7 51:9
**appreciate**
    16:15 22:24
    63:7
**appropriate**
    42:2
**area** 28:17
    30:10 44:4
**argue** 41:9
**arguing** 41:10
**arrest** 43:20
    52:18,19,20
    53:10,12

**arrested** 43:14
    44:6
**arrests** 43:17
    53:19 54:21
**aside** 25:3
**asked** 6:19,24
    12:23 14:15
    22:13 32:14
    34:21 52:25
**asking** 15:7
    41:11,22 42:15
**assistance** 44:1
**assistant** 17:24
    29:3,3 30:6
**assume** 28:17
**atlanta** 20:2,5,7
    28:23 29:1 35:4
**attached** 69:8
**attend** 60:20
**attends** 60:22
**attorney** 4:9
    5:23 9:16 65:25
    68:13,14 69:10
**attorneys** 9:20
    65:22
**attributes** 48:10
**authority** 67:6
**authorized** 68:8
**automatically**
    54:4
**available** 30:10
    69:7
**aware** 12:23
    19:13 23:18
    25:1,4 30:25

31:3 34:4 35:9,9
37:19 53:19,22
57:12 60:13,24
62:4

**b**

**b** 26:18
**back** 33:21
    42:10,12 43:10
    50:1 62:10
**background**
    42:21
**baker** 52:11,17
    52:25 53:6,12
    54:18
**baltimore** 29:4
    62:11
**bank** 46:23
**based** 13:6 36:1
    41:17 45:19
    46:11
**bay** 2:3
**beach** 2:9 67:4
    68:4 70:4
**beer** 17:23,24
    18:3
**began** 9:22
**behalf** 1:13 2:1
    2:6
**behavior** 39:8
    40:13 41:24
    43:22 44:9
**belief** 70:9
**believe** 26:25
    35:24 46:12

**bell** 60:7
**benefit** 25:14,15
**best** 48:16 52:7
  70:9
**better** 18:12
  41:16
**bevan** 26:16,16
  26:18
**billiards** 65:15
  65:16
**bipolar** 35:15
  35:19,23 36:6
  36:17 37:13
  41:18 48:13
  50:19,25
**blaze** 20:2,5,7
**block** 28:24
**bought** 22:16
  34:11
**boulevard** 2:8
**boyfriend** 26:12
  64:3,15
**boyfriend's**
  26:13
**break** 5:17,20
  35:12 63:2
**briefly** 4:20
**bring** 10:8
**broke** 43:25
  56:15
**business** 24:6,9
  24:12,25 28:10
  33:7 34:5,9
**businesses** 25:3

**buys** 24:9

**c**

**c** 4:1 67:1,1 68:1
  68:1 69:2 70:1,1
**call** 21:17 56:14
**called** 27:14
  32:21 44:5 51:1
**camps** 20:15
**car** 43:24
**care** 47:16
  48:16 50:24,25
  54:12 59:10
**career** 21:5
  42:25
**carlton** 2:8 4:9
**carltonfields.c...**
  2:10
**case** 1:3 4:11
  6:6 8:14 11:6
  40:23 41:2,6,19
  51:9,22
**categories** 8:24
  9:1
**category** 9:3
**cause** 21:3
**caused** 63:14
**certain** 6:24
  8:14
**certainly** 30:5
  35:22
**certificate** 3:4,4
  3:5
**certification**
  68:16

**certify** 42:17
  67:6 68:7,10,13
  70:6
**certifying** 68:17
**change** 71:4,7
  71:10,13,16
**changed** 52:22
**changes** 69:8
**chappel** 60:15
  60:18 62:4
**childhood** 36:4
  36:5
**chris** 26:14,14
  26:18
**circle** 43:10
**circling** 33:21
**circumstances**
  36:23 43:20,24
**circumstantial**
  63:14
**civil** 69:19,19
**claimed** 41:19
**claims** 41:1,6,14
  41:17
**clarification**
  22:25
**clarify** 5:12
  22:22 27:20
**clarifying** 49:11
**clarity** 6:4 11:5
  13:13
**clean** 16:2
**clearer** 36:13
**clearly** 38:14

**client** 41:20
**clinical** 43:4
**close** 11:13
**closed** 51:23
**club** 20:7,13
**coach** 14:17
  15:14 17:24
  18:2 29:1,3 30:3
  30:6
**coaches** 17:25
**coaching** 30:13
  30:18
**colloquy** 42:19
**combination**
  25:7
**come** 15:24 17:1
  17:1 18:24
  62:10
**commenced**
  68:11
**commission**
  67:14 68:23,23
**committee** 47:6
  47:11,13
**communicate**
  12:4 45:8,13,18
**communication**
  34:10
**communicatio...**
  9:3,18 10:2 12:8
**community** 48:1
**companies**
  33:19
**company** 28:6
  29:6,11 31:8,9

31:16 32:4,17
38:22,23 43:6
47:1
**compensated**
33:14
**complaint** 16:10
16:11,13,23
41:21
**completed**
68:12 69:12
**concluded**
66:11
**confides** 12:1
**confuse** 44:19
**confused** 43:23
44:21 52:21
**connected** 68:14
**connection** 9:23
53:9
**consent** 45:23
46:2
**consider** 24:11
51:18
**considered**
69:13
**conspiracy** 59:1
**consulting**
32:17 33:7,18
**contained** 70:8
**contest** 56:5,9
**context** 15:24
41:13
**continue** 35:12
46:15 51:24,25
59:9

**continued** 57:7
59:18,21 61:9
61:15,18
**continuing** 57:6
**contractor**
33:13
**control** 46:18
68:17
**conversation**
15:1 16:6,18
**copies** 10:12
69:11
**copy** 66:9
**correct** 7:2 8:6
9:16,17,24,25
10:2,3 11:7,8
15:10,11,14,15
15:17 17:19,19
22:8 24:5 25:17
26:3,9,10 29:21
30:15,16 31:15
33:9,10,24,25
35:25 36:1
37:13,14 45:1,2
45:24,25 46:4,5
46:7,13,14
48:12 49:11
50:11 52:9,10
53:11,14,15
54:8,9 58:17,18
60:16 68:9 70:8
**corrections**
70:10
**correctly** 6:21
15:25 58:24

64:19
**counsel** 39:20
43:9 68:13,14
**county** 67:4
68:4 70:4
**couple** 9:23
18:19,24
**course** 6:5 66:1
**court** 1:1 4:22
5:6 42:10,17
51:7 54:2
**criminal** 43:12
**current** 19:12
23:16
**currently** 21:14
25:20 26:2
27:21 28:13
55:14
**cut** 26:20
**cv** 1:3

**d**

**d** 3:1 4:1
**daily** 11:21
**date** 1:14 24:23
35:20 69:9
71:24
**dated** 64:17
68:18 70:12
**dates** 32:3 44:20
53:4
**dating** 39:6,10
**daughter** 10:21
11:1,6 13:7
**david** 62:12

**dawn** 60:15
61:6 62:4
**day** 12:22 13:9
14:12,20,22
15:9 34:12,12
65:3,3 67:9
68:18 70:12
**days** 12:24 13:3
15:21,21 37:4
46:13 49:21,21
49:22 52:4 54:4
54:5 69:12
**daytona** 28:17
**dear** 69:6
**decisions** 46:3
48:7,9
**declare** 71:20
**deems** 41:24
**defendant** 1:9
1:13 2:6
**defendant's** 3:8
7:17 8:10
**defenses** 41:1,6
41:14
**definitely** 31:22
31:23
**degree** 42:23,24
**delving** 40:20
41:12
**department**
32:18 33:8
**depends** 11:19
48:24
**deponent** 71:23

**deposed** 4:16 11:3

**deposing** 69:10

**deposition** 1:10 3:9 4:21 6:9,13 7:23,24 8:18 9:24 10:5,22,24 12:20,24 13:8 13:14 58:17,20 66:11 68:8,9,10 68:11 70:7

**depressed** 36:25

**depression** 36:16,19 37:9 37:11 44:13,23

**derive** 25:12

**describe** 11:9

**desk** 10:15

**determination** 15:9

**determine** 51:8 54:7

**determined** 51:5,15

**diabetes** 54:12

**diagnosed** 35:14 35:18,23,24 36:4,5,16 37:9 37:10,13

**diagnosis** 35:19 41:18 51:1

**different** 7:21 20:20

**difficult** 53:5

**difficulty** 38:11 38:12,17 39:2,4 39:9

**direct** 3:3 4:6 68:17

**directed** 43:9 66:3

**directing** 40:17

**direction** 42:3 68:17

**director** 43:5

**directs** 5:23

**disability** 41:18

**discharge** 47:14 47:15

**discharged** 49:19

**discoverable** 40:6 41:7

**discriminated** 12:16 21:4

**discuss** 10:25

**discussed** 9:16 11:4 18:19,22 19:3,8 61:12

**disheartening** 19:6

**disorder** 50:19

**disrespect** 6:5

**dissolve** 54:3

**dissolved** 54:3,5

**distorted** 38:11 38:15 48:11

**district** 1:1,1

**division** 1:2

**doctor** 47:24

**doctors** 45:20 56:13 59:12 62:25

**document** 6:23 9:8 71:20

**documents** 3:9 6:24,25 7:22 8:6 8:14,20,23,24 9:2,2,5 10:5,8 10:11,16 46:11 51:22

**doing** 23:21 32:15,17 42:4 54:13 56:4,8

**dr** 60:7 62:12

**drink** 17:22

**drinking** 17:5,6 17:8,10,14,18 17:20

**dual** 51:1

**duly** 4:4 67:7 68:7

**e**

**e** 3:1 4:1,1 26:18 32:24,24 67:1,1 68:1,1 69:19,19 70:1,1 71:3,3,3

**earlier** 10:12 48:10

**educational** 42:21

**effective** 59:24

**efforts** 29:23

**eight** 9:4

**either** 12:9

**elite** 32:21,23,24 33:8,12,14

**email** 12:6 16:9 16:13 64:10 69:10

**emailed** 69:11

**embry** 1:7 4:10 13:15,23 14:8 14:11 22:2,4,7 22:15,17 28:18 28:21 29:18 30:24 31:2 32:10 33:23 35:3,7,8 54:16 54:19,22,25 57:11 59:19 61:16,19 64:21 65:19 69:4 71:1

**emergency** 46:12

**employed** 21:14 21:15 22:4,11 22:15,17 59:19 61:16,19

**employee** 33:11 68:14

**employer** 19:20

**employers** 28:19

**employment** 13:12,23 22:2,6 29:19,20,24

57:11
**ended** 22:6
**engaged** 55:4
**enjoys** 55:12,14
**entail** 46:21
**entering** 44:6
**entity** 19:17
**environmental**
  63:13
**episode** 36:7,12
  36:13 37:24
  38:8 48:14
  63:11,13,15
**episodes** 37:16
  38:1 53:22
  54:24
**errata** 3:6 69:8
  69:9,12 70:11
**esq** 2:2,2,7 69:2
**established**
  24:11 40:24
**estate** 46:19
**evaluate** 48:1
**evaluated** 47:7
  47:20
**evaluations**
  48:4
**event** 63:24
**events** 18:1
  63:23 64:4
**everybody** 48:5
**exact** 15:20 32:3
  35:20 37:2 49:1
**exactly** 27:2

**examination** 4:6
**examining** 47:6
**examples** 39:13
  39:16,21 40:3
  40:11 41:23
  42:15
**exception** 70:10
**excited** 55:8
**executed** 70:11
**exhibit** 3:9,9
  7:16,17,20 8:9
  8:10,18,19,20
  8:23
**exhibiting** 43:22
  44:8
**exhibits** 3:8 7:7
  9:11
**expect** 5:22
**experience** 13:6
**experiencing**
  56:20
**expires** 67:14
  68:23
**extremely** 19:5

**f**

**f** 67:1 68:1 70:1
**facility** 47:16
  49:19 50:3,6,8
  50:18,23
**facts** 71:20
**fail** 69:14
**fair** 12:8 34:17
  65:6,8
**faith** 14:16
  15:13

**familiar** 8:12
  20:6 27:25 31:4
**fantastic** 25:11
  26:18
**far** 17:20 41:14
  48:10 56:13
  59:20 63:1 66:2
**fazio** 1:20 5:15
  7:6 8:8 9:11
  67:13 68:6,22
**february** 34:3,4
  34:7
**federal** 69:13,19
**feel** 22:25 23:3
**felt** 12:15 21:2,3
  21:4,5
**fiance** 26:17
**fields** 2:8 4:10
**figure** 22:21
**file** 19:22,22
  20:2 51:21
**filed** 16:23
  19:16 20:1
**filing** 66:2
**fill** 65:3
**finally** 49:19
**financially**
  68:14
**find** 16:23 64:8
**fine** 7:14 35:21
**finish** 5:12 40:1
**finished** 38:24
**firm** 10:2 21:12
  43:7

**first** 14:10,19
  35:14 36:7,11
  36:13 37:8 61:4
  62:15 63:17
  68:7
**fl** 69:10
**floor** 2:3
**florida** 1:1 2:4,9
  27:9 28:15
  30:10,13 67:3
  67:13 68:3,6,7
  68:22 69:13,19
  70:3
**floridarentals....**
  27:6
**followed** 44:24
**following** 50:22
**follows** 4:5
**foregoing** 68:9
  68:16 70:7
  71:20
**forgot** 32:16
**form** 13:16 14:2
  18:7 34:19 36:9
  37:17 38:3
  39:14,19,24
  48:18 49:5,12
  55:19 57:3
  59:25 61:24
  63:16 65:11
**former** 19:20
**forth** 68:11
**forward** 42:19
**fpr** 1:20 67:13
  68:22

[frame - helpful]                                                    Page 78

| | | | h |
|---|---|---|---|
| **frame** 22:21 29:16 62:6 64:16 | 57:9 60:3 62:3 63:6,21 65:14 65:24 66:6 | 24:14 28:3,5 30:11 35:11 40:19 42:7 43:8 63:2 64:9 | **h** 71:3 |
| **free** 22:25 23:3 | **geez** 35:17 | **good** 4:8 11:11 | **hand** 67:9 |

frame 22:21
  29:16 62:6
  64:16
free 22:25 23:3
friday 1:14
friend's 44:3
friends 65:7,9
full 13:9 32:7
  34:23,25 35:2,3
  35:5 46:18 59:7
fun 65:10
function 58:8
functioning
  57:20,23 58:3
further 54:1,7
  68:10,13

g

g 4:1
gaining 51:12
game 17:5,7,8
  17:14,15,16,17
  17:17,23 18:3
  18:14,15
games 18:2
gaston 2:7 3:3
  4:7,9 7:6,10,15
  7:18 8:8,11,17
  8:21 9:10,13
  13:21 14:6
  18:11 34:24
  36:18 37:23
  38:7 39:18,23
  40:7,14 41:3,8
  41:17 42:1,20
  49:2,8,16 56:1

57:9 60:3 62:3
  63:6,21 65:14
  65:24 66:6
geez 35:17
general 36:3
  57:18 64:16
getting 11:4
  52:21
giannerini 1:4
  1:11 3:2 4:4,15
  6:4,7,7 7:19
  8:12 11:7 39:21
  42:22 58:9,13
  58:14,15 63:7
  67:7 69:2,4,5,6
  70:16 71:1,2
give 34:15 39:13
  40:11 46:2
  47:17
given 70:7
gives 45:23
go 4:20 7:4
  13:17 14:3 15:4
  18:7 33:3 34:19
  36:9 37:17,19
  38:3 39:14
  40:25 42:16
  47:16 48:18
  49:6,12 55:19
  57:3 59:25
  61:24 63:17
  65:11
goes 60:14
going 11:3 16:2
  16:3 20:20

24:14 28:3,5
  30:11 35:11
  40:19 42:7 43:8
  63:2 64:9
good 4:8 11:11
  35:13 48:6
  55:22 56:25
  57:14
goodman 62:12
  62:12
gosh 28:23
  50:15
graduated
  36:21 38:24
  43:4
ground 4:21
group 2:3 9:4
  9:19 69:3
guarantee 30:4
guardian 45:5
  45:14,16 46:13
  46:17,18 47:8
  48:2 51:10 52:8
  54:8 59:6
guardianship
  9:5,7 44:16,25
  45:3,15 46:3,9
  46:15,21 47:21
  51:12,21,24
  53:12 54:1,3
guess 21:17 27:3
  36:11 38:15
  48:22 50:24
  56:14 61:2

h

h 71:3
hand 67:9
happen 21:24
happened 21:25
  49:23
happening
  11:19
happens 56:23
happier 55:17
happy 5:20 27:3
  27:4 55:21 56:4
  56:8 62:2
harassing 40:21
  41:12
hard 5:15
hastings 64:11
  64:12
head 5:5 29:1,3
  30:9,9,9
health 46:25
  54:10,14 58:16
healthcare
  31:10,12
hear 39:2 58:22
  58:24
heard 12:25
  27:12,18 58:25
  59:3
hearing 47:14
  47:17 58:23
hearings 54:7
help 20:15 28:3
helpful 61:23

**henrichsen** 2:2
2:3 6:16 9:4,19
13:16 14:2 18:7
21:12 34:19
36:9 37:17 38:3
39:14,19,25
40:9,16 41:5,10
41:22 42:5,13
48:18 49:5,12
55:19 57:3
59:25 61:24
63:16 65:11
66:4,8,10 69:2,3
**hereinabove**
68:11,12
**hh** 67:14 68:23
**high** 36:21
**hipaa** 45:19,22
**hire** 34:13
**history** 43:13
53:16 63:22
**hold** 39:25 49:5
49:5
**holidays** 64:25
**home** 44:4 50:1
50:2 62:10 65:5
**hospital** 50:7,12
50:22
**hospitalization**
36:24 37:8
44:10,13,14,15
44:17,22,24
51:19 53:13
61:8,11 62:22
63:10

**hospitalizations**
54:15
**hospitalized**
36:15,19 37:1
51:17,18 62:10
**hospitals** 50:13
**house** 44:2,3
**hslawyers.com**
2:5 69:3
**human** 29:6
32:17 33:8
**hyper** 39:7
48:11

**i**

**idea** 37:15 65:17
**identified** 27:1
**ii** 2:2
**illness** 48:15
**inadvertently**
44:19
**incapacitated**
51:5,15,19
**incapacity** 51:8
**income** 21:19
22:8 23:17,20
24:2 25:12
**independent**
33:13 47:19
**independently**
13:8
**information**
26:19,23
**instances** 18:21
**insurance** 29:6
29:11 38:22,23

46:25 47:1
**intend** 7:7
**interested** 68:15
**interpersonal**
57:21
**interrupted**
15:5
**interviews**
30:23
**investment** 24:4
**involved** 46:3
**involvement**
28:9 59:10
**issue** 17:10,13
41:20 42:15
**issues** 41:12
58:16,19
**item** 40:6

**j**

**jacksonville** 2:4
**january** 1:14
67:10 68:18
69:1 71:2
**jeopardy** 21:6
**job** 1:21 13:24
23:10 30:24
31:1 32:15 34:2
34:15,23 35:1,1
35:2,3,4 58:1,3
58:4 69:5
**jobs** 30:17,21
32:14
**john** 62:15
**judge** 42:8

**k**

**keep** 39:23 41:3
53:3
**kid** 40:21
**knew** 25:9
**know** 5:25 11:2
11:19 12:21,22
13:2,4,7 15:20
15:20 17:1,1,3
18:2,9,10,16,18
20:1,14,16 21:9
23:11,13,14
24:10,21,24
25:2 26:22 27:1
27:5,12,14,15
28:7,14,18
29:23 30:20,23
31:1 32:4,5,13
32:16,19 33:14
33:16,17 34:2
34:10 35:17,18
35:22,25 36:12
36:14,15 38:10
38:14 39:6,8
40:2,4,24 42:6
42:18 43:12,14
43:17 44:13
48:3,20,24,24
50:18 51:2,18
54:11 56:10,12
56:18,23,24
59:14,18,20
60:4,5,11,17,22
60:25 61:4,8,13
61:15 62:6,20

**[know - mean]** Page 80

62:22 63:1,11
63:12,23 64:8
64:11,16 66:7
**knowledge** 18:6
19:16,18,19,21
24:3 30:12
33:11,19 34:12
34:18,22 40:24
59:23 62:17,24
70:9

**l**

**l** 2:2 32:24 60:9
69:2
**lack** 19:23
**lacrosse** 17:15
17:16 19:24
20:9,11,15
23:25 29:1 30:9
**large** 68:7
**law** 2:3 9:4,19
10:2 21:12
45:22 69:3
**laws** 45:19
**lawsuit** 12:14
19:12,17,23
20:2,21,23,25
21:8 40:5
**lawsuits** 19:14
**leading** 42:2
63:12
**league** 19:23
20:13
**leaving** 29:18
30:21 32:10

**left** 30:24 31:2
33:23 34:18,21
34:22 35:7,7
**legal** 1:21 21:1,6
69:17
**length** 48:21
**letter** 3:5 16:25
**letting** 40:4
**lhp** 1:3
**life** 63:23
**likes** 65:13
**line** 43:8 71:4,7
71:10,13,16
**list** 27:1
**listed** 26:25
48:10
**little** 20:20 23:2
63:9
**live** 44:4
**livelihood** 21:5
**lives** 26:5,6
**living** 26:11
50:2
**llc** 24:11,13 25:3
28:1
**located** 28:13
**location** 1:16
18:14
**long** 25:6 26:1
29:8,9,10 37:1
48:17 59:14
60:17,19,25
**longer** 31:14,15
34:8 54:7 63:3,8

**look** 8:12,24
30:17
**looking** 7:19
43:25 44:1
**loss** 58:21
**lost** 23:10
**lot** 39:7 65:6
**lyn** 1:20 67:13
68:6,22

**m**

**ma'am** 53:8
**made** 23:11
29:23 70:10
**magistrate** 42:7
**major** 19:23
**make** 4:23 6:20
44:20 48:6,9
**makes** 65:20
**making** 65:17
**man** 55:23,24
**management**
28:1
**manic** 36:7,11
36:13 37:15,24
38:1,6,8 39:8,8
43:22 44:8
48:13 53:22
54:24 63:10,12
**marissa** 1:4 6:8
11:6,10 12:1,9
12:11,13 13:11
13:22,24 14:7
16:6,18 18:22
19:12,14,19,22
20:1,5,14,18,21

20:22 21:14
23:16 24:3,21
25:2,5 27:5
28:19 29:23
31:1,20,24
32:11 33:22
34:15 35:14
37:16 43:12
45:5,17,22 46:1
46:9 47:3,7,14
47:15,20 48:5,6
48:13 51:4,15
52:8,11,25
53:16,19,23
54:15,21,24
55:2 57:15,20
58:25 59:14
60:12,14,20,23
60:25 61:4 62:5
62:17,24 63:22
64:24 65:3,17
65:20
**marissa's** 28:9
36:7 49:17
54:10 56:3,7
59:6,10 60:4
64:15
**marked** 3:8 7:17
7:20 8:10,17,23
**married** 58:9
**matter** 41:14
49:3
**mean** 15:3
24:10 40:3,25
43:3 50:18

57:25 58:1,6
59:16
**means** 40:8
68:17
**meant** 24:8
40:10
**medical** 40:24
45:8,13,18 46:3
46:22 48:14
56:3,7 59:7,10
**medication** 6:1
49:23 50:20
62:23
**medications**
62:18
**meet** 47:24
59:12
**memory** 51:10
58:21
**mental** 28:24
**mention** 17:9
**mentioned** 9:14
23:5 39:1 45:3
55:4 60:14
64:23
**message** 12:4
**messages** 12:5
**michael** 58:12
58:13,14
**microphone**
26:20 47:23
**middle** 1:1
**minute** 64:7
**minutes** 11:17
63:4

**mistake** 53:3
**misunderstood**
52:24
**money** 23:11
**months** 37:5
**morning** 11:17
**mornings** 11:16
**mortgage** 46:24
**move** 35:11 40:1
40:19 42:7 43:8
**moving** 42:14
**multiple** 50:5

**n**

**n** 3:1 4:1 26:18
**name** 4:8,13
24:13 26:13,15
28:2,22,25
32:22 50:14,16
51:3 58:11 60:5
60:6 62:12,15
62:16 64:8
**national** 43:5
**nature** 58:19
**necessarily**
47:12
**need** 5:19 35:12
**needed** 32:9
47:17 48:2 54:8
62:25
**neighbors** 44:5
**neil** 2:2 69:2
**never** 10:1
19:16 25:9
27:11

**new** 29:24 35:11
**nhenrichsen** 2:5
69:3
**nice** 55:23,24
**night's** 56:25
57:14
**nightmares**
56:11,13,16,19
56:22,24 57:7
57:10,14,16
**nod** 5:5
**normally** 56:4,8
**notary** 67:13
68:6,22
**notations** 70:10
**note** 69:8
**noted** 56:3,7
**notes** 68:9
**notification** 3:5
**number** 9:3,4
**nurse** 30:9,9
43:4
**nursing** 42:23
42:24,25

**o**

**o** 4:1 69:2
**oath** 3:4 4:4 5:1
**objection** 13:16
14:2 18:7 34:19
36:9 37:17 38:3
39:14,19 48:18
49:6,12 55:19
57:3 59:25
61:24 63:16
65:11

**objections**
39:23
**obtain** 29:24
46:2
**obtained** 44:16
44:25
**occupational**
57:24,25 58:2
**occur** 12:24
13:3 44:9
**occurred** 18:14
18:15 23:2
**offered** 16:1
**offers** 31:1
**office** 16:2
**official** 67:9
**oh** 17:3 23:18
26:16 28:16,23
50:15
**okay** 4:20,24
5:1,9 6:8,11 7:3
7:15 8:2,17 10:8
10:11,16,25
11:5 12:1 13:2,6
16:15 18:17
21:7 23:4 24:8
26:8 29:14,17
30:12 33:1,6
40:16 41:5
44:18,22 45:3
50:12 52:17,19
53:9 58:1,2
**okeechobee** 2:8
**once** 49:18
52:15

**[opinion - proceeding]**                                                            Page 82

| | | | |
|---|---|---|---|
| **opinion** 60:2 | **palms** 24:16,19 | **perjury** 71:20 | **pools** 32:21,23 |
| 61:22 | 24:22,25 25:3 | **permission** | 32:24 33:8,12 |
| **oral** 5:8 | 29:20 55:15 | 45:21 47:18 | 33:15 |
| **orally** 5:4 | **paranoid** 38:15 | **persecuted** 59:4 | **position** 23:22 |
| **order** 40:1,19 | 39:7,12,17 40:8 | **person** 12:9 | 30:4 32:18 |
| 42:14 46:24 | 40:11,12,12,25 | 19:17 46:19 | **positions** 30:3 |
| 47:20 54:2 66:2 | 41:24 42:16 | 47:19 | 30:10,13 |
| 66:7,8 | 48:11 | **personal** 26:19 | **predicate** 37:18 |
| **ordering** 69:11 | **pardon** 20:10 | 26:23 39:5 | 63:17 |
| **orlando** 1:2 | **parent** 16:11,12 | **peter** 20:3 | **prefer** 7:10 |
| 50:14 | 40:21 45:21 | **petition** 45:4 | **prepare** 6:12 |
| **outside** 51:19 | **park** 29:7,11 | 51:4,8,9 | 10:5 |
| **own** 24:9 25:14 | **parr** 60:15 | **petitioning** 52:5 | **prescribed** |
| 25:15 26:7 | **part** 12:3 22:10 | **phone** 12:9 42:8 | 62:18 |
| 31:14,15 43:6 | 32:6 34:8 47:7 | **piccolo** 24:16,18 | **presence** 18:5 |
| 48:3 | 63:17 | 24:21,25 25:3 | **present** 10:18 |
| **owned** 21:22 | **parties** 68:13 | 29:20 55:15 | **pretty** 38:25 |
| 24:21 31:8,13 | 69:11 | **place** 68:11 | 50:21,21 65:4 |
| 32:4 34:8 | **partners** 24:24 | **plaintiff** 1:5 2:1 | **prevent** 58:16 |
| **owner** 20:3 | **party** 68:14 | 6:6,9 11:6 | 58:20 |
| 24:18 | **past** 64:15 | **planning** 55:6 | **previous** 35:4 |
| **owns** 21:18 26:8 | **pay** 46:24,25 | **play** 20:5 65:13 | 42:11 |
| 28:13 | **paycheck** 24:7 | **playing** 20:12 | **prior** 9:19 10:1 |
| | **paying** 65:22 | **please** 4:13 5:11 | 28:21 29:2 |
| **p** | **payments** 46:24 | 5:20,25 7:16 8:9 | 35:19,24 36:14 |
| | **penalties** 71:20 | 14:5 22:25 23:3 | 45:15 |
| **p** 2:2 4:1 | **pending** 5:18,19 | 32:22 40:17 | **private** 47:16 |
| **p.a.** 2:8 | **people** 34:11 | 42:17 69:9 | **probably** 28:16 |
| **p.m.** 1:15,15 | 44:4 47:10 | **pllc** 2:3 69:3 | 29:12 35:16,16 |
| 66:12 | **perceiving** | **plural** 27:19 | 38:16 |
| **page** 3:2 4:24 | 40:12 | **plus** 35:5,5 | **procedure** |
| 42:18 71:4,7,10 | **performance** | **point** 48:15 | 69:19,19 |
| 71:13,16 | 14:17 15:14 | **police** 44:5 | **proceeding** |
| **pages** 68:9 | **period** 50:16 | **pool** 65:13 | 21:11 |
| **paid** 30:3,4 | 51:2 | | |
| **palm** 2:9 67:4 | | | |
| 68:4 70:4 | | | |

produce  8:14
produced  46:11
profession
  48:14
professional
  68:6
properties
  21:18,19,20,22
  22:8,14,14 23:5
  23:7,8,9,12,15
  24:9 25:8,13,19
  26:9 27:10,13
  27:19 28:12
property  22:2
  22:16 24:4
  25:16,18,21,25
  26:1,4,7 27:16
  27:20,22,25
  28:2 33:6
protective  40:1
  40:19 42:14
  66:1
provided  51:22
providers  56:3
  56:7
psychiatric  48:4
  50:13
psychiatrist
  47:25 59:15,24
  60:4,11 62:11
psychologist
  47:25
psychotic  48:13
public  67:13
  68:6,22

pull  64:9
purchased  22:1
  25:20
pursuant  8:3
put  7:4,16 21:5
  41:20 56:25

**q**

question  5:11
  5:13,18,19,24
  13:19 14:5 15:6
  17:2 19:25
  20:20 37:18,20
  39:17 41:11,25
  42:6,10,11,14
  42:18 47:22
  49:7 52:2 61:3
  63:17 66:2
questioning
  16:22 43:9
questions  4:22
  5:23 6:15,18,19
  22:13 41:9 42:3
  65:25 66:4
quickly  49:24
  50:21,21

**r**

r  4:1 67:1 68:1
  70:1 71:3,3
rbd  1:3
reach  30:8
reached  30:2,12
read  42:10,11
  66:5 69:7 70:6
  71:20

reality  38:10
  48:11
realized  48:6
really  11:11
  19:25 20:14,16
  21:13 23:13
  27:7,14 33:16
  33:16 37:2
  48:20 50:16
  51:16 53:4
  56:23 60:5,6,19
  62:14,16 63:7
  63:19
reason  13:7
  28:24 45:10,12
  56:5,9 62:14
  69:8 71:6,9,12
  71:15,18
reasonable
  69:13
reasoning  13:5
recall  14:21
  15:21,25 16:5,8
  16:11,19 19:11
  20:4,16 21:13
  24:23 27:7 28:8
  28:20 30:19,22
  32:3,13,13
  33:20 34:6,14
  36:2,8 37:12
  38:5 39:10
  43:19,24 44:7
  48:21 49:1
  51:11,13,16
  52:5,16 53:21

53:24,24,25
  60:6,6,19 62:16
  63:19,20 64:6
  64:18
recalled  23:19
  51:12
recalling  36:14
receipt  69:12
receive  7:7,25
received  8:5,13
  21:2
recollection
  36:3 37:7 51:14
  52:7
recommend
  47:20
record  4:14 6:5
  11:5 63:5
recorded  6:21
records  51:7
  59:7
recruiting  31:4
  31:7,10,12,24
  32:11 33:21,22
  34:3,8,18
recruitment
  43:7
refer  6:6,8
reference  18:23
referenced  69:7
referred  62:13
referring  6:18
  13:14 35:1 50:9
  51:17 61:6

**reflect** 51:7
**refresh** 51:10
**regard** 69:13
**regards** 57:6
**regional** 43:5
**rehab** 50:23
**rehabbing** 65:5
**rehabilitation**
  50:8
**relate** 41:1,6
**related** 9:8
  17:10 53:14
  56:14
**relates** 56:19
**relating** 9:5
  19:23
**relation** 39:2
**relationship**
  11:9,12 38:13
  39:3,5 55:2,22
**relationships**
  39:3,5 57:21
**relative** 68:13
**relevancy** 41:13
**relevant** 39:21
  39:22 40:5
**relocate** 30:11
  30:15
**remember**
  16:14,17,21
  20:12 23:1 28:2
  28:22 31:21
  35:20 37:2,4,21
  37:24 38:1 49:9
  50:14,16 51:3,3

52:4 62:14
**remembered**
  22:12 23:21
**remote** 1:10
  32:18
**remotely** 2:1,6
**renovate** 25:8
**renovated** 25:19
**renovating**
  25:13,16,22
  26:2
**renovations**
  55:11
**rent** 27:10,13,15
  27:19
**rentable** 25:23
**rental** 21:18,19
  21:20,25 22:1
  22:13,14,16
  24:3 33:6
**rentals** 25:5,6,6
  27:9
**rented** 21:23
  26:2
**renting** 22:3,7
  23:15 25:16,18
  27:21,22
**rents** 21:18
  25:25
**repeated** 56:11
**report** 68:8
**reported** 1:20
**reporter** 3:4
  4:22 5:6 7:9,13
  42:10,17 66:6

68:6,17
**represent** 4:10
  7:21 9:23
**reproduction**
  68:16
**requesting** 8:13
**requests** 6:23
**resource** 32:18
**resources** 29:7
  33:8
**respond** 5:4
**responded** 6:25
**response** 6:21
  8:22 53:1
**responsive** 9:2
**restored** 49:17
**returned** 69:12
**review** 10:4
  69:7
**reviewed** 6:14
  6:15,17 9:14
**reviewing** 10:11
**riddle** 1:7 4:10
  13:15,23 14:8
  14:11 22:2,4,7
  22:15,17 28:18
  28:21 29:18
  30:24 31:2
  32:10 33:23
  35:3,7,8 54:16
  54:19,22,25
  57:11 59:19
  61:16,19 64:21
  65:19 69:4 71:1

**right** 9:10,12
  25:21 29:14
  36:21 41:24
  49:23 50:20
  63:2
**rights** 49:17
**ring** 60:7
**rollins** 23:24
  30:2 38:24
**ron** 64:10
**ronald** 2:2
**room** 10:18
**roxeanne** 1:11
  3:2 4:3,15 67:7
  69:2,5 70:16
  71:2
**rule** 41:7,13
  69:19,19
**rules** 4:21 69:13

**s**

**s** 4:1 71:3
**sad** 19:7
**saw** 10:11 12:11
  61:10 64:23
**saying** 5:16 16:8
  26:22 34:7 41:3
  49:9
**scheduled** 12:21
**school** 36:21
**scope** 13:17
  14:3
**screen** 7:5,12
**seal** 67:9
**search** 6:24

**season**  30:5
**second**  8:5 27:8
   27:8 38:21
   52:21
**see**  8:9 30:2,8
   48:1 61:9,9,15
   61:18 62:11,25
   64:24
**seeing**  59:15
   60:17 61:1,5
   62:13
**seek**  21:6 61:13
**seem**  57:2
**seemed**  39:6
**seen**  55:18
   60:12 62:5
**self**  21:15 22:11
   29:20
**sell**  31:16
**selling**  23:11
**sense**  29:15
**sent**  49:20
**separate**  51:9
**separately**
   44:23
**serving**  9:20
**set**  68:11,12
**setting**  58:1,1,3
   58:4
**settings**  57:24
**severance**  16:1
**severely**  36:25
**sex**  64:2
**shake**  5:5

**share**  7:11,11
**sheet**  3:6 69:8
   69:10,12 70:11
**short**  25:6,25
   50:15 51:2
   58:21
**shorthand**  68:9
**sign**  69:9
**signature**  67:12
   68:21 71:23
**signed**  69:15
**sir**  41:8
**sit**  13:8
**sitting**  10:14
   58:17,20
**sleep**  56:25
   57:14
**sleeping**  56:4,8
**slips**  32:20
**sold**  22:20 23:6
   23:7,8,9 34:5,9
**sole**  24:18
**solutions**  1:21
   69:17
**somebody**  26:6
**somebody's**
   44:2 45:19
**sorry**  15:4 23:18
   26:20 31:11
   33:2 35:20,23
   44:11 50:5 53:2
   53:2 56:15
   58:22 61:20
**sort**  65:3

**sought**  21:1
**sounds**  18:13
   55:8,11
**source**  24:2
**sources**  23:17
**speak**  10:21,23
   11:15,16,18
   46:22
**specialists**  31:5
   31:7,25 32:11
   33:21,23 34:3,8
   34:18
**specific**  21:10
   21:13 57:17
**specifically**
   20:19 41:23
**spell**  60:8
**spends**  65:4
**spent**  42:25
**spoke**  14:19
   15:8,16,22,23
   52:19 53:10
**spoken**  6:16
   13:4 14:22
**spouse's**  58:11
**stabilized**  50:20
**stable**  55:2
**start**  5:13
**started**  4:24
   22:7 32:19,20
   43:6 61:4
**starting**  44:20
**state**  4:13 27:25
   28:2 48:6,8 67:3
   67:13 68:3,6,22

   70:3
**stated**  71:21
**statements**  70:8
**states**  1:1
**statute**  69:13
**stenographica...**
   1:20
**stenotype**  68:8
**stevenson**  29:4
**street**  2:3
**stress**  56:14,14
   56:20
**stressful**  19:6
**student**  16:12
**students**  18:5
**subject**  66:1
**subpoena**  3:9,9
   6:14,20 7:4,20
   7:24,25 8:3,5,13
   8:19,19,22 9:15
   10:13,14 11:4
**subpoenas**  7:22
   9:15 10:4
**substance**  14:25
   53:16
**sue**  19:20
**suggested**  69:12
**suite**  2:8
**sum**  38:16
**summer**  20:13
**summertime**
   32:9
**sun**  27:25 28:2
**sure**  4:23 6:20
   13:22 14:7 15:3

**[sure - today]**                                                    Page 86

15:4,7,8 24:18
38:25 44:18
65:4
**surrounding**
36:24
**sworn**   4:4 67:8
68:7

**t**

**t**   32:24 67:1,1
68:1,1 70:1,1
71:3,3
**take**   5:15,17,20
54:12 63:2,4
64:7
**taken**   1:13,14
5:2 62:18,23
68:11
**talented**   25:10
**talk**   5:14 11:21
13:22 14:1,7,10
15:2 45:21
46:25 58:25
**talked**   12:19
13:24 18:25
19:1 20:18,22
44:10 65:21
**talking**   7:1 23:1
29:16 35:6
56:16 59:3 64:8
**team**   16:3 19:24
20:6,7,13,14
23:25 45:9,13
45:18 46:23
**tell**   5:11 6:2
13:11 14:13

16:3,24 21:10
21:16 38:8
**telling**   18:13
57:13
**temporary**
46:12
**term**   25:6,6,25
26:1 58:21
**terminated**
12:16 14:12,15
14:20 15:9,12
16:4 21:3 24:1
25:21 29:22
31:21 54:16,19
54:22,25 61:20
**termination**
14:1,8,11,19,23
15:17,24 16:7
18:20,22,25
19:4,9 20:19
56:11,21
**terms**   14:2
**testified**   4:5
**testify**   7:24 68:8
**testimony**   44:12
69:7,12
**text**   12:4,5
**thank**   4:11 6:11
7:3 8:16 24:17
27:24 42:19
66:10
**thanksgiving**
12:12 64:24
**theories**   59:1

**therapist**   56:19
61:1,5,6,7,9,10
61:10,14,16,18
62:2,13
**therapists**   62:5
**therapy**   57:2,15
60:14,20,23
61:22
**thing**   16:21 17:4
27:11 56:10
**things**   19:2,7
23:2 39:7 40:4
40:20 41:20
47:3 63:14
**think**   9:11 11:11
12:3,22,25
15:25 16:20,20
21:9,21,25
22:18 24:20
27:11 29:5
31:22 32:19
33:25,25 38:21
38:23 40:2,20
42:1 43:23,25
44:12 46:20
47:12 48:5,11
48:14 49:21
54:13 55:21
56:18 57:5 58:8
60:10 63:3,8
64:5 65:8
**thinking**   38:13
**third**   26:4
**thought**   44:2

**thoughts**   38:14
**threated**   19:20
20:2
**threaten**   19:22
**three**   9:3 22:18
22:19 23:5,6
48:25 49:10,15
50:1
**time**   1:15 5:17
10:1 11:20
12:11 13:17
14:3,19 15:20
22:5,21 29:16
32:6,7,19,22
34:9,23,25 35:2
35:3,5,6 37:3,8
37:12 38:13,18
39:3,10 47:4,20
48:5,21 49:1,22
50:4,16 51:2
52:6 53:6 58:24
59:9 62:6,9,22
63:8 64:16,20
64:23 65:3,5
68:11
**times**   17:9 18:19
18:25 20:15
32:3,6,7,8 46:8
50:5 52:13 53:4
62:20
**today**   4:12 6:2,9
6:13 7:8,23 8:2
10:6,12,23
54:10,13

**together** 53:4
**told** 11:2,2
  12:13,15 14:14
  14:18 15:12,25
  16:6 17:21 19:3
  20:18,21,25
  21:7 57:16
**topic** 35:11
**total** 26:8
**touched** 19:10
**tracy** 1:20 67:13
  68:6,22
**transcript** 68:16
  69:7,14
**transcription**
  68:9
**transcripts**
  69:10
**trauma** 63:22
**traumatic** 63:23
  63:24 64:4
**treated** 19:7
**treatment** 21:2
  50:24,25 59:23
  61:22
**trematerra** 20:3
**true** 70:8 71:21
**truth** 6:2 68:8
**try** 40:18
**trying** 16:19
  17:2 18:12 21:9
  22:20 29:15
  41:15 43:23
  53:3

**two** 7:21 12:24
  13:3 16:1 21:21
  22:14 23:8,9
  26:8 28:12
  48:23,23,25
  49:10,25 50:17
  64:18
**type** 20:6 27:13
  33:18 54:11
**types** 19:7
**typically** 6:6

**u**

**ultimately** 30:20
**unable** 47:3
**unaware** 65:20
**uncommon**
  17:25
**under** 4:4 41:7
  41:13 68:17
  69:13 71:20
**undersigned**
  67:6
**understand** 5:1
  5:11,24 16:15
  18:12 19:25
  23:1 35:21 40:7
  41:15,16 47:22
  58:15 61:2
**understanding**
  9:22 42:8 46:1
  65:2
**understood**
  6:22 22:24 35:6
  41:25 49:3
  50:19 53:1 56:2

**unfair** 21:2
**unfairly** 12:16
  19:6
**unfamiliar** 44:3
**unit** 48:4
**united** 1:1
**university** 1:8
  4:11 13:12,13
  13:15 14:14
  15:13 17:11
  18:1,20 19:4,13
  21:23 24:2
  28:23,25 29:4
  29:23 30:21
  32:10 33:23
  71:1
**unpaid** 30:7
**unusual** 18:4
**upcoming** 12:19
**upset** 19:5
**use** 7:7 30:5
**used** 40:9 69:15
**uses** 27:10,12,15
  27:18
**usually** 51:1

**v**

**v** 26:18 69:4
  71:1
**varies** 11:16,18
**vehicle** 27:13,19
**verify** 69:7
**veritext** 1:21
  69:10,17
**veritext.com**
  69:10

**versus** 36:4
**videoconferen...**
  1:10,16
**videotaped** 64:2
**view** 41:2
**volunteer** 23:22
**volunteering**
  23:24
**vs** 1:6

**w**

**w** 2:3
**wade** 64:7,9,11
  64:11
**wait** 27:7,8
  38:21 52:21
**wakes** 56:24
**walk** 18:2
**walked** 44:1
**want** 7:11 27:20
  30:14 39:16
  40:7 44:11,19
  62:14 63:9
**wanted** 6:20
  16:25 22:22
  47:14,15
**wants** 13:2
**way** 35:21 42:4
  57:1
**we've** 7:20 8:17
  8:23 18:19 19:1
  19:2
**wedding** 55:6
**week** 12:22
**weekly** 11:24,25

**[weeks - zorrilla]**                                                                 Page 88

**weeks**  9:23
  15:21,22 16:1
  37:4,6 48:23,23
  48:25,25 49:10
  49:11,14,15,25
  50:1,17
**went**  50:8,15,18
  50:23,24
**west**  2:9
**winter**  29:7,11
  64:25
**witness**  3:5 4:3
  13:19 14:4 18:9
  26:25 27:1
  34:21 36:11
  37:21 38:5
  39:16 40:17
  41:22 42:3
  48:20 49:7,14
  55:21 57:5 60:2
  62:1 63:19
  65:13 67:9 68:7
**women's**  19:24
  20:9,11
**word**  40:10 41:4
  41:4
**words**  40:15
  54:6
**work**  31:24 32:7
  32:8 34:13
  55:14 57:6
**worked**  29:5,10
  32:5,6,11 33:22
  64:20 65:18

**working**  21:12
  21:23 34:23,25
  35:2,3,4 38:22
  56:12,13,17
  57:2,15
**workplace**
  38:12,18,18,20
**works**  56:18
**write**  5:6
**wrong**  44:12
  62:16

|        **x**        |
| **x**   3:1 |

|        **y**        |

**y**  60:9
**yeah**  38:21,23
  38:23,25 63:25
**year**  32:20
  64:18
**years**  4:19 28:20
  29:13,14 32:5
  43:6 49:4,11,15
  62:7,8 64:18
**yesterday**  13:1

|        **z**        |

**zoom**  1:16
**zorrilla**  2:7 3:3
  4:7,9 7:6,10,15
  7:18 8:8,11,17
  8:21 9:10,13
  13:21 14:6
  18:11 34:24
  36:18 37:23
  38:7 39:18,23

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.